# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| BENJAMIN HUDOCK AND BREANN HUDOCK, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>v.<br><br>LG ELECTRONICS U.S.A., INC.; BEST BUY CO., INC.; BEST BUY STORES, L.P.; and BESTBUY.COM, LLC,<br><br>           Defendants. | Case No. 0:16-cv-01220-JRT-FLN<br><br><br><br>**PLAINTIFFS' OPPOSITION TO LG ELECTRONICS U.S.A., INC'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

Introduction ................................................................................................ 1

Statement of Facts ...................................................................................... 1

Argument .................................................................................................... 4

   I.   Plaintiffs' Allegations Are More Than Sufficient to Satisfy Article III
       Standing Requirements at This Stage ...................................................... 4

       A.  Rule 12(b)(1)'s standard of consideration. .................................... 4

       B.  Because the constitutionality of applying a particular
           state's law to Plaintiffs' claims is one of fairness under
           the Due Process and Full Faith and Credit Clauses, not
           one of standing under Article III, the Court should deny
           Defendant's motion. ....................................................................... 5

       C.  Because Plaintiffs have individual "case or controversy"
           standing, the Court should deny Defendant's motion. ................. 7

       D.  Because Plaintiffs have individual prudential standing, the
           Court should deny Defendant's motion. ........................................ 8

       E.  Because the choice of Minnesota and New Jersey law may
           ultimately be proper after the development of necessary
           facts in due course, the Court should deny Defendant's
           motion. ......................................................................................... 12

       F.  Because Defendant asserts an unripe Rule 23 "typicality"
           argument in the guise of a Rule 12 "standing" argument, the
           Court should deny Defendant's motion. ...................................... 15

  II.  Plaintiffs' Allegations Easily State a Claim upon Which Relief
      Can Be Granted. ................................................................................... 21

       A.  Rule 12(b)(6)'s standard of consideration. .................................. 21

B.  If successful, Plaintiffs' action will provide a public benefit because Defendant held out their false statements to the public at large, and Plaintiffs seek relief for thousands of consumers. ............................................................... 21

C.  Plaintiffs properly state a claim for which relief can be granted under the MUDTPA. .................................................... 23

D.  Plaintiffs sufficiently plead an ascertainable loss flowing from Defendant's violation of the NJCFA............................................ 29

E.  Plaintiffs' allegations of LG's deceptive conduct satisfy Rule 9(b). ...................................................................... 34

F.  Plaintiffs have properly asserted an unjust enrichment claim. ...................................................................... 39

G.  Plaintiffs adequately allege facts supporting their breach of warranty theories. .................................................... 42

H.  Plaintiffs adequately allege facts supporting their breach of contract theory. ......................................................... 49

Conclusion ....................................................................... 51

## Introduction

This action challenges LG Electronics U.S.A., Inc.'s ("LG's") and Best Buy's practice of falsely presenting the refresh rates of LG televisions as twice what they actually are. Plaintiffs invoke consumer protection, warranty, and contract theories, pleading with particularity, to seek compensation and equitable relief to remedy Defendants' materially false and deceptive marketing practices.

LG seeks dismissal based on (1) premature procedural arguments costumed as "standing" issues, (2) its misinterpretation of Rule 9(b) standards and consumer protection law, (3) an improper evidentiary presentation involving its irrelevant "limited warranty," and (4) an assertion that it has no liability under contract law despite the breach of its agreement to provide a 120Hz television to Plaintiffs Benjamin and Breann Hudock. LG's cursory and superficial analysis serves only to cloud the issues and to jump far beyond the Rule 12 stage.

## Statement of Facts

Plaintiffs' Complaint alleges that LG and Best Buy falsely label certain LG televisions as having twice the "refresh rate" they are capable of. A defining and material specification of a television is its refresh rate, or Hz specification. Compl. ¶ 16. Televisions are commonly offered in 60Hz and 120Hz, and less commonly 240Hz. The refresh rate corresponds exactly to the

1

Hz specification. The refresh rate, or Hz, of a particular television also indicates the number of times per second a television completely refreshes the image displayed. *Id.* ¶ 15.[1] The higher the refresh rate (Hz specification) of a television, the more unique images are displayed per second allowing the television to display moving images more clearly, resulting in better picture quality and a better overall viewing experience.

All televisions have a baseline refresh rate of 60Hz because electric current in the United States runs at 60Hz. *Id.* ¶ 17. In order to legitimately manufacture a television with a refresh rate higher than 60Hz, advanced interpolation technology must be used to predict, create, and insert unique images between the images carried over the 60Hz electrical current. *Id.* ¶ 18. Televisions with this technology can legitimately produce 120, or even 240, unique images per second and are superior in quality and command higher prices than televisions that simply refresh the image the standard 60 times per second as allowed by the electric current. *Id.* ¶¶ 30, 31.

---

[1] Defendant challenges Plaintiffs' definition of refresh rate as "unique images per second" rather than "cycles per second." LG Br. 2-3. However, Best Buy's website defines refresh rate as, "[The number of] times per second a TV screen image is *completely reconstructed*." Compl. ¶ 36 (emphasis added). Defendant's "cycles per second" definition, taken to its logical conclusion, would mean a television cycling *the exact same image* 120 times per second, resulting in the display of only one, single image per second, should legitimately be considered to have a refresh rate of 120Hz. But that is absurd.

LG markets and advertises a number of television models as having "refresh rates" of "120Hz" or "240Hz" that, in reality, have a true Hz specification of 60Hz (in the case of LG's "120Hz" models) or 120Hz (in the case of LG's "240Hz" models). *Id.* ¶ 20. Simply put, LG inflates the refresh rate capabilities of these televisions by 100%.

In late 2013, Plaintiffs, cognizant of the interplay between refresh rate and television quality, were specifically looking to purchase a television with 120Hz capability or higher. *Id.* ¶ 33. Plaintiffs purchased an LG model television from Best Buy advertised by Defendant as conforming to their refresh rate requirement of 120Hz, but which, in reality, refreshes images at 60Hz. *Id.* ¶¶ 37, 38. Plaintiffs subsequently noticed the difference in performance and learned, contrary to their express purpose and desire, they had purchased a 60Hz television instead of a 120Hz television. *Id.* ¶ 38.

Defendant repackages certain facts of the Complaint in an attempt to justify their practices while misstating Plaintiffs' clear position. Defendant's point seems to be that *any technology* that aims to reduce motion blur is the absolute equivalent of increasing the actual refresh rate of a television. LG Br. 3. In other words, Defendant's position is that, although a television may truly only be 60Hz, they can still justifiably claim a doubling of the television's refresh rate because, in their sole estimation, it is proper to do so because they "enhanced" the performance a different way. This argument is

3

the equivalent of an automobile manufacturer claiming the inclusion of racing tires on a vehicle turns a V-4 engine into a V-8.

What Defendant seeks license to do is astonishing in its breadth and implication. In marketing and advertising its televisions, LG falsifies an accepted and highly material specification, a television's Hz rating. As to this vital specification, the consumer is left only with the representations of LG, and LG's retailers, for information when making purchasing decisions. Refresh rate is one of the most material specifications touted by television manufacturers to consumers. Compl. ¶ 3.

## Argument

### I.   Plaintiffs' Allegations Are More Than Sufficient to Satisfy Article III Standing Requirements at This Stage.

#### A.   Rule 12(b)(1)'s standard of consideration.

A party challenging a complaint under 12(b)(1) for lack of standing must demonstrate lack of standing on the face of the complaint or challenge the factual truthfulness of the averments. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). "[I]n a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true;" the motion is only successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *Id.* If plaintiff's standing does not adequately appear from the materials of record, the plaintiff should be given the opportunity to

provide further particularized allegations of fact in support of standing prior to a ruling on the motion to dismiss. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975). Here, the Defendant challenges standing on the face of the Complaint.

**B.    Because the constitutionality of applying a particular state's law to Plaintiffs' claims is one of fairness under the Due Process and Full Faith and Credit Clauses, not one of standing under Article III, the Court should deny Defendant's motion.**

Whether Minnesota, New Jersey, or Wisconsin law applies to Plaintiffs' claims is not a question of Article III standing, and Defendant's argument that only Wisconsin law can apply to a Wisconsin purchaser were rejected decades ago by the Supreme Court. The constitutional boundaries of a choice-of-law determination are set not by Article III but by the Due Process Clause (U.S. Const. amend. XIV) and Full Faith and Credit Clause (U.S. Const. art. I, §1). *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981). In that case, the Court held, "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id*. at 312-13.

In *Hague*, after an evaluation of the well-developed facts, which revealed plaintiff was a Wisconsin resident who was killed by the operator of

5

another vehicle in Wisconsin, the Supreme Court affirmed the Minnesota court's decision to apply Minnesota law, which allowed the stacking of the decedent's uninsured motorist coverages from policies formed in Wisconsin. Minnesota's contacts were indeed somewhat minimal—the decedent had worked in Minnesota, defendant Allstate was "present and doing business in Minnesota" (although not principally), and the decedent's plaintiff had moved to Minnesota prior to filing suit—but the Court concluded, "Minnesota had a significant aggregation of contacts with the parties and the occurrence, creating state interests, such that application of its law was neither arbitrary nor fundamentally unfair." *Id.* at 320. Significantly, the Court expressly rejected the same argument Defendants make here, holding, "Mr. Hague's residence in Wisconsin does not—as Allstate seems to argue— constitutionally mandate application of Wisconsin law to the exclusion of forum law." *Id.* at 315. Thus, Defendants' argument, even viewed through the appropriate choice-of-law constitutional framework, rather than the improper standing prism, fails.

Should the Court sustain Plaintiffs' Complaint, it will have the opportunity to evaluate both the Article III standing of absent class members, *see Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (a class must "be defined in such a way that anyone within it would have standing"), and the fairness of applying Minnesota and New Jersey law to

6

absent class members' claims, *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985) (state must have significant contact or significant aggregation of contacts with absent class member's claims), at the class certification stage. Currently, however, the only claims to be tested by Rule 12(b) belong to the named Plaintiffs alone—and they clearly have standing to assert their own controversy.

### C. Because Plaintiffs have individual "case or controversy" standing, the Court should deny Defendant's motion.

Article III standing simply requires: (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) that the injury is likely redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In this case, Plaintiffs have constitutional standing by virtue of the injuries they have suffered as a result of Defendant's false and misleading advertising, detailed above and in their Complaint.

Defendant incorrectly implies that Plaintiffs have manufactured constitutional standing to bring claims under other states' laws by purporting to bring the claims on behalf of a national class. However, their reliance on *Sondel v. Northwest Airlines, Inc.*, to support this argument is inapposite. No. CV 3-92-381, 1993 WL 559028 (D. Minn. Jan. 14, 1993). The *Sondel* court held that a proposed class will not have standing where the named plaintiff

does not have a judicially cognizable injury or their own claims are otherwise barred. This proposition is unremarkable. In contrast, Plaintiffs describe their particular and individual injuries throughout the Complaint.

### D.   Because Plaintiffs have individual prudential standing, the Court should deny Defendant's motion.

Prudential standing restricts access to courts to the *litigants* best suited to assert a particular claim. *Oti Kaga, Inc. v. S. D. Hous. Dev. Auth.*, 342 F.3d 871, 880 (8th Cir. 2003). A plaintiff will only "run afoul" of prudential standing generally when (1) an injury's effects on the plaintiff are indistinct from those felt by other persons generally, or (2) when the injury fails to be protected by the statutory provisions invoked by the plaintiff. *Id.* Neither of these prudential concerns arise here. Persons in general are not injured—only those, including Plaintiffs, who purchased televisions subject to Defendant's challenged statements. Furthermore, the consumer protection statutes invoked here, which provide redress for those injured by deceptive statements and conduct, clearly protect Plaintiffs, as discussed *infra*.

Plaintiffs' claims against Best Buy arise at least in part under the Minnesota Private Attorney General Statute. Minn. Stat. § 8.31, subd. 3a (the "Private AG Statute"). The statute allows "any person injured by a violation of Minnesota's consumer protection statutes" to bring suit. "In describing who may bring an action, subdivision 3a does so in the broadest

8

terms… [and] [n]either the private remedies statute nor the substantive statutes contains any language restricting those who may sue." *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 8 (Minn. 2001). The substantive statutes invoked by Plaintiffs in this case are likewise very broadly construed to enhance consumer protection. *State by Humphrey v. Phillip Morris, Inc.*, 551 N.W.2d 490, 496 (Minn. 1996). Plaintiffs' claims against LG arise at least in part under New Jersey Statutes, section 56:8-19, which permits "any person who suffers any ascertainable loss" as a result of a violation of the NJCFA to "bring an action … therefor." The NJCFA "was intended to be one of the strongest in the country." *Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641, 647 (D.N.J. 2013).

Here, Plaintiffs are in the exact class of people that the statutes were designed to protect. Neither Minnesota's nor New Jersey's statutes have any requirement that consumers make purchases in those states to invoke the protections of the statute. *See*, *e.g.*, *Grp. Health*, 621 N.W.2d at 8 (no restriction on who may sue); *In re NorVergence, Inc.*, 424 B.R. 663, 679 (Bankr. D.N.J. 2010) ("Nothing in the NJCFA limits its reach to New Jersey Plaintiffs."). Plaintiffs' allege they were misled by Best Buy, a Minnesota entity with its principal place of business in Minnesota. Plaintiffs allege they were misled by LG, a New Jersey resident with its principal place of business in New Jersey. Defendant cites no authority for the proposition that courts

9

should fail to apply the broadly drafted consumer protection laws of a defendant's home state, designed to curtail deceptive conduct by their businesses toward consumers, merely because some victims reside in neighboring states.

Defendant cites *Insulate* for the proposition that "named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." LG Br. 5. Defendant fails to recognize, however, that the plaintiff in that case "ha[d] not identified any specific state in which wrongful conduct occurred that may be causally connected to [plaintiff's] injury." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-2664, 2014 WL 943224, *11 (D. Minn. Mar. 11, 2014). This distinction is particularly poignant in the context of this case because Judge Montgomery, who authored the *Insulate* opinion, has also held that *in consumer protection cases*, the court may apply, for example, Minnesota consumer protection law to consumers who purchased defendant's products in other states where the deceptive statements at issue were conceived in, or emanated from within, Minnesota, where the defendant had its principal place of business. *Mooney v. Allianz Life Ins. Co. of N. Am.*, 244 F.R.D. 531, 535 (D. Minn. 2007); *see also generally Peterson v. BASF Corp.*, 618 N.W.2d 821, 825 (Minn. Ct. App. 2000) (finding no abuse of discretion where Minnesota court certified nationwide class of purchasers under New Jersey

10

Consumer Fraud Act where defendant's principal place of business was in New Jersey, and finding that non-New-Jersey plaintiffs had claims typical of the class); *see also In re NorVergence*, 424 B.R. at 679 ("Nothing in the NJCFA limits its reach to New Jersey Plaintiffs."). And at the appropriate time, this Court will apply Minnesota's choice-of-law rules to determine both whether Minnesota law may apply to Plaintiffs' claims against Best Buy and whether New Jersey law may apply to Plaintiffs' claims against LG. *See Nesladek v. Ford Motor Co.,* 46 F.3d 734, 736 (8th Cir. 1995) ("[F]ederal courts sitting in diversity apply the forum state's conflict of laws rules.").

Furthermore, *Insulate* and the cases on which *Insulate* relied are antitrust cases where "the constitutional and prudential requirements of standing take on particular significance." *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1160 (D. Minn. 2014) (internal quotation omitted). Indeed, many courts refuse to dismiss claims at this stage brought under the laws of states in which no named plaintiff resides. *See*, *e.g.*, *Ramirez v. STI Prepaid LLC*, 644 F. Supp. 2d 496, 505 (D.N.J. 2009)); *In re Target Corp.*, 66 F. Supp. 3d at 1160. That said, this is not a case, even such as *In re Target*, where plaintiffs invoked the consumer protection laws of all 50 states, regardless of whether any of the named parties resided, acted, or were injured there. To the contrary, Plaintiffs invoke the statutory laws of

11

Minnesota and New Jersey, where the defendants reside and where they

acted with regard to their misrepresentations.

> **E. Because the choice of Minnesota and New Jersey law may ultimately be proper after the development of necessary facts in due course, the Court should deny Defendant's motion.**

Defendant further argues that Plaintiffs' state law consumer protection

claims must be "dismissed" because the law of the state in which the

Plaintiffs reside, Wisconsin, "governs" their claims. LG. Br. 7. Although

Defendant recites the bare elements of Minnesota's choice-of-law rules, it

cannot provide a proper choice analysis because the facts of this case—and

the contacts with each of the possible states—have not yet been established

through discovery. *See, e.g., In re Nat'l Hockey League Players' Concussion

Injury Litig.*, No. MDL 14-2551 SRN, 2015 WL 1334027, at *16 (D. Minn.

Mar. 25, 2015) (holding, at motion to dismiss stage, "Without discovery and a

fuller record, it is not possible for the Court to conduct these fact-intensive

inquiries to evaluate which states' laws should apply to Plaintiffs' medical

monitoring claim."); *Cantonis v. Stryker Corp.*, No. 09-3509, 2010 WL

6239354, at *3 (D. Minn. Nov. 23, 2010) (at motion to dismiss stage of

litigation, the court was "not prepared to conclude that the application of

Minnesota law to this case is so arbitrary and fundamentally unfair as to

violate due process," nor could it "make the fact intensive choice of law determination on the record before it").

Defendant's superficial analysis of *In re Baycol Products Litigation*, 218 F.R.D. 197 (D. Minn. 2003), in which Judge Davis applied the law of the plaintiffs' resident states, is inapposite. First, Judge Davis properly waited until the class certification stage to adjudicate the choice-of-law question. *See generally id.* (adjudicating class certification motion). Second, the plaintiffs in those cases brought negligence claims, seeking damages for personal injuries. *See id.* at 207 (observing that domicile of defendant not given "much weight *in tort cases*") (emphasis added). Here, again, the claims sound in consumer fraud and deceptive trade practices. This Court has emphasized the importance of this distinction in the context of the choice-of-law question. *See In re St. Jude Med., Inc., Silzone Heart Valves Prods. Liab. Litig.*, MDL No. 01-1396, 2006 WL 2943154, *6 (D. Minn. Oct. 13, 2006) (contrasting choice of tort law versus consumer protection law, and holding, "Consumer protection statutes focus on the behavior of the defendant, and therefore it is appropriate to apply law from where the defendant has the most contacts."), *rev'd on other grounds*, 522 F.3d 836 (8th Cir. 2008). Plaintiffs have clearly alleged that Best Buy and LG have their principal places of business in Minnesota and New Jersey, respectively, and the extent to which their decision-making took place in those states will be confirmed by discovery.

13

Even if the court were ultimately to apply law that does not recognize the statutes referred to under each "count" in the Complaint, Plaintiffs have pled sufficient facts supporting consumer protection legal theories recognized across states. "Counts" are not causes of action or claims. Rather, the use of counts to identify various legal theories may be used merely to assist the court "in seeing how the plaintiff hopes to prevail… [A complaint] need not identify the law on which the claim rests." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992); *see also Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 997 (N.D. Ill. 2013) ("If there is another theory under which the same set of facts would entitle the plaintiff to relief, then dismissal of the complaint is improper.").

Even if the Court were ultimately to apply Wisconsin substantive law (as the Defendants urge), Plaintiffs have still pled sufficient facts to recover for damages as a result of false or misleading advertising under Wisconsin's Deceptive Trade Practices Act ("WDTPA"), which requires facts showing: (1) the defendant made a representation to the public with the intent to induce an obligation, (2) that the representation was untrue, deceptive or misleading, and (3) that the representation caused the plaintiff a pecuniary loss. *Novell v. Migliaccio*, 749 N.W.2d 544, 553 (Wis. 2008).

Here, Plaintiffs have alleged, *inter alia*, that Defendant advertised and sold televisions with a refresh rate at 100% over its true rate, intending to

cause consumers to rely on the misrepresentations and purchase televisions with the false refresh rates, and causing Plaintiffs to purchase televisions at a price they would not have been willing to pay for, or purchase televisions they would not have otherwise purchased. *See, e.g.*, Compl. ¶¶ 51-57. Thus, whether Plaintiffs' counts are labeled as violations of Minnesota law, New Jersey law, or Wisconsin law is of little consequence because the facts, as alleged, entitle the Plaintiffs to some form of judicial relief and require the instant motion be denied.

> **F.    Because Defendant asserts an unripe Rule 23 "typicality" argument in the guise of a Rule 12 "standing" argument, the Court should deny Defendant's motion.**

Defendant's argument that all Plaintiffs (including the putative class members) must have purchased the same model of television—despite failing to point out any relevant differences in those models that would shed light on the veracity of Defendants' common representation about their refresh rates—is actually a typicality argument in the guise of "standing." Such an argument cannot support a motion to dismiss and should be reserved, if at all, for the class certification stage of this litigation.

Courts have squarely addressed, and rejected, the exact argument Defendant puts forth here. In *Fallick v. Nationwide Mut. Ins. Co.*, for instance, the court of appeals reversed the district court's "dismissal" of an ERISA class action based on the class representative's lack of "standing" to

represent participants in benefit plans other than his own. Calling the same argument Defendant asserts here "fundamentally flawed," the court held: "Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422-23 (6th Cir. 1998). The Eighth Circuit has agreed with *Fallick. See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) (noting that standing principles do not "'limit a claimant's right to proceed under Rule 23 on behalf of all individuals affected by the [defendant's] challenged conduct, *regardless of the representative's lack of participation in all the ERISA-governed plans involved*[,]' [and t]hus, a plaintiff may seek relief … that sweeps *beyond his own injury*.") (quoting *Fallick*, 162 F.3d at 423)) (emphasis added); *see also In re Principal U.S. Prop. Account ERISA Litig.*, 274 F.R.D. 649, 653-58 (S.D. Iowa 2011) (discussing *Braden* and *Fallick* and holding that whether plaintiff who had individual standing could represent others in different retirement plans was a class certification question); *Haddock v. Nationwide Fin. Servs., Inc.*, 262 F.R.D. 97, 110 (D. Conn. 2009), *vacated and remanded on other grounds sub nom. Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26 (2d Cir. 2012) (determining that defendant "is erroneously attempting to conflate the

16

standing and class certification requirements"); 1 Alba, Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2:6 n.3 (4th ed. 2002) (commenting that once a named plaintiff demonstrates individual standing as against each defendant, the inquiry shifts to a class action analysis). Thus, whether a plaintiff has standing to assert her individual claim is distinct from whether she can represent others with a similar grievance under the procedures outlined by Rule 23. The first is an actual standing issue, the second is a procedural one, not to be decided under Rule 12.

Here, Plaintiffs' individual standing is based on their purchase of an LG 55LN5100-UB television on November 29, 2013, from Best Buy and LG. Compl. ¶ 34. Plaintiff makes no personal claim to have purchased other models subject to their legal theory. Therefore, *dismissal* based on lack of personal standing is improper. Plaintiffs' only reference to other models in the complaint appropriately resides in the "CLASS ALLEGATIONS" section of the Complaint, under "Typicality." *See id.* ¶ 45 (listing other models that were also advertised and marketed as having twice the refresh rate as they were actually capable of).

Even if the Court were to evaluate Plaintiffs' typicality at this premature juncture, Plaintiffs have adequately alleged that their claims are typical of those of the proposed Class and Subclass under Rule 23(a)(3). Federal Rule of Civil Procedure 23(a)(3) mandates that the claims or defenses

of the representative parties be "typical" to the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). The typicality requirement is not an onerous burden, and simply "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." *Paxton v. Union Nat'l Bank*, 688 F.2d 555, 562 (8th Cir. 1982) (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)).

It is true that "named plaintiffs in a class action may not rely on injuries that the putative class may have suffered, but instead must allege that they personally have been injured." *Chin v. General Mills, Inc.*, No. 12-2150, 2013 WL 2420455, at *9 (D. Minn. June 3, 2013) (finding named plaintiff lacked standing to bring claims based on certain products she did not purchase). But Plaintiffs have established their *own* injuries, and properly allege that others have experienced the same or similar injury. "When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types." *Khoday v. Symantec Corp.*, No. 11-180, 2014 WL 1281600, at *16 (D. Minn. March 13, 2014)) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012)).

Requiring a representative plaintiff to have purchased every single model or product variant that a defendant sells with the same exact

misrepresentation—regardless of what the facts show—is not only arbitrary, but it also would upend decades of precedent holding that what matters is that class members share the same or similar *grievance*, regardless of immaterial differences in the products purchased. The cases are legion.[2]

---

[2] *See DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174-75 (8th Cir. 1995) (plaintiffs could represent others who had different mortgage instruments where the issue to be resolved was whether defendant "over-escrowed" funds pursuant to those mortgage instruments); *City of Farmington Hills Emp. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 352-53 (D. Minn. 2012) (plaintiff could represent class of investors who signed different agreements and participated in different investment pools where all investment products contained similar, challenged language); *Mund v. EMCC, Inc.*, 259 F.R.D. 180, 184 (D. Minn. 2009) (differences in contract language related to payment of "collection costs" did not preclude plaintiff from representing others who were charged a flat 35% collection fee rather than being charged the actual costs of collection efforts, where such differences were not relevant to whether class members agreed to pay referral fees versus actual costs of collection efforts); *In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 603 (D. Minn. 1999) (variations in the types and language of policies purchased by consumers did not preclude ability of plaintiff to represent others who fell victim to defendant's similar misrepresentations about the necessity and performance of those policies); *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 575-76 (D. Minn. 1995) (where plaintiff car dealership alleged that manufacturer's mandatory, blanket 1% MSPR assessment was unlawful, fact that other dealers of different sizes sold different product lines in different demographic areas and employed different manufacturer incentives did not disqualify plaintiff from representing other dealers); *In re Workers' Comp.*, 130 F.R.D. 99, 106-07 (D. Minn. 1990) (holding that plaintiffs could represent victims of common scheme despite different transactions and variations in the types of insurance they purchased); *Jenson v. Cont'l Fin. Corp.*, 404 F. Supp. 806, 810-11 (D. Minn. 1975) (where investors purchased securities defendants had failed to register, differences as to which types of coins they purchased and as to manner in which they took delivery were irrelevant to whether plaintiffs could represent such investors in class suit); *Khoday v. Symantec Corp.*, No. 11-180, 2014 WL 1281600, *16 (D. Minn. Mar. 13, 2014) (where defendant sold different insurance products represented to

Here, Plaintiffs satisfy the typicality requirement for class certification under Rule 23(a) because, unlike in *Chin*: (1) each Class and Subclass member purchased LG televisions that were advertised and marketed as having twice the refresh rate as they were capable of; and (2) each class and Subclass member suffered the same or similar injury as a result of the Defendants' false and misleading representations and advertisements. Compl. ¶ 45. As was the case in *Khoday*, the actual distinctions among "different products" are trivial. The doubling of refresh rates across the board is precisely the course of conduct for which class certification is appropriate.

Defendant has failed to cite a single "variation" in their televisions that would be relevant to Plaintiffs' claims. *See Azimpour v. Select Comfort Corp.*, No. 15-4296, 2016 WL 3248231, at *2 (D. Minn. June 13, 2016) (expressly holding that Plaintiff's broader theory of company-wide fraudulent pricing and advertising scheme as to all of its various products renders *Chin* inapposite). Plaintiffs have demonstrated both personal standing to challenge

---

consumers as enabling them to "redownload" the software they already purchased, plaintiffs' claims were representative of other consumers who purchased different products because they had alleged a similar grievance among the different products, namely that there were alternative methods to redownload their software without added cost); *Mooney v. Allianz Life Ins. Co. of N. Am.*, No. 06-545, 2007 WL 128841, *8 (D. Minn. Jan. 12, 2007) (differences in state-specific versions of defendant's marketing materials for challenged annuity products could not prevent plaintiff from representing purchasers of those other products where defendant could not show that such differences were "material" to the common legal theory advanced).

their own purchases and have adequately alleged typicality due to the same or similar grievance as to other models. Therefore, Defendant's motion to dismiss should be denied.

## II.   Plaintiffs' Allegations Easily State a Claim upon Which Relief Can Be Granted.

### A.   Rule 12(b)(6)'s standard of consideration.

In evaluating a motion under Rule 12(b)(6), "a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant." *United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin. Corp.*, 690 F.3d 951, 955 (8th Cir. 2012). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.   If successful, Plaintiffs' action will provide a public benefit because Defendant held out their false statements to the public at large, and Plaintiffs seek relief for thousands of consumers.

Pursuant to the Minnesota Attorney General Statute, the attorney general shall investigate violations of the law involving "unfair, discriminatory, and other unlawful practices in business, commerce, or trade," such as those invoked in Counts I, II, and III. Minn. Stat. Ann. § 8.31,

subd. 1. Such powers are not limited to the attorney general: "any person injured by a violation of [the aforementioned] laws may bring a civil action and recover damages… and receive other equitable relief as determined by the court." Minn. Stat. § 8.31, subd. 3a.

Courts have held that the Private AG Statute applies only to those claimants who demonstrate that their cause of action benefits the public. *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000). In *Nystrom*, the court held that the public benefit requirement was not met where the plaintiff "was defrauded in a single one-on-one transaction in which *the fraudulent misrepresentation… was made only to [plaintiff]*." *Id.* (emphasis added). However, the court in *Collins v. Minn. Sch. of Bus., Inc.*, found a public benefit when the wrongful conduct was directed toward consumers at large, despite the fact that only a small number of consumers were actually injured, distinguishing *Nystrom*. 655 N.W.2d 320, 330 (Minn. 2003) ("MSB misrepresented the nature of its program to the public at large"). Taken together, *Nystrom* and *Collins* stand for the proposition that a public benefit is established when a private plaintiff alleges that: (1) a practice violated laws enumerated in Minn. Stat. § 8.31, subdivision 1; (2) the practice was directed to a large group of consumers; and (3) successful prosecution of the claim advances state interest. Public benefit is not measured by how many people were injured, but by whether the violative conduct was aimed at a

sufficiently large group of consumers. *Id.* That is clearly the case here. *See* Compl. ¶ 43 (due to the nature of the trade and commerce involved, Plaintiffs believe that the Class and Subclass members are well into the thousands, possibly millions).

Applying the same logic, Minnesota courts routinely find a public benefit where, as here, plaintiffs seek to end a fraudulent marketing campaign held out to the public at large. *See, e.g., In re Levaquin Prods. Liab. Litig.*, 752 F. Supp. 2d 1071, 1078-79 (D. Minn. 2010); *ADT Sec. Servs., Inc. v. Swenson*, 687 F. Supp.2d 884, 891-92 (D. Minn. 2009). In addition, pursuing damages in the context of a class action provides an independent basis to establish a public benefit. *In re Nat'l Arbitration Forum Trade Practices Litig.*, 704 F. Supp. 2d 832, 839 (D. Minn. 2010). As such, Plaintiffs' claims based on Defendant's pervasive false and misleading advertising to consumers in general stands to benefit the public.

### C.   Plaintiffs properly state a claim for which relief can be granted under the MUDTPA.

Defendant's argument, that the Court should jettison the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA") legal theory because Plaintiffs "fail" to seek injunctive relief itself fails, for the following reasons.

Initially it must be noted that Defendant's argument that Plaintiffs are not likely to be harmed by LG's misrepresentations in the future because

they are now "aware of" them attempts to create an impenetrable paradox: 1) no individual can state a claim until she has been injured and can articulate the misrepresentation, but 2) because the person knows of the misrepresentation, she will not fall for it again, and therefore lacks standing. Heads I win, tails you lose. Courts have recognized the infirmity of this argument and have held the issue of future harm is one of fact. *See Masterson Pers., Inc. v. The McClatchy Co.*, No. 05-127, 2005 WL 3132349, *7 (D. Minn. Nov. 22, 2005) (holding MUDTPA future harm is issue of fact not ripe for motion to dismiss); *Boschee v. Burnet Title Co.*, No. CT 03-016986 (Minn. Dist. Ct. Jun. 15, 2004) ("To bar a person … from bringing an action under the [MU]DTPA merely because they are now forewarned against such a practice would seem to run counter to the remedial nature of the [MU]DTPA. Moreover, the strong possibility exists that [plaintiff] may sometime in the future again decide to re-finance her home or to purchase a new home") (Declaration of David M. Cialkowski, Ex. 1). No facts alleged here suggest it is unlikely Plaintiffs will buy another television.

Moreover, Defendants' argument fails on a multitude of other grounds. First, Plaintiffs expressly request that Defendants be ordered to cease from further advertisements that inaccurately state the refresh rates of LG televisions (Compl. at ¶ 48) and any further relief at the Court deems just

and proper (Compl. at 24). Thus Plaintiffs have plead a claim for injunctive relief.

Second, pleading specific relief is not necessary under the rules: "every final judgment should grant the relief to which each party is entitled, even if the party had not demonstrated that relief in its pleadings." Fed. R. Civ. P. 54. "This provision has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved." *Baker v. John Morrell & Co.*, 266 F. Supp. 2d 909, 929 (N.D. Iowa 2003) (internal quotation omitted); *accord Charles Schmitt & Co. v. Barrett*, 670 F.2d 802 (8th Cir. 1982). As expressly noted by the court in *Tuttle v. Lorillard Tobacco Co.*, "the DTPA is not the exclusive remedy for conduct falling within its scope."No. CIV991550, 2001 WL 821831, *5 (D. Minn. July 5, 2001). Because Plaintiffs have pled facts sufficient to state a claim for—among other things—fraudulent and deceptive practices in consumer transactions, the Complaint should not be dismissed even if it did not explicitly seek injunctive relief in the Prayer for Relief.

Third, MUDTPA (Minn. Stat. § 325D.44) itself carves out a private right of action for injunctive relief. Defendant illogically concludes, however, that a plaintiff is thereby *limited* to injunctive relief and cannot maintain an action for damages as well under the MUDTPA, despite the existence of the Private AG Statute (Minn. Stat. § 8.31, subd. 3a), which expressly permits a

25

private cause of action for damages for violation of *any* law related to unfair

trade practices. While Plaintiffs acknowledge the existence of Defendant's

case law, Plaintiffs also hasten to point out that the Minnesota Supreme

Court—the only court that matters when federal courts are called upon to

interpret state law—has never addressed the issue. This Court should predict

that, in light of the following arguments and authorities, which *no* court has

yet considered, the Minnesota Supreme Court would hold that the MUDTPA

is a law that comes within the ambit of the Private AG Statute, which

permits injured consumers to make claims for both damages and equitable

relief.

First, according to that statute, a private plaintiff may sue under any of

"the laws referred to in subdivision one" of section 8.31. Minn. Stat. § 8.31,

subd. 3a. Subdivision 1 of that section expressly refers to "the law of this

state respecting *unfair*, discriminatory, and *other unlawful practices in*

*business, commerce, or trade*, and specifically, *but not exclusively*, [various

statutory sections] *and other laws against false or fraudulent advertising . . .*

*." Id.*, subd. 1 (emphasis added). Subdivision 1 thus expressly states that the

statutes listed there are *not exclusive*. It is a fundamental principal of

statutory interpretation that terms—such as 8.31's "but not exclusively"

directive—should not be interpreted in a way that renders other provisions of

the Act superfluous, void, or insignificant. Minn. Stat. § 645.16; *Walker v.*

26

*Hartford Life & Accident Ins. Co.*, No. 15-2570, 2016 WL 4087236, at *2 (8th Cir. Aug. 2, 2016). Section 325D.44 is clearly a law of Minnesota respecting an unfair practice in business, commerce, or trade. Moreover, the prohibitions found in the MUDTPA relate solely to unfair trade practices in the sale of goods and misrepresentations in advertising. *Cf.* § 325D.44, subd. 1; *see also Lenscrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1487-88 (D. Minn. 1996) (describing Minnesota's UDTPA as "substantially similar" to federal "false or deceptive advertising" statute).

In addition, the Minnesota Supreme Court has identified the MUDTPA as one of the provisions counted among Minnesota's "consumer fraud statutes." *See State by Humphrey v. Alpine Air Prods.*, 500 N.W.2d 788, 790 (Minn. 1993); *see also generally Minnesota ex rel. Hatch v. Fleet Mortg.*, 158 F. Supp. 2d 962, 966-67 (D. Minn. 2001) (considering together sections 325D.44 and 325F.69 and characterizing them as "consumer protection statutes" *in suit brought under section 8.31*). These cases reveal that Minnesota courts have historically permitted the Attorney General to bring claims under the MUDTPA pursuant to section 8.31.

Second, the mere absence of section 325D.44 from the listing contained in 8.31 does not reflect purposeful exclusion for another reason. Because the Minnesota Legislature passed both the MUDTPA and the Private AG Statute

in 1973,[3] the language used for the attorney general act when the bill was introduced could not have included any express references to the MUDTPA *because the MUDTPA was not yet a law*. This fact stands in sharp contrast to the reason that the attorney general act expressly incorporated the Consumer Fraud Act and the False Statement in Advertisement Act: the CFA[4] and FSAA[5] had been *codified* long before the AG bill was even introduced, whereas the MUDTPA had not yet passed and thus had no statutory code for the AG bill to reference.

Subsequent enactments also demonstrate the legislature's intent that the MUDTPA is considered an unfair trade law. Several other Minnesota statutory provisions adopted since 1973 have expressly included the MUDTPA alongside Minnesota's other consumer protection laws.[6] Most notably, section 325F.71 creates "liability for a civil penalty pursuant to sections *325D.43 to 325D.48*, regarding deceptive trade practices; 325F.67, regarding false advertising; and 325F.68-70, regarding consumer fraud[.]" Because only the Attorney General may "sue for and recover for the state . . . a civil penalty" (Minn. Stat. § 8.31, subd. 3(b)), the legislature clearly

---

[3] 1973 Minn. Laws 296 (private AG statute); 1973 Minn. Laws 420 (MUTDPA).

[4] Minnesota's Consumer Fraud Act was adopted in 1963, Act of May 23, 1963, ch. 842, § 1, 1963 Minn. Laws 1533, 1534.

[5] The FSAA was initially adopted in 1913, Minn. Stat. § 8903 (supp. 1913).

[6] Minn. Stat. §§ 58.08, 325F.71, 325G.505, and 609.2336.

intended for section 325D.44 to come within the purview of section 8.31, subdivision 1, i.e., the description of laws the Attorney General may enforce via a civil penalty.

Thus, because the legislature clearly intended section 325D.44 to support an action for consumer protection damages, Plaintiffs' claims should not be limited to injunctive relief under that section. Based on these authorities, arguments, and statutory history (which none of Defendant's authorities consider), and based on the fact that the Minnesota Supreme Court has previously grouped the MUDPTA with other laws enumerated in section 8.31, subdivision 1, this Court should predict that the Minnesota Supreme Court would permit a claim for damages under the MUDPTA— through the vehicle of section 8.31, subdivision 3a, to survive a motion to dismiss.

## D. Plaintiffs sufficiently plead an ascertainable loss flowing from Defendant's violation of the NJCFA.

Plaintiffs' Complaint successfully pleads they have sustained "any ascertainable loss" as required under the New Jersey Consumer Fraud Act, § 54:8-1, *et seq.* "The fundamental remedial purpose of the [NJCFA] dictates that plaintiffs should be able to pursue consumer-fraud actions without experiencing financial hardship." *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 25 (N.J. 1994). Further, the NJCFA "is a broad remedial act" with "expansive

reach" and a "history of . . . constant expansion of consumer protection." *Harnish,* 931 F. Supp. 2d at 653. At the pleadings stage, the "NJCFA [has a] broad standard for ascertainable loss." *Id.*; *see also Union Ink Co., Inc. v. AT&T Corp.,* 801 A.2d 361, 379 *(*N.J. Super. Ct. App. Div. 2002)*,* ("[A]n ascertainable loss occurs when a consumer receives less than what was promised"); *Miller v. Am. Family Publishers*, 663 A.2d 643, 655 (N.J. Super. Ct. Ch. Div. 1995) ("a plaintiff need prove only that he has purchased an item partially as a result of an unfair or deceptive practice or act and that the item is different from that for which he bargained") (internal quotation marks omitted). The Third Circuit Court has held that "the relevant issue . . . is whether the [plaintiffs] got less than what they expected." *Marcus v. BMW of N. Am., LLC*, 687 F. 3d at  607  (internal quotation marks and citation omitted).

Defendant asks this Court to transform the NJCFA to a narrow and restrictive statute contrary to its stated purpose and recognized history. They argue that in order to sufficiently *plead* ascertainable loss under the NJCFA, the standard is quite higher than set forth above and Plaintiffs "must establish an 'actual loss,' that is 'quantifiable or measurable' or 'real and demonstrable,' as opposed to 'hypothetical or illusory' or 'speculative'." LG Br. 19 (relying on *Thiedemann v. Mercedes-Benz, USA, LLC*, 872 A.2d 783 (N.J. 2005)). However, the court in *Thiedemann* dealt "specifically, [with] what a

plaintiff must demonstrate in order to survive a *motion for summary judgment* when challenged on" ascertainable loss. *Id.* at 786 (emphasis added); *see also id.* at 792-93 (discussing evidence required at summary judgment).

In *Perkins v. DiamlerChrysler Corp.*, 890 A.2d 997 (N.J. Super. Ct. App. Div. 2006), the court illustrated the inapplicability of *Thiedemann* outside of the summary judgment context. The court reasoned: "Unlike the [plaintiffs] in *Thiedemann,* who failed to provide such evidence in the face of a motion for summary judgment, in this case plaintiff was faced only with a . . . motion to dismiss, and her obligation to provide admissible evidence of [ascertainable loss] had not arisen when the trial judge dismissed the complaint." *Id.* at 1004.

Defendant also cites *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076 (N.J. 2007), out of context. In *Int'l Union*, the ascertainable loss question was analyzed in the context of the predominance prong of a class-certification ruling and not during the motion to dismiss stage. *Id.* The court in *Int'l Union* rejected plaintiffs attempt to use what amounted to a fraud on the market theory in place of ascertainable loss to illustrate predominance for NJCFA class certification. *Id.* at 1088.

Here, Defendant attempts to short-circuit the discovery-dependent process employed by the very cases they cite in support of their position. The plaintiffs in both *Thiedemann* and *Int'l Union* were allowed the opportunity to gather and present evidence, and Plaintiffs in the matter at hand should be allowed to do the same.

Notwithstanding the inapplicability of Defendant's legal arguments challenging Plaintiffs' pleading of ascertainable loss, Plaintiffs' Complaint satisfies even Defendant's misplaced objections. Defendant claims Plaintiffs have not provided "specific information" demonstrating any difference in value between the television they purchased and the television they expected to receive. LG Br. 20. To the contrary, Plaintiffs' Complaint states: 120Hz televisions have advanced technology (Compl. ¶ 18); there are increased costs associated with televisions greater than 60Hz (*Id.* ¶ 19); higher refresh rates result in better picture quality (*Id.* ¶ 30); and higher refresh rates command higher prices. *Id.* ¶ 31. Furthermore, Plaintiffs' Complaint sets forth specific methodologies by which an expert could calculate the premium associated with higher refresh rates. *Id.*

Even if *Thiedemann* could apply at the Rule 12 stage, an ascertainable loss is one "that is *capable of calculation . . . .*" *Thiedemann*, 872 A.2d at 793 (emphasis added). The information contained within Plaintiffs' Complaint not only illustrates an ascertainable loss is "capable of

32

calculation" but provides methodologies to calculate the amount. In *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 335-36 (D.N.J. 2014), the court clarified, "The [complaint] alleges facts that would allow the Court to quantify a difference in value and even suggests a means to calculate loss . . . [t]he precise amount of loss need not be known; it need only be measurable. Rule 9(b) does not require that a plaintiff allege a specific dollar amount to survive the pleadings stage." (citations omitted). Defendant is asking this Court to require more evidence of damages, prior to any discovery or expert analysis, than courts typically have, even at summary judgment.

Defendant next intimates that Plaintiffs could not have suffered any loss because they purchased the 60Hz television at a "deep discount." LG Br. 20. There are several reasons why this argument is flawed. First, Plaintiffs were not in the market for a 60Hz television *at all*. Compl. ¶ 33. Had Defendant's marketing been truthful, they would never have made the sale in the first place. Furthermore, a "discount" off a deceptively inflated price is still higher than it would have been had Defendant told the truth. In any event, the calculation of damages is more properly the subject of expert testimony, and the Court should not even consider such arguments until the appropriate time.

Plaintiffs allege they received less than they expected, did not receive what they bargained for, and, further, Plaintiffs provide a method for

33

calculating the specific loss. Defendant's motion should be denied and Plaintiffs should be allowed to pursue their NJCFA beyond the pleadings stage.

### E. Plaintiffs' allegations of LG's deceptive conduct satisfy Rule 9(b).

Rule 9(b) requires plaintiffs to include "factual allegations explaining the who, what, when, where and how [the defendants'] conduct amounted to false, deceptive, or misleading conduct." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F. 3d 659, 666 (8th Cir. 2012). "The level of particularity required depends on the nature of a case." *Id.* at 663. "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud *or otherwise inject precision or some measure of substantiation* into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (emphasis added). Under this standard, "the Court should consider the complaint as a whole." *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 2015 WL 1334027, at *8.

That standard is easily met in this case. The heart of LG's argument is that Plaintiffs fail to identify any misrepresentations made by LG, but that is simply not true. *See* LG Br. 13. First, Plaintiffs allege that "LG *labels* its LED televisions as having refresh rates of '120 Hz' or '240 Hz' when, in actuality, its televisions' refresh rates are 60Hz and 120 Hz, respectively." Compl. ¶ 2

(emphasis added). In other words, LG places these misrepresentations on the product label. LG also posts spec sheets on its website for its television models, and these all misrepresent the refresh rate specifications in Hz at a number that is twice the true value. *Id.* ¶ 23. Finally, LG also makes these representations on its packaging, "which all consumers see in conjunction with the transaction." *Id.* ¶ 24.

In addition to these affirmative misrepresentations—all of which LG makes itself—LG commits fraud by omission. "Compounding the confusion and deception, the actual and true refresh rate of LG's televisions are not made readily available, in any medium, to the consumer." *Id.* ¶ 22.

Plaintiffs provide detailed information about their purchase of an LG television, model number 55LN5100-UB. *Id.* ¶ 32. Plaintiffs did their research over the course of "weeks leading up to their purchase," and determined that they wanted to buy a television with at least a 120Hz refresh rate because of the higher picture quality. *Id.* ¶ 33. They eventually purchased their LG television through the Best Buy website on November 29, 2013. *See id.* at ¶ 34.

In other words, Plaintiffs provide the facts about LG's misrepresentations and omissions, the materiality of those misrepresentations, and their purchase of the television at issue. These

allegations adequately "inject precision or some measure of substantiation into [Plaintiffs'] fraud allegation." *Frederico*, 507 F.3d at 200.

The purpose of Rule 9(b) is to "provide notice of the precise misconduct with which defendants are charged and to prevent false or unsubstantiated charges." *Dzielak*, 26 F. Supp. 3d at 319 (quotations omitted). As a result, courts have developed a body of case law upholding consumer fraud allegations similar to those Plaintiffs make in this case. For example, in *Dzielak*, the plaintiffs alleged that Whirlpool sold washing machines with the Energy Star logo, which "would be understood by consumers as an affirmation of fact that the washers met the efficiency standards of the Energy Star program." *Id.* at 334. The plaintiffs alleged that they saw the Energy Star logo, they understood it as such a representation, and that it was false. *Id.* The court found those allegations sufficient to state a claim against Whirlpool for affirmative misrepresentation under the NJCFA, as well as several other states' consumer protection laws. *See id.*

Judge Kyle's opinion in *Carlson v. A.L.S. Enterprises* is also instructive. In that case, the plaintiffs alleged that the defendants sold odor-eliminating hunting clothing to consumers, which the defendants falsely represented was effective and could be reactivated by using a standard household clothes dryer. No. 07-3970, 2008 WL 185710, at *1 (D. Minn. Jan. 18, 2008). The court explained that the purpose of Rule 9(b) is to ensure that a defendant is

able to prepare a defense to charges of fraud, and that "a complaint [need not] be suffused with every minute detail of a misrepresentation." *Id.* at *3. The plaintiffs "pleaded the exact statements" alleged to be fraudulent, and stated that these representations were made in advertising, marketing, and packaging materials, among other places. *Id.* Further, they alleged that the misrepresentations were made "on an ongoing basis since they began selling [the] clothing." *Id.* The court concluded that these allegations were sufficient to satisfy the "what, where, when, and how" requirements of Rule 9(b).

The "who, what, when, where, and how" components of a fraud claim are satisfied when the plaintiff identifies the manufacturer, the content of the misrepresentations, when the purchases were made, where the misrepresentations were made, and how the misrepresentations were misleading or caused harm to the consumer. *See, e.g.*, *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1194-95 (N.D. Cal. 2014) ("The complaint satisfies Rule 9(b) because it adequately alleges (i) the who: Hain; (ii) the what: 'All Natural' labeling on Waffles containing SAPP, a synthetic ingredient; (iii) the when: purchases made between May 2012 and March 2014; (iv) the where: labels on the Waffles, copies of which are attached to the complaint; (v) and the how: purchases made with reasonable reliance on the 'All Natural' statement." (citations omitted)); *Astiana v. Ben & Jerry's Homemade, Inc.*, Nos. C 10-4387, C 10-4937, 2011 WL 2111796, at *6 (N.D.

Cal. May 26, 2011) ("The 'who' is Ben & Jerry's, Breyers, and Unilever. The 'what' is the statement that ice cream containing alkalized cocoa is 'all natural.' The 'when' is alleged as 'since at least 2006,' and 'throughout the class period.' The 'where' is on the ice cream package labels. The 'how the statements were misleading' is the allegation that defendants did not disclose that the alkalizing agent in the alkalized cocoa was potassium carbonate, which plaintiffs allege is a 'synthetic.'").

All of those prongs are met in this case. The "who" is LG. The "what" is LG's Hz-based misrepresentation of its televisions' refresh rates. The "when" is the November 2013 timeframe when Plaintiffs were researching and purchasing their television, and throughout the class period. The "where" is on the television's labels and packaging and the spec sheets that LG makes available on its website. The "how" is Plaintiffs' purchase made in reasonable reliance on the stated 120Hz refresh rate when the television actually has a refresh rate of 60Hz. This is a straightforward consumer fraud claim, and LG is in a position to "respond and to prepare a defense to charges of fraud," and it will not "hav[e] to guess about the precise contours of Plaintiffs' fraud claims." *Carlson*, 2008 WL 185710, at *3. LG cannot credibly be heard to complain that it does not understand what it is supposed to have done wrong.

**F.     Plaintiffs have properly asserted an unjust enrichment claim.**

Defendant's position appears to be: Plaintiffs' legal claims fail. But because Plaintiffs have brought legal claims, Plaintiffs have an adequate remedy at law, even though Plaintiffs cannot recover on those claims and even though Plaintiffs may plead in the alternative at this stage of the litigation. *See* LG Br. 21-22. Defendant's position defies common sense. It also defies well-settled legal principles and a significant body of case law allowing unjust enrichment claims to survive a motion to dismiss even when joined with consumer fraud, breach of warranty, and other legal claims.

Under the Federal Rules of Civil Procedure, plaintiffs may plead claims in the alternative. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). "Although an adequate remedy might prevent plaintiffs from *eventually prevailing* on equitable claims, nothing prevents the plaintiffs from pleading both types of causes of action." *In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 191 (D. Me. 2010) (emphasis added) (collecting cases). It is premature to dismiss an equitable claim because of the availability of an adequate legal remedy at the pleadings stage because generally "courts cannot determine the adequacy of a legal remedy from the pleadings." *Id.*

As a result, courts routinely uphold complaints that allege both legal claims, such as consumer fraud, and unjust enrichment claims. *See, e.g., In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 238 (M.D. Pa. 2010) (allowing equitable and legal claims to be pled in the alternative); *In re Light Cigarettes*, 751 F. Supp. 2d at 193 (same); *Daigle v. Ford Motor Co.*, 713 F. Supp. 2d 822, 828 (D. Minn. 2010) (same).

Although LG cites cases involving dismissal of unjust enrichment claims because of the existence of an adequate legal remedy, those decisions all arise later in the litigation or are otherwise distinguishable. For example, in *Mooney*, the court dismissed the unjust enrichment claim and concluded that the plaintiffs had an adequate remedy at law only after the court determined that the plaintiffs had put forth sufficient evidence for their consumer fraud claim to survive *summary judgment. Moone*, 2009 WL 511572, at *4. Further, the *Mooney* plaintiffs did not oppose the argument that they possessed an adequate remedy at law. *Id.* Similarly, in *Kelley*, the plaintiff never argued that the statutory remedy under the Minnesota Fraudulent Transfer Act was inadequate. *Kelley v. Coll. of St. Benedict*, 901 F. Supp. 2d 1123, 1132 (D. Minn. 2012). *Drobnak* involved dismissal of all of the plaintiff's claims, and the court emphasized that the plaintiffs failed to "indicate whether the plaintiffs' windows actually failed"—in a case about

defective windows. *Drobnak v. Anderson Corp.*, 561 F.3d 778, 784 (8th Cir. 2009); *see also Daigle*, 713 F. Supp. 2d at 828 n.1 (distinguishing *Drobnak*).

LG also repeatedly cites *Bane*, but that case expressly left open this issue. *United States v. Bane*, 721 F.3d 1025, 1029 (8th Cir. 2013) ("This presents a serious question that we need not resolve at this time because we remand the case for further consideration."). Moreover, even the *dicta* in that case does not support Defendants' position. The plaintiff brought claims under the Minnesota Fraudulent Transfer Act and the Federal Debt Collection Procedure Act, which courts often find are intended to "displace unjust enrichment claims." *Id.* at 1031. In contrast to the fraudulent transfer statutes, most "state statutes are interpreted *not* to displace state common law causes of action" in the absence of a showing of "specific legislative intent to the contrary." *In re Light Cigarettes*, 751 F. Supp. 2d at 193. *Bane* was also decided after summary judgment, and the plaintiff "sought the exact same damages under both the statutory and equitable claims—the [plaintiff] did not seek any relief in equity which it could not obtain under the statutory claims." 721 F.3d at 1031. Indeed, the court noted that district courts may be "unwilling to dismiss an unjust enrichment claim at the pleading stage," emphasizing, "[b]ut the issue here is not one of pleading" because that case was on appeal from *summary judgment. Id.*

41

In this case, Plaintiffs seek disgorgement and restitution, which are equitable remedies that are not duplicative of the damages they seek on their legal claims. Compl. ¶ 80; Prayer for Relief ¶ 4. It is simply too early in this case to evaluate whether Plaintiffs have an adequate remedy at law, and as a result, the Court should conclude that Plaintiffs have properly alleged a claim for unjust enrichment.

### G. Plaintiffs adequately allege facts supporting their breach of warranty theories.

Under Minnesota law, an express warranty arises when a seller makes an affirmation about a product that becomes part of the basis of the bargain between the parties, or any description of the goods becomes part of the basis of the bargain between the parties. Minn. Stat. § 336.2-313. Whether a representation constitutes an express warranty is fact-intensive inquiry and generally left to the jury. *Crothers by Crothers v. Cohen*, 384 N.W.2d 562, 563-64 (Minn. Ct. App. 1986); *accord In re Levaquin Prods. Liab. Litig.*, 752 F. Supp. 2d at 1080-81.

Minnesota law also recognizes implied warranties in connection with the sale of goods. "The doctrine of implied warranty is favored by [the Supreme Court of Minnesota], and such warranties should be given effect when it is possible to do so." *Beck v. Spindler*, 99 N.W.2d 670, 680 (Minn. 1959). One such warranty is the implied warranty of merchantability. The

42

warranty of merchantability is implied in a contract for sale if the seller is a merchant with respect to goods of that kind and requires—among other things—that goods are fit for ordinary purposes for which they are used, conform to the affirmations of fact on the label, and would pass without objection in the trade under the contract description. Minn. Stat. § 336.2-314.

To establish a claim for breach of warranty, whether express or implied, the Plaintiff must generally plead "the existence of a warranty, a breach, and a causal link between the breach and the alleged harm." *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52-53 (Minn. 1982). Courts will find a breach of warranty claim sufficiently pled where the complaint describes with specificity possible sources of misrepresentations. *See*, *e.g.*, *Daigle,* 713 F. Supp. 2d at 825-26 (applying Minnesota law). Minnesota law does not require the plaintiff to plead privity of contract. Minn. Stat. § 336.2-318 ("A seller's warranty, whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty."); *see also Church of the Nativity of Our Lord v. WatPro, Inc.*, 474 N.W.2d 605, 609 (Minn. Ct. App. 1991).

Here, Plaintiffs adequately plead facts supporting their warranty claim, alleging, *inter alia*, that (1) Defendant placed a false refresh rate in advertisements and spec sheets related to LG televisions, (2) that the refresh

43

rates became part of the basis of the bargain in that Plaintiffs purchased televisions expecting them to conform to the refresh rates, (3) Plaintiffs would not have purchased the televisions or paid as much for the televisions if Defendant had disclosed the refresh rates, (4) Plaintiffs notified Defendant of these claims by letter, and (5) Plaintiffs suffered a loss as a result of the misrepresentation. Compl. ¶¶ 81-89.

In this case, Defendant does not argue that Plaintiffs have failed to plead the three basic elements for a breach of warranty. In fact, Defendant only disputes the validity of the warranties based on (1) an alleged disclaimer, and (2) the alleged failure of condition precedent (*i.e.*, reasonable notice). LG Br. 23-26. Neither of these bases represents a failure on the part of the Plaintiffs' pleading, but rather present affirmative defenses to a breach of warranty claim. As a matter of law, plaintiff need not plead all facts responsive to an anticipated affirmative defense before it is raised. *See*, *e.g.,* *Braden*, 588 F.3d at 601 n. 10; *accord Acker v. Envtl. Res. Mgmt., Inc.*, 93 F. Supp. 3d 1060, 1066 (D. Minn. 2015).

The court may consider *only* the allegations contained in the Complaint, and must presume they are true. In this case, Plaintiffs have pled the existence and breach of warranties, which caused them injury, sufficiently specific to survive a motion to dismiss. Furthermore, the existence of a warranty and its potential limitations or conditions is a fact-

intensive inquiry that necessitates discovery and should be left to the ultimate finder of fact; such questions should not be resolved solely on the pleadings. Accordingly, Defendant's motions to dismiss should be denied.

LG yet asserts that "the Court properly may consider the LG Limited Warranty because it is embraced by the allegations in the Complaint." LG Br. 23 n.7. LG cites *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 859 n.1 (D. Minn. 2012), where the court noted that "court[s] may consider 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" In that case, however, the Court found that the complaint specifically referenced the express warranty at issue. *Id.*

Since *Thunander*, however, the District of Minnesota has consistently held that a warranty that is not specifically referenced in the complaint may not be considered by the court on a 12(b)(6) motion. In *Browe v. Evenflo Co., Inc.*, No. 14-4690, 2015 WL 3915868, *2-3 (D. Minn. June 25, 2015), for example, the court distinguished *Thunander*, noting that the complaint's warranty allegations did not refer to or depend on the defendant's proffered, limited warranty. *Id.* at *3. Similarly, the court in *George v. Uponor Corp.*, 988 F. Supp. 2d 1056, 1072 (D. Minn. 2013), refused to consider a proffered warranty because there were no allegations in the complaint that that the proffered warranty applied to plaintiff's allegations. *Id.* And in *Residential Funding Co., LLC v. Cmty. W. Bank, N.A.*, No. 13-3468, 2014 WL 5207485,

45

*11 (D. Minn. Oct. 14, 2014), this Court refused to consider the defendants'
proffered agreement because it was not referenced or relied upon in the
complaint. *Id.*

Here, LG does not point to any allegations in the complaint that refer
to or reference LG's Limited Warranty. Indeed, Plaintiffs' Complaint neither
refers to nor references the proffered "LG Limited Warranty." Plaintiffs'
express warranty claims are based on "Defendants['] place[ment of] the false
refresh rate . . . in advertisements and spec sheets related to the LG
televisions." Compl. ¶ 84. Likewise, Plaintiffs' implied warranty claims are
based exclusively on Defendant's description of the LG televisions. Compl. ¶¶
90-97. Plaintiffs have *not* alleged that the "LG Limited Warranty" was
breached. *See George*, 988 F. Supp. 2d at 1072 (declining to consider warranty
submitted by defendant because the plaintiff's warranty claims were not
based on that specific warranty).

Additionally, there is no indication in the Complaint that Plaintiffs
were ever made aware of, or agreed to be bound by, the purported LG Limited
Warranty. LG correctly states that warranty disclaimers must be
"conspicuous." LG Br. 24 (citing Minn. Stat. §§ 336.2-316(2); 336.1-201(10)).
The statute defines "conspicuous" to mean that the warranty must be "so
written, displayed, or presented that a reasonable person against which it is
to operate ought to have noticed it." Minn. Stat. § 336.1-201(10).

LG conclusively argues that "LG's warranty disclaimers are [conspicuous] here." LG Br. 24. In support, LG cites *Glorvigen v. Cirrus Design Corp.*, No. 06-2661, 2008 WL 398814, *5 (D. Minn. Feb. 11, 2008), a case in which the disclaimer at issue was contained in "the [signed] purchase agreement." Here, however, there is no way for the Court to determine whether the purported disclaimer was a part of any agreement between the parties or otherwise conspicuously presented so that a reasonable person against which it is to operate ought to have noticed it. *See* Minn. Stat. § 336.1-201(10). Nor could LG establish such conspicuousness, as that fact is neither alleged in Plaintiffs' Complaint nor apparent from the Limited Warranty itself (even if it were to be considered by the court). Thus, without the ability to establish that the Limited Warranty was conspicuously presented to Plaintiffs, the Court should deny LG's motion to dismiss Plaintiffs' breach of warranty claims.

Finally, LG contends that Plaintiffs failed to give notice of the breach within a reasonable time after its discovery. LG Br. 25. LG argues that "Plaintiffs did not provide notice . . . until *close to two-and-a-half years* after they purchased the TV." *Id.* (emphasis in original). Again, this argument is based on an affirmative defense, not subject to dismissal on the pleadings. Even so, LG's argument is doomed to fail because it incorrectly equates Plaintiffs' "purchase" with their "discovery." Plaintiffs were required to notify

47

LG of the alleged warranty breach within a reasonable time after *discovery of the defect*, not within a reasonable time after purchase of the product. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, No. A06-2227, 2007 WL 4237504, at *3 (Minn. Ct. App. Dec. 4, 2007).

LG also provides no explanation for why it thinks Plaintiffs should have discovered the defect at the time they purchased the television. It is not enough that Plaintiffs noticed that the picture was not as clear as they had expected. First, Plaintiffs' Complaint does not allege that Plaintiffs noticed the low picture quality *immediately* after purchase, only that they noticed it at some point after their purchase. Compl. ¶ 38. Second, low picture quality on a television could have many various causes, such as input resolution, contrast ratio, color, scaling, lighting, etc. Noticing that the picture quality was not as clear as expected is not the same as discovering that the television had a lower refresh rate than advertised (which is the defect alleged in the Complaint). Indeed, in their complaint, Plaintiffs alleged that, although "Plaintiffs noticed that the television's images were not as clear as expected[, o]nly later did Plaintiffs come to learn that their television's actual refresh rate was 60Hz . . . —not 120Hz as advertised." *Id.* ¶ 38.

### H.  Plaintiffs adequately allege facts supporting their breach of contract theory.

In Minnesota, the elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to the right to demand performance by the defendant, and (3) breach of the contract by the defendant. *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). In opposition to Plaintiffs' breach of contract claim, LG claims that (1) there was no contract with LG, and (2) that the Plaintiffs did not perform conditions precedent to the contract. Like their breach of warranty defenses, challenging the actual existence of a contract and affirmative defenses to fulfilling the contract are inappropriate for a motion to dismiss. *See, e.g., Braden*, 588 F.3d at 601 n. 10; *Acker,* 93 F. Supp. 3d at 1066.

As to the first element—whether a contract was formed—LG provides no analysis and cites no cases supporting its position. Instead, in a single sentence, LG conclusively states that "[h]ere, Plaintiffs have not pled any contract with LG." *Id.* at 26.

"The formation of a contract requires communication of a specific and definite offer, acceptance, and consideration." *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008) (quoting *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d

772, 782 (Minn. Ct. App. 2006)). Facts supporting each of those elements were explicitly alleged in Plaintiffs' Complaint. Plaintiffs alleged an offer: "Defendants offered to sell Plaintiffs a '120Hz' television." Compl. ¶ 99. Plaintiffs also allege acceptance and consideration: "Plaintiffs accepted Defendants' offer and performed under the contract by providing payment for the television at the price dictated by Defendants' offer." *Id.* ¶ 100. Thus, Plaintiffs have unequivocally alleged facts supporting each of the elements of formation of a contract, and therefore LG's assertion that no contract was alleged must fail.

The second element refers to conditions precedent to Plaintiffs' right to demand LG's performance of the contract. *See Residential Funding Co., LLC,* 2014 WL 3952321, at *9. (applying Minnesota law). LG attempts to cloud the Court's analysis of this element by arguing that there were conditions precedent found in the improperly proffered *warranty*, and that those conditions precedent were not performed. However, LG's attempt to recast Plaintiffs' breach of contract claim as a breach of warranty claim and then shield itself with the purported warranty disclaimer must be rejected by the Court.

As discussed above, Plaintiffs alleged that a contract existed, the terms of which were that Plaintiffs would provide payment and LG would manufacture and provide plaintiffs with a 120Hz television. Compl. ¶¶ 99-

100. Thus, the only alleged condition precedent was that Plaintiffs pay for the television, a condition which Plaintiffs allege that they performed. *Id.* ¶ 100. Therefore, Plaintiffs have sufficiently alleged each element of a claim for breach of contract, and LG's motion to dismiss this claim must be denied.

## Conclusion

Based on the foregoing points and authorities, Plaintiffs respectfully request that the Court DENY Defendant's motion to dismiss in its entirety.

Dated: August 22, 2016                    Respectfully submitted,

By: */s/ David M. Cialkowski*
David M. Cialkowski (MN Lic. #0306526)
ZIMMERMAN REED, LLP
1100 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com

Daniel C. Hedlund (MN Lic. #258337)
Joseph C. Bourne (MN Lic. #0389922)
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dhedlund@gustafsongluek.com
jbourne@gustafsongluek.com

Luke P. Hudock (WI Lic. #1086264)
HUDOCK LAW GROUP, S.C.
P.O. Box 83
Muskego, WI 53150
Telephone: (414) 526-4906
lphudock@law-hlg.com

*Attorneys for Plaintiffs*