## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *Hudock et al. v. LG Electronics U.S.A., Inc. et al.*<br><br>This Document Relates To:<br><br>All Actions | Lead Case No. 16-cv-01220 JRT-KMM<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by and through undersigned Counsel, brings these consolidated actions on their own behalf and on behalf of the Class and Subclass defined below against Defendant LG Electronics U.S.A., Inc. ("LG"), and Defendants Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC (collectively, "Best Buy"). The actions entitled, *Hudock et al. v. LG Electronics U.S.A., Inc. et al.*, 16-cv-01220-JRT-KMM, *Villa Lara v. LG Electronics U.S.A., Inc. et al.*, 17-cv-05222-JRT-KMM, and any other action deemed related by the Court in this District have been consolidated for all purposes. Plaintiffs allege upon facts and information and belief as follows.

### INTRODUCTION

1.     This is a class action on behalf of consumers who purchased LG televisions.

2.     LG labels its LED televisions as having refresh rates of "120Hz" or "240Hz" when, in actuality, its televisions' refresh rates are 60Hz and 120Hz, respectively.

3.     "Hz," the scientific symbol for the unit "Hertz," literally means one cycle per second. In the television industry, Hz is the standard unit of measurement for reporting a television's refresh rate, that is, how many unique images per second are displayed on the television screen. "120Hz" literally means 120 unique images per second. "240Hz" literally

1

means 240 unique images per second. By expressly misrepresenting the refresh rate as a specific number of cycles per second, LG has deliberately misled consumers into believing that LG's LED televisions have a higher refresh rate than they actually have.

4.     A television's refresh rate is directly linked to picture quality, and is one of the most material specifications touted by television manufacturers to consumers. Due to the advanced technology required to achieve refresh rates higher than 60, higher refresh rates are directly, demonstrably and mathematically linked to higher prices.

5.     Best Buy has likewise advertised LG televisions using misleading and untrue specifications.  Like LG, Best Buy markets and advertises the LG televisions with the same false refresh rates as LG. Best Buy makes these false assertions in advertisements and information displayed to customers in its stores and on its website.

6.     As a consequence of Defendants' fraudulent scheme, Plaintiffs paid more for LG's LED television than he would have otherwise paid had the accurate refresh rate been disclosed by Defendants.  Due to Defendants' deceptive practices, Plaintiffs received televisions with lower picture quality than represented by Defendants.  Plaintiffs' experience and injury is typical of many consumers who have purchased LG televisions.

## PARTIES

**A.** **Plaintiffs**

7.     Plaintiff Ivan Villa Lara ("Villa Lara") is a resident of Los Angeles County, California who purchased an LG television, model number 55LN5100 from Best Buy.

8.     Plaintiff Scott Poppen ("Poppen") is a resident of Kane County, Illinois who purchased two LG televisions, model numbers 55LA6200 and 55LN5100 from Best Buy.

9.     Plaintiff Benjamin Hudock is a resident of East Troy, Wisconsin who, jointly with his wife, Plaintiff Breann Hudock, purchased an LG television, model number 55LN5100-UB from Best Buy.

10.     Plaintiff Breann Hudock is a resident of East Troy, Wisconsin who, jointly with her husband, Plaintiff Benjamin Hudock, purchased an LG television, model number 55LN5100-UB from Best Buy (together, with Benjamin Hudock, the "Hudock Plaintiffs").

11.     Plaintiff Gerald DeLoss ("DeLoss") is a resident of Deerfield, Illinois. Plaintiff DeLoss purchased a 55" LG UF6450 series television from Kohl's.

12.     Plaintiff Eugene Mannacio ("Mannacio") is a resident of Novato, California who purchased an LG television, model number 60UH7700, from Best Buy.

**B.** **LG Electronics U.S.A., Inc.**

13.     Defendant LG Electronics U.S.A., Inc. is a New Jersey corporation with its principal place of business in Englewood Cliffs, New Jersey.

14.     Defendant LG sells its LED televisions through retailers, including Best Buy, and supplies retailers, including Best Buy, with all specifications for its LED televisions with the intent that retailers pass that information to consumers.

C.     **Best Buy**

15.     Defendant Best Buy Co., Inc. is a Minnesota corporation with its principal place of business in Richfield, Minnesota.

16.     Defendant Best Buy Stores, L.P., is a Virginia limited partnership with its principal place of business in Richfield, Minnesota.

17.     Defendant BestBuy.com, LLC, is a Virginia limited liability company with its principal place of business in Richfield, Minnesota.

18.     As set forth herein, all claims asserted against the Best Buy entities are asserted against Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC under a direct liability theory, agency theory, and alter ego theory based on the following facts:

*Direct Liability*

19.     Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC are all directly liable to Plaintiffs for the conduct alleged herein.

20.     Best Buy Co., Inc. centrally manages, at its corporate headquarters in Minnesota, the development of all Best Buy merchandise and services offerings, *pricing and promotions*, procurement and supply chain, *online and mobile application operations*, *marketing and advertising* and labor deployment across all channels.

21.     Best Buy Co., Inc. conducts and controls both its online and brick-and-mortar retail operations—including the marketing and sale of LG televisions with misleading and false refresh rates—through Best Buy Stores, L.P.

22.     Best Buy Stores, L.P. conducts and controls its online and brick-and-mortar retail operations—including the marketing and sale of the LG television with a misleading

4

and false refresh rate purchased by Plaintiffs—through the website BestBuy.com and through Best Buy stores.

23.     BestBuy.com, LLC, which is wholly owned by parent Best Buy Stores, L.P., operates the retail website through which Plaintiffs saw some of the false, deceptive, and misleading advertising for the LG televisions at issue in this case and through which Best Buy Co., Inc., and Best Buy Stores, L.P., directed and conducted these marketing and retail activities.

24.     Best Buy Co., Inc. sells consumer electronics through its retail stores, as well as through BestBuy.com.

25.     Best Buy Co., Inc. negotiates directly with key vendors, including LG, for payment terms, promotional programs, return policies, and factory warranties to maximize profitability of its retail sales, conducted through Best Buy Stores, L.P., and BestBuy.com.

26.     Best Buy Co., Inc., worked directly with LG, Best Buy Stores, L.P., and BestBuy.com, LLC, to advertise and sell the deceptively advertised LG television at issue in this case.

*Agency Liability*

27.     Best Buy Co., Inc. and BestBuy.com, LLC, are liable as principles of their agent, Best Buy Stores, L.P., for directing and controlling the unlawful acts as alleged herein.

28.     BestBuy.com, LLC, is a wholly owned subsidiary of Best Buy Stores, L.P.

29.     Best Buy Stores, L.P., is a subsidiary of Best Buy Co., Inc., the parent holding company for various Best Buy businesses.

30.     Best Buy Co., Inc. centrally manages, at its corporate headquarters in Minnesota, the development of all Best Buy merchandise and services offerings, *pricing and promotions*, procurement and supply chain, *online and mobile application operations*, *marketing and advertising* and labor deployment across all channels.

31.     Best Buy Co., Inc. thus conducts its retail operations of consumer electronics, home office products, entertainment software, appliances, and related services using its subsidiary arm, Best Buy Stores, L.P.

32.     In turn, Best Buy Stores, L.P. conducts its online retail operations on its website using its subsidiary, BestBuy.com, LLC.

33.     At the direction and under the control of Best Buy Co., Inc., Best Buy Stores, L.P., deceptively advertised and sold LG televisions with false refresh rates, as described herein, both in stores and online.

34.     At the direction and under the control of Best Buy Stores, L.P., BestBuy.com, LLC, approved and published the deceptively worded messages regarding refresh rates to be associated with the LG televisions depicted for sale online.

*Alter Ego Liability*

35.     BestBuy.com, LLC, and Best Buy Stores, L.P., are alter egos for the parent and holding company, Best Buy Co., Inc., for purposes of the unjust and deceptive acts alleged herein.

36.     Best Buy Co., Inc. centrally manages, at its corporate headquarters in Minnesota, the development of all Best Buy merchandise and services offerings, *pricing*

*and promotions*, procurement and supply chain, *online and mobile application operations*, *marketing and advertising* and labor deployment across all channels.

37.     All three entities are significantly intertwined such that the parent corporation has a close, synergistic relationship with its subsidiaries that transcends mere ownership. Acting through its various affiliates including Best Buy Stores, L.P., and BestBuy.com, LLC, Best Buy Co., Inc., is the largest specialty retailer of consumer electronics in the world. Best Buy Co., Inc. actively identifies itself as the retailer of the products it sells, not its subsidiaries.

38.     The entities do not observe corporate distinctions for purposes of sharing the inventory they offer to customers. Best Buy Co., Inc., manages its U.S. retail operations with leadership teams responsible for all areas of its business, operating an omni-channel platform that it says provides customers the ability to shop when and where they want. Through the Best Buy website, customers may elect to pick up orders initiated online in any Best Buy store, or have merchandise shipped directly to them from a Best Buy distribution center or retail store.

39.     All three Best Buy entities share a single, principle executive office in Richfield, Minnesota.

40.     The sole internet presence for all three entities is www.bestbuy.com.

41.     All three Best Buy entities share overlapping policies related to consumer transactions including, but not limited to, the Conditions of Use for their shared retail website, www.bestbuy.com, and privacy policies applicable to websites owned or operated

by Best Buy Co., Inc., and its subsidiaries, as well as information collected in Best Buy stores or other locations under the Best Buy name.

42.     All three Best Buy entities honor the same consumer rewards programs – the "My Best Buy" rewards program and the benefits flowing from use of the Best Buy credit card or "My Best Buy Visa card" apply to both purchases in store and online.

43.     All three Best Buy entities share the benefits of established intellectual property rights such as trademarks including, for example, in BEST BUY, the BEST BUY logo, the tag design, MY BEST BUY, and BESTBUY.COM, such that no entity has an independent identity to consumers. These marks, however, are not "owned" by Defendants but by other of their Best Buy entities, including Best Buy Concepts, Inc., and BBY Solutions, Inc., demonstrating the control Best Buy Co., Inc. exerts over its various arms.

44.     The domain name "bestbuy.com" is registered to BBY Solutions, Inc., (and not BestBuy.com), further demonstrating the control Best Buy Co., Inc. exerts over its subsidiaries and affiliates, in addition to the informal nature under which the various Best Buy entities are operated.

45.     The Best Buy entities' collective operations to promote retail sales of consumer electronics, among other activities, establish a functional economic unity between the companies. For purposes of the retail sales of the subject LG televisions, and the statements made to the public in connection with those sales, Best Buy Defendants have no independent identity.

46.     It is necessary to hold all three entities liable for the false and deceptive practices implicated by the advertising on the Best Buy website as Best Buy Stores, L.P.,

and in turn, BestBuy.com, LLC, are vehicles through which Best Buy Co., Inc., has unjustly engaged in false and misleading advertising as alleged herein.

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over the instant lawsuit pursuant to 28 U.S.C. § 1332(d)(2), because the parties are sufficiently diverse, there are more than 100 members in the class and the aggregate amount in controversy exceeds $5,000,000, exclusive of attorneys' fees, interest, and costs.

48.     This Court has personal jurisdiction over the Defendants because they conduct substantial and continuous business in the State of Minnesota.

49.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and (b) because a substantial part of the events or omissions that give rise to the claims occurred within the State of Minnesota and the Defendants conduct a substantial part of their business within this District.

## SUBSTANTIVE ALLEGATIONS

### A.     General Allegations

50.     When watching television, the viewer is exposed to a series of still images displayed in rapid succession, which gives the appearance of motion on the television screen.  The number of times a television is able to display a unique image per second is referred to as the television's refresh rate and is measured in Hertz, abbreviated as "Hz."[1] Refresh rate, and the corresponding Hz measurement, are industry standard specifications

---

[1] A Hertz is defined as one cycle per second.

that directly correspond to each other—a television with a refresh rate of 60Hz displays 60 unique images per second; a television with a refresh rate of 120Hz displays 120 unique images per second; and a television with a refresh rate of 240Hz displays 240 unique images per second.  Simply stated, for televisions, refresh rate equals Hz and Hz equals refresh rate.

51.     The refresh rate, or Hz measurement, is a vital specification of a television. Higher refresh rates serve to reduce or eliminate motion blur when fast moving objects or scenes appear on screen.   It is somewhat analogous to the shutter speed of a camera—the faster the shutter speed, the better a camera is able to capture a moving object as a still frame, without motion blur.  In much the same way, the more often a television can refresh the picture and generate unique images, the better and more clearly a television is able to display moving objects on the screen.

52.     A significant hurdle to increasing the refresh rates for televisions is that electric current runs at 60Hz in the United States.  This means that the natural, or native, refresh rate of a television can be at most 60Hz because only 60 unique images per second are able to be carried by the electrical frequency.

53.     In order to surpass the 60Hz barrier and produce 120Hz and 240Hz televisions that display the corresponding number of unique images per second, a manufacturer producing a 120Hz or 240Hz refresh rate television must incorporate advanced interpolation technology.  Such technology predicts, creates and displays an extra unique image (or images) in between each of the 60 images that are produced by the 60Hz electrical current.  For example, a regular 60Hz television displays 60 unique images per

second as follows: A-B-C-D-E-F-G-H and so on.  A 120Hz television with interpolation technology takes the same broadcast and displays 120 unique images per second in the following manner: A-ab-B-bc-C-cd-D-de-E-ef-F-fg-G-gh-H and so on.  For a television to have a refresh rate greater than 60Hz, it must rely on some form of advanced interpolation technology.

54.     Given the technological challenges (and cost) in surpassing the inherent 60Hz threshold, television manufacturers, rather than investing in the technology to increase the actual Hz and refresh rates of their televisions, have developed alternate methods to artificially enhance the perceived performance of their products without actually increasing the refresh rate to the specified number of unique images per second.

55.     The actual refresh rate of LG's LED televisions are one-half of the refresh rates LG represents in its specifications held out to consumers.  An LG LED television marketed as "120Hz" has an actual refresh rate of 60Hz and shows 60 unique images per second, an LG LED television marketed as "240Hz" has a refresh rate of 120Hz and shows 120 unique images per second.

56.     As already stated, the Hz specification of a television has a specific and particular meaning: Hz is the accepted and conventional method used to determine a television's refresh rate.  LG has hijacked this unit of measurement and represented it as a "specification" that is a complete fabrication.

57.     Compounding the confusion and deception, the actual and true refresh rate of LG's televisions are not made readily available, in any medium, to the consumer.

58.    Shockingly, while LG makes it a practice to conceal the actual and true Hz specification of their televisions, they make a particularly pointed effort to literally misrepresent the refresh rate of their televisions in print and on the internet. Through its website, LG makes available "Spec Sheets" for their television models.  In the Spec Sheet is a line dedicated to refresh rate.  On 60Hz televisions, LG's spec sheets list the refresh rate as "120Hz"; on 120Hz televisions, LG's spec sheets list the refresh rate as "240Hz." The refresh rate specification is misrepresented in Hz and is listed at one-hundred percent over its true value.

59.    Overall, LG's actions in marketing its televisions with regard to refresh rate consist of efforts to conceal, fabricate, and misrepresent information to retailers, with the intent that retailers rely on such information, adopt that information, and then pass it on directly to the consumer.  It is akin to LG marketing a 48-inch television but representing that the television is 55 inches.  Only with refresh rates, the misrepresentation is even more egregious because a consumer has no method to validate refresh rate claims—they are left with no choice but to rely on the manufacturer's and retailer's representations.

60.    A consumer's lone bulwark against LG's efforts to deceive and the barrage of misinformation, obfuscation and concealment that follows, is reliance on a seemingly objective and informed third party to provide accurate and reliable information regarding LG's LED televisions.  Retailers of LG's televisions are in such a position, and consumers often depend on them to provide guidance and to help them differentiate among items.

61.    Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC, as retailers of LG's televisions, are in a position to inform consumers and provide them with

accurate information regarding LG's televisions and, in particular, the refresh rates of those televisions.  In fact, Best Buy holds itself out to be experts in the products they sell as their company motto is, "Expert Service. Unbeatable Price."

62.     However, as is standard industry practice, retailers—including Best Buy— rely on manufacturers—including LG—to provide specifications and the content to be included on fact tags and online for consumers to view and rely on when making purchasing decisions.

63.     Accordingly, rather than providing the "expert" insight and consultation expected of them, Best Buy joined LG in deceiving consumers and propagated LG's misrepresentations by advertising LG televisions as having refresh rates and a Hz specification of two times the actual capability of the televisions.  In short, Best Buy copied and adopted LG's misrepresentations in its own labeling, thereby endorsing LG's deceptions as legitimate.

64.     To make things worse, Best Buy not only repeated LG's misleading representations, but advertised LG's televisions, both on Best Buy's website and in stores, as having "Screen Refresh Rate[s]" of "120Hz" or "240Hz," when in reality the LG televisions it sold had half those refresh rates.

65.     Plaintiffs reasonably relied on Defendants' false and misleading advertisements and labeling by purchasing an LG LED television.  Plaintiffs reasonably believed, based on Defendants' misrepresentations, that he was purchasing a television with a significantly and materially higher refresh rate and, therefore, advanced technology and a better picture quality than the television actually possessed.  As a result, Plaintiffs

paid substantially more than he would have otherwise paid for the televisions had the refresh rate been accurately disclosed by Defendants. Plaintiffs would not have purchased his LG television, or, alternatively, would have paid much less for it, had the accurate refresh rate been accurately disclosed by Defendants.

66.     Plaintiffs have suffered an ascertainable loss as a result of Defendants' conduct in that they paid more than their LED television was worth and more than what Defendants would have been able to charge had their true refresh rate been displayed. Under contract law and relevant state consumer protection statutes, such conduct entitles Plaintiffs to benefit-of-the-bargain damages, or the expectation interest they were deprived of, that is, delivery of the product as promised (*i.e.*, a 120Hz television), or the cost to purchase what was promised (*i.e.*, the monetary equivalent of a 120Hz television) regardless of any discount offered at the time of purchase.

67.     Like screen size and resolution, refresh rate is one of the top selling points for LED televisions, and is thus a material term of the products' sales display. Defendants' own marketing and in-store and digital placards prominently and intentionally feature the refresh rate, stated in "Hz."

68.     All other features being equal, televisions with higher refresh rates have more objective value and command a price premium compared to televisions with lower refresh rates. The price premium associated with higher refresh rates occurs across brands and product lines and can be applied with particularity to LG's LED televisions, including Plaintiff's television model.

69.     Televisions with higher refresh rate capabilities consistently command a quantifiable, 15-20% higher Manufacturer's Suggested Retail Price ("MSRP") and actual sales prices than television models with lower refresh rates.

70.     Defendants have in their possession all significant and relevant MSRP data, sales data, or both, from which an expert can perform a hedonic regression analysis to isolate the exact value associated with each constituent characteristic of LG's LED televisions, including the refresh rate.

71.     In addition to sales data, LG has in its possession the manufacturing cost data of its televisions which will show the input cost difference between higher and lower refresh rate televisions which inevitably translates to a respective retail price differential.

72.     Even in the absence of these multiple sources of relevant data, an expert can conduct a conjoint analysis, involving a scientific survey measuring consumer preferences, which can isolate and quantify the premium attributable to refresh rates reflected in retail pricing.

73.     Plaintiffs approximate their losses at 15-20% of their purchase price. In addition, given the universal price difference between higher and lower refresh rate televisions, the data in possession of Defendants and the methodologies available for expert analysis, Plaintiffs will be able to provide a detailed quantification of damages both for the Class and for themselves during the appropriate stage of litigation. Alternatively, a readily available and appropriate metric for calculating the lost benefit of the bargain or deprivation of expectation interests is delivery of the product promised (*i.e.*, a 120Hz television), or replacement costs (*i.e.*, the monetary equivalent of a 120Hz television)

regardless of any discount offered at the time of purchase. Thus, even if Plaintiffs' television were sold to them at a "discount," their damages could be calculated as the difference between what it would have cost Plaintiffs to purchase a 120Hz television and the price they paid for the 60Hz television they actually received. For instance, on November 21, 2013, around the time of Villa Lara's purchase, Best Buy offered a Samsung 120Hz LED television, model UN55FH6003FXZA, with the same dimensions and resolution (1080p) as LG's 55LN5100, for $799.99. Under the replacement cost methodology, Villa Lara's ascertainable loss would be $300.

**B.    Plaintiff Villa Lara's Allegations**

74.    Villa Lara purchased an LG LED television, model number 55LN5100 from a Best Buy store located in Compton, California on November 28, 2013.

75.    In the weeks leading up to his purchase, Villa Lara began shopping for a new television for his home. He received numerous mailers to his home in Compton, California from Best Buy highlighting its Black Friday deals, and searched BestBuy.com from his home in Compton, California to compare various television models. Villa Lara recalls that the refresh rate was among the most prominent features advertised for the televisions he considered.

76.    Villa Lara understood that a higher refresh rate television would provide a better, clearer image of moving objects on the screen and viewed television models with different refresh rates in the Best Buy showroom. Villa Lara was able to ascertain a television's promoted refresh rate immediately upon viewing the fact tag's specifications, the contents of which were created by LG and used by Best Buy.  The fact tag is the slip

of paper prominently placed on the shelf that calls attention to top-selling features and specifications of the displayed television, including the refresh rate.

77. Villa Lara understands the refresh rates shown on the fact tags in the Best Buy Store and on its websites to be representations and warranties by both LG (which created the written specifications) and Best Buy (which displayed the specifications), as it is standard industry practice for retailers to rely on, copy, and adopt the technical specifications and representations provided to them by the manufacturers.

78. Because he intended to use the television to watch sporting events and action movies, Villa Lara decided to search for and purchase a television with a minimum of a 120Hz refresh rate.

79. On or about November 14, 2013, Villa Lara informed his grandmother, Celina Lara, that he desired to purchase a new television from Best Buy but was unable to immediately pay for or obtain credit to purchase the same. Celina Lara offered to open a Best Buy credit card account to complete the transaction for the television on credit so that Villa Lara would be able to own the television he desired. In consideration of the merchandise he acquired, Ivan agreed to be responsible for the debt on the account and to reimburse his grandmother for the full amount on the Best Buy credit card account.

80. On November 28, 2013, Villa Lara and his grandmother stood in line for hours at the Best Buy Store in Compton, California, where he subsequently viewed the advertisements and specifications of the LG 55LN5100 television in Best Buy's store on the fact tag, which included the refresh rate of 120Hz promoted prominently by LG as a feature to highlight in its written materials to Best Buy, displayed for the television. As

part of Best Buy's Black Friday protocol, the television and its specification (again including the refresh rate of 120Hz) were also presented to him on a ticket he was required to obtain prior to purchasing the television (presumably this was a mechanism enacted to keep track of the status of Best Buy's inventory during the high-volume sales day).

81.    Relying on the 120Hz advertised refresh rate Villa Lara saw prominently displayed in store on both his merchandise ticket and the fact tag, he decided to purchase the LG 55LN5100 television from the Best Buy store for $499.99 through his grandmother's Best Buy credit card account per their agreement detailed above. As part of the purchase, Villa Lara also obtained a 5-year Performance Service Plan, costing an additional $99.99. While Villa Lara made his purchase during a Black Friday promotion for the price of $499.99, Villa Lara's television model was manufactured in limited quantities exclusively and solely for the Black Friday promotion at Best Buy. Villa Lara believed he was getting a good deal for the premium feature of a "120Hz" refresh rate.

82.    On or about January 4, 2014, Villa Lara began making payments to his grandmother for the purchase price of the television, the Performance Service Plan, and other items he agreed to be responsible to pay for. By approximately June 2015, Villa Lara had fully reimbursed his grandmother for the television and Performance Service Plan. Villa Lara is considered the purchaser and owner of the merchandise under applicable law.

83.    Within a few weeks of purchasing his television, by January 2014, Villa Lara noticed that the television's images were not as clear as he expected for a 120Hz television. When Villa Lara had the time, he worked through the various settings on the television and thoroughly reviewed the owner's manual created and supplied by LG to determine whether

there was a setting that may have been affecting the picture quality. Villa Lara reviewed the settings several times over several months but did not discover any way to adjust settings to improve the picture quality.

84.     The following holiday season (approximately mid-December 2014 or later), Villa Lara viewed the performance of a true 120Hz television (a non-LG brand) at a friend's house prompting him to again question the performance of his television.

85.     As a result of this experience, in or around January 2015, Villa Lara began conducting online research in forums and blogs, and discovered that his model television was only a 60Hz television. Before making his discovery in the online forum, Villa Lara was unable to discover that Defendants' representations as to the refresh rate of the television he purchased were false despite reasonable diligence. Villa Lara could not have known that his television was not the promised 120Hz refresh rate, something that requires expertise beyond that of a reasonable lay person.

86.     Had Villa Lara known that the actual refresh rate of the television was 60Hz—not 120Hz as advertised—he would not have purchased the television or, alternatively, would not have been willing to pay as much for it. Villa Lara was promised a 120Hz television but received a 60Hz television valued approximately 15-20% less (approximately $75 to $100) than what he was promised.

87.     On May 10, 2017, Villa Lara submitted his television to Best Buy for repair under the 5-year Performance Service Plan he obtained at the time of initial purchase for approximately $100.00. The repair was unrelated to the refresh rate of the television. Rather than repair the television, to comply with its obligations under the extended service

contract, Best Buy provided him with store credit in the form of gift cards equivalent to the purchase price of his television. On the Service Order, Best Buy listed Ivan Villa Lara as the "Customer," and processed the order under his name without dispute over whether he was the owner or purchaser of the television or of the extended warranty.

## C.     Plaintiff Poppen's Allegations

*Poppen's Purchase of LG Television Model Number 55LA6200*

88.     On or about April 29, 2013, Poppen purchased an LG television, model number 55LA6200 from a Best Buy store located in South Elgin, Illinois.

89.     Prior to purchasing his television, from his home, Poppen researched various televisions on Best Buy's website. Because Poppen intended to use a new television to watch sporting events, he specifically was in the market for a 120Hz refresh rate television and therefore limited his search for a new television to those that were advertised as having a 120Hz refresh rate. Poppen recalls that the refresh rate was among the most prominent features advertised for the televisions he considered for purchase.

90.     Poppen understands that a higher refresh rate television would provide a better, clearer image of moving objects on the screen. Poppen was able to ascertain whether a television was advertised as having 120Hz refresh rate immediately upon viewing the specifications listed on Best Buy's website, the contents of which are created by manufacturers—including LG—for use by retailers—including Best Buy.

91.     Poppen understands the refresh rates advertised on Best Buy's website to be representations and warranties by both LG (which created the written specifications) and Best Buy (which displayed the specifications) as it is standard industry practice for retailers

to rely on, copy, adopt, and highlight the key technical specifications and representations provided to them by manufacturers, that drive sales.

92.     Prior to his purchase and during his research on Best Buy's website, Poppen viewed the specifications for LG television model 55LA6200 and noted the 120Hz refresh rate specification, which was prominently displayed at the top in large text as a key selling feature.

93.     Relying on the 120Hz refresh rate he saw advertised, which had been promoted by LG as a feature to highlight in its written materials to Best Buy, and which was in fact prominently advertised on Best Buy's website, Poppen made his initial decision to purchase the LG 55LA6200 television model.

94.     On or about April 29, 2013, Poppen traveled to a Best Buy store in South Elgin, Illinois with the intent to purchase the LG 55LA6200 television he had identified online as the 120Hz refresh rate television he wished to purchase. While in the store, store personnel confirmed the advertised 120Hz refresh rate of the LG 55LA6200 television was accurate. Upon Best Buy's confirmation the advertised 120Hz refresh rate was indeed correct and accurate, Poppen purchased the LG 55LA6200 television for approximately $1,300. With this purchase, Poppen also obtained an extended warranty for the television.

95.     When Poppen began to use the LG 55LA6200 television for its intended purpose of watching sports, in the fall of 2013, he noticed the performance of the television was not as expected for a 120Hz refresh rate television—images were not as clear and fast-moving objects would noticeably skip across the screen.

96.     Poppen contacted Best Buy, reported the issue, and engaged his warranty protection in an attempt to rectify the problem and Best Buy subsequently replaced the component display panel of the television. When Poppen noticed the issue remained even after a new display panel was being used, he once again contacted Best Buy. Rather than attempt to repair the television, on or about November 16, 2014, Best Buy replaced Poppen's television with a new LG 55LA6200.

97.     At no point did anyone at Best Buy—whom Poppen reasonably relied on to address his technical questions and issues—inform him that these televisions did not have the 120Hz refresh rate capabilities that were promised.

98.     The new television, but same model, exhibited the same issues. Tired of dealing with the hassle of a seemingly unrepairable issue, Poppen subsequently replaced the LG 55LA6200 television with a Samsung model.

99.     Had Poppen known the television did not feature a 120Hz refresh rate as advertised, he would not have purchased—or even considered for purchase—the LG 55LA6200 television.  Poppen was promised a 120Hz refresh rate television but received a 60Hz refresh rate television valued approximately 15-20% less (approximately $195 to $260) than what he was promised.

100.    Prior to August 2018, Poppen was unaware that the 120Hz refresh rate Defendants advertised for the television he purchased was misleading and inaccurate. Prior to August 2018 he was unaware that, in fact, the televisions he purchased had a 60Hz refresh rate. Poppen's lack of prior awareness of the television's refresh rate was

22

reasonable due to, in part, his research that specifically identified the television he wished to purchased based on Defendants' advertising stating that it had a 120Hz refresh rate.

*Poppen's Purchase of LG Television Model Number 55LN5100*

101.   On or around November 25, 2013, Poppen purchased an LG television, model number 55LN5100, from the same Best Buy store located in South Elgin, Illinois.

102.   Again, prior to purchasing his television, Poppen researched various televisions on Best Buy's website from his home. Poppen was again specifically in the market for a 120Hz refresh rate television and limited his search for a new television to those that were advertised as having a 120Hz refresh rate. Poppen recalls that the refresh rate was among the most prominent features advertised for the televisions he considered for purchase.

103.   Poppen understood that a higher refresh rate television would provide a better, clearer image of moving objects on the screen. Poppen was able to ascertain whether a television was advertised as having 120Hz refresh rate immediately upon viewing the specifications listed on Best Buy's website, the contents of which are created by manufacturers—including LG—for use by retailers—including Best Buy.

104.   Again, Poppen understands the refresh rates advertised on Best Buy's website to be representations and warranties by both LG (which created the written specifications) and Best Buy (which displayed the specifications) as it is standard industry practice for retailers to rely on, copy, adopt, and highlight the key technical specifications and representations provided to them by manufacturers, that drive sales.

105.    Prior to his purchase and during his research on Best Buy's website, Poppen viewed the specifications for LG television model 55LN5100 and noted the 120Hz refresh rate specification, which was prominently displayed at the top in large text as a key selling feature.

106.    Relying on the 120Hz refresh rate he saw advertised, which had been promoted by LG as a feature to highlight in its written materials to Best Buy, and which was in fact prominently advertised on Best Buy's website, Poppen made his decision to purchase the LG 5LN5100 television model.

107.    On or about November 25, 2013, Poppen purchased the LG 55LN5100 television for approximately $536.00 from BestBuy.com.

108.    Had Poppen known the television did not feature a 120Hz refresh rate as advertised, he would not have purchased—or even considered for purchase—the LG 55LN5100 television.  Poppen was promised a 120Hz refresh rate television but received a 60Hz refresh rate television valued approximately 15-20% less (approximately $84.00 to $107) than what he was promised.

109.    Poppen was unaware prior to August 2018 that the 120Hz refresh rate Defendants advertised for the television he purchased was misleading and inaccurate. He was unaware prior to August 2018 that, in fact, the television he purchased had a 60Hz refresh rate. Poppen's lack of prior awareness of the television's refresh rate was reasonable due, in part, to his research that specifically identified the television he wished to purchase based on Defendants' advertising stating that it had a 120Hz refresh rate.

D. **Hudock Plaintiffs' Allegations**

110. The Hudock Plaintiffs purchased an LG LED television, model number 55LN5100-UB.

111. In the weeks leading up to their purchase, the Hudock Plaintiffs began shopping for a new television for their home. The Hudock Plaintiffs understood that a higher refresh rate television would provide a better, clearer image of moving objects on the screen. The Hudock Plaintiffs decided to search for and purchase a television with a minimum of a 120Hz refresh rate.

112. On November 29, 2013, Plaintiff Breann Hudock viewed advertisements and specifications of the LG 55LN5100-UB television on Best Buy's website, BestBuy.com.

113. The main product page for the 55LN5100-UB television on Best Buy's website, which was viewed by Plaintiff Breann Hudock, advertised a "120Hz refresh rate" in bold text. Under that bold heading, the webpage explained that a 120Hz refresh rate "[h]elps minimize blurring and ghosting during intense action sequences, so you can enjoy movies, sporting events and games in crystal clarity."

114. The "Specifications" section of that webpage contained the following representation:

| Screen Refresh Rate | 120Hz | This refers to how many times per second a TV screen image is completely reconstructed. A TV with a 60Hz refresh rate means that the picture will be completely rebuilt 60 times in one second. Why is this important? Generally, the more the screen is refreshed, the smoother the images will appear. |
|---|---|---|

115. Plaintiff Breann Hudock spoke to her husband, Plaintiff Benjamin Hudock, over the phone and read the above specifications to him. Together, relying on the 120Hz advertised refresh rate, Plaintiffs decided to purchase the LG 55LN5100-UB television

from Best Buy's website for $499.99. While the Hudock Plaintiffs made their purchase during a Black Friday promotion for the "on sale" price of $499.99 reduced from the claimed "regular price" of $999.99, upon information and belief, the Hudock Plaintiffs' television model was manufactured in limited quantities exclusively and solely for the Black Friday promotion at Best Buy and was never, in fact, available for purchase at the claimed "regular price" of $999.99. After purchasing the television, the Hudock Plaintiffs noticed that the television's images were not as clear as expected.  Only later did the Hudock Plaintiffs come to learn that their television's actual refresh rate was 60Hz.  Had the Hudock Plaintiffs known that the actual refresh rate of the television was 60Hz—not 120Hz as advertised—they would not have purchased the television or, alternatively, would not have been willing to pay as much for it. The Hudock Plaintiffs were promised a 120Hz television but received a 60Hz television valued approximately 15-20% less (approximately $75 to $100) than what they were promised.

### E.    Plaintiff DeLoss' Allegations

116.    Plaintiff DeLoss purchased a 55" LG LED television, model number 55UF6450.

117.    Prior to purchasing this television, Plaintiff DeLoss researched various models and specifications of televisions online. Plaintiff DeLoss understood that a higher refresh rate television would provide a better, clearer image of moving objects on the screen. For this reason, he decided to search for and purchase a television with a minimum of a 120Hz refresh rate.

118.   Plaintiff DeLoss reviewed the specifications for the 55UF6450 television model as labeled and represented by LG. LG advertised the refresh rate of this model as 120Hz. Prior to purchasing the television, Plaintiff DeLoss confirmed the purported 120Hz refresh rate online, as well as on the packaging of the television.

119.   On January 30, 2016, Plaintiff DeLoss, relying on the 120Hz advertised refresh rate, decided to purchase the 55UF6450 television from Kohl's for $699.99.

120.   Only after purchasing the television did Plaintiff DeLoss come to learn that his television's actual refresh rate was 60Hz. Had he known that the actual refresh rate was 60Hz—not 120Hz as advertised—he would not have purchased the television or, alternatively, would not have been willing to pay as much for it. Plaintiff DeLoss was promised a 120Hz television, but he received a 60Hz television worth approximately 15-20% less (approximately $105 to $140) than what he was promised.

**F.   Plaintiff Mannacio's Allegations**

121.   On or about February 2016, Plaintiff Eugene Mannacio purchased a 60" LG television, model number 60-UH-7700, at the Best Buy located on 700 Du Bois Street in San Rafael, California. He purchased the television to use in his home for personal and family purposes.

122.   When shopping for a television, image quality and refresh rate were important qualities to Plaintiff Mannacio. Plaintiff Mannacio reviewed the different television brands and models in-store for their advertised refresh rates and image qualities. He knew that a higher refresh rate indicated a higher picture quality for televisions.

123.   At the San Rafael Best Buy, Plaintiff Mannacio reviewed the 60" LG television's advertised refresh rate, which represented that the television refreshed at 240Hz on the television's shelf label and online by Best Buy and LG. Believing this representation and relying on it as true, Plaintiff Mannacio purchased the television.

124.   Plaintiff Mannacio later learned that his television actually had a 120Hz refresh rate, half the rate that Best Buy and LG advertised.

125.   Had Plaintiff Mannacio known that the television had half the refresh rate than advertised, he would not have been willing to purchase it, or, alternatively, would not have been willing to pay as much for it. The television Plaintiff Mannacio received was worth approximately 15-20% less than the 240Hz version he was promised, meaning he overpaid by approximately 15-20%.

## CLASS ACTION ALLEGATIONS

126.   Plaintiffs bring all claims herein pursuant to Fed. R. Civ. P. 23.   The requirements of Fed. R. Civ. P. 23 are all satisfied with respect to the class defined below.

**A.   Class Definitions**

127.   The National Class includes:

> All persons in the United States who, from May 9, 2010 until the present, purchased an LG LED television that LG labeled as having a "Hz" rating twice as high as its actual refresh rate.

128.   The Best Buy Purchaser Subclass includes:

> All persons in the United States who, from May 9, 2010 until the present, purchased, from a Best Buy store or from Best Buy's website, an LG LED television that Best Buy labeled as having a "Hz" rating twice as high as its actual refresh rate.

129.    Excluded from the Class and Subclass are Defendants, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons immediate families, and the presiding judge(s) in this case and his, her, or their immediate family. The Class and Subclass also do not include consumers who purchased televisions whose packaging and in-store or digital placards stated "Trumotion 120" or "Trumotion 240" *without* a "Hz" unit after the number.

**B.      The Proposed Class and Subclass Satisfy the Rule 23(a) Prerequisites**

130.    **Numerosity**: At this time, Plaintiffs do not know the exact size of the Class or Subclass; however, due to the nature of the trade and commerce involved, Plaintiffs believe that the Class and Subclass members are well into the thousands, possibly millions, and thus are so numerous that joinder of all members is impractical.  The number and identities of Class and Subclass members is administratively feasible and can be determined through appropriate discovery in the possession of the Defendants.

131.    **Commonality**: There are questions of law or fact common to the Class and Subclass, which include but are not limited to the following:

    a.      Whether Defendants represented to Plaintiffs and the Class and Subclass that the LG televisions were capable of a higher refresh rate, expressed in Hz, than the televisions could actually produce;

    b.      Whether Defendants intended Plaintiffs and members of the Class and Subclass to rely on the statements of refresh rate;

c.    Whether Plaintiffs and members of the Class and Subclass were harmed by Defendants' misrepresentations;

d.    Whether Defendants' conduct violated California law;

e.    Whether Defendants' conduct violated Illinois law;

f.    Whether Defendants' conduct violated Minnesota law;

g.    Whether Defendants' conduct violated New Jersey law; and

h.    Whether Plaintiffs and the Class and Subclass have been damaged, and if so, the proper measure of damages.

132.    **Typicality**: Like Plaintiffs, many other consumers purchased LG televisions that were advertised and marketed as having twice the refresh rate as they were actually capable of. The allegations in paragraphs 73-119, *supra*, show it was typical for Plaintiffs and Class Members to see Defendants' advertisements and marketing materials and then purchase the LG televisions. Plaintiffs' claims are further typical of the claims of the Class and Subclass because Plaintiffs and each Class member and Subclass member were injured by Defendants' false representations about the refresh rates of LG televisions. Plaintiffs and the Class and Subclass have suffered the same or similar injury as a result of Defendants' false and misleading representations and advertisements. Defendants' false statements were identical—they represented that the LG LED televisions had refresh rates that were twice the value of the actual and true refresh rates. For instance, for model 65UF7700, LG states: "Refresh Rate[:] TruMotion 240Hz," when that model's actual refresh rate is 120Hz. For model 55UF6450, LG states: "Refresh Rate[:] TruMotion 120Hz," when that model's actual refresh rate is 60Hz. For model 55UF8300, LG states:

"Refresh Rate[:] TruMotion 120Hz," when that model's actual refresh rate is 60Hz. For model 55UF6800, LG states: "Refresh Rate[:] TruMotion 120Hz," when that model's actual refresh rate is 60Hz. For model 55UF7600, LG states: "Refresh Rate[:] TruMotion 120Hz," when that model's actual refresh rate is 60Hz. For model 65UF9500, LG states: "Refresh Rate[:] TruMotion 240Hz," when that model's actual refresh rate is 120Hz. For model 65UF8500, LG states: "Refresh Rate[:] TruMotion 240Hz," when that model's actual refresh rate is 120Hz. Plaintiffs suffered the same injury as other class members who purchased televisions whose refresh rates were misrepresented by 100%. Plaintiffs' claims and the claims of members of the Class and Subclass emanate from the same legal theory, Plaintiffs' claims are typical of the claims of the Class and Subclass, and, therefore, class treatment is appropriate.

133.   **Adequacy of Representation**:  Plaintiffs are committed to pursuing this action and has retained counsel competent and experienced in prosecuting and resolving consumer class actions.  Plaintiffs will fairly and adequately represent the interests of the Class and Subclass and do not have any interests adverse to those of the Class or Subclass.

## C.   The Proposed Class and Subclass Satisfy the Rule 23(b)(2) Prerequisites for Injunctive Relief

134.   Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole. Plaintiffs remain in the market for televisions; there is no way for them to know when or if Defendants have ceased misrepresenting the refresh rates of LG televisions, and are therefore in danger of being harmed again.

135.   Specifically, Defendants should be ordered to cease from further advertisements that inaccurately state the refresh rates of LG televisions.

136.   Defendants' ongoing and systematic practices make declaratory relief with respect to the Class and Subclass appropriate.

**D.     The Proposed Class Satisfies the Rule 23(b)(3) Prerequisites for Damages**

137.   The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class or Subclass, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual members of the Class or Subclass will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of monetary, injunctive, and equitable relief at issue for each individual Class or Subclass member.

**LEGAL BASES FOR RELIEF**

**COUNT I**
**Violation of Minnesota's Prevention of Consumer Fraud Act – Unlawful Practices,**
**Minn. Stat. § 325F.68, *et seq.***

138.   Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

139.   The LG televisions sold by LG, Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC are merchandise as defined in Minnesota Statutes § 325F.68, subd. 2.

140.   Defendants are persons as defined in Minnesota Statutes § 325F.68, subd. 3.

141.   Each Defendant (LG, through its creation of false, prominently highlighted specifications, and Best Buy, through its adoption and dissemination of the prominently

highlighted specifications on its website and on its fact tags) misrepresented the refresh rate of LG televisions, by artificially inflating the refresh rate, expressed in Hz, to at least twice the actual refresh rate.  The false statement of the refresh rates of the LG televisions were untrue, misleading, and deceptive, inducing Plaintiffs to spend more for a television that has lower picture quality than represented.

142.   The misrepresented refresh rate of LG televisions, expressed in Hz, is a material fact to Plaintiffs and other consumers because it is directly related to picture quality, and because Defendants themselves recognize the materiality of their representations as evidenced by their prominent placement on Defendants' labels, packaging, brochures, and shelf tags.  Consumers, including Plaintiffs and the members of the Class and Subclass would not have paid as much for the LG televisions had Defendants accurately disclosed the refresh rate of the televisions.  Nor could Defendants charge as much for such televisions, as the refresh rate is directly related to the amount of money manufacturers and retailers are able to charge for televisions.

143.   Defendants placed the false refresh rate, expressed in Hz, in advertisements and spec sheets related to the LG televisions, intending that consumers would rely on those misrepresentations and purchase the televisions from Defendants.  Plaintiffs and the Class and Subclass were harmed by Defendants' misrepresentations.  Had Defendants disclosed the true refresh rate, Plaintiffs and members of the Class and Subclass would not have purchased the televisions or would not have been willing to pay as much for the televisions.

144.   Plaintiffs and members of the Class and Subclass have suffered loss by paying more than they would have otherwise paid—and more than Defendants would have

been able to charge—for the LG televisions and by receiving televisions with lower picture quality than they were promised by Defendants.

## COUNT II
### Violation of Minnesota's Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*

145.    Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

146.    By falsely inflating and misstating the refresh rate on LG televisions, each Defendant (LG, through its creation of false, prominently highlighted specifications, and Best Buy, through its adoption and dissemination of the prominently highlighted specifications on its website and on its fact tags) represented that the televisions were of a particular standard, quality, quantity, and grade when the televisions were in fact of a lower standard, quality, quantity, and grade.  The refresh rate of televisions is directly related to picture quality.   By representing that the refresh rate was higher than it actually is, Defendants misled Plaintiffs and members of the Class and Subclass into believing that the televisions were capable of higher refresh rate and picture quality than they actually were.

147.    Plaintiffs and members of Class and Subclass have suffered loss by paying more than they would have otherwise paid for the LG televisions and by receiving televisions with lower picture quality than they were promised by Defendants.

## COUNT III
### Violations of the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.13

\#

148.    Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

149.     Minnesota Stat. § 325D.13 provides: "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

150.     Defendants are "persons" within the meaning of Minn. Stat. § 325D.10.

151.     Each Defendant (LG, through its creation of false, prominently highlighted specifications, and Best Buy, through its adoption and dissemination of the prominently highlighted specifications on its website and on its fact tags) knowingly misrepresented directly to Plaintiffs and consumers the true quality of their merchandise, in advertising and selling its merchandise, by falsely inflating and misstating the refresh rate on LG televisions. The refresh rate of televisions is directly related to picture quality.  By representing that the refresh rate was higher than it actually is, Defendants misled Plaintiffs and members of the Class and Subclass into believing that the televisions were capable of higher refresh rate and picture quality than they actually were, and thus violated Minn. Stat. § 325D.13.

152.     Plaintiffs and members of Class and Subclass have suffered loss by paying more than they would have otherwise paid for the LG televisions and by receiving televisions with lower picture quality than they were promised by Defendants.

## COUNT IV
**Violation of New Jersey's Consumer Fraud Act – Fraud in Connection with Sale or Advertisement of Merchandise, N.J. Stat. Ann. § 56:8-1, *et seq.***

153.     Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

154.   Defendants' representations related to the refresh rates of LG televisions, as described herein, are advertisements as defined by N.J. Stat. Ann. § 56:8-1(a).

155.   The LG televisions sold by Defendants are merchandise as defined in N.J. Stat. Ann. § 56:8-1(c).

156.   Defendants are persons as defined in N.J. Stat. Ann. § 56:8-1(d).

157.   Defendants misrepresented the refresh rate of LG televisions, artificially inflating the refresh rate, expressed in Hz, to at least twice the actual refresh rate (LG, through its creation of false, prominently highlighted specifications, and Best Buy, through its adoption and dissemination of the prominently highlighted specifications on its website and on its fact tags).  The false statement regarding the refresh rates of the LG televisions were untrue, misleading, and deceptive, inducing Plaintiffs and other consumers to spend more for televisions that have lower picture quality than represented.

158.   The misrepresented refresh rate of LG televisions, expressed in Hz, is a material fact to Plaintiffs and other consumers because it is directly related to picture quality and value, and because Defendants themselves recognize the materiality of their representations as evidenced by their prominent placement on Defendants' labels, packaging, brochures, and shelf tags. Consumers, including Plaintiffs and the members of the Class and Subclass would not have paid as much for the LG televisions had Defendants accurately disclosed the refresh rate of the televisions. Nor could Defendants charge as much for such televisions, as the refresh rate is directly related to the amount of money manufacturers and retailers are able to charge for televisions.

159.    Defendants placed the false refresh rate, expressed in Hz, in advertisements and spec sheets related to the LG televisions, intending that consumers would rely on those misrepresentations and purchase the televisions from Defendants.  Plaintiffs and the Class and Subclass were harmed by Defendants' misrepresentations and purchased the LG televisions.  Had Defendants disclosed the true refresh rate, Plaintiffs and members of the Class and Subclass would not have purchased the televisions or would not have been willing to pay as much for the televisions.

160.    Plaintiffs are entitled to sue both LG (which created the representations) and Best Buy (which displayed the same representations), as the concerted conduct of both Defendants caused Plaintiffs and members of the Class and Subclass to suffer an ascertainable loss by receiving less than what was promised, as discussed *supra*. Plaintiffs have also suffered an ascertainable loss by being deprived of his expectation interest and benefit of his bargain.

### COUNT V
### Violation of the California Legal Remedies Act,
### Cal. Civ. Code § 1780 *et seq.*

161.    Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

162.    This legal theory, alleged in the alternative to relief under Minnesota or New Jersey consumer protection law, is based on Defendants' deceptive and misleading conduct, based on common misrepresentations of material fact, in violation of the California Legal Remedies Act, Cal. Civ. Code § 1780 *et seq.*("CLRA").

163.   Plaintiffs are consumers, purchasers, or other persons entitled to the protection of the CLRA as he purchased an LG LED television for personal, family, or household purposes.

164.   LG's LED televisions are goods, products, consumer goods, merchandise, property, and/or assets as those terms are defined under the CLRA.

165.   Each Defendant (LG, through its creation of false, prominently highlighted specifications, and Best Buy, through its adoption and dissemination of the prominently highlighted specifications on its website and on its fact tags) misrepresented the refresh rate of LG televisions, artificially inflating the refresh rate, expressed in Hz, to at least twice the actual refresh rate.  The false statement of the refresh rates of the LG televisions were untrue, misleading, and deceptive, inducing Plaintiffs to spend more for a television that has lower picture quality than represented.

166.   The misrepresented refresh rate of LG televisions, expressed in Hz, is a material fact to Plaintiffs and other consumers because it is directly related to picture quality, and because Defendants themselves recognize the materiality of their representations as evidenced by their prominent placement on Defendants' labels, packaging, brochures, and shelf tags.  Consumers, including Plaintiffs and the members of the Class and Subclass, would not have paid as much for the LG televisions had Defendants accurately disclosed the refresh rate of the televisions.  Nor could Defendants charge as much for such televisions, as the refresh rate is directly related to the amount of money manufacturers and retailers are able to charge for televisions.

167.    Defendants placed the false refresh rate, expressed in Hz, in advertisements and spec sheets related to the LG televisions, intending that consumers would rely on those misrepresentations and purchase the televisions from Defendants. Plaintiffs and the Class and Subclass were harmed by Defendants' misrepresentations. Had Defendants disclosed the true refresh rate, Plaintiffs and members of the Class and Subclass would not have purchased the televisions or would not have been willing to pay as much for the televisions.

168.    Through the above described conduct, Defendants have engaged in deceptive and misleading business practice as proscribed by Cal. Civ. Code § 1770 (5), (7), (9), and (13), *inter alia*, by:

a.    Misrepresenting that the LG LED televisions at issue have characteristics, uses, benefits, and qualities which they do not have;

b.    Misrepresenting that the LG LED televisions at issue are of a particular standard, quality, and grade when they are not; and

c.    Advertising the LG LED televisions at issue with the intent not to sell them as advertised;

d.    Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions;

169.    Plaintiffs and members of the Class and Subclass have suffered an actual loss by paying more than they would have otherwise paid—and more than Defendants would have been able to charge—for the LG televisions and by receiving televisions with lower picture quality than they were promised by Defendants.

170. Plaintiffs have provided Defendants pre-filing notice in accordance with Cal. Civ. Code § 1782 by mailing notice via certified mail on November 27, 2017. By this letter, Plaintiffs demanded that Defendants provide a classwide remedy that rectifies its misconduct. By letter dated December 29, 2017, Defendants have refused to rectify the conduct complained of as described within on a classwide basis and provide any relief demanded. Therefore, Plaintiffs seek damages in addition to his claims for injunctive and other equitable relief under Cal. Civ. Code § 1780.

**COUNT VI**
**Violation of California Unfair Competition Law,**
**California Business and Professions Code § 17200 *et seq.***

171. Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

172. This legal theory is alleged in the alternative to relief under Minnesota or New Jersey consumer protection law.

173. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." The UCL declares that any act or business practice that is forbidden by law is unlawful and a violation of the UCL.

174. Plaintiffs and the Class and Subclass are consumers, purchasers, or other person entitled to the protection of the UCL.

175. Defendants' conduct, as described above, constitutes unlawful, unfair, and fraudulent practices under the UCL.

176.   Defendants' unlawful practices include, but are not limited to, violations of Cal. Civ. Code § 1770(5), (7), (9), and (13) (*inter alia*).

177.   Defendants committed unfair and/or fraudulent business practice by their marketing and advertising of LG LED televisions with refresh rates that were twice as high as their actual refresh rates, injuring consumers and offending established public policy.

178.   Plaintiffs suffered an injury-in-fact and lost money as a result of Defendants' conduct and practices as described herein and challenged by paying more than they would have otherwise paid—and more than Defendants would have been able to charge—for the LG televisions and by receiving televisions with lower picture quality than they were promised by Defendants.

179.   Separate from any restitution that may be due, Plaintiffs and the Class and Subclass are entitled to injunctive and declaratory relief, including but not limited to, injunctive and declaratory relief in the form of an order requiring Defendants to immediately cease the unfair, unlawful, and fraudulent business practices alleged herein, and attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*.

### COUNT VII
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. 505/1

180.   Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

181.   This legal theory is alleged in the alternative to relief under Minnesota or New Jersey consumer protection law.

182.    The LG televisions sold by LG, Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC are merchandise as defined in the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 (the "CFA").

183.    Defendants' representations related to the refresh rates of LG televisions, as described herein, are advertisements as defined by Section 1(a) of the CFA.

184.    Each Defendant (LG, through its creation of false, prominently highlighted specifications, and Best Buy, through its adoption and dissemination of the prominently highlighted specifications on its website and on its fact tags) engaged in unfair or deceptive practices in violation of the CFA when they misrepresented the refresh rate of LG televisions, by artificially inflating the refresh rate, expressed in Hz, to at least twice the actual refresh rate.   The false statement of the refresh rates of the LG televisions were untrue, misleading, and deceptive, inducing Plaintiffs and members of the Class and Subclass to spend more for a television that has lower picture quality than represented.

185.    The misrepresented refresh rate of LG televisions, expressed in Hz, is a material fact to Plaintiffs, members of the Class and Subclass, and other consumers because it is directly related to picture quality, and because Defendants themselves recognize the materiality of their representations as evidenced by their prominent placement on Defendants' labels, packaging, brochures, and shelf tags.   Consumers, including Plaintiffs and members of the Class and Subclass, would not have paid as much for the LG televisions had Defendants accurately disclosed the refresh rate of the televisions.   Nor could Defendants charge as much for such televisions, as the refresh rate is directly related to the amount of money manufacturers and retailers are able to charge for televisions.

186.    Defendants placed the false refresh rate, expressed in Hz, in advertisements and spec sheets related to the LG televisions, intending that consumers would rely on those misrepresentations and purchase the televisions from Defendants.  Plaintiffs and members of the Class and Subclass were harmed by Defendants' misrepresentations.   Had Defendants disclosed the true refresh rate, Plaintiffs and members of the Class and Subclass would not have purchased the televisions or would not have been willing to pay as much for the televisions.

187.    Defendants' conduct described herein repeatedly occurred in Defendants' trade or business and were capable of deceiving a substantial portion of the consuming public.

188.    Plaintiffs and members of the Class and Subclass have suffered a loss by paying more than they would have otherwise paid—and more than Defendants would have been able to charge—for the LG televisions and by receiving televisions with lower picture quality than they were promised by Defendants.

189.    As a direct and proximate result of the unfair and deceptive practices of Defendants set forth above, Plaintiffs and members of the Class and Subclass are entitled to actual damages, compensatory damages, penalties, and attorneys' fees and costs as set forth in Section 10a of the CFA.

190.    Separate from any damages that may be due, Plaintiffs and members of the Class and Subclass are entitled to injunctive relief, including but not limited to, injunctive relief in the form of an order requiring Defendants to immediately cease the unfair and

deceptive business practices alleged herein, and attorneys' fees and costs pursuant to Section 10a(e).

## COUNT VIII
## Breach of Express Warranty

191. Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

192. Defendants are merchants as defined by relevant statutes.

193. The televisions sold to Plaintiffs and the Class and Subclass are goods as defined by relevant statutes.

194. An express warranty is created by a seller to a buyer by any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, or by any description of the goods which is made part of the basis of the bargain, *inter alia*.

195. As described herein, LG, Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC placed the false refresh rate, expressed in Hz, in advertisements and spec sheets related to the LG televisions, intending that consumers would rely on those misrepresentations and purchase the televisions from Defendants.

196. Defendants' false statements of the refresh rates of the LG televisions became a basis of the bargain, and Plaintiffs and members of the Class and Subclass expected that the LG televisions that they purchased would conform to Defendants' affirmations of the refresh rates.

197. Plaintiffs and the Class and Subclass were harmed by Defendants' misrepresentations and purchased the LG televisions.

198.   Had Defendants disclosed the true refresh rate, Plaintiffs and members of the Class and Subclass would not have purchased the televisions or would not have been willing to pay as much for the televisions.

199.   Plaintiffs and members of Class and Subclass have suffered loss by paying more than they would have otherwise paid for the LG televisions and by receiving televisions with lower picture quality than they were promised by Defendants.

## COUNT IX
## Breach of Implied Warranty

200.   Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

201.   The televisions sold to Plaintiffs and the Class and Subclass are goods as defined by relevant statutes.

202.   Defendants are merchants as defined by relevant statutes.

203.   Every sale of consumer goods that are sold at retail in California shall be accompanied by the manufacturer's and the retail seller's implied warranty that that the goods are merchantable which includes that the goods are fit for their ordinary purposes for which such goods are used, pass without objection in the trade under the contract description, and conform to the promises or affirmations of fact made on the container or label.

204.   As described herein, the LG televisions sold to Plaintiffs and members of the Class and Subclass were not as described by LG, Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC in the contract description. Had the true and accurate refresh rates of the televisions been known, they would not have passed without objection in the trade

and consumers would not have purchased the televisions, or would have been willing to pay less, because the televisions did not comply with the contract descriptions, which described the televisions as being capable of higher refresh rates than they actually were. Further, as explained herein, trade usage of "Hz" refers to refresh rates.  Defendants were aware of such trade usage and nevertheless misstated the refresh rates on the televisions sold to Plaintiffs and members of the Class and Subclass.  The description of the televisions sold to Plaintiffs and members of the Class and Subclass did not meet the contract descriptions as interpreted by trade usage because they were not capable of the refresh rates listed in the descriptions.

205.   High refresh rate televisions are used for, and reasonably and objectively expected to be capable of, displaying moving objects and action with reduced motion blur. High refresh rate televisions are specifically selected by consumers who wish to watch high action television (such as sports programming), making such use the ordinary purpose of the products.  Because the refresh rates are actually lower than described, the televisions purchased by Plaintiffs and members of the Class and Subclass are unfit for that ordinary purpose.

206.   As described herein, the televisions sold to Plaintiffs and members of the Class and Subclass did not conform to the promises or affirmations of fact made on the packaging and labels associated with the televisions. The packaging and associated technical specifications represented that the refresh rate of the televisions sold to Plaintiffs and members of the Class and Subclass were capable of a much higher refresh rate, expressed in Hz, than they actually were.

207.   Plaintiffs and members of the Class and Subclass were harmed by these implied warranties by purchasing the televisions.

208.   As a result of Defendants' breaches of their implied warranties of merchantability, Plaintiffs and members of the Class and Subclass have been injured.  Had Plaintiffs and members of the Class and Subclass known the true and accurate refresh rates of the televisions, they would not have purchased the televisions, or would have been willing to pay less.

## COUNT X
### Breach of Contract
### (by Plaintiffs Villa Lara, Poppen, Mannacio,
### and the Hudocks against Defendant Best Buy)

209.   Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

210.   Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC offered to sell Villa Lara a "120Hz" television.

211.   Plaintiffs accepted Defendants' offer and performed under the contract by providing payment for the television at the price dictated by Defendants' offer.

212.   Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC breached their contract with Plaintiffs by supplying a television with a refresh rate of 60 Hz.

213.   As a direct result of the Best Buy Defendants' breach of contract, Plaintiffs have sustained economic losses and is entitled to compensatory damages in an amount to be proven at trial.

## COUNT XI
### Unjust Enrichment

214.   Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

215.    As described herein, LG, Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC placed the false refresh rate, expressed in Hz, in advertisements and spec sheets related to the LG televisions, intending that consumers would rely on those misrepresentations and purchase the televisions from Defendants.

216.    Had Defendants disclosed the true refresh rate, Plaintiffs and members of the Class and Subclass would not have purchased the televisions or would not have been willing to pay as much for the televisions.

217.    Defendants generated profits from misleading Plaintiffs and members of the Class and Subclass into purchasing LG televisions.

218.    Defendants have been knowingly and unjustly enriched at the expense of and to the detriment of Plaintiffs and the members of the Class and Subclass by collecting excess profits to which Defendants are not entitled.

219.    Defendants' actions were unjust because, absent the material misrepresentations about the refresh rates of their televisions, they would not have been able to receive as much money for those models as they did, and as Plaintiffs paid due to the false statements.

220.    LG, Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC have unjustly retained those ill-gotten profits and should be required to disgorge this unjust enrichment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Subclass, request relief as follows:

1.      Certification of the Class and Subclass as defined herein pursuant to Fed. R. Civ. P. 23(a) and 23(b)(1), (b)(2), (b)(3), or a combination of subsections;

2.      Appointment of Plaintiffs as Class and Subclass Representative and the undersigned counsel as Class Counsel;

3.      Restitution of all charges paid by Plaintiffs and members of the Class and Subclass because of Defendants' deceptive business practices as described herein;

4.      Disgorgement and restitution to Plaintiffs and to members of the Class and Subclass of all monies wrongfully obtained and retained by Defendants;

5.      Compensatory and actual damages in an amount according to proof at trial;

6.      Statutory damages and penalties, as provided by law;

7.      Prejudgment interest commencing on the date of payment of the charges and continuing through the date of entry of judgment in this action;

8.      Costs and fees incurred in connection with this action, including attorneys' fees, expert witness fees, and other costs, as provided by law; and

9.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.


Dated:   February 7, 2019                    Respectfully submitted,

                                             */s/ Daniel C. Hedlund*
                                             Daniel C. Hedlund (MN Lic. #258337)
                                             Raina Borrelli (MN Lic. #392127)

Brittany N. Resch (MN Lic. #397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dhedlund@gustafsongluek.com
rborrelli@gustafsongluek.com
bresch@gustafsongluek.com

David M. Cialkowski (MN Lic. #306526)
Alyssa J. Leary (MN Lic. #397552)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com
alyssa.leary@zimmreed.com

Hart L. Robinovitch (MN Lic. #240515)
**ZIMMERMAN REED LLP**
14646 N. Kierland Blvd.
Suite 145
Scottsdale, AZ 85254
Telephone: (480) 348-6415
hart.robinovitch@zimmreed.com

Luke P. Hudock (*Admitted Pro Hac Vice*)
**HUDOCK LAW GROUP, S.C.**
P.O. Box 83
Muskego, WI 53150
Telephone: (414) 526-4906
lphudock@law-hlg.com

Samuel J. Strauss (*Admitted Pro Hac Vice*)
**TURKE & STRAUSS LLP**
613 Williamson Street
Suite 201
Madison, WI 53703
Telephone: (608) 237-1774
sam@turkestrauss.com

***Counsel for Plaintiffs***