# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

|  |  |
|---|---|
| *Hudock et al. v. LG Electronics U.S.A., Inc. et al.*<br><br><br>This Document Relates To:<br>All Actions | Lead Case No. 16-cv-1220 JRT-KMM<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [REDACTED]** |

# TABLE OF CONTENTS

Table of Authorities ............................................................. 4

Introduction ...................................................................... 12

Statement of Facts ............................................................. 13

    I.    Defendants' Deception ................................................ 13

        A.    LCD TV Hz specifications refer to a
                television's refresh rate. ...................................... 14

        B.    Defendants' strategic partnership to capitalize on the
                perceived importance of refresh rates to consumers. ........ 20

        C.    Defendants made a concerted effort to keep
                representations consistent throughout the Class Period. . 23

        D.    Retailers prominently placed the Hz specification on
                web headlines and in-store signage where it was visible
                to all consumers. ............................................... 26

        E.    Defendants knew that their refresh rate representations
                were not true and caused significant confusion. ................ 34

    II.    Plaintiffs' Harm ...................................................... 38

Class Definitions ............................................................... 40

Legal Analysis .................................................................. 41

    I.    Rule 23(a)'s Requirements Are Met. ........................... 41

        A.    The Class is sufficiently numerous. .................... 42

        B.    The claims present questions of law and fact common
                to the Classes. .................................................. 42

        C.    Plaintiffs' claims are typical of those of the Classes.......... 44

D.    Plaintiffs and their Counsel will adequately represent the Class. .......................................................... 47

    1.    Plaintiffs do not have interests antagonistic to the Classes. .................................................. 47

    2.    Plaintiffs' counsel is qualified. ................................ 48

II.    Rule 23(b)'s Requirements Are Met ............................................. 48

A.    Injunctive relief certification is appropriate. ..................... 48

B.    Predominance is satisfied. .................................................. 49

    1.    Choice of Law ............................................................ 49

    2.    Common questions of law and fact predominate ..... 66

C.    A class action is superior to adjudication of individual claims. ................................................................................. 76

III.    The Court May Certify Alternative Classes ................................. 77

Conclusion ...................................................................................................... 80

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostino v. Quest Diagnostics Inc.*,
  256 F.R.D. 437 (D.N.J. 2009) ........................................................ 54

*Allen v. ConAgra Foods, Inc.*,
  No. 3:13-cv-01279-WHO, 2019 WL 3302821 (N.D. Cal. July 22, 2019) ....... 79

*Allstate Ins. Co. v. Hague*,
  449 U.S. 302 (1981) ................................................................... 50

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) .................................................. 45, 46

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................... 76

*Apple Inc. v. Samsung Elecs. Co.*,
  735 F.3d 1352 (Fed. Cir. 2013) ................................................... 75

*Arlandson v. Hartz Mountain Corp.*,
  792 F. Supp. 2d 691 (D.N.J. 2011) .............................................. 54

*Azimpour v. Select Comfort Corp.*,
  No. 15-4296, 2016 WL 3248231 (D. Minn. June 13, 2016) ................. 45

*Balts v. Balts*,
  142 N.W.2d 66 (Minn. 1966) ....................................................... 60

*Barden v. Hurd Millwork Co., Inc.*,
  249 F.R.D. 316 (E.D. Wis. 2008) ................................................. 62

*Belmont Condo. Ass'n, Inc. v. Geibel*,
  74 A.3d 10 (N.J. Super. Ct. App. Div. 2013) ................................ 69

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ...................................................... 41

*Boyes v. Greenwich Boat Works, Inc.*,
   27 F. Supp. 2d 543 (D.N.J. 1998) .................................................................. 65

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ........................................................................ 75

*Briseno v. ConAgra Foods, Inc.*,
   674 F. App'x 654 (9th Cir. 2017) .................................................................. 75

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human,*
   *Res.*, 532 U.S. 598 (2001).............................................................................. 48

*Chapman v. Tristar Prods., Inc.*,
   No. 1:16-CV-1114, 2017 WL 1433259 (N.D. Ohio Apr. 24, 2017) ............... 79

*Chi. Heights Venture v. Dynamit Nobel of Am., Inc.*,
   782 F.2d 723 (7th Cir. 1986) .......................................................................... 63

*City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*,
   281 F.R.D. 347 (D. Minn. 2012) ..................................................................... 71

*Cole v. Gen. Motors Corp.*,
   484 F.3d 717 (5th Cir. 2007) .......................................................................... 56

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .................................................................................... 75, 76

*Cruz v. Lawson Software, Inc.*,
   No. 08-5900, 2010 WL 890038 (D. Minn. Jan. 5, 2010).............................. 55

*Danielson v. Nat'l Supply Co.*,
   670 N.W.2d 1 (Minn. Ct. App. 2003) ................................................. 58, 59, 63

*Diamond Multimedia Sys., Inc. v. Super. Ct.*,
   968 P.2d 539 (Cal. 1999) ................................................................................ 62

*Dirks v. Clayton Brokerage Co. of St. Louis, Inc.*,
   105 F.R.D. 125 (D. Minn. 1985) ..................................................................... 44

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001) ........................................................................ 62

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ................................................................... 71

*Elias v. Ungar's Food Prods., Inc.*,
    252 F.R.D. 233 (D.N.J. 2008) ........................................................... 65, 70, 71

*Ellsworth v. U.S. Bank, N.A.*, No. C,
    No. C 12-02506 LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014) ............. 79

*Fluck v. Jacobson Machine Works, Inc.*,
    No. CX-98-1899, 1999 WL 153789 (Minn. Ct. App. Mar. 23, 1999)............. 61

*Första AP-Fonden v. St. Jude Med., Inc.*,
    312 F.R.D. 511 (D. Minn. 2015) ................................................................... 77

*Gennari v. Weichert Co. Realtors*,
    691 A.2d 350 (N.J. 1997) ....................................................................... 69, 70

*Gillis v. Respond Power, LLC*,
    677 F. App'x 752 (3d Cir. 2017) ................................................................... 79

*Glover v. Merck & Co., Inc.*,
    345 F. Supp. 2d 994, 998 (D. Minn. 2004)....................................... 51, 52, 53

*Grp. Health Plan, Inc. v. Philip Morris Inc.*,
    621 N.W.2d 2 (Minn. 2001) .................................................................... 67, 68

*Harnish v. Widener Univ. Sch. of Law*,
    931 F. Supp. 2d 641 (D.N.J. 2013) ............................................................... 69

*Hartley v. Suburban Radiologic Consultants, Ltd.*,
    295 F.R.D. 357 (D. Minn. 2013) ................................................................... 76

*Hudock v. LG Elecs. U.S.A., Inc.*,
    No. CV 16-1220, 2017 WL 1157098 (D. Minn. Mar. 27, 2017)......... 46, 48, 66

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................ 75, 78, 79

*In re Control Data Corp. Sec. Litig.*,
  116 F.R.D. 216 (D. Minn. 1986) ................................................................ 41

*In re Dial Complete Mktg. & Sales Practices Litig.*,
  312 F.R.D. 36 (D.N.H. 2015) ..................................................................... 44

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*,
  No. 16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019)... 79

*In re Lutheran Bhd. Variable Ins. Prod. Co. Sales Practices Litig.*,
  No. 99-MD-1309(PAM/JGL), 2004 WL 909741 (D. Minn. Apr. 28, 2004) ... 68

*In re Mercedes-Benz Tele Aid Contract Litig.*,
  257 F.R.D. 46 (D.N.J. 2009) ................................................................ 54, 70

*In re Mercedes-Benz Tele Aid Contract Litig.*,
  No. CIV. 07-2720 DRD, 2010 WL 2976496 (D.N.J. July 22, 2010) ........ 54, 55

*In re Scotts EZ Seed Litig.*,
  304 F.R.D. 397 (S.D.N.Y. 2015) ................................................................ 75

*In re Select Comfort Corp. Sec. Litig.*,
  292 F.R.D. 598 (D. Minn. 2001) ................................................................ 77

*In re St. Jude Med., Inc*,
  MDL No. 01-1396, 2006 WL 2943154 (D. Minn. Oct. 13, 2006) ...........*passim*

*In re St. Jude Med., Inc.*,
  425 F.3d 1116 (8th Cir. 2005) ................................................................... 41

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  309 F.R.D. 482 (D. Minn. 2015) ................................................................ 51

*In re Target Corp. Data Sec. Breach Litig.*,
  66 F. Supp. 3d 1154 (D. Minn. 2014)......................................................... 54

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013)................................................................ 53, 54

*In re Workers' Comp.*,
   130 F.R.D. 99, 104 (D. Minn. 1990) ............................................................. 47

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   267 F.R.D. 549 (D. Minn. 2010) ............................................................. 70, 71

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   644 F.3d 604 (8th Cir. 2011) ............................................................. 41

*Jenson v. Eveleth Taconite Co.*,
   139 F.R.D. 657 (D. Minn. 1991) ............................................................. 45

*Jepson v. Gen. Cas. Co., Wisc.*,
   513 N.W.2d 467 (Minn. 1994) ............................................................. 59

*Khoday v. Symantec Corp.*,
   No. 11-180 (JRT/TNL), 2014 WL 1281600 (D. Minn. Mar. 13, 2014)...*passim*

*Klass v. Twin City Fed. Sav. & Loan Ass'n*,
   190 N.W.2d 493 (Minn. 1971) ............................................................. 72

*Lockwood Motors, Inc. v. Gen. Motors Corp.*,
   162 F.R.D. 569 (D. Minn. 1995) ............................................................. 41

*Lommen v. City of E. Grand Forks*,
   522 N.W.2d 148 (Minn. Ct. App. 2003) ............................................................. 59

*Luckey v. Alside, Inc.*,
   245 F. Supp. 3d 1080 (D. Minn. 2017) ............................................................. 67

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................. 60

*Medtronic, Inc. v. Adanced Bionics Corp.*,
   630 N.W.2d 438 (Minn. Ct. App. 2001) ............................................................. 60

*Meyer v. Dygert*,
   156 F. Supp. 2d 1081 (D. Minn. 2001) ............................................................. 67

*Milkovich v. Saari*,
   203 N.W.2d 408 (Minn. 1973) ............................................................. 57

*Miller v. Pilgrim's Pride Corp,*
    366 F.3d 672 (8th Cir. 2004) .......................................................... 59

*Mooney v. Allianz Life Ins. Co. N. Am.,*
    244 F.R.D. 531 (D. Minn. 2007) ............................................... *passim*

*Mooney v. Allianz Life Ins. Co. of N. Am.,*
    No. 06-545, 2007 WL 128841 (D. Minn. Jan. 12, 2007) .............................. 67

*Myers v. Gov't Emps. Ins. Co.,*
    225 N.W.2d 238 (Minn. 1974) ......................................................... 59

*Nerland v. Caribou Coffee Co., Inc.,*
    564 F. Supp. 2d 1010 (D. Minn. 2007) .......................................... 42

*Paxton v. Union Nat'l Bank,*
    688 F.2d 552 (8th Cir. 1982), *cert. denied*, 460 U.S. 1083 (1983) ................ 44

*Penn. Emp., Benefit Tr. Fund v. Zeneca, Inc.,*
    710 F. Supp. 2d 458 (D. Del. 2010) .............................................. 54

*Peterson v. BASF Corp.,*
    618 N.W.2d 821 (Minn. Ct. App. 2000) ........................................... 65

*PPX Enters., Inc. v. Audiofidelity Enters., Inc.,*
    818 F.2d 266 (2d Cir. 1987) ........................................................ 68

*Rapp v. Green Tree Servicing, LLC,*
    302 F.R.D. 505 (D. Minn. 2014) ................................................... 57

*Rilley v. MoneyMutual, LLC,*
    329 F.R.D. 211 (D. Minn. 2019) ................................................... 68

*Samuel-Bassett v. Kia Motors Am., Inc.,*
    34 A.3d 1 (Pa. 2011) ............................................................... 79

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.,*
    821 F.3d 992 (8th Cir. 2016) ...................................................... 40

*Schumacher v. Schumacher,*
    627 N.W.2d 725 (Minn. Ct. App. 2001) .......................................... 72

*Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*,
  476 F.3d 594 (8th Cir. 2007) ........................................................................ 56

*SCM Corp. v. Deltak Corp.*,
  702 F. Supp. 1428 (D. Minn. 1988) .............................................................. 62

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ................................................................................ 50, 53

*Stewart v. Assocs. Consumer Discount Co.*,
  183 F.R.D. 189 (E.D. Penn. 1998) ................................................................ 79

*Thompson v. Allianz Life Ins. Co. of N. Am.*,
  330 F.R.D. 219 (D. Minn. 2019) ............................................................. 53, 61

*Vaccarino v. Midland Nat. Life Ins. Co.*,
  No. CV 11-5858, 2013 WL 3200500 (C.D. Cal. June 17, 2013) ................... 76

*Varacallo v. Mass. Mut. Life Ins. Co.*,
  752 A.2d 807 (N.J. Super. Ct. App. Div. 2000) ........................................... 69

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338, 350 (2011) ............................................................................. 42

*Whitney v. Guys, Inc.*,
  700 F.3d 1118 (8th Cir. 2012) ..................................................................... 50

**Statutes**

Iowa Code § 714H.1 ........................................................................................ 56

Minn. Stat. § 8.31 ........................................................................................... 66

Minn. Stat. § 325D.13 ..................................................................................... 67

Minn. Stat. § 325D.43 ..................................................................................... 66

Minn. Stat. § 325D.44 ..................................................................................... 67

Minn. Stat. § 325F.68 ..................................................................................... 66

Minn. Stat. § 325F.69 ...................................................................... 67

Minn. Stat. § 336.2-318 .................................................................. 62

Minn. Stat. § 541.31...................................................................... 57

N.J. Stat. Ann. § 56:8-2 ................................................................. 69

**Rules**

Fed. R. Civ. P. 23 ......................................................................*passim*

**Other Authorities**

1 NEWBERG ON CLASS ACTIONS 3d (1992) § 3.24 ........................................... 69

## INTRODUCTION

Defendant LG was acutely aware that, during the proposed class period, consumers valued and paid more money for televisions with higher numeric Hertz ratings. These ratings (*e.g.*, 60Hz, 120Hz, 240Hz), labeled prominently at the point of sale as "Hz," express the refresh rates of LG's LCD televisions. The refresh rate is the number of times per second that the images on the screen are completely rebuilt with new image information. The higher the Hz, the smoother the picture.

To avoid the cost of increasing the native refresh rate in its televisions through better (but more expensive) technology, LG used a technique called backlight scanning to smooth the picture on certain of its LCD televisions, which essentially quickly turns the backlight on and off on portions of the screen in an  attempt to sharpen the picture. However, backlight scanning is completely incapable of doubling or quadrupling the number of new images generated per second. Even so, LG passed off backlight scanning as an increased refresh rate.

The common evidence shows that LG and Best Buy labeled TVs with only 60Hz native refresh rates as 120Hz, and TVs with only 120Hz native refresh rates as 240Hz. Common evidence shows Defendants knew these labels were not true. Common evidence shows that LG and Best Buy knew these labels were causing actual, material consumer confusion. Common

evidence shows that LG vigilantly policed retailers to make sure they were placing these false Hz ratings on consumer-facing labels. And common evidence shows that Defendants' false labeling caused harm and damages to all consumers who purchased the mislabeled TVs.

Plaintiffs respectfully request that this Court grant their motion for class certification.

## STATEMENT OF FACTS[1]

## I.    Defendants' Deception

Between May 9, 2010, and the present, LG[2] marketed and sold LED televisions with refresh rates of 120Hz, TruMotion120Hz, 240Hz, and TruMotion 240Hz, with the intention of passing off the refresh rate of those televisions as either 120Hz or 240Hz, when the refresh rate was actually 60Hz or 120Hz, respectively. LG knew this representation was untrue, yet still convinced retailers, including BBY, to participate in this labeling scheme. As a result, Plaintiffs and members of the proposed Classes purchased LG televisions under false pretenses and have been damaged.

---

[1] Unless otherwise noted, exhibit references throughout refer to documents attached to the Declaration of David M. Cialkowski ("Cialkowski Decl.") filed concurrently herewith.

[2] LG Electronics, U.S.A., Inc. ("LG") and Best Buy Co., Inc.'s, Best Buy Stores, L.P.'s, and BestBuy.Com., LLC (collectively, "Best Buy" or "BBY") (together, "Defendants").

### A.    LCD TV Hz specifications refer to a television's refresh rate.

LCD televisions[3] display a series of still images to the viewer. For each image, data is loaded into the millions of pixels that comprise the viewing area of the television. Ex. 1 ("den Boer Rprt."), at ¶10. Each time all the pixels on the screen are newly loaded with image data, the screen is considered "refreshed." The frequency with which this happens is the refresh rate of the television. *Id.* at ¶12. A television's refresh rate is commonly understood to be measured in, and indicated by, the label Hz. *Id.* at ¶13. BBY agrees with this definition refresh rate and meaning of Hz in LCD labeling.[4] A standard and basic television will have a refresh rate of 60Hz. *Id.* at ¶16

Because LCD televisions display still images, they are susceptible to motion blur during certain programing. *Id.* Motion blur occurs when images on the screen appear to be moving too fast to be viewed clearly and without

---

[3] LED televisions are LCD televisions that use LED lighting elements for the backlight; the terms are used interchangeably in Defendants' documents and by the experts.

[4] BBY stated, "TV Refresh Rate – The higher the hertz, the smoother the picture," and "A TV with a 240Hz (hertz) refresh rate will completely rebuild its picture 240 times in one second." https://web.archive.org/web/20160602053148/http:/www.bestbuy.com/site/home-promotions/tv-buying-guide/pcmcat310100050031.c?id=pcmcat310100050031 (last visited Aug. 6, 2019).

blurred edges. The two most common methods to address motion blur are: 1) increasing the number of times new image data can be rendered by the television, *i.e.*, increasing the refresh rate; and 2) manipulating the backlight. *Id.* ¶17, 24.

Increasing the refresh rate allows the television to display more new images per second which, in turn, greatly reduces motion blur. *Id.* at ¶17. An LED television with a refresh rate of 120Hz or 240Hz has the capability to use motion interpolation technology (MEMC) to generate additional images per second for content that arrives at lower frequencies (like 24Hz, 30Hz, or 60Hz) and to fully render advanced content, like video games, which may already deliver content at 120 and 240 images per second. *Id.* at ¶20. Increasing the refresh rate is the optimal method of reducing motion blur, but is technologically complex and very expensive.[5]

Another, much less expensive and less technologically advanced method to address motion blur is backlight manipulation. *Id.* at ¶24. Backlight manipulation such as backlight scanning turns the backlight on and off in sequenced segments on the screen, so that different portions of the image are illuminated over the course of a single frame. *Id.* Depending on the

---

[5] *See* Ex. 2, BBY0065523; Ex. 3 ("Gezella Tr."), 78:4-81:5 (discussing Ex. 4, BBY0030908), 107:20-108:23 (discussing Ex. 5, BBY0064508); den Boer Rprt. ¶¶21-22.

content being supplied, a television with backlight scanning can realize a reduction in motion blur due to the image on the screen not appearing in total. *Id.* Backlight scanning does not impact the frequency with which new image data is capable of being loaded into the pixels, *i.e.* it does not increase or change the actual refresh rate—it merely flashes light on the screen.[6]



---

[6] *See* den Boer Rprt. ¶25; Ex. 6, LGE0131144 ; Ex. 7, LGE0329814

Ex. 8 ("LG 30(b)(6) Tr."), 362:7-23. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ .[8]

---

[7] *See* Exs. 9,10 (LGE0466578-80) (collectively, the "Accused Models"). The Parties are continuing to meet and confer on the appropriate models to include on this list and will amend or supplement as necessary.

[8] *See, e.g.*, Ex. 11, LGE0135515; Ex. 7, LGE0329814; LG 30(b)(6) Tr. 68:14-69:3, 332:24-333:16.



**Figure 1**. April 2012 [REDACTED] Presentation, at Slide 3 (Ex. 13, LGE0116153)

---



[9] LG relies on the [REDACTED] (Ex. 12, LGE0449573) to assert that its [REDACTED]. Even if this were true, the [REDACTED] *Id*. at 8. [REDACTED] den Boer Rprt. ¶54.

In sum, █████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████[10] The latent claims is contradicted by the written record.

As shown below, BBY, other retailers, and LG itself called out this labeling

practice as deceptive and confusing.

### B. Defendants' strategic partnership to capitalize on the perceived importance of refresh rates to consumers.

By way of background with regard to the Defendant entities and their

interactions, LG is a New Jersey corporation with its principal place of

business in Englewood Cliffs, New Jersey. ██████████████████████

██████████████████████████████████████████████. Ex. 14

("Calacci Tr."), 112:15-113:14, 115:6-13. ███████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████ Calacci Tr. 30:1-31:25; Ex. 15

("Nemecek Tr."), 31:2-18; 124:18-24. All televisions sold in the United States

are marketed and distributed from the New Jersey office. LG 30(b)(6) Tr.

233:5-234:1 (citing Ex. 16, LGE0465199). In order to better understand

---

[10] *See, e.g.*, LG 30(b)(6) Tr. 68:14-69:3, 332:24-333:1, 333:14-16.

consumer trends with respect to televisions and the most desirable features of televisions, LG has an entire division devoted to consumer insights located in New Jersey. LG 30(b)(6) Tr. 184:3-12.

While LG concentrates its final approval decision-making in New Jersey, it also maintains a significant physical presence in Minnesota to work closely with key retailers like BBY.[11] Specifically, LG opened an office in Edina, Minnesota in approximately 2008, and its Minnesota-based employees communicate regularly with New Jersey headquarters. *See, e.g.*, Simonson Tr. 17:12-18:8, 19:2-20:4, 29:10-21, 34:11-17, 36:3-22. ██████████████████ ███████████████████████████████████████████████████████. Wolf Tr. 140:4-25; Ex. 20 ("BBY 30(b)(6) Tr."), 217:24-219:1. ████████████ ████████████████████████████████████████████████████████████████ ██████████████████████. BBY 30(b)(6) Tr. 270:18-19.

BBY is a Minnesota corporation with its principal place of business in Richfield, Minnesota. BBY Stores and BBY.com share the principal place of business in Richfield, Minnesota. BBY's merchandising, marketing, and sales practices all emanate from the Minnesota offices.[12] All three entities are

---

[11] Ex. 17 ("Spry Tr."), 83:19-85:18; LG 30(b)(6) Tr. 24:2-25:3; Ex. 18 ("Wolf Tr."), 137:12-24, 139:5-11; Ex. 19 ("Simonson Tr."), 32:8-21, 33:5-11; Nemecek Tr. 14:18-15:1, 118:23-119:2.

[12] *See, e.g.*, Spry Tr. 70:4-8; 124:25-125:25.

intertwined ███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████.[13] BBY coordinates the web-based, mobile, and brick-

and-mortar platforms to sell merchandise. Wolf Tr. 17:11-18:7. Through BBY

Stores and BBY.com, BBY deceptively advertised and sold LG televisions

with false refresh rates. The same deceptive advertisements of LG televisions

were promoted and purchased in BBY's stores and on its website.



██████.[14] ███████████████████████████████████████

███████     Spry Tr. 158:14-23; BBY 30(b)(6) Tr. 172:20-173:1. ████████

████████████████████████████████████████████████████

████████████████████████████████████.[15]

---

[13] *See, e.g.*, Spry Tr. 9:19-10:10; 11:1-9, 23:5-28:14; Wolf Tr. 16:18-25; 27:17-28:15; BBY 30(b)(6) Tr. 41:19-43:4.

[14] *See, e.g.*, Spry Tr. 83:19-87:1████████████████████████████████████
██████████████████████, 59:20-61:2,  105:24-106:16 ████████████████
██████████████ Calacci Tr. 13:4-14:14 █████████████████████████████
███████████████ 30:1-31:25 ███████████████████████████████████
██████████████████████████); *see generally* BBY
30(b)(6) Tr. 171-184.

[15] Wolf Tr. 137:12-24, 139:5-11, 140:4-25, 142:19-143:6; Nemecek Tr. 43:17-44:2.

22



Simonson Tr. 28:6-23, 30:16-31:4, 61:23-62:7.

*Id.* at 53:3-5.

**C.** **Defendants made a concerted effort to keep representations consistent throughout the Class Period.**

Calacci Tr. 28:23-29:6, 51:5-52:12, 74:20-75:1

128:8-17, 133:3-9, 160:20-24.

(Ex. 22, LGE0126487);

(Calacci Tr. 71:24-72:13, 158:17-159:23; Ex. 23, LGE0317213);

---

[16] *See, e.g.*, Ex. 21, LGE0135117 ("[BBY] proof[s] everything against the spec sheets" for "ads, fact tags, online messaging"); LG 30(b)(6) Tr. 208:22-209:10, 222:9-12; Calacci Tr. 30:1-31:25,112:15-113:14, 115:6-13; Wolf Tr. 99:17-20, 135:18-137:11; Simonson Tr. 46:24-48:2, 53:8-23, 78:4-80:2; Nemecek Tr. 31:2-18, 40:1-12, 124:18-24; BBY 30(b)(6) Tr. 213:7-214:2.

(Calacci Tr. 99:11-19, 158:17-159:23). 

Calacci Tr. 27:1-23, 31:18-25; 166:24-167:22.

LG 30(b)(6) Tr. 39:23-40:13

. Ex. 24, LGE0280067 (Product Detail Pages ("PDPs") Guide); *see also* Ex. 25, LGE0416373

Beyond providing information to retailers,

Ex. 26, LGE0468466.

For its own part, BBY's main vehicles for communicating critical information to consumers, like refresh rate, includes PDPs on BBY.com, and fact tags and brand vignettes in BBY stores. █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ BBY 30(b)(6) Tr. 195:8-196:22. █████████████

███████████████████████████████████████████ Wolf Tr. 67:22-24, 69:4-11, 72:2-8, 72:18-25. ████████████████████

████████████████████████████████████████████████████

███████████████████. LG 30(b)(6) Tr. 208:22-209:10.

**D.    Retailers prominently placed the Hz specification on web headlines and in-store signage where it would be seen by all consumers.**

During the Class Period, Defendants used the following verbiage to describe the refresh rate of certain LG television models:

- 120Hz;
- TruMotion 120Hz;
- 240Hz; and
- TruMotion 240Hz.

The Accused Models in Exs. 9, 10 were advertised during the Class Period with one of these iterations. *See*, Ex. 27 (LG Third Am. ROG Resp. (Apr. 23, 2019)). Figures 2 and 3 below depict a typical BBY fact tag for the Accused Models.



**Figure 2**. BBY 2013 Fact Tag, Ex. 28 (LGE0466407)

**Figure 3**. BBY 2013 Fact Tag, Ex. 29 (LGE0466408)

Brand vignettes and assortment grids are also common in stores and allow consumers to compare the primary features of televisions within a brand. *See* Figures 3 and 4; Wolf Tr. 40:24-42:22; Simonson Tr. 112:15-18.



**Figure 4.** BBY 2015 Assortment Grid (Ex. 30, LGE0007300)

Other retailers of LG's televisions also

. *See* Figures 5-7, *infra.*



**Figure 5.** PC Richards 2010 Fact Tag (Ex. 31, LGE0008110)



**Figure 6.** Fry's 2015 Assortment Grid (Ex. 32, LGE0087214)



**Figure 7.** Costco 2016 Product Detail Page (Ex. 33, LGE0093199)

When LG began marketing the Accused Models, ███████████████

███████████████████████████████████████████████████████

███████████████████████.[17] It later added TruMotion to the specification in

approximately 2009. LG 30(b)(6) at 59:23-60:4. ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[17] *See, e.g.*, Ex. 34, BBY0065417, at 65422; Figures 2 and 3, *supra*.

██████████████████████████████████████" Ex. 2, BBY0065523.[18] Despite

its initial reluctance, ██████████████████████████████████████

█████.[19] Throughout the Class Period, ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████ stating:

- "████████████████████████████████████████."[20]

- ████████████████████████████████████████████████."[21]

- ████████████████████████████████████████████████████"[22]

- ███████████████████████████████████"[23]

- LG response to retailer inquiry "████████████████████████████████████"[24]

---



[18] *See also* Ex. 35, LGE0331892 ███████████████████████████████████████████████████████; Ex. 36, LGE0139759 ████████████████████████████████████████████████████████████████

[19] *See* BBY 30(b)(6) Tr. 276:12-277:5 (citing Ex. 37, BBY0031722).

[20] BBY 30(b)(6) Tr. 300:17-24.

[21] *Id.* at 254:2-12.

[22] Ex. 38, LGE0003515.

[23] Ex. 7, LGE0329814.

[24] Ex. 39, LGE0412105.



- ████████████████████████ [25]

Until 2014, ███████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ *See* BBY 30(b)(6) Tr. 279-284:3, 289:14-290:1,

321:11-16. ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████. *Id.*

In 2014, LG ███████████████████████████████████████████

█████████████████████████████████████████████.[26] ████████████████

██████████████████████████████████████████████████████████

████████████ [27] BBY 30(b)(6) Tr. 313:1-314:16.

---

[25] Ex. 40, LGE0139329.

[26] *See, e.g.,* Ex. 41, LGE0034469; Ex. 42, LGE0072756; Ex. 43, LGE0070986,
Ex. 44, LGE0035120, and Ex. 21, LGE0135117 (███████████████████████
████████████ Ex. 45, LGE0071626 ████████████
███████████. "MCI"-labeled TVs are not included in the proposed class
definition.

[27] *See, e.g.,* Ex. 46, BBY0046436, at 46441 (BBY 2014 email ████████████████
██████████████████████████████████████████████████████████
████████ ).

By early 2015, however, ███████████████████████
███████████████████████ [28] ███████████████████
███████████████████ [29] This continued until early 2017, when, after this lawsuit commenced, ███████████████████████
█████████████████████████████████████████████████
█████████████████ "[30] When Plaintiffs filed this action, ██████████
█████████████████████████████████████████████ [31]
████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████ Defendants made a concerted effort throughout the Class

---

[28] *See, e.g.*, Ex. 47, LGE0245954; Ex. 48, LGE0468062 (███████████████
█████████████████████); Ex. 49, LGE0061503.

[29] *See, e.g.*, BBY 30(b)(6) 333:9-13; Ex. 33, LGE0093199.

[30] *See, e.g.,* Ex. 50, LGE0082048 (April 2017 email to Product Marketing Team stressing the "███████████████████████████████████████
███████████████████████████)."

[31] Ex. 51, BBY0043773 (May 11, 2016: "█████████████████████████
██████████████████████████); Ex. 52, BBY0052210 (May 12, 2016: ███████████████████████████████████████████████.

[REDACTED]

[REDACTED] .[32]

**E.   Defendants knew that their refresh rate representations were not true and caused significant confusion.**

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] . *See* LG

30(b)(6) Tr. 188:23-189:12 (citing Ex. 56, LGE0134043, Ex. 57, LGE0134044);

---

[32] *See, e.g.*, Calacci Tr. 28:2-17 [REDACTED]

[REDACTED] Simonson Tr. 48:17-49:11 [REDACTED]

[REDACTED] 50:9-51:8, 52:21-53:2; Ex. 53, LGE0460927 (LG rules for fact tags: '[REDACTED]

[REDACTED]

[REDACTED] ; Ex. 48, LGE0468062 (LG Sales Call Update: [REDACTED]

[REDACTED] Ex. 54, LGE0085489, at 85690 (LG mentioning that they are going to [REDACTED]

[REDACTED] Wolf Tr. 122:20-25 ([REDACTED]

[REDACTED] ): LG 30(b)(6) Tr. 204:2-14 (discussing collaborative process; "[REDACTED]

[REDACTED] 224:14-225:21 (discussing implementation of policy to [REDACTED]

[REDACTED] , 225:24-226:20 (citing Ex. 55, LGE0150502) ('[REDACTED]

[REDACTED] ).

*see also* Ex. 35, LGE0331892, at 331895 (LG would be at a " ███████████

████████████████████████████████████████████████████████

███████████ ); Ex. 58, LGE0334132, at slide 3 (███████████████

████████████████████████████████████████████████████████

███████████████████████ ); Ex. 59, LGE0136212 ("█████████████

████████████████████████████████████████████████████ ; Ex.

60, BBY0070641 ████████████████████████████████████████

██████████████████████████ ).

In fact, LG specifically ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ *See, e.g.*, BBY 30(b)(6) 266:17-25; Ex. 61 ("Loretucci Tr.") at 41:10-

21, 128:8-16 ███████████████████████████████████████████████

███████████ ; Ex. 62, LGE0056756 ████████████████████████████

████████████████████ ; Ex. 63, LGE0060194 (LG sales team feedback

noting that █████████████████████████████████ ); Ex. 64, BBY0065020

████████████████████████████████████████████████████████

██████████ ); Ex. 65, BBY0030190, at slide 12 (████████████████████

████████████████████████████████████████████████████ .

Predictably, ████████████████████████████████████████████

████████████████████████████████████████████████████████





For example:

- ███████████████████████████████████████████ Ex. 66, BBY0063559.

- ███████████████████████████████████ Ex. 67, LGE0060245.

- ███████████████████████████████████████████ Ex. 68, LGE0085661, at 85664.

- ███████████████████████████████████ Ex. 69, LGE0019259.

- Providing ████████████████████████████████ Ex. 70, LGE0138062.

- ████████████████████████████████████ BBY 30(b)(6) Tr. 303:20-305:10 (discussing Ex. 71, BBY0060394 and Ex 72, LGE0441993).

- ████████████████████████████████████ Ex. 73, LGE0030906.

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████   (Figure 8).[33]



**Figure 8.** ████████████████████████
(Ex. 74, LGE0020631)

---

[33] *See also* Ex. 54, LGE0085489, at 85491 █████████████████
██████; Exs. 75-78, LGE0139914, 139918, 139919, 139920 (respectively)
(BBY email regarding ██████ ██████████████████████████████
████████████████████████████ Ex. 79, LGE0132555
█████████████████████████████████████████████████
██████████; BBY 30(b)(6) Tr. 317:6-18 ("The technology itself is
confusing.") (discussing Ex. 80, BBY0065539); LG 30(b)(6) Tr. 110:24-111:14
(LG's 30(b)(6) witness was ████████████████████████████████████
██████████████████████████████████

## II.    Plaintiffs' Harm

Each Plaintiff was misled by Defendants' false advertising. Regardless of where they made their purchase, they each sought a television with a specific refresh rate, viewed the Hz specifications of an Accused Model, and made their purchase believing the Hz specification accurately reflected the refresh rate of their new television.

Breann Hudock lives in Wisconsin and purchased a 55LN5100-UB model LG television from BBY. Ex. 81 ("Hudock Tr."), at 331:19-24, 332:1-4. She purchased a television on BestBuy.com on November 29, 2013. *Id.* at 469:1-6, 261:8-10. Before purchasing her television, Hudock searched for televisions with specific features, including 120Hz refresh rates. *Id.* at 300:23-24, 301:1-3. Prior to purchasing her television, Hudock visited a BBY store where an employee informed Hudock that a high refresh rate is important when viewing sports and playing video games. *Id.* at 301:17-22.

Ivan Villa Lara lives in California and purchased a 55LN5100 model LG television from a BBY store in Compton, California on November 28, 2013. Ex. 82 ("Villa Lara Tr."), 249:15-20. While researching potential televisions, Villa Lara received an advertisement by mail from BBY, which specifically advertised a 120Hz refresh rate for the 55LN5100, a factor that was very important to him. Villa Lara Tr. 185:20-186:15, 188:24-189:6, 192:17-23, 407:1-3. Relying on this advertisement, Villa Lara arranged to

purchase the specific television using his grandmother's credit by promising that he would make the payments for the television. *Id.* at 186:16-187:8, 256:14-25, 406:23-407:3. Villa Lara viewed the fact tag in the store, confirmed the advertised refresh rate was 120Hz, and purchased it on his grandmother's credit card. *Id.* ███████████████████████████

███████  *Id.* at 188:9-23, 293:1-4.

Eugene Mannacio also lives in California and purchased a 60UH7700 LG television from a BBY store in San Rafael, California, in or around March 2016. Ex. 83 ("Mannacio Tr."), at 132:2-17. Prior to Mannacio's purchase, Mannacio reviewed LG and BBY's websites and learned that the 60UH7700 television had a 240Hz refresh rate. *Id.* at 174:10-17, 182:20-183:2. Mannacio was also able to review such specifications in-person at the store prior to purchase. *Id.* at 163:17-25.

Brian Fleishman lives in Pennsylvania and purchased a 55LA9650 LG television from a BBY store in Maryland in or around June 2014 by telephone; Fleishman had the television shipped to him in Pennsylvania. Ex. 84 ("Fleishman Tr."), 52:4-8, 51:5-11 160:18-24, 161:1-2. Fleishman specifically wanted a television with a high refresh rate and verified that the 55LA9650 had a 240Hz refresh rate on BBY's website prior to purchase. *Id.* at 168:14-21, 245:19-24, 246:1-6.

## CLASS DEFINITIONS

Plaintiffs seek to certify a Class of all persons in the United States who purchased an LG LED television between May 9, 2010 and the present, labeled as having a Hz-rating that was twice the native refresh rate of its panel. *See* Accused Models. This Class is asserted against LG. Plaintiffs also seek to certify a Best Buy Purchaser Subclass consisting of all persons in the United States who purchased an LG LED television from a Best Buy store or from Best Buy's website between May 9, 2010 and the present, labeled as having a Hz-rating that was twice the native refresh rate of its panel. *Id.* The Subclass is asserted against both BBY and LG.

The Eighth Circuit "adheres to the rigorous analysis of the Rule 23 requirements which includes that a class 'must be adequately defined and clearly ascertainable.'" *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (quoting Fed. R. Civ. P. 23). Plaintiffs have identified specific models of televisions subject to the alleged deceptive advertising, and the Class is thus defined using objective criteria as required by Rule 23. *See* Accused Models. The definition itself also uses only objective criteria.

## LEGAL ANALYSIS

### I.     Rule 23(a)'s Requirements Are Met.

Federal courts have "broad discretion in determining whether or not to certify a class under Rule 23." *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 573 (D. Minn. 1995). In exercising its discretion, the court should resolve any doubt regarding the propriety of certification "in favor of allowing the class action" so that it will remain an effective tool for deterring wrongdoing. *In re Control Data Corp. Sec. Litig.*, 116 F.R.D. 216, 219 (D. Minn. 1986) (citation and quotation omitted).

The court should not resolve merits disputes at the class certification stage. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 617 (8th Cir. 2011). However, courts may look beyond the pleadings in some instances to inquire into whether questions affecting the class are susceptible to common proof in light of the evidence. *Blades v. Monsanto Co.*, 400 F.3d 562, 566-67 (8th Cir. 2005) ("the court must look only so far as to determine whether... common evidence could suffice to make a prima facie case for the class.").

The court should exercise its discretion to certify a class where the plaintiff establishes the elements of Rule 23(a) and at least one subsection of Rule 23(b). *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). Plaintiffs have done so here.

41

### A.   The Class is sufficiently numerous.

The court must first decide whether "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Based on sales data provided by Defendants and third parties, there are thousands of members of the Classes, making joinder of all members impractical. *See* Ex. 85 ("Weir Rprt."), ¶49 (summarizing sales of Accused Models).

### B.   The claims present questions of law and fact common to the Classes.

Next, Rule 23(a)(2) requires Plaintiffs to "demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation omitted).  A common question is one "for which a prima facie case can be established through common evidence." *Zurn*, 644 F.3d at 618. The requirement does not mandate that all such questions be common to every member of the Classes or that individuals be identically situated. A plaintiff satisfies the commonality requirement when a legal question linking the class members drives the resolution of the litigation.  *Dukes*, 564 U.S. at 350; *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1031 (D. Minn. 2007).

In this case, common evidence will be used to prove whether Defendants represented to Plaintiffs and the Classes that the Accused Models had a higher refresh rate than they actually had and whether

Defendants intended Plaintiffs and members of the Classes to rely on the false statements of refresh rate. Common evidence will also be used to prove the materiality of refresh rate to consumers, including Plaintiffs and the Classes.

In turn, the common questions underlying this litigation focus solely on Defendants' uniform course of conduct rather than the conduct of any individual Class member. As detailed in the Statement of Facts, Plaintiffs will show, among other things, that:

- All Accused Models of televisions had the same Hz or TruMotion Hz rating in their specifications;

- All Accused Models were made with panels that limited their native refresh rate to one-half the Hz or TruMotion Hz rating;

- The Hz or TruMotion Hz rating on fact tags in-store or online were displayed as the prominent specifications featured for their televisions;

- Defendants are aware that refresh rate is a material feature in selecting a television for purchase;

- Refresh rate is universally understood as the number of times each second the television is capable of being refreshed with new image data, and represented by Hz;

- Defendants intentionally misrepresented the true refresh rate of LG LED TVs with the Hz or TruMotion Hz labeling to induce sales;

- Members of the Classes did not obtain a television with the refresh rate they purchased;

- Consumers were confused by Defendants Hz ratings; and

- Class members were damaged because the value of the television they received was less than what they paid.

As detailed above, the marketing remained substantively similar throughout the Class Period. *See In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 60 n.12 (D.N.H. 2015) (overruling defendant's objections to class certification because "the exact language [defendant] used to promote [the product] was modified over the years does not alter the fact that the message [defendant] conveyed about [the product] was uniform and consistent…"). Thus, Plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.

### C.   Plaintiffs' claims are typical of those of the Classes.

The typicality requirement of Rule 23(a)(3) focuses on the similarity of the legal and remedial theories behind the claims of the Plaintiffs and the Class members, not on their personal characteristics. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561-62 (8th Cir. 1982), *cert. denied*, 460 U.S. 1083 (1983). The requirement is satisfied when "the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members." *Dirks v. Clayton Brokerage Co. of St. Louis, Inc.*, 105 F.R.D. 125, 133 (D. Minn. 1985); *see also Paxton*, 688 F.2d at 561-62 (typicality established "if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory.") (quotation omitted). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives

44

rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Here, proof of Plaintiffs' and class members' claims will require the same evidence. Defendants' Hz representation doubled the native refresh rate, was rationalized by using backlight scanning across all Accused Models, and resulted in a uniform percentage overcharge. *See* Ex. 86 ("Gaskin Rprt."), ¶¶53-54. This is the hallmark of typicality. Thus, while the specific dollar amounts may differ between proposed Class members and named Plaintiffs based on what each actually paid, this does not defeat a showing of typicality. *See Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 665 (D. Minn. 1991).

The fact that putative Class members purchased different model televisions from those of the named representatives does not defeat typicality either. *See also Khoday v. Symantec Corp.*, No. 11-180 (JRT/TNL), 2014 WL 1281600, at *16 (D. Minn. Mar. 13, 2014) (holding that where, as here, "a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations… apply uniformly across the different product types.") (quotation omitted). *See also Azimpour v. Select Comfort Corp.*, No. 15-4296, 2016 WL 3248231, at *2 (D. Minn. June 13, 2016) (rejecting argument that a plaintiff does not have standing to bring claims based on products he did not purchase where plaintiff's theory was that a company-

45

wide fraudulent pricing and advertising scheme applied to all of its various products). As this Court held, Plaintiffs would not be precluded from asserting claims on behalf of a class if "Plaintiffs' injuries are sufficiently similar to those of the proposed class to permit claims for a broader range of LG products." *Hudock v. LG Elecs. U.S.A., Inc.*, No. CV 16-1220, 2017 WL 1157098, at *2 (D. Minn. Mar. 27, 2017).

Here, Plaintiffs satisfy the typicality requirement because each Class member purchased an LG television that was uniformly advertised and marketed as having twice the refresh rate it was capable of. *See* pp. 26-34, *supra*. The "different products" at issue in this case are not different with respect to the nature of the misrepresentation and measurable specifications of each television. Defendants admit that ███████████████████████ ████████████████████████████████████. *See* Figure 1, *supra* ("██████████████████████████████████"). The differences in the Accused Models are relevant only to the amount of damages at issue, which is insufficient to defeat certification. *See Alpern*, 84 F.3d at 1540 ("the fact that damage calculations might differ [between plaintiffs] is a minor matter in comparison with [the] fundamental similarities.").

**D.   Plaintiffs and their Counsel will adequately represent the Class.**

**1. Plaintiffs do not have interests antagonistic to the Classes.**

Rule 23(a) finally requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Plaintiffs must show that (1) the representative party's attorney is qualified, experienced, and generally able to conduct litigation, and (2) that the suit is not collusive and plaintiff's interests are not antagonistic to the class. *In re Workers' Comp.*, 130 F.R.D. 99, 107 (D. Minn. 1990).

Here, Plaintiffs have no interests that are antagonistic to the interests of the proposed Classes. Each Plaintiff is aware of their duties as a Class representative and have already assumed those duties. *See* Hudock Tr. 146:3-10, 323:4-18, 363:2-5; Villa Lara Tr. 393:21-397:18, 323:18-324:7; Fleishman Tr. 234:4-235:2, 252:19-253:3; Mannacio Tr. 236:20-240:20, 260:21-25. Indeed, all Plaintiffs have fully participated in discovery to date, including producing documents and sitting for full day depositions, have kept in regular contact with counsel regarding developments in the case, and have actively assisted counsel in litigating the case. Cialkowski Decl., ¶14. These representatives, with the assistance of their counsel, will vigorously and capably press the claims of the Classes.

### 2. Plaintiffs' counsel is qualified.

Plaintiffs' counsel has substantial experience in litigating, trying, and successfully resolving class action litigation. *See* Cialkowski Decl., ¶¶6-13; Hedlund Decl., ¶¶3-8."[T]he single most important factor considered by the courts in determining the quality of the representative's ability and willingness to advocate the cause of the class has been the caliber of the plaintiff's attorney." 1 NEWBERG ON CLASS ACTIONS 3d (1992) § 3.24 at 3-133 n.353. Counsel here satisfy this requirement.

## II.   Rule 23(b)'s Requirements Are Met.

### A.   Injunctive relief certification is appropriate.

This Court has already indicated that the prospect of injunctive relief as alleged may satisfy Rule 23(b)(2)'s requirements: "the result of this lawsuit may indirectly lead to changes in LG's and BBY.com's marketing related to the 120Hz refresh rate, thereby preventing future lawsuits and creating a public benefit." *Hudock*, 2017 WL 1157098, at *6. There is evidence that both BBY and LG ███████████████████████████████████████████████████ ████████████████████████████████████. BBY 30(b)(6) Tr. 323:2-333:22. However, Plaintiffs' claim for injunctive relief survives until it is clear that the misconduct will not recur. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001) (citation and quotation omitted).

Both Defendants received pre-suit notice of Plaintiffs' claims, and neither Defendant did anything to address the illegalities until after the lawsuit was filed. *See*, *e.g.*, Pls.' Apr. 29, 2016 Ltrs. to Defs. [D.E. 26-1, 2] (July 12, 2016). Moreover, ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████. Defendants are recidivists, making injunctive relief important and appropriate.

## B.    Predominance is satisfied.

Individual issues will not predominate because the claims focus on Defendants' uniform conduct and common evidence of consumer reaction to representations about refresh rates, not the circumstances concerning individual purchases. The choice-of-law analysis below demonstrates that it is appropriate to apply Minnesota law to all claims against BBY and New Jersey law to the consumer protection and warranty claims against LG. Because there are no true substantive conflicts with respect to unjust enrichment law, forum law applies to those claims uniformly. Accordingly, resolution of Class members' claims is easily managed.

### 1.  Choice of Law

Because more than one state has contacts with the claims at issue, the court must conduct a choice-of-law analysis before analyzing whether legal

and factual issues predominate consistent with Rule 23(b)(3). In ascertaining the appropriate law to apply in diversity cases, courts must apply the forum state's choice-of-law rules. *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012). Therefore, Minnesota's choice-of-law rules govern here. Because Minnesota law should be applied to all Class members' claims against BBY and the unjust enrichment claim asserted against LG, and New Jersey law should apply to warranty and consumer fraud claims asserted against LG, the predominance requirement is met.

### a. Constitutional minimum contacts analysis

For a state's law to apply, the state must have "'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [forum] law is not arbitrary or unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-313 (1981)). In many situations, more than one state will have constitutionally sufficient contacts. In this case, all states have residents that have suffered the harm complained of herein.[34]

---

[34] *See, e.g.*, Best Buy "Store Directory," *available at:* https://stores.bestbuy.com/ (last accessed Aug. 2, 2019) (there is a Best Buy store in every U.S. jurisdiction).

Here, Minnesota has sufficient contacts with all BBY purchasers' claims such that the Court may constitutionally apply forum law to claims against BBY. BBY is incorporated, headquartered, and operates its principal place of business in Minnesota. BBY centrally manages all pricing, promotions, marketing, and advertising of TVs, in both its brick-and-mortar and online retail arms, at its corporate headquarters in Minnesota; accordingly, all of the corporate acts implicated by the claims against BBY occurred in Minnesota. *See* pp. 21-23, *supra*.

Accordingly, "no one would doubt that an individual class member could sue a defendant in Minnesota and apply Minnesota law.... [I]t is constitutionally permissible to apply Minnesota law in the class action context." *In re St. Jude Med., Inc*, MDL No. 01-1396, 2006 WL 2943154, at *4 (D. Minn. Oct. 13, 2006), *rev'd on other grounds*, 522 F.3d 836 (8th Cir. 2008); *see also In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 486 (D. Minn. 2015) (certifying nationwide class under Minnesota law and holding that Minnesota defendant that made decisions material to class members' harm in Minnesota was subject to application of Minnesota law under U.S. Constitution).

LG also has sufficient contacts with Minnesota such that application of Minnesota law to claims against LG is not arbitrary or unfair. *See, e.g.*, *Glover v. Merck & Co., Inc.*, 345 F. Supp. 2d 994, 998 (D. Minn. 2004) (finding

defendant that did business in Minnesota and sold the product at issue in Minnesota had sufficient contacts with Minnesota to constitutionally apply Minnesota law to claims asserted against it). █████████████████

███████████████████████████████████████████████████

████████████████. *See* pp. 20-23, *supra*. While it maintains its corporate

headquarters in New Jersey, ██████████████████████████

███████████████████████████████████████████████████

██████████████████████████████. *Id.*

Finally, because LG is headquartered in New Jersey and ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████. *See, e.g.*, LG 30(b)(6) Tr. 233:5-

234:1 (citing Ex. 16, LGE0465199) ████████████████████

███████████████████████████████ ), 6:2-24, 23:22-24:1 ███

███████████████████████████████████████████████████

█████████████████████████████████, 108:17-109:8 ████████████

█████████████████████████████, 184:3-12 (██████████████

██████████████████████; Calacci Tr. 111:6-21, 112:1-6, 112:25-113:14

(███████████████████████████████████████████████████

███████████████████████████████

### b. Minnesota choice of law analysis

As noted above, a choice-of-law analysis is not required for claims that are substantively similar across the relevant jurisdictions. *Shutts*, 472 U.S. at 816. Thus, the Court must first determine whether the laws of the state at issue conflict; a conflict exists if the rule of one state or the other is outcome-determinative. *Glover*, 345 F. Supp. 2d at 997. There are no material variations in contract law across jurisdictions. *See, e.g.*, *Thompson v. Allianz Life Ins. Co. of N. Am.*, 330 F.R.D. 219, 222-23 (D. Minn. 2019) ("[The] elements [for breach of contract] are undoubtedly similar in all jurisdictions... [Accordingly] courts have found class certification appropriate where the class alleges a breach of a standardized contract.");[35] *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013) ("As courts have noted, state contract law defines breach consistently such that the question will usually be the same in all jurisdictions. A breach is a breach is a breach, whether you are on the sunny shores of California or

---

[35] In *Thompson*, the court distinguished that case's ambiguous annuity contract from a typical "standardized contract" analysis. *Id.* Here, there is no issue regarding interpretation of an ambiguous contract that would bring to bear various state rules regarding ambiguous contract term construction.

enjoying a sweet autumn breeze in New Jersey.") (citation and quotation omitted).[36]

Nor are courts inclined to find material variations in state unjust enrichment laws. *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1177-78 (D. Minn. 2014) ("The substantive law of unjust enrichment is consistent across all jurisdictions."); *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 710 (D.N.J. 2011) ("Numerous [federal] courts [sitting in diversity] have held that unjust enrichment laws do not vary in any substantive manner from state to state… Since no actual conflict exists, [forum state] law will be applied to all Plaintiffs' unjust enrichment claim."); *Penn. Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 477 (D. Del. 2010) ("states' [unjust enrichment] laws do not create an actual conflict"); *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 464 (D.N.J. 2009) ("there are no actual conflicts among the laws of unjust enrichment"); *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009), *as modified on reconsideration*, No. CIV. 07-2720 DRD, 2010 WL 2976496

---

[36] Like *Thompson*, the court *In re Foodservice* found significant conflicts in law regarding breach of contract claims that required "examination of individual contract language" because "the language variations were material to the issue of breach." *Id.* at 124.

(D.N.J. July 22, 2010) ("differences [in unjust enrichment laws] are not material and do not create an actual conflict").[37]

In contrast, some state's consumer protection laws create conflicts with Minnesota's in a few areas that have been recognized as substantive (*e.g.*, proof of individual reliance and scienter), and the warranty laws of other states vary more considerably.[38] Thus, while Minnesota law may be applied to unjust enrichment claims and the breach of contract claim without further analysis, Plaintiffs concede that the claims of consumer fraud and breach of warranty require application of Minnesota's choice-influencing factors to determine which states' laws should apply.

---

[37] Not all courts agree that unjust enrichment laws lack substantive conflicts. *See Cruz v. Lawson Software, Inc.*, No. 08-5900, 2010 WL 890038, at *6-7 (D. Minn. Jan. 5, 2010) (noting splits in authority as to whether independent causes of action for unjust enrichment claims exist and various statutes of limitation creating material, outcome determinative conflicts with Minnesota law) (*distinguishing Mooney v. Allianz Life Ins. Co. N. Am.*, 244 F.R.D. 531, 534 (D. Minn. 2007)). *Cruz*'s citation to *Mooney*, however, is poignant here because the court inherently noted the propriety of certification in *Mooney* because it involved "allegations of fraudulent sales emanating from Minnesota."). The persuasive decisions demonstrate that perceived differences are not relevant in the context of consumer protection cases.

[38] For reference, Plaintiffs have provided this Court with a comparison of the limited variations in state law for consumer protection claims, as well as the non-conflicting legal standards for unjust enrichment and breach of contract at Exs. 87-89 (respectively). However, with respect to warranty law, the substantive elements vary considerably and there appears to be no useful grouping of these rules.

Although the Court is free to assume such conflicts exist and proceed directly to the application of the Leflar/Milkovich test,[39] the differences highlight the policy interests prioritized in each jurisdiction with respect to consumer transactions. Variations in consumer protection laws that may impact the claims at issue in this case include whether individual reliance is required, and whether defendants must have acted with scienter.[40] *St. Jude*, 2006 WL 2943154, at *5, n.4.[41] Variations in state warranty law that may impact the claims at issue in this case include whether direct privity is required and whether individual reliance is required. *See, e.g.*, *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 726 (5th Cir. 2007) (but finding variations in warranty law across jurisdictions defeated predominance under Louisiana choice of law rule requiring the laws of all fifty-one jurisdictions to apply to the case).

_____

[39] *Mooney*, 244 F.R.D. at 534 ("Because of the outcome of the choice-of-law analysis below, it is unnecessary to determine the precise number of outcome-determinative conflicts…. It is sufficient to recognize that conflicts exist.").

[40] The Court need only consider substantive areas of law. If a rule is procedural or relates to the remedy, Minnesota law applies. *Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir. 2007).

[41] In *St. Jude*, the Court also determined that substantive areas of conflict in consumer law included whether the statutes provided a private right of action and proscribed omissions. Since then, the Iowa legislature has enacted Iowa Code § 714H.1 providing for a private right of action obviating all conflicts in this area of law, and omissions are not at issue in this case.

With these differences noted,[42] Minnesota law requires the court to weigh flexible criteria to choose whether one state's law may be applied over another's: 1) predictability of results, 2) maintenance of interstate and international order, 3) simplification of the judicial task, and 4) advancement of Minnesota's governmental interest, and 5) the better rule of law. *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973) (the "*Milkovich* Factors"). "The fifth factor is not considered unless the other factors do not resolve the choice-of-law issue—which, as a practical matter, means that the fifth factor is almost never considered." *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 519 (D. Minn. 2014) (citations omitted).[43] As detailed below, these results favor applying Minnesota law to the consumer fraud and warranty claims against BBY and New Jersey law to the consumer fraud and warranty claims against LG.

---

[42] Minnesota applies the statute of limitations of the jurisdiction whose substantive law applies. Minn. Stat. § 541.31 ("if a claim is substantively based… upon the law of one other state, the limitation period of that state applies.").

[43] Because analysis of the foregoing factors favor a particular jurisdiction, the fifth factor is not considered.

### i.   Minnesota law applies to the consumer protection and warranty claims against BBY.

**Predictability of Results:** This element addresses "whether the choice of law was predictable before the time of the transaction or event giving rise to the cause of action." *Danielson v. Nat'l Supply Co.*, 670 N.W.2d 1, 7 (Minn. Ct. App. 2003). This factor applies "primarily when parties desire advance notice of which state law will govern in future disputes." *Id.* (quotation omitted). This factor should not be given significant weight due to the nature of the transaction – consumers in this case are unlikely to have any indication one way or another as to what law would apply to their purchase of televisions. *Id.* (noting purchase of a product in a certain location does not constitute an expectation that the specific state's law would govern future disputes).

Nonetheless, BBY maintains language on its website demonstrating that it cannot be surprised by application of Minnesota law ("in the absence of applicable federal law, then the laws of the State of Minnesota[ ], without regard to principles of conflict of laws, will govern these terms and apply to any disputes or claims between you and Best Buy.").[44] Accordingly, BBY could predict (and actually desires) that Minnesota law applies.

---

[44] Best Buy "Terms and Conditions," *available at:* https://www.bestbuy.com/site/help-topics/terms-and-

**Maintenance of Order:** This element is "primarily concerned with whether the application of Minnesota law would show manifest disrespect for [another state's] sovereignty or impede the interstate movement of people and goods." *Jepson v. Gen. Cas. Co. Wisc.*, 513 N.W.2d 467, 471 (Minn. 1994). This element seeks to ensure that Minnesota has sufficient contacts with, and interest in, the facts and issues being litigated. *Danielson*, 670 N.W.2d at 8; *Myers v. Gov't Emps. Ins. Co.*, 225 N.W.2d 238, 242 (Minn. 1974).

Here, as discussed in detail above at p. 51, Minnesota has the most significant contacts with the claims being litigated against BBY. *See St. Jude*, 2006 WL 2943154, at *5; *Mooney*, 244 F.R.D. at 536.

**Simplification of the Judicial Task:** This factor concerns this Court's ability to discern and apply the law of a state other than Minnesota. *Lommen v. City of E. Grand Forks*, 522 N.W.2d 148,152 (Minn. Ct. App. 2003). Unless dealing with complex issues of international law, this factor is rarely important. *Miller v. Pilgrim's Pride Corp*, 366 F.3d 672, 674 (8th Cir. 2004). Applying Minnesota or another state's law in this case poses no foreseeable problem; therefore, this factor is neutral. *Mooney*, 244 F.R.D. at 536.

---

conditions/pcmcat204400050067.c?id=pcmcat204400050067 (Last Updated Feb. 15, 2019).

**Advancement of Minnesota's Interests:** The governmental interest factor requires courts to determine which law most effectively advances a "significant interest of the forum state." This requirement assures that "Minnesota courts are not called upon to apply rules of law inconsistent with Minnesota's concept of fairness and equity." *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 455 (Minn. Ct. App. 2001) (quotation omitted).

The differences among various state consumer protection statutes reflect the "the extent to which they will tolerate a degree of lessened protection for consumers to create a more favorable business climate for the companies that the state seeks to attract to do business in the state." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 592 (9th Cir. 2012).[45] Other states, like Minnesota, prioritize the interest in allowing liberal recovery for consumers. Minnesota's statutes are broadly worded to apply to "any person likely to be damaged," indicating that the legislature ensconced a policy

---

[45] *Mazza* was decided under California choice of law rules, which recognize that the "place of the wrong" has the predominant interest, and weighs those interest against the interests of other jurisdictions. *Id.* at 593. California then asks "which state interest is most impaired." *Id.* These rules stand in contrast to Minnesota's, however, which long ago abolished the principle of applying *lex loci delicti*—the law of where the "injury" occurred. *Balts v. Balts*, 142 N.W.2d 66, 70 (Minn. 1966).

fostering the broad remedial effects of policing Minnesota's business environment by permitting recovery even from those injured extraterritorially. *Mooney*, 244 F.R.D. at 536-37.

Courts have interpreted this to mean Minnesota not only has a strong interest in not only regulating business within its boundaries, but also protecting individuals harmed by conduct emanating from its boundaries. *Thompson*, 330 F.R.D. at 225 (noting the Minnesota consumer fraud act is "a statute that the Minnesota legislature intended to apply to Minnesota companies"). Accordingly, Minnesota's governmental interest in protecting its reputation by policing Minnesota business' conduct that reaches outside the state is an important one meriting heavy consideration. *Fluck v. Jacobson Machine Works, Inc.*, No. CX-98-1899, 1999 WL 153789 at *4 (Minn. Ct. App. Mar. 23, 1999). Certainly, jurisdictions in which putative Class members reside have an interest in protecting their citizens from violations of consumer protection laws and warranty laws. But this interest is not superior to, or undermined by, the application of Minnesota law to Plaintiffs' claims; and other states' *less* protective laws attempting to shelter domiciled businesses are not implicated here at all, because BBY is already at home in

Minnesota.[46] As stated in *Mooney* with regard to the unjust enrichment claims,

> [A]pplication of Minnesota's [consumer protection law and] law of unjust enrichment in this case serves Minnesota's policy of preventing a corporation from using Minnesota as a shield to engage in unfair business practices that result in the corporation's unjust enrichment. Although other states have an interest in applying their own laws, their interest is not so strong so as to prevent their citizens from benefitting from Minnesota's *willingness to provide statutory and common law remedies* for fraudulent conduct emanating from Minnesota.

244 F.R.D. at 537 (emphasis added).

Moreover, courts have found that where a conflict exists in warranty law, Minnesota generally has the greater interest in applying its laws where other states require, for instance, privity. *See SCM Corp. v. Deltak Corp.*, 702 F. Supp. 1428, 1430-35 (D. Minn. 1988) (quoting Minn. Stat. § 336.2-318) (finding conflicting law "contrary to Minnesota's interest as a justice administering state" where it required privity and would preclude recovery under warranty by a third-party beneficiary); *see also Barden v. Hurd Millwork Co., Inc.*, 249 F.R.D. 316, 320 (E.D. Wis. 2008) ("the goal of warranty law is protection rather than regulation, and each state's warranty

---

[46] *See, e.g.*, *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001) (dismissing as "pure fancy" the suggestion that "Hawaii would wish to restrict its residents from recovery that others could obtain" under California law where defendant resided); *Diamond Multimedia Sys., Inc. v. Super. Ct.*, 968 P.2d 539, 557 (Cal. 1999) ("[A state] has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices.").

law is designed to protect consumers within the state.") (citing *Chi. Heights Venture v. Dynamit Nobel of Am., Inc.*, 782 F.2d 723, 727 (7th Cir. 1986)).

The foregoing analysis thus applies equally to the warranty theories of liability, and to the extent this Court finds outcome-determinative conflicts amongst jurisdictions in unjust enrichment or contract law, to those claims as well. Each legal theory uses as its factual trigger a common misrepresentation in connection with consumer transactions from emanating from Minnesota (or New Jersey in the context of LG, discussed *infra*). All claims against BBY are predicated on the same factual allegations as the consumer protection claims, and this Court should, therefore, conclude that Minnesota's governmental interests are best advanced by applying Minnesota law to the claims that may be in conflict with other jurisdictions with respect to Minnesota-domiciled Defendant BBY. *See Mooney*, 244 F.R.D. at 535; *St. Jude*, 2006 WL 2943154, at *4-7.

### ii. New Jersey law applies to the consumer protection and warranty claims against LG.

**Predictability of Results:** As noted above, this factor should not be given significant weight given the nature of the transaction – consumers in this case are unlikely to have any indication one way or another as to what law would apply to their purchase of televisions. *Danielson*, 670 N.W.2d at 7. Moreover, LG also maintains language on its website to suggest it could not

be surprised by the application of New Jersey to claims against it ("This privacy policy shall be governed by the laws of the State of New Jersey.").[47]

**Maintenance of Order:**   New Jersey has significant contacts with the claims asserted against LG such that it also has sufficient interest in the facts and issues being litigated. LG is headquartered in New Jersey, distributes, markets, and warrants its products from New Jersey, and benefits from the protections of the laws of New Jersey. *See* p. 52, *supra.*

**Simplification of the Judicial Task:** As noted above, applying another state's law in this case poses no foreseeable problem. This factor is therefore neutral.  *See Mooney*, 244 F.R.D. at 536.

**Advancement of Minnesota's Interests:** The interests advanced in support of the application of Minnesota law to BBY are shared equally by the state of New Jersey with respect to LG. Accordingly, application of New Jersey law will advance Minnesota's interest in broadly protecting consumers from deceptive and unfair conduct.

LG's headquarters are in New Jersey, and the decisions regarding its Hz-rating labeling emanated from New Jersey. LG's collective activities arise in the context of consumer transactions, and all claims asserted in this case

---

[47] LG "Privacy Policy," *available at:* https://www.lg.com/us/privacy (Last Updated June 26, 2019).

invoke laws designed to prevent such activities from emanating from New Jersey. *See generally*, *Peterson v. BASF Corp.*, 618 N.W.2d 821, 826 (Minn. Ct. App. 2000) (finding no abuse of discretion where Minnesota court certified nationwide class of purchasers under New Jersey Consumer Fraud Act where defendant's principal place of business was in New Jersey). Courts have found New Jersey has a significant interest in having its law applied to protect consumers from the conduct of merchants located within its borders under similar circumstances: "While there can be no doubt that the New Jersey legislature desired to protect its own residents, it is equally clear that this state has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries." *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998). *See also Elias v. Ungar's Food Prods., Inc.*, 252 F.R.D. 233, 250 (D.N.J. 2008) ("A New Jersey business made a promise emanating from New Jersey. An express warranty embodies a promise and New Jersey has an interest in ensuring its businesses live up to their promises to consumers and provide a remedy if the promise is broken.") (certifying nationwide warranty and consumer fraud claims under New Jersey law).

As detailed above, Minnesota shares a similar interest in broadly protecting consumers from unfair and deceptive conduct emanating from within its borders. Because LG is domiciled in New Jersey, this Court should

conclude that Minnesota's interests (concurrently with New Jersey's) are best advanced by applying New Jersey law to the warranty and consumer protection claims against LG. *See Mooney*, 244 F.R.D. at 535; *St. Jude*, 2006 WL 2943154, at *4-7.

### 2. Common questions of law and fact predominate

#### a. Consumer Protection

The Court should certify the claims against BBY under the following consumer statutes: Minnesota's Prevention of Consumer Fraud Act: Minn. Stat. § 325F.68, *et seq.* ("MCFA"); Minnesota Uniform Deceptive Trade Practices Act: Minn. Stat. § 325D.43, *et seq.* ("MDTPA"); and Minnesota Unlawful Trade Practices Act, § 325D.13 ("MUTPA").

"Under Minnesota's Private Attorney Statute [Minn. Stat. § 8.31, subd. 3a] ('Private AG Statute')... any person injured by a violation of the laws entrusted to the Minnesota Attorney General to investigate and enforce – including the MCFA and MUTPA – may file a lawsuit and recover damages as well as costs and fees." *Hudock*, 2017 WL 1157098, at *5 (internal citation and quotation omitted). The MDTPA permits any person likely to be damaged by deceptive trade practices to seek injunctive relief from future damage. *Id.* at *6. Together, the MUTPA, MDTPA, and the MCFA protect consumers from false and deceptive advertising in connection with the sale of

merchandise. *See generally*, Minn. Stat. § 325D.13; Minn. Stat. § 325D.44; Minn. Stat. § 325F.69.

Minnesota's consumer protection statutes are broad and liberally construed. *See Meyer v. Dygert*, 156 F. Supp. 2d 1081, 1086 (D. Minn. 2001) ("The law is clear that [Minnesota's consumer statute] was intended to be broader than the common law fraud cause of action, and that it is remedial in nature and should thus be liberally construed."). Although Minnesota's consumer protection statutes generally require a causal nexus between the prohibited conduct and the claimed damages, proof of causation is relaxed and is satisfied by common, circumstantial evidence of causation rather than by a showing of individual reliance. *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 14-15 (Minn. 2001) (holding misrepresentation in sales claims do not require a showing of individual reliance), *accord Mooney v. Allianz Life Ins. Co. of N. Am.*, No. 06-545, 2007 WL 128841, at *8-9 (D. Minn. Jan. 12, 2007); *Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1096 (D. Minn. 2017) (Tunheim, C.J.) ("The Minnesota Supreme Court clarified, in *Group Health Plan*, that a plaintiff ultimately must prove 'causation,' or a 'legal nexus' between the offending conduct and the plaintiff's damages, but that personal reliance by the plaintiff is not the only way to demonstrate the requisite legal nexus.").

The Court can presume causation where a representation is not merely deceptive but actually false and material. *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 273 (2d Cir. 1987) (cited by *Grp. Health Plan*, 621 N.W.2d at 15, n.11 as a case that properly sets forth the causation standard in consumer fraud cases).  Plaintiffs have demonstrated that BBY advertised the Accused Models to the Subclass with knowing, false representations about the Hz rating with substantively identical messages throughout the Class Period. *See* pp. 26-34, *supra*.

Common evidence here also shows that ███████████████████ ████████████████████████████████████████████ ████████████████. *See* pp. 34-37, *supra*. This market reality allows ████ ██████████████ for the Accused Models. As such, the elements for recovery under Minnesota's consumer protection laws are susceptible to resolution with common evidence on a systematic, class-wide basis. *Khoday*, 2014 WL 1281600, at *30 (finding predominance in consumer fraud claims); *Rilley v. MoneyMutual, LLC*, 329 F.R.D. 211, 219 (D. Minn. 2019) (finding common issues predominated consumer protection and unjust enrichment claims where defendant made misleading statements in connection with payday loans); *In re Lutheran Bhd. Variable Ins. Prod. Co. Sales Practices Litig.*, No. 99-MD-1309(PAM/JGL), 2004 WL 909741, at *1 (D. Minn. Apr. 28, 2004) (same).

Similarly, the Court should certify a class under the New Jersey Consumer Fraud Act ("NJCFA"), § 56:8-1, *et seq.*, with regard to the claims in both Classes against LG. The NJCFA prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, or the knowing concealment, suppression, or omission of any material fact." N.J. Stat. Ann. § 56:8-2. It "was intended to be one of the strongest [consumer fraud acts] in the country." *Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641, 647 (D.N.J. 2013).

Like Minnesota's Private AG Act, the NJCFA requires "only proof of a causal nexus between the [deceptive conduct] and the loss." *Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807, 814 (N.J. Super. Ct. App. Div. 2000). *See also Belmont Condo. Ass'n, Inc. v. Geibel*, 74 A.3d 10, 24 (N.J. Super. Ct. App. Div. 2013) ("A plaintiff need not even show reliance on the violation of the [CFA] as long as an ascertainable loss resulting from defendant's conduct is demonstrated… Accordingly, in order to prevail, a plaintiff need only demonstrate a causal connection between the unlawful practice and ascertainable loss.") (internal citations and quotations omitted).[48]

Liability under the NJCFA stems from Defendants' misrepresentations, "whether or not any person has in fact been misled, deceived, or damaged thereby." *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 365 (N.J. 1997)

---

[48] *See* pp. 73-76, *infra*.

(quoting N.J. Stat. Ann. § 56:8-2). Thus, as is the case for claims arising under Minnesota's consumer protection laws, the resolution of these claims turns almost entirely on Defendants' uniform conduct of marketing and selling televisions with false refresh rates, by which Plaintiffs and members of the Classes suffered an ascertainable loss by paying Defendants a price premium which they would not have otherwise paid. *In re Mercedes-Benz*, 257 F.R.D. at 73-75 (certifying NJCFA claim as issues of law and fact common to the proposed class predominated over individual issues; "the issues… turn on the knowledge and actions of the company rather than those of the individual class members, and are therefore common to the class."); *see also Elias*, 252 F.R.D. at 248-249. As demonstrated above, common proof predominates these questions.

### b. Warranty

Minnesota law applies to Plaintiffs' claims for breach of warranty against BBY and New Jersey law applies to the claims against LG. Warranty claims generally require an objective inquiry into the Defendants' conduct against all consumers, such that common questions of law and fact predominate the warranty claims as well. *See, e.g.*, *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 563 (D. Minn. 2010), a*ff'd*, 644 F.3d 604 (8th Cir. 2011) (certifying warranty claims and reasoning that such claims accrue at the tender of delivery of the nonconforming goods, so varying

circumstances of plaintiffs were irrelevant to claims arising at the time of purchase). Such common questions include whether Defendants misrepresented their products, and whether that misrepresentation breached warranties.

Moreover, neither individual reliance nor causation is required under Minnesota or New Jersey warranty law, further illustrating that common issues will predominate the claims arising under express and implied warranties. *Id.* at 564; *Elias,* 252 F.R.D. at 250-51 (certifying express warranty claims under New Jersey law for claims arising from misrepresentations on product packaging), *accord Ebin v. Kangadis Food Inc.,* 297 F.R.D. 561, 569 (S.D.N.Y. 2014) (certifying express and implied warranty claims for product labeling under New Jersey law).

### c. Contract

Minnesota law applies to Plaintiffs' breach of contract claims against BBY. Like the other claims in asserted in this case, breach of contract elements are subject to common proof through generalized evidence. *See, e.g., City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 355-56 (D. Minn. 2012) (certifying breach of contract and MCFA claims).

Here, Plaintiffs' breach of contract claim is easily resolved on a class-wide basis. ████████████████████████████████████████

████████████████████████████████████████████████, were

part of the bargained-for exchange and did not change from consumer to

consumer. Liability hinges on the meaning of "Hertz" and "refresh rate" and

not on individual consumer transactions. The breach occurred at the point of

purchase with respect to all Class members. Moreover, as detailed below,

Plaintiffs' damages will not defeat predominance as, *inter alia*, Plaintiffs seek

to recover the premium paid attributable to the misrepresented Hz

specification, which can be resolved using a common class-wide formula.

Common issues of law and fact therefore predominate over questions

affecting only individual members of the Subclass such that the Court should

certify the breach of contract theory.

### d. Unjust Enrichment

Minnesota law applies to Plaintiffs' claims for unjust enrichment

against BBY and LG. Unjust enrichment occurs when a benefit, which would

be inequitable to retain, has been conferred on the defendant. *Klass v. Twin

City Fed. Sav. & Loan Ass'n*, 190 N.W.2d 493, 494-95 (Minn. 1971). Unjust

enrichment requires conduct on the part of the defendant that can be

considered morally wrong or stemming from a bad motive on the part of the

defendant. *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App.

2001).

Courts will certify unjust enrichment claims where they are based on the same conduct underlying certified consumer protection claims on the basis that "class issues will also predominate regarding whether Defendants were unjustly enriched at the class members' expense." *Khoday*, 2014 WL 1281600 at *31; *see also Mooney*, 244 F.R.D. 531 at 533-537 (D. Minn. 2007)) (finding predominance satisfied for unjust enrichment claims premised on same legal theory as MCFA claims). As detailed above, class issues predominate the consumer protection claims, and claims for unjust enrichment should be certified for the same reasons.

### e. Plaintiffs' survey and economics experts demonstrate common harm and classwide damages.

Plaintiffs' experts Steve Gaskin and Colin Weir set forth evidence of class-wide harm and a damages model that can be determined using Choice-Based Conjoint Analysis ("CBC") and accompanying economic analysis. Mr. Gaskin designed and conducted a CBC to assess the reduction in market value of LG LED televisions resulting from the disclosure to consumers of the actual refresh rates at the time and point of first purchase. Gaskin Rprt. ¶9. This CBC takes into account relevant economic considerations. *See* Weir Rprt. ¶¶30-46. Gaskin's CBC "estimates the reduction in market value (measured in dollars and percentage terms) due to the Hz deceptive advertising, meaning the difference in the market value of an LG LED

television with the Hz deceptive advertising, and the value of an otherwise identical LG LED television with the actual refresh rate disclosed to consumers at the time and point of first purchase." Gaskin Rprt. ¶11.

The CBC found that "[t]he reduction in market value due to a change from 'TruMotion 120 Hz' to 'Refresh Rate 60 Hz and TruMotion' is 5.31%... The reduction in market value due to a change from 'TruMotion 240 Hz' to 'Refresh Rate 120 Hz and Tru Motion' is 1.300%...," or $76.90 for a $1500 television and $19.50 for a $1500 television. Gaskin Rprt. ¶54. These percentages (and associated example dollar values) reflect the differences in what consumers would be willing to pay for a truthfully advertised LG LED television versus an LG LED television with a misleading refresh rate. Each Class members' economic loss is 5.31% (for a television advertised as 120 Hz) or 1.3% (for a television advertised as 240 Hz) of the purchase price of their LG LED television. This model therefore tracks Plaintiffs' theory of liability as required by *Comcast*. From an economics perspective, this "methodology can determine the damages across any of the challenged LG televisions, prescribed time period, and across any specific states or other defined geographic regions…" Weir Rprt. ¶12.

Courts, including this Court, have routinely accepted CBC Analysis as a proper methodology for calculating price premiums on a class-wide basis in a consumer class action. *See, e.g.*, *Khoday*, 2014 WL 1281600 at *33 (finding a

conjoint survey conducted by Mr. Gaskin allowed "for a determination of the actual value to consumers" of a mislabeled product in a class case); *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1368 (Fed. Cir. 2013) (holding that it was an abuse of discretion for the district court to fail to consider plaintiff's expert's conjoint analysis, and explaining that "there may be a variety of ways to show that a feature drives demand, including with evidence that a feature significantly increases the desirability of a product incorporating that feature"); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1022-32 (C.D. Cal. 2015) *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017) (holding that the proposed conjoint analysis was "sufficiently reliable to be used in calculating class-wide damages," and, therefore, satisfied *Comcast* as part of a hybrid damages methodology); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015) (accepting expert testimony that expert "will isolate the premium associated with the 50% thicker claim using one of three statistical methods: hedonic regression, a contingent valuation study, or a conjoint analysis").

Plaintiffs' damages model shows that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). This damages model measures "only those damages attributable" to Plaintiffs' theory of liability—namely that LG

and BBY labeled or advertised the Accused Models as having refresh rates of 120Hz or 240Hz when in reality the refresh rates were only 60Hz or 120 Hz, respectively. *See* Compl. [D.E. 175] (May 1, 2019) at ¶¶1-5. As a result, Plaintiffs allege that they and the Classes "paid more for [the Accused Models] than [they] would have otherwise paid had the accurate refresh rate been disclosed by Defendants." *Id.* at ¶6; *Comcast*, 569 U.S. at 35; *see also Khoday*, 2014 WL 1281600, at *33 (citing *Vaccarino v. Midland Nat. Life Ins. Co.*, No. CV 11-5858 CAS (MANx), 2013 WL 3200500, at *14 (C.D. Cal. June 17, 2013)). Plaintiffs have therefore presented common evidence of harm and a reliable class-wide damages model based on common evidence that is directly tied to their theory of liability.

## C.   A class action is superior to adjudication of individual claims.

"A class action is a superior form of litigation if it is capable of addressing 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Hartley v. Suburban Radiologic Consultants, Ltd.*, 295 F.R.D. 357, 378 (D. Minn. 2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)). Courts consider four factors when considering Rule 23(b)(3)'s superiority requirement: (1) the interests of members of the class in individually controlling the prosecution of separate actions; (2) whether other litigation

has already commenced; (3) the desirability or undesirability of concentrating claims in one forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

Application of these factors warrants a finding of superiority. With possibly hundreds of thousands of Class members represented by the named Plaintiffs, each holding a claim worth 5.31% or 1.3% of the purchase price of their television, the adjudication of individual lawsuits in fora nationwide is patently less desirable and efficient than resolution of all claims through the class action device. *See, e.g.*, *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 522 (D. Minn. 2015) (superiority met where prohibitive costs of prosecuting a class action "compared to the relatively small potential recoveries, make it unlikely that class members would want or be able to prosecute their claims on an individual basis, or that it would be more efficient for them to do so.").

## III.   The Court May Certify Alternative Classes

The court may mold, shape and otherwise define the Classes as it sees proper. *See In re Select Comfort Corp. Sec. Litig.*, 292 F.R.D. 598, 604 (D. Minn. 2001). Accordingly, if this Court decides that the law cannot be applied uniformly across national classes, this Court may alternatively apply Minnesota law with respect to jurisdictions that have no outcome-determinative conflicts with Minnesota consumer protection law. *See St.*

*Jude*, 2006 WL 2943154, at *5 (Minnesota law can be applied to claims in all jurisdictions in which there are no substantive conflicts). Common evidence shows that ████████████████████████████████████████ ████████████████████████, and such conduct negates the conflicts with the states that impose a scienter requirement, allowing the Court to certify a class under Minnesota law that includes Plaintiffs from 39 jurisdictions.[49] If the Court still considers scienter an outcome-determinative conflict despite these allegations, there are 29 jurisdictions that do not conflict with Minnesota on either scienter or reliance requirements that can also comprise an acceptable class under Minnesota law.[50]

Finally, and also in the alternative, the Court may certify state classes based on the state where each Plaintiff resides—in California, Wisconsin, and Pennsylvania—for those claims that each Plaintiff asserts. *See, e.g.*, *In re ConAgra Foods*, 90 F. Supp. 3d at 986 (certifying express warranty and

---

[49] Arizona, Arkansas, Georgia, Indiana, Maryland, Nevada, North Carolina, Oregon, Pennsylvania, Texas, Virginia, and Wyoming arguably require plaintiffs to prove individual reliance. Ex. 87.

[50] Alabama, Arizona, Arkansas, Colorado, Georgia, Indiana, Iowa, Louisiana, Maryland, Nevada, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Dakota, Texas, Utah, Virginia, and Wyoming have arguable substantive conflicts with Minnesota consumer protection law. Ex. 87. This Court recognized a similar grouping of states in *St. Jude*, 2006 WL 2943154, at *5.

consumer protection claims, and denying certification of implied warranty claims only due to lack of privity with the defendant); *Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506 LB, 2014 WL 2734953, at *19-20 (N.D. Cal. June 13, 2014) (certifying breach of contract, UCL, and unjust enrichment claims for California class); *Allen v. ConAgra Foods, Inc.*, No. 3:13-cv-01279-WHO, 2019 WL 3302821, at *20-21 (N.D. Cal. July 22, 2019) (certifying Wisconsin consumer protection class); *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292, at *30 (W.D. Mo. Mar. 21, 2019) (certifying Wisconsin consumer protection and unjust enrichment class); *Stewart v. Assocs. Consumer Discount Co.*, 183 F.R.D. 189 (E.D. Penn. 1998) (certifying class for unjust enrichment, breach of warranty, and consumer protection claims under Pennsylvania law); *Chapman v. Tristar Prods., Inc.*, No. 1:16-CV-1114, 2017 WL 1433259, at *3, *13 (N.D. Ohio Apr. 24, 2017) (certifying express warranty and unjust enrichment class for Pennsylvania consumers); *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 32 (Pa. 2011) (affirming certification of Pennsylvania implied and express warranty classes); *Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756 (3d Cir. 2017) (vacating denial of class certification for breach of contract claims: "Because form contracts should be interpreted uniformly as to all signatories, Pennsylvania and federal courts have recognized that claims

involving the interpretation of standard form contracts are particularly well-suited for class treatment.").

## CONCLUSION

Plaintiffs respectfully request this Court GRANT their motion for class certification.

Dated: August 6, 2019          Respectfully submitted,

By: */s/ David M. Cialkowski*
David M. Cialkowski (MN Lic. #306526)
Alyssa J. Leary (MN Lic. #397552)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com
alyssa.leary@zimmreed.com

Hart L. Robinovitch (MN Lic. #240515)
**ZIMMERMAN REED LLP**
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Telephone: (480) 348-6415
hart.robinovitch@zimmreed.com

Daniel C. Hedlund (MN Lic. #258337)
Raina Borrelli (MN Lic. #392127)
Brittany N. Resch (MN Lic. #397656 )
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dhedlund@gustafsongluek.com
rborrelli@gustafsongluek.com
bresch@gustafsongluek.com

Luke P. Hudock (*Pro Hac Vice*)
**HUDOCK LAW GROUP, S.C.**
P.O. Box 83
Muskego, WI 53150
Telephone: (414) 526-4906
lphudock@law-hlg.com

Samuel J. Strauss (*Pro Hac Vice*)
Alex Phillips (*Pro Hac Vice*)
**TURKE & STRAUSS LLP**
613 Williamson Street, Suite 201
Madison, WI 53703
Telephone: (608) 237-1774
Sam@turkestrauss.com
AlexP@turkestrauss.com

*Attorneys for Plaintiffs and the Putative Class*