**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| HUDOCK et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>LG ELECTRONICS U.S.A., INC. et al.,<br><br>                    Defendants.<br><br>This document relates to:<br><br>All actions | Lead Case No. 0:16-cv-01220-JRT-KMM<br><br>**DEFENDANTS LG ELECTRONICS U.S.A., INC., BEST BUY CO., INC., BEST BUY STORES, L.P., and BESTBUY.COM, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

I.    THE PARTIES ......................................................................................... 3
         i.    Breann Hudock ............................................................................. 4
         ii.   Ivan Villa Lara ............................................................................. 4
         iii.  Eugene Mannacio .......................................................................... 5
         iv.   Brian Fleishman .......................................................................... 5

II.   BACKLIGHT SCANNING ENHANCES REFRESH RATE TO REDUCE
      MOTION BLUR ON LED TELEVISION ............................................... 6
      A.   There Is No Industry Definition of "Refresh Rate" .................... 7
      B.   There Are Different Technologies to Enhance Refresh Rate and Reduce
           the Perception of Motion Blur ................................................... 8
      C.   LG TVs Used Different Technologies to Enhance Refresh Rate and
           Reduce Motion Blur ................................................................ 11
      D.   LG and BBY Did Not Distinguish Between Refresh Rate Technologies .. 12
      E.   LG Tested and Confirmed the Refresh Rates of Televisions Using
           Backlight Scanning Technology ............................................... 13
      F.   Plaintiffs' Several Narrow Definitions of Refresh Rate Suit Their
           Purposes ............................................................................... 14

III.  CONSUMER PURCHASING EXPERIENCES VARIED SIGNIFICANTLY .... 15
      A.   Available Features Varied Over Time and Among Models ....................... 15
      B.   Consumer Preferences Have Varied Based on Intended Use .................... 16
      C.   Product Price Varied Immensely for Numerous Reasons .......................... 17
      D.   Consumers Were Exposed to Different Information About TVs ............... 19
      E.   Consumers Had Different Purchasing Experiences Depending on the
           Sales Channel ........................................................................ 21
           i.    In-Store Shopping Experience ................................................. 21
           ii.   Online Experience ................................................................ 29

LEGAL STANDARD ......................................................................................... 30

ARGUMENT .................................................................................................. 31

I.    PLAINTIFFS HAVE NOT ESTABLISHED COMMONALITY ........................ 31

II.   PLAINTIFFS ARE NOT TYPICAL OR ADEQUATE ....................................... 36
      A.   The Plaintiffs' Individual Issues of Reliance Defeat Typicality ............... 36

B.      Villa Lara Is Subject to Additional Unique Defenses................................. 37

C.      Hudock Is Not an Adequate Class Representative ..................................... 38

III.    PLAINTIFFS CANNOT SATISFY THE PREDOMINANCE
        REQUIREMENT. ...................................................................................... 39

        A.      Individual Issues Predominate Because Plaintiffs Cannot Apply
                Minnesota or New Jersey Law Across the Class...................................... 39

                i.      Minnesota's Choice of Law Rules Apply ...................................... 40

                ii.     The Laws of the 50 States Conflict for All Claims......................... 40

                iii.    It Would Be Unconstitutional to Apply Minnesota or New Jersey
                        Law to All Claims ......................................................................... 41

                iv.     The *Milkovich* Factors Do Not Support Application of Minnesota
                        or New Jersey Law Here.................................................................. 43

        B.      All of Plaintiffs' Theories of Liability Depend on First-Party Reliance
                and Thus Individual Issues Predominate.................................................. 48

                i.      Plaintiffs' Consumer Fraud Claims Require Individualized
                        Evidence of Reliance ..................................................................... 49

                ii.     Likewise, Resolution of Plaintiffs' Contract and Warranty
                        Claims Require the Same Individualized Inquiries, Defeating
                        Their Bid for Class Certification.................................................... 55

                iii.    Defendants Retain the Right to Present Evidence Negating
                        Reliance, Which Can Only Be Done on an Individualized Basis.... 58

IV.     A CLASS ACTION IS NOT SUPERIOR ........................................................ 61

V.      PLAINTIFFS HAVE NOT ESTABLISHED THAT DAMAGES CAN BE
        DETERMINED ON A CLASS-WIDE BASIS ................................................... 62

        A.      Plaintiffs' Damages Methodology Does Not Fit Their Legal Theory ........ 64

                i.      Plaintiffs' Model Does Not Measure a Change in Market Value.... 64

                ii.     Plaintiffs' Methodology Did Not Consider Necessary Supply
                        Side Factors.................................................................................. 66

                iii.    Courts Have Rejected Damages Models Based on Conjoint
                        Analyses That Do Not Account for Supply-Side Factors ............... 68

                iv.     Plaintiffs' CBC Differs From Other Conjoints  That Have Been
                        Accepted ...................................................................................... 69

                v.      Plaintiffs' Damages Model Is Similar to One Presented in An
                        Analogous Case Where Certification Was Denied ......................... 71

                vi.     Plaintiffs' Additional Authority is Inapposite ............................... 71

        B.      Plaintiffs Have Not Presented a BBY Subclass Model ............................. 72

        C.      Plaintiffs' Damages Model Does Not Support Their Damages Theory ..... 73

VI.     THERE ARE NO GROUNDS TO CERTIFY A RULE 23(b)(2) CLASS............ 75

VII.   PLAINTIFFS' REQUEST FOR ALTERNATIVE CLASSES FAILS FOR
     THE SAME REASONS ................................................................................ 76
     A.    The Proposed Alternate Consumer Protection Class Is Unmanageable ..... 77
     B.    The Proposed Single-State Subclasses Fare No Better ............................. 79

CONCLUSION ......................................................................................................... 80

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*In re 5-Hour Energy Mktg. & Sales Practices Litig.*,
    No. ML13-2438PSG(PLAx), 2017 WL 2559615 (C.D. Cal. June 7,
    2017)...................................................................................................................59, 88

*In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Prices
    Litig.*,
    No. 09-MD-2059, 2010 WL 3893807 (D. Minn. Sept. 29, 2010).........................56, 66

*Apple Inc. v. Samsung Elecs. Co.*,
    735 F.3d 1352 (Fed. Cir. 2013) ............................................................................ 79

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
    909 F. Supp. 2d 1147 (N.D. Cal. 2012) ................................................................ 80

*Avery v. State Farm Mut. Auto. Ins. Co.*,
    216 Ill. 2d 100 (2005)............................................................................................ 86

*Avritt v. Reliastar Life Ins. Co.*,
    615 F.3d 1023 (8th Cir. 2010) ...................................................................65, 83, 84

*Barden v. Hurd Millwork Co., Inc.*,
    249 F.R.D. 316 (E.D. Wis. 2008) ......................................................................... 55

*In re Baycol Prods. Litig.*,
    218 F.R.D. 197 (D. Minn. 2003) ...................................................................*passim*

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) .............................................................................. 54

*Brown v. Wells Fargo & Co.*,
    284 F.R.D. 432 (D. Minn. 2012) .....................................................................44, 56

*Buetow v. A.L.S. Enterprises, Inc.*,
    650 F.3d 1178 (8th Cir. 2011) .............................................................................. 58

*Buetow v. A.L.S. Enters., Inc.*,
    259 F.R.D. 187 (D. Minn. 2009) .....................................................................43, 56

*Burks v. Abbott Labs.*,
    639 F. Supp. 2d 1006 (D. Minn. 2009) ................................................................ 86

*Coleman v. Watt,*
   40 F.3d 255 (8th Cir. 1994) ................................................................... 39

*Comcast Corp. v. Behrend,*
   569 U.S. 27 (2013) ............................................................ 11, 38, 72, 81

*In re ConAgra Foods, Inc.,*
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ..................................................... 80

*Cruz v. Lawson Software, Inc.,*
   No. 08-5900, 2010 WL 890038 (D. Minn. Jan. 5, 2010)......................... 48

*Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.,*
   321 F.R.D. 193 (E.D. Pa. 2017).............................................................. 88

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.,*
   No. 16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21,
   2019)....................................................................................................... 50

*Dugan v. TGI Fridays, Inc.,*
   231 N.J. 24 (2017)...........................................................................62, 63

*Ebert v. Gen. Mills, Inc.,*
   823 F.3d 472 (8th Cir. 2016) ..........................................................38, 39, 47

*Elizabeth M. v. Montenez,*
   458 F.3d 779 (8th Cir. 2006) ................................................................ 44

*Fitzpatrick v. Gen. Mills, Inc.,*
   635 F.3d 1279 (11th Cir. 2011) ............................................................ 86

*Ford Motor Co. Ignition Switch Prod. Liab. Litig.,*
   174 F.R.D. 332 (D.N.J. 1997)................................................................ 56

*Foster v. St. Jude Med., Inc.,*
   229 F.R.D. 599 (D. Minn. 2005) ...................................................*passim*

*In re GenesisIntermedia, Inc. Sec. Litig.,*
   232 F.R.D. 321 (D. Minn. 2005) .......................................................... 45

*Glastetter v. Novartis Pharm. Corp.,*
   252 F.3d 986 (8th Cir. 2001) ................................................................ 82

*Good v. Ameriprise Fin., Inc.,*
   248 F.R.D. 560 (D. Minn. 2008) ......................................................66, 69

*Gray v. Bayer Corp.*,
  No. CIV.A. 08-4716 JLL, 2011 WL 2975768 (D.N.J. July 21, 2011) ...................... 53

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
  188 F. Supp. 2d 1122 (D. Minn. 2002) .................................................... 58

*Grp. Health Plan, Inc. v. Philip Morris Inc.*,
  621 N.W.2d 2 (Minn. 2001) ................................................................ 57

*Halvorson v. Auto-Owners Ins. Co.*,
  718 F.3d 773 (8th Cir. 2013) .............................................................. 81

*In re Hardieplank Fiber Cement Siding Litig.*,
  No. 12-MD-2359, 2018 WL 262826 (D. Minn. Jan. 2, 2018) ..............................64, 82

*Harnish v. Widener Univ. Sch. of Law*,
  833 F.3d 298 (3d Cir. 2016) ............................................................... 63

*In re Hartford Sales Practices Litig.*,
  192 F.R.D. 592 (D. Minn. 1999) ........................................................... 68

*Hughes v. Wal-Mart Stores, Inc.*,
  250 F.3d 618 (8th Cir. 2001) .............................................................. 52

*Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*,
  192 N.J. 372 (2007) ....................................................................... 62

*Jepson v. Gen. Cas. Co. of Wisconsin*,
  513 N.W.2d 467 (Minn. 1994) .........................................................48, 52, 54

*Jones v. ConAgra Foods, Inc.*,
  No. C 12-01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ...................... 88

*Khoday v. Symantec*,
  Civil No. 11-180, 2014 WL 1281600 (D. Minn. Mar. 13, 2014) ........................... 78

*Khoday v. Symantec Corp.*,
  93 F. Supp. 3d 1067, 1079 (D. Minn.)*, as amended* (Apr. 15, 2015) ...................70, 78

*Kranz v. Koenig*,
  No. CIV. 06-3380 PAMJSM, 2007 WL 4562619 (D. Minn. Jan. 4, 2007) .................................................................................... 61

*In re Lenovo Adware Litig.*,
  No. 15-MD-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ................ 77

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
    171 F.3d 818 (3d Cir. 1999) ................................................................. 64

*In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.*,
    No. 99-MD-1309(PAM/JGL), 2004 WL 909741 (D. Minn. Apr. 28,
    2004) ........................................................................................................ 86

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) .............................................................57, 63

*Martinelli v. Johnson & Johnson*,
    No. 2:15-CV-01733-MCE-DB, 2019 WL 1429653 (E.D. Cal. Mar. 29,
    2019) ........................................................................................................ 77

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ......................................................51, 53, 54

*In re Milk Prods. Antitrust Litig.*,
    195 F.3d 430 (8th Cir. 1999) ............................................................... 46

*Milkovich v. Saari*,
    203 N.W.2d 408 (Minn. 1973) ....................................................*passim*

*Mitchell v. Franklin Bank, S.S.B.*,
    No. 05-1320 PAMRLE, 2006 WL 4081216 (D. Minn. Dec. 29, 2006) .................... 44

*Moua v. Jani-King of Minn., Inc.*,
    No. CIV08-4942ADMJSM, 2010 WL 935758 (D. Minn. Mar. 12, 2010)................. 65

*Nafar v. Hollywood Tanning Sys., Inc.*,
    339 F. App'x 216 (3d Cir. 2009) .............................................................. 66

*In re Nat'l Hockey League Players' Concussion Injury Litig.*,
    327 F.R.D. 245 (D. Minn. 2018) ......................................................47, 84

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F. Supp. 3d 1050  (C.D. Cal. 2015)............................................73, 76

*In re NJOY, Inc. Consumer Class Action Litig. ("NJOY II")*,
    Case No. CV 14-428-JFW(JEMx), 2016 WL 787415 (C.D. Cal. Feb. 2,
    2016).................................................................................................72, 76

*Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*,
    604 N.W.2d 91 (Minn. 2000) .........................................................51, 54

*Novell v. Migliaccio*,
    2008 WI 44 (2008) ................................................................................. 88

*O'Shaughnessy v. Cypress Media, L.L.C.*,
    No. 4:13-CV-0947-DGK, 2015 WL 4197789 (W.D. Mo. July 13, 2015)............46, 47

*Olen v. N. Tier Retail, LLC*,
    No. CIV. 11-2665, 2012 WL 1580994 (D. Minn. May 4, 2012) ............................... 84

*Patrick v. Wells Fargo Bank, N.A.*,
    385 P.3d 165 (Wash. Ct. App. 2016) ....................................................................... 86

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ................................................................................................. 49

*Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*,
    No. CV 14-7242-DMG, 2016 WL 5920345 (C.D. Cal. June 23, 2016).................... 61

*Pilgrim v. Universal Health Card, LLC*,
    660 F.3d 943 (6th Cir. 2011) ................................................................................... 53

*Rapp v. Green Tree Servicing, LLC*,
    302 F.R.D. 505 (D. Minn. 2014) ...........................................................47, 49, 56, 85

*Retired Chi. Police Ass'n v. City of Chi.*,
    7 F.3d 584 (7th Cir. 1993) ....................................................................................... 45

*Estate of Riedel by Mirick v. Life Care Ret. Cmtys., Inc.*,
    505 N.W.2d 78 (Minn. Ct. App. 1993) .................................................................... 85

*Saavedra v. Eli Lilly & Co.*,
    No. 2:12-cv-66-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ...................... 76

*Schmidt v. Bassett Furniture Indus.*,
    No. 08-C-1035, 2011 WL 67255 (E.D. Wis. Jan. 10, 2011)...................................... 88

*Schmitz v. Aegis Mortg. Corp.*,
    No. CIV. 97-3142, 1998 WL 1100084 (D. Minn. Aug. 3, 1998)............................... 69

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ............................................................................. 80

*Sprague v. Gen. Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) ................................................................................... 44

*In re St. Jude Med., Inc.*, (*"St. Jude I"*)
    425 F.3d 1116 (8th Cir. 2005) ....................................................49, 54, 83

*In re St. Jude Med., Inc.* (*"St. Jude II"*),
    522 F.3d 836 (8th Cir. 2008) ...............................................*passim*

*State v. Minn. Sch. of Bus., Inc.*,
    915 N.W.2d 903 (Minn. Ct. App. 2018) .................................... 58

*Thompson v. Allianz Life Ins. Co. of N. Am.*,
    330 F.R.D. 219 (D. Minn. 2019) .........................................*passim*

*Thompson v. Am. Tobacco Co.*,
    189 F.R.D. 544 (D. Minn. 1999) ........................................... 84

*Ung v. Universal Acceptance Corp.*,
    319 F.R.D. 537 (D. Minn. 2017) ......................................83, 84

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................38, 39

*Whitney v. Guys, Inc.*,
    700 F.3d 1118 (8th Cir. 2012) ............................................ 48

*Wurm v. John Deere Leasing Co.*,
    405 N.W.2d 484 (Minn. Ct. App. 1987) ................................. 64

*Zakaria v. Gerber Prods. Co.*,
    LA CV15-00200 (C.D. Cal. June 18, 2015)............................. 77

**Statutes**

Cal. Bus. & Prof. Code § 17208....................................................... 85

Conn. Gen. Stat. Ann. § 42-110g .................................................... 86

Ill. Comp. Stat. Ann. 505/10a ........................................................ 86

Minn. Stat. Ann. § 336.2-313.......................................................... 63

Minn. Stat. § 325D.45, subd. 1 ....................................................... 84

N.J. Stat. Ann. § 12A:2-313............................................................ 63

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................................... 69

## INTRODUCTION

This deceptive advertising case is about "refresh rate" – one specification (out of dozens) in LED televisions, and that certain LG televisions used backlight scanning to increase refresh rate.[1]  Refresh rate is one of several features relating to picture quality; higher refresh rates reduce motion blur.  Eight plaintiffs –solicited by counsel (or family) – filed claims challenging defendants' advertising and marketing of LG televisions, claiming that they overpaid for them.  Only four plaintiffs remain.  Four others dropped their claims (three with prejudice) – one after being deposed.

Plaintiffs' motion ignores the cornerstone factor to every television purchase – the Plaintiffs.  Every purchase is unique.  Every consumer comes to the table with their own wants and needs.   Every consumer conducts different research, sees different advertisements, and talks to different salespersons.  Some go to stores, while others shop online; others do both.  Some – like Hudock and Villa Lara – seek out sales.  Others – like Fleishman – take advantage of price matching.  Some – like Mannacio – are focused on identifying a product perfectly suited to their intended use.  The result is a unique, personalized experience leading to the ultimate purchase – a purchase that may or may not consider the refresh rate of the television.

Plaintiffs ignore myriad individualized facts that bear on each and every unique purchaser's putative claim.  Plaintiffs acknowledge that their claims are based on "a

---

[1] All references to "televisions" refer to "LED televisions."

common misrepresentation in connection with consumer transactions."[2]   But basing claims on a purported misrepresentation raises a host of individual questions, whose answers will vary by purchaser.   What did a purchaser know about the product?   Why was the purchaser looking for that television?   Did the purchaser receive any representations?   What were they?   Who gave them – salesperson, friend, relative, someone else?  Were the representations explained?   What did the purchaser understand the representation to mean?   Did the purchaser care?   It is impossible to decide a misrepresentation claim without answering each of these questions on an individualized basis, and without allowing defendants to explore and rebut the responses in the same manner.

These issues are compounded by the nature of the alleged misrepresentation – enhancing refresh rate through backlight scanning.  Plaintiffs contend that "refresh rate" has a universal definition, allowing for enhancement only using one specific technology. Yet industry practice shows otherwise, and even Plaintiffs are on their third definition in this litigation.  There is no such universal definition.

As to the legal issues, Plaintiffs misconstrue the law.  Plaintiffs' claims (and those of putative class members), are governed by the law of the state where they were purportedly harmed – their home state or state of purchase.  Thus, the laws of the 50 states – not Minnesota and New Jersey – govern Plaintiffs' claims, precluding class treatment.  Moreover, even if Minnesota and New Jersey law did govern, Plaintiffs'

---

[2] Plfs.' Mem. Class Cert. at 63 (ECF No. 225) ("Mem.").

claims still could not be resolved without conducting detailed, individualized inquiries into a multitude of factual and legal issues, such as causation, reliance, materiality, and damages. And as to proof of class-wide damages, Plaintiffs submit an irreparably flawed choice-based conjoint survey. As explained below it fails to meet the required *Comcast* standard.

The class action procedure can be appropriate where it makes a case more efficient and manageable. Aggregating Plaintiffs' claims here does not achieve either stated goal, and would mire the Court in endless mini-trials, and scores of jury instructions on all states' laws. It is impossible to try this case on a class-wide basis. Plaintiffs have failed to carry their burden to show otherwise. Certification should be denied.

## **BACKGROUND**

### I.   **THE PARTIES**

LG Electronics U.S.A., Inc. ("LG") distributes and markets home entertainment and appliances, including LED televisions throughout the United States. US sales are conducted through more than 350 retailers, including Best Buy, as LG does not sell directly to consumers. (ECF No. 221 ¶16; Alessi Decl. ¶2) Retailers set their own prices and maintain their own marketing strategies.

Best Buy Co., Inc. is a consumer electronics retailer. Its affiliates, Best Buy Stores, L.P. and BestBuy.com, LLC ("BBY.com," and collectively, "BBY") operate brick-and-mortar stores, and conduct online operations, respectively. (ECF No. 222 ¶¶24, 39.) Since 2010, BBY has sold televisions from at least a dozen different brands in its approximately 1,000 physical stores, and on-line. (Motschenbacher Decl. ¶3.)

4

While the Plaintiffs tried to essentially write themselves out of their motion, focusing near-exclusively on Defendants, each Plaintiff has unique circumstances critical to an evaluation of their claims.

### i.     Breann Hudock

Hudock, from Wisconsin, purchased an LG, model 55LN5100, at BestBuy.com during a 2013 Black Friday sale, (Ex.[3] 1, 101:15-101:18; 106:23-107:5; 192:2-5; Ex. 2; ECF No. 175 ¶¶10, 117), saving $500 on her purchase.  (Ex. 1, 143:13-143:15.)  Hudock, an avid discount shopper, looks for discounts on apps nearly daily.  She learned of the LG deal on hip2save.com (*id.* 65:10-23; 215:1-216:1),[4] and did not view the television before making her purchase. (*Id.* 303:23-303:24.)   Hudock's brother-in-law, Luke Hudock, represents plaintiffs in this case and suggested to Hudock that the refresh rate of her television was not as advertised. (*Id.* 7:16-7:21; 93:3-94:1.) Hudock has never witnessed a refresh rate issue with her television, (*id.* 309:22-310:1), has never heard of the term backlight scanning, and has no understanding of that technology. (*Id.* 86:21-87:2.) Former-plaintiff Benjamin Hudock is Hudock's husband and Attorney Hudock's brother. (*Id.* 7:16-7:21.)

### ii.     Ivan Villa Lara

Villa Lara, a California resident whose grandmother purchased the same LG 55LN5100, in California in the same BBY Black Friday sale (Tafur Ex. 1.) and, like

---

[3] Unless stated otherwise, all citations to "Ex." refer to exhibits to the Declaration of Phoebe Wilkinson.

[4] Hudock had initially purchased a different television, but cancelled it in favor of the discounted 55LN5100 when she found the Hip2Save deal. *Id.* 468:21-469:12.

Hudock, saved $500 on the purchase.  (*Id.*)  Villa Lara claims that he reimbursed his grandmother for the television.



### iii.      Eugene Mannacio

Mannacio, a California resident, purchased an LG 60UH7700, from BBY in California in March 2016. (Ex. 4.)  His prior television failed and Mannacio bought a Samsung television.   (Ex. 5 131:1-132:17.) The HDMI port on the Samsung was incompatible with his laptop, so Mannacio returned it and purchased the LG 60UH7700. (*Id.* 132:15-132:17.)  Connectivity to his laptop was critical.  Indeed, Mannacio brought his laptop to the BBY store and attached it to the HDMI port on the television, to be sure it was compatible, before agreeing to buy it.   (*Id.*  160:7-160:12;  179:20-180:5.) Mannacio joined this lawsuit after being contacted by Plaintiffs' counsel. (*Id.* at 194:20-203:17.)

### iv.      Brian Fleishman

Fleishman, a Pennsylvania resident, purchased an LG 55LA9650 in June 2014. (Amendola Ex. 1.)  Fleishman learned about a deeply reduced price for the television at another retailer, Micro Center, through a website called Slick Deals, but he wanted to get

BBY reward points. (Ex. 6, 49:17-50:23.)   So under the terms of BBY's price match

program, he purchased the television by phone from a BBY store in Maryland (*id.* 47:10-

48:5), saving $1,200 on the purchase.   (*Id*. 410:11-411:15; s*ee infra* 19.)   Fleishman

joined this lawsuit after being contacted by Plaintiffs' counsel.  (Ex. 6, 13:11-17, 21:21-

23:11.)

## II.   BACKLIGHT SCANNING ENHANCES REFRESH RATE TO REDUCE MOTION BLUR ON LED TELEVISIONS



The effectiveness of enhanced refresh rate depends on the motion-blur reduction

delivered to the viewer, not the specific technology used to achieve that reduction or the

---

[5] *See* Ex. 8.

[6] Ex. 9.

[7] Exs. 10 at 169, 9.

[8] *See, e.g.*, Ex. 11.

cost of implementing that technology. There has never been an industry-standard definition for "refresh rate" and it has never required or referred to a specific technology.

## A.   There Is No Industry Definition of "Refresh Rate"

There is no industry-standard definition for "refresh rate."[9]   In fact, there is significant variation in how "refresh rate" has been defined across sources and over time, without reference to "new" or "unique" images, as Plaintiffs insist.

- Information Display Measurements Standard: "The frequency with which a display updates the screen information" (Ex. 12);

- Standard Dictionary of Electrical and Electronics Terms: "The number of times in each second that the information displayed on a nonpermanent display … is rewritten or reenergized" (Ex. 13);

- American National Standards Institute: "[F]requency with which the image on the screen is redrawn" (Ex. 14);

- Wikipedia (June 2019): "[T]he number of times in a second that a display hardware updates its buffer" (Ex. 15);

- CNET (2013): "[H]ow often a TV 'refreshes' or changes the image on screen," (Ex. 16);

- *USA Today* (2014): "[H]ow smooth the image appears" (Ex. 11);

Refresh rate is often expressed in Hertz ("Hz"), a unit of measurement defined as "cycles per second."[10]   Hertz also is used, for example, to express wall-socket power frequency.   ███████████████████████

██████████████████████████████ ██ ██████████████████████

---

[9] *Id.* ¶14.

[10] *See* Ex. 17.

[11] Ex. 7 ¶39.



**B.     There Are Different Technologies to Enhance Refresh Rate and Reduce the Perception of Motion Blur**

Methods to enhance refresh rate and reduce motion blur include "backlight scanning" and "motion interpolation."  The most common form of motion interpolation is Motion Estimation/Motion Compensation ("MEMC").[12]  Backlight scanning and MEMC work in different ways, each increasing the number of times per second that the information on the screen is refreshed/updated.  MEMC does so by predicting intermediate video information and inserting an artificial, interpolated frame between existing frames.[13]



---

[12] Ex. 18, 133:23-134:8.

[13] *See* Exs. 9, 19.

**Figure 1, Ex. 20**

Contrary to Plaintiffs' false allegation that LG televisions used backlight scanning to save money, backlight scanning in fact offers numerous advantages over MEMC. Some consumers dislike MEMC – and even turn it off – because they feel it creates an artificial look, called the "soap opera effect."[14]   MEMC also "complicates the electronics and requires larger [thin-film-transistors] to charge up the pixels in half the time."[15]   It can also project incorrect images through erroneous predictions.  Ironically, Plaintiffs' own expert believes that backlight scanning is the "better solution" for reducing motion blur.[16]

Like MEMC, backlight scanning increases the number of times per second that information is updated/refreshed on the screen.[17]   It is analogous to the two-bladed shutter mechanism used by a film projector to increase the refresh rate of a movie: the two-bladed shutter cause each image to flash on the screen twice,[18] as shown here:

---

[14] *See, e.g.*, Exs. 21, 22 (explaining how to turn off motion interpolation technology for a better movie-watching experiences), 9; *see* Ex. 37, 53:24-55:24 ██████████ ████████.

[15] Ex. 10 at 169.

[16] *Id.* at 170.

[17] Ex. 7 ¶30.

[18] *Id.* ¶¶34, 37.



Figure 6.1 **Dual-bladed shutter** in a film projector flashes each frame twice. Rarely, 3-bladed shutters are used; they flash each frame thrice.

**Figure 2, Ex. 7**

In televisions, backlight scanning uses the backlight to increase the frequency of the information being flashed on the screen by turning the backlight on and off. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[19] They called this Blinking Backlight or Black Frame Insertion ("BFI").[20] But consumers found that BFI diminished brightness.[21]

---

[19] *Id.* ¶ 37.

[20] *Id.*; Plfs.' Ex. 4.

[21] Ex. 19.



**Figure 3, Ex. 19**

Engineers developed a solution to the diminished brightness problem by "turning the backlight on and off rapidly … in sequence in a pattern scanning down the screen"[22], thereby increasing refresh rate and reducing motion blur without impacting brightness.[23]

The result is a technology that provides consumers the benefit of motion-blur reduction without the drawbacks of MEMC or BFI, irrespective of the cost of production. Given that backlight scanning is superior for reducing motion blur,[24] it adds value to the TV.

### C.     LG TVs Used Different Technologies to Enhance Refresh Rate and Reduce Motion Blur

Since 2010, LG in the US market has supplied televisions with refresh rates of 60Hz, 120Hz, and 240Hz – some with the designation TruMotion 120Hz, 120Hz, TruMotion 240Hz, or 240Hz.  TruMotion is a marketing term used for televisions with

---

[22] Ex. 7 ¶37.

[23] *Id.* ¶30; Ex. 10 at 171.

[24] Ex. 10 at 170.

enhanced refresh rates created by motion interpolation, backlight scanning, or both.



**Figure 4, Ex. 20**

**D.     LG and BBY Did Not Distinguish Between Refresh Rate Technologies**

---

[25] Ex. 18, 85:3-85:17; *see also* Exs. 20, 24.

[26] Ex. 18 362:7-362:23.

### E.      LG Tested and Confirmed the Refresh Rates of Televisions Using Backlight Scanning Technology

Both LG and BBY obtained confirmation of the refresh rates of the LG televisions that used backlight scanning.  LG received independent testing reports,[27] and shared those results with BBY as early as 2011.[28]   Test reports confirm the LG TruMotion 120Hz television with backlight scanning has a 120Hz refresh rate, and LG TruMotion 240Hz television with backlight scanning has a 240Hz refresh rate:



**Figure 5, Plfs.' Ex. 12**

---

[27] Plfs.' Ex. 20; Exs. 18, 291:1-291:3, 293:19-293:21; Ex. 7 ¶11; Ex. 25.

[28] Ex. 26.



**Figure 6, Ex. 25**

These reports confirm that LG's televisions delivered to consumers what was offered: higher refresh rate.

### F.   Plaintiffs' Several Narrow Definitions of Refresh Rate Suit Their Purposes

The lack of a universal definition of refresh rate is underscored by Plaintiffs' confusing definitions throughout this litigation.   While Plaintiffs claim that "[l]iability hinges on the meaning … refresh rate'" (Mem. at 72), their own definition has been a moving target.   At the beginning of this lawsuit, Plaintiffs claimed that refresh rate referred only to "*unique* images per second," and therefore, an enhancement that did not increase the number of unique images, did not increase the refresh rate.   (*See, e.g.*, ECF No. 1 ¶¶3, 15-20.)   Plaintiffs' expert, Dr. den Boer, offered a different definition – "[t]he frequency with which all pixels in the display are updated with new data."   (Plfs.' Ex. 1 ¶12.)   He also conceded that "new data" could be the same data that was already loaded

into the pixels rather than a unique image as Plaintiffs claimed.[29] (Ex. 27, 138:16–139:21.)  So now, Plaintiffs changed their definition to "the number of times per second that the images on the screen are completely rebuilt with new image information." (Mem. at 12.) The only common thread holding Plaintiffs' various definitions together is a desire to define refresh rate to exclude backlight scanning as an acceptable method to increase refresh rate.

## III.   CONSUMER PURCHASING EXPERIENCES VARIED SIGNIFICANTLY

Innumerous televisions have been purchased in the past decade.  The variability of facts under which these purchases were made is staggering.  Not only did transactions differ by date, retailer, and purchase price, they concerned televisions with myriad evolving feature sets, and involved scores of individual conversations with retailers.

### A.   Available Features Varied Over Time and Among Models



(Ex. 30.)  Feature sets varied, and changed year to year.  (Ex. 31 at 14, 38-46.)

---

[29] Ex. 7 ¶50 (████████████████████████████████████████████
████████████████████████).

[30] Ex. 28 (television features included picture quality, price, screen size, TV type, brand, design, and advanced technology); Ex. 29 (55LN5100 spec sheet lists numerous features); Ex. 18, 86:16–86:22.

As with features, consumer preferences for, as well as availability of, brands has

varied. [31] 

(Motschenbacher Decl. ¶5)

## B.   Consumer Preferences Have Varied Based on Intended Use

While some consumers may have been interested in refresh rate some of the time,

that interest has been inconsistent, even from one purchase to another.

[35] and when Hudock bought a TV for her bedroom in July 2013 she did

not consider the refresh rate at all because she wanted a TV whose size was right for the

space.[36]  This individual variability on a TV-by-TV purchase basis, even within the same

household, is not unusual.

---

[31] Ex. 31 at 123, 127; Ex. 23 at 41; Motschenbacher Decl. ¶5.

[32] Ex. 18, 56:14-56:21.

[33] *Id.*

[34] Ex. 1, 181:3-182:12; Ex. 3, 253:11-257:18.

[35] Ex. 3, 253:11-257:18.

[36] Ex. 1, 181:8 - 182:11.

17

███████████████████████████████████████████████████

████████████████████████████████████

### C.    Product Price Varied Immensely for Numerous Reasons

Pricing for televisions is enormously variable, seasonal, and competitive. Consumers paid different prices for identical televisions.  Price can depend on screen size, model, retailer, and season of purchase; consumers paid different prices for the *same* television purchased on the *same* day at the *same* store, due to price matching and other policies.



**Figure 7**[37]

---

[37] *Id.* at 27.



---

[38] *Id.*



**Figure 9**

Then there is "price matching" – where retailers will "match" the lower price of a competitor.  Fleishman purchased with a "price match guarantee," because Microcenter was selling an LG 55LA9650 for $1,099, compared to $2,299.98 at BBY. (Ex. 6 409:15-411:15.) He wanted to receive Membership Rewards points,[39] so he found a BBY store near an out-of-state Microcenter and demanded a price-match, paying $1,200 less than some who bought that same television from BBY on that day at the listed price.  (*Id.* 411:3-15.)

### D.     Consumers Were Exposed to Different Information About TVs

Every consumer has a different approach to buying a television.  Many do side-by-side comparisons, ███████████████████████████████

---

[39] BBY's membership program provides additional value for consumers like Fleishman, as rewards points can be used towards future purchases.

████████████████████████████████████[40]   Each Plaintiff deposed in this action testified to doing pre-purchase research, either online (on a variety of websites) or in retail establishments.[41]

It has been known in the marketplace that some LG televisions advertised as TruMotion 120Hz used backlight scanning technology to enhance the refresh rate, as LG introduced televisions with backlight scanning at the 2009 Consumer Electronics Show and *Consumer Reports* reported the same: "The set also uses a scanning backlight technique to achieve a 240Hz effect (called TruMotion 240Hz), helpful in reducing motion blur." (Ex. 36.)   Other articles reported the same, as LG and other television suppliers. *See, e.g.,* (Exs. 16; 9.)   These articles, published prior to *any* of Plaintiffs' LG television purchases here, openly discussed that use of backlight scanning to enhance refresh rate was commonplace, and that LG was one of the suppliers who used backlight scanning (among other technologies) to enhance refresh rate in its TruMotion 120Hz and TruMotion 240Hz TVs.   Purchasers, including Plaintiff Mannacio, reviewed articles such as these.[42]

---

[40] Ex. 3, 187:20-22; 186:6-15: 209:2-211:20; 217:17-218:18.

[41] Ex. 1, 290:21-291:10; Ex. 3, 207:15-210:23; Ex. 6, 103:5-15; Ex. 5, 171:23-173:20; Ex. 37, 26:1-10.

[42] Ex. 5, 25:8-12; Ex. 37, 47:17-47:18 (████████████████████████████████
████████████.   Even the exhibits submitted by Plaintiffs demonstrate that LG was transparent and disclosed that it used backlight scanning to enhance refresh rate.   *See* Plfs.' Ex. 11; *see also* Ex. 39.

### E.   Consumers Had Different Purchasing Experiences Depending on the Sales Channel

LG works with different retailers who each employ their own marketing and advertising plans.  Differences in retailer marketing policies, ideas and designs create different purchasing experiences for shoppers, depending on where they shop, and whether they shop online, in a store or both.  ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

### i.   In-Store Shopping Experience

███████████████████████████████████████

████████ LG televisions are sold at numerous retailers, nationwide.[43]  In many cases, the store-to-store experience of even the same retailer can vary significantly.  Plaintiffs gloss over the materiality of these individualized experiences, and the role they played in consumers' decisions to purchase a particular television.  ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[43] ███████████████████████████████████████████
███████████████████████████████████████████
████████████

███████████████     ████████████████████████████████████

████████████████████████     [45]

BBY sells LG televisions at hundreds of BBY stores nationwide, with the assistance of thousands of sales associates ("Blue Shirts") across the country. (Motschenbacher Decl. ¶10.) ████████████████████████

███████████████████████████████████████████████████████

███████████     █████████████████████████████████████████

██████████████████████████████

a)      **BBY In-Store Marketing Materials**



The fact tag for Manaccio's television demonstrates the individualized nature of his case – not to mention the fallacy of Plaintiffs' theory.   Manaccio testified unequivocally that he reviewed the fact tag for his television model displayed at a BBY

---

[44] Ex. 40.

[45] Ex. 3, 209:24-212:22; Ex. 38, 177:18-182:19; Ex. 37, 41:4-15.

[46] Ex. 41, 164:19-165:1.

[47] *See id.*, 116:4–116:15.

[48] *Id.*, 127:13–137:17.

[49] *See, e.g., id.* 162:21–163:2.

store, and that the fact tag stated that the television had a 240Hz refresh rate (which he claimed was a feature he wanted).[50] ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

[50] Ex. 5, 182:15-183:2.

**Figure 11**[51]



---

[51] Simonson Ex. 2.

And here is a published fact tag template for that model:



**Figure 12**[52]

This is just one example of statements and verbiage used on the BBY fact tags varied in myriad ways throughout the time in question.  There were other varieties of tags, such as those showing other available sizes:[53]

---

[52] Ex. 42.

[53] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████ Ex. 43, 65:8–14; Ex. 41, 131:7–131:18.



**Figure 13**[54]

**b)    BBY Sales Associates**

Many customers who visited a BBY store interacted with Blue Shirts, ███

███████████████████████ (Ex. 40; Plfs.' Ex. 20, 171:14–21, 173:6–21).) ██



████████████████████████████████████ Only a plaintiff-by-plaintiff inquiry

would reveal the information that was supplied by a Blue Shirt to any one putative class

member, and whether that putative class member relied on the information in connection

with the decision to purchase.   With a large portion of shoppers reporting that

---

[54] Ex. 44.

conversations with Blue Shirts were at least somewhat influential, it is clear that resolution of Plaintiffs' issues could not be done on a class-wide basis.

### c)    BBY In-Store Displays

In-store display televisions allow consumers to personally evaluate picture quality, including possible motion blur (if it is important to them), prior to purchase.  ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ex. 41 163:10-163:14.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Ex. 45 at 19-21.

Given the important role of visual observation, BBY along with television suppliers have developed a plethora of displays, such as:



---

[55] Ex. 3, 245:2–245:15; Ex. 3, 210:24-220:13.

[56] Ex. 46.

- Some TV models, including Black Friday "door-busters" like the 55LN5100, were only displayed in-box on the department floor. (Motschenbacher Decl. ¶13.)



**Figure 14**[57]

BBY's TV section has changed and evolved throughout the 2010-2017 time period, ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

### d)  Variation at Other Retailers

Every retailer selling LG televisions has their own unique marketing materials and sales associate training methods.[58]  Plaintiffs attempt to avoid the individualized issues

---

[57] Ex. 46.

[58] Ex. 18, 203:11-204:16.

this creates by incorrectly claiming that LG "exerted control over how … retailers advertised the refresh rate of Accused Models" (Mem. at 24), and that "marketing remained substantively similar throughout the Class Period" and across retailers. (*Id.* at 44.)   Not so. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ ██ ███

████████████████████████████████████████████

███

### ii.        Online Experience

Many consumers purchase online – resulting in a materially different buying experience.[59]   Marketing materials online differ in style and content from the marketing materials available in store.[60] Displays such as the brand vignette do not translate online. And while online shoppers do not have the benefit of seeing a television in person, they do have the benefit of allowing instant comparison shopping across a variety of

---

[59] Plfs' Ex. 68.

[60] Plfs' Ex. 26.

[61] Different still are customers who purchase after a combination of online and in-store research.

[62] *See e.g.*, Ex. 41, 74:18-76:14.

websites.[63]  Variations between online retailers are especially significant as Amazon sells products from third-parties (take for example, Vann's).  (Ex. 57.)  Therefore, a customer could buy a TV from Vann's through Amazon and view different marketing than a customer who purchases the same TV from Vann's on Vann's own website.

Plaintiffs failed to account for this enormous variability.  When these variations are applied to the relevant legal standard it is clear that Plaintiffs' claims cannot be resolved on a class-wide basis.

## LEGAL STANDARD

A district court may certify a class under Rule 23(a) only if, "after a rigorous analysis," all elements are established.  *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477-78 (8th Cir. 2016) (internal quotation omitted).  It is not a pleading standard; a party seeking certification "must affirmatively demonstrate his compliance."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Plaintiffs moved to certify classes under Rule 23(b)(3), which requires findings of both predominance and superiority.  *Ebert*, 823 F.3d at 477-78.  Predominance "is even more demanding than Rule 23(a)."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  In addition, Plaintiffs moved to certify a class under Rule 23(b)(2), and must show that "a single injunction or declaratory judgment would provide relief" classwide, *Dukes*, 564 U.S. at 360, and would be "cohesive[]," which is "more stringent" than Rule 23(b)(3)'s predominance requirement.  *Ebert*, 823 F.3d at 480.

---

[63] Ex. 1, 65:16-66:12.

Plaintiffs must establish all Rule 23 elements, *see, e.g.*, *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994), and have not met that here.

## ARGUMENT

## I.    PLAINTIFFS HAVE NOT ESTABLISHED COMMONALITY

Plaintiffs may not, as they have here, simply list common questions, "since [a]ny competently crafted class complaint literally raises common questions." *Dukes*, 564 U.S. at 349; *see also Ebert*, 823 F. 3d at 478.   Instead, Plaintiffs must show their claims "depend upon a common contention" that is "capable of classwide resolution," meaning "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 564 U.S. at 350.   The critical element is not the presence of common questions, but whether answering those questions will "produce a common answer." *Id.* at 351.

Plaintiffs do not articulate even one purportedly common question, instead listing statements they "will show." (Mem. at 43.)   They state that they "will show" that "[a]ll Accused Models of televisions had the same Hz or TruMotion Hz rating in their specifications." *Id.*   That is not a question.   Moreover, this contention cannot be proved through common evidence.   Plaintiffs' own allegations are that Defendants changed their advertising in 2014 and "stopped using TruMotion and Hz," *id.* at 32, and that BBY removed "Hz" from all refresh rate marketing for LG TVs sometime in 2016-2017.  *Id.* at 33.   Plaintiffs' exhibits also show that the refresh rate specification was listed in different

ways for different models at different times.[64]   Likewise, there were differences in how retailers marketed refresh rate.   For example, in 2013 at P.C. Richard & Son, the LG 55LA6200, a TruMotion 120Hz model, was described as having "120Hz Technology" without any reference to TruMotion or refresh rate:



**Figure 15[65]**

Because of these variations in terminology and presentation, the question whether "televisions had the same Hz or TruMotion Hz rating in their specifications" does not generate common answers.

---

[64] Plfs.' Ex. 54 (█████████████████████████████).
[65] Park Ex. 1.

Another purported "common" issue is that "[r]efresh rate is universally understood as the number of times each second the television is capable of being refreshed with new image data, and represented by Hz." (Mem. at 43.)  This is the heart of Plaintiffs' claims, forming the basis for their claim of actionable misrepresentation and causation.  But there is no universal definition or understanding of refresh rate.  Plaintiffs themselves have used three different definitions over the course of this litigation, *see supra* Section II.F, and Defendants' expert explained that there are multiple definitions.[66]  Numerous press articles, technical publications and standards and manufacturer and retailer materials also offer their own definitions.  (*See supra* at 20.)  Thus, the question "What is the definition of refresh rate?" will generate different answers depending on the particular plaintiff.[67]

Likewise, whether "[c]onsumers were confused by Defendants [sic] Hz ratings," is not a common question that generates common answers.  Mem. at 43.  It defies common-sense for there to be a class-wide common answer on "confusion."  Whether a consumer was confused depends on each consumer's individual research, knowledge, and experience, which is not uniform.  It was widely disclosed to the public through popular publications and salespeople in stores that LG enhanced refresh rate using backlight scanning.  What did a purchaser read?  What does a purchaser know about the technology?  What was a purchaser told by a sales associate?  For example, Plaintiffs'

---

[66] Ex. 7 ¶39.

[67] This assumption also underlies Plaintiffs' second, sixth and seventh purported common issues, resulting in those not generating common answers for the same reason.  Mem. at 43.

exhibits show ███████████████████████████████████████████████

█████████████████████████ Plfs' Exs. 30, 32.  Did a purchaser inquire about what

made TruMotion different?  These questions and more must be answered by individual

inquiry.[68]

Plaintiffs contend that "The Hz or TruMotion Hz rating on fact tags in-store or

online were displayed as the prominent specifications featured for their televisions."

(Mem. at 43.)  This is not common either.  Photographs taken at BBY refute Plaintiffs'

contention that the Hz or TruMotion Hz rating was uniformly displayed prominently or at

all.  Tafur Ex. 1; Simonson Exs. 5-9. ████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████[69]



Hence, Plaintiffs' entire theory craters as to Mannacio and commonality.

---

[68] Take Villa Lara – █████████████████████████████████████████████
███████████████████████████████████████████████████ Ex.
3 197:3-199:17, 252:1-11.

[69] Ex. 42.

Plaintiffs also propose as a common issue that "refresh rate is a material feature in selecting a television for purchase." (Mem. at 43.)  Yet, this statement does not generate common answers because materiality is subjective.   Materiality is not even common between purchases made by the same Plaintiff:

- Hudock stated that her husband valued a higher refresh rate for watching sports and playing videogames for the TV purchased for the basement, Ex. 1, 90:7-19, but she did not even consider refresh rate at all for the TV purchased for other rooms.  *Id.*, 181:3-182:12.



Finally, there is no commonality on the issue of purported damages.  Mem. at 43. Pricing for TVs varies significantly based on numerous factors.  *See supra* Section III.C. Hudock and Villa Lara both bought their televisions at steep discounts during Black Friday sales, and Fleishman was able to purchase his unit at a massive discount due to price matching.  *See supra* Section III.C. ███████████████████████████

█████████████████████[72] There is no commonality in these circumstances (or predominance).  *Buetow v. A.L.S. Enters., Inc.*, 259 F.R.D. 187, 192 (D. Minn. 2009).

---

[70] Ex. 3, 219:15-25, 256:11-25.

[71] *Id.*, 331:19-22.

[72] Ex. 3, 323:8-327:11; Ex. 37, 79:11-14.

## II.      PLAINTIFFS ARE NOT TYPICAL OR ADEQUATE

### A.      The Plaintiffs' Individual Issues of Reliance Defeat Typicality

A plaintiff is typical if "the pursuit of his claims will advance the interest of class members" and if "his claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Mitchell v. Franklin Bank, S.S.B.*, No. 05-1320 PAMRLE, 2006 WL 4081216, at *2 (D. Minn. Dec. 29, 2006) (internal quotation omitted).  Typicality is not established if the named plaintiff can prove their own claim, but not necessarily anybody else's.  *See e.g. Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).  Plaintiffs cannot meet this standard as their theory of liability depends on individualized inquiries, such as reliance.  *See Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006) ("The presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry."); *Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 446-447 (D. Minn. 2012).

As discussed below,[73] each legal theory advanced here requires each Plaintiff to show that they relied on or were aware of representations from Defendants.  Thus, no plaintiff can be "typical."  This is more true because many class members, including named Plaintiffs, had in-person oral communications relevant to reliance.  *See, e.g.*, Ex. 1, 351:7-352:6, 356:2-8, 446:18-447:7; Ex. 37, 45:16-46:12; ECF No. 291 at 12.  The individualized nature of such communications defeats typicality because the evidence

---

[73] *See infra* Section VII.A.

relevant to the named Plaintiffs would have no bearing on the claims of purported class members.  *See Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir. 1993) (plaintiffs not typical when class claims based on communications that "were for the most part verbal").

## B.   Villa Lara Is Subject to Additional Unique Defenses

A plaintiff is not typical if "subject to unique defenses."  *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 329 (D. Minn. 2005).  Plaintiff Villa Lara is subject to multiple unique defenses, as the Court has previously noted.  ECF No. 59, 17cv0522-JRT-KMM at 7, n.2. ███████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ This is at odds with Plaintiffs' argument that each purchaser is entitled to damages based on the economic loss attributable to a reduction in market value.[75]  Proving the unique damages he believes he is entitled to would not prove the purported class damages.

To the extent Villa Lara's claims are governed by California law, he cannot show a redressable injury under California's UCL, and most of his "warranty claims … likely would be dismissed for failure to provide pre-suit notice."  ECF No. 59, 17cv0522-JRT-KMM at 6-7, 15.  Defendants will also assert unique defenses to Villa Lara's warranty claims (against both Defendants) and breach of contract claim (against BBY only), based on lack of privity, *see* ECF No. 29 in 17cv0522-JRT-KMM at 16-17, 20-21, and he will

---

[74] Ex. 3, 325:2-7.

[75] Mem. at 74.

have to prove "sufficient facts to establish that his grandmother was his agent."  ECF No. 59, 17cv0522-JRT-KMM at 15.  Based on his individual circumstances he fails Rule 23's typicality requirement.

### C.      Hudock Is Not an Adequate Class Representative

The adequacy requirement exists "to uncover conflicts of interest between named parties and the class they seek to represent."  *O'Shaughnessy v. Cypress Media, L.L.C.*, No. 4:13-CV-0947-DGK, 2015 WL 4197789, at *5 (W.D. Mo. July 13, 2015) (internal quotation omitted).  "A close personal relationship between the name[d] plaintiff and class counsel" is such a conflict.  *Id.*  "A named plaintiff who lacks the desire to 'vigorously pursue' the interests of potential class members is not a fair and adequate representative of the class."  *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999).

Plaintiff Hudock is not adequate because Luke Hudock, one of Plaintiffs' legal representatives, is her brother-in-law, Ex. 1, 7:16-21, with whom she has a close family relationship.  Ex. 1, 10:12-21, 12:14-16, 13:4-15.[76]  She has no knowledge of Attorney Hudock's legal practice, but trusts him because he is a family member.  *Id.* 293:7-294:18. She has no knowledge of either of the proposed class counsel.  *Id.*, 30:14-31:6, 224:3-6, 232:230233:22.  She feels she does not need information about the other lawyers on her

---

[76] Plaintiff Hudock also testified that Attorney Hudock was the one who informed her that her TV was allegedly not 120Hz.  Ex. 1 91:13-94:1.

case because she relies on her brother-in-law.  *Id.*, 292:4-294:18.[77]  This disqualifies her. *O'Shaughnessy*, 2015 WL 4197789 at *5.

## III.  PLAINTIFFS CANNOT SATISFY THE PREDOMINANCE REQUIREMENT.

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 327 F.R.D. 245, 256 (D. Minn. 2018) (internal quotation omitted).  This inquiry is "more demanding" than Rule 23(a)(2)'s commonality requirement, *id.* at 257, and courts "must perform a rigorous analysis."  *Ebert*, 823 F.3d at 478.  "[I]f individual questions … overwhelm the questions common to the class" predominance does not exist.  *Id.* (internal quotation omitted).

### A.  Individual Issues Predominate Because Plaintiffs Cannot Apply Minnesota or New Jersey Law Across the Class.

The choice-of-law determination is critical to class certification.  "Differences in state law, no matter how slight, are important and must be determined prior to certification because such differences may swamp any common issues and defeat predominance."  *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 208 (D. Minn. 2003) (internal quotation omitted), *see, e.g.*, *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 510 (D. Minn. 2014) (fifty state laws made "fashioning a plan for applying those laws on a class wide basis … nearly impossible"); *Thompson v. Allianz Life Ins. Co. of N.*

---

[77] It is not relevant that Plaintiffs are not seeking to certify Attorney Hudock as class counsel, as Plaintiff Hudock has shown to have abdicated her responsibilities as a class representative to him.

*Am.*, 330 F.R.D. 219, 226 (D. Minn. 2019) (class denied); *Foster v. St. Jude Med., Inc.*, 229 F.R.D. 599, 605 (D. Minn. 2005).

### i.       Minnesota's Choice of Law Rules Apply

This Court must apply Minnesota's choice-of-law rules.  *See Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012).  If a conflict exists, the Court must consider whether the laws at issue can be constitutionally applied.  *Jepson v. Gen. Cas. Co. of Wisconsin*, 513 N.W.2d 467, 469 (Minn. 1994).  If they can, the Court must look to the choice-influencing factors from *Milkovich v. Saari*, 203 N.W.2d 408 (Minn. 1973) (the "*Milkovich* factors").

### ii.      The Laws of the 50 States Conflict for All Claims

Plaintiffs "concede" that the laws governing their consumer protection and warranty claims conflict.  Mem. at 55.[78]  They incorrectly dispute the same as to breach of contract and unjust enrichment.  There is significant variation in the law on these two claims, and "the choice of one forum's law over the other will determine the outcome of the case."  *Whitney*, 700 F.3d at 1123 (quoting *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000)).  Courts routinely find conflicts for these claims.  *See, e.g.*, *Cruz v. Lawson Software, Inc.*, No. 08-5900, 2010 WL 890038, at *6 (D. Minn. Jan. 5, 2010) (conflicts for unjust enrichment based on statute of limitations and independent cause of action); *Baycol*, 218 F.R.D. at 214 (conflict on "actual definition" of unjust enrichment); *Thompson*, 330 F.R.D. at 223 (conflict on contract

---

[78] Plaintiffs significantly understate (Plfs.' Ex. 87) the scope of the conflicts.  *See infra* Section VII.A.

construction); *Rapp*, 302 F.R.D. at 510 (conflict on use of extrinsic evidence in contract interpretation).    Defendants have provided Exhibits 54 and 55, which identify some relevant conflicts among state contract and unjust enrichment law.

### iii.    It Would Be Unconstitutional to Apply Minnesota or New Jersey Law to All Claims

The state whose law is to be applied "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [that state's] law is not arbitrary or unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313 (1981)).    The constitutional concern is "protection of out-of-state parties' constitutional rights," particularly those of absent class members.   *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (*St. Jude I*).

This analysis cannot be done by considering only **defendant's** forum contacts, as Plaintiffs do here.   Mem. at 51-52.   In *St. Jude I*, the court acknowledged the defendant's "significant contacts with Minnesota, including [the defendant] being headquartered in Minnesota, and the fact that 'much of the conduct relevant' to the claims 'occurred or emanated from Minnesota," but cautioned that – despite those contacts – "we suspect Minnesota lacks sufficient contacts with all the parties' claims."   *Id.* at 1119.   The court noted that "[t]here is no indication out-of-state parties 'had any idea that [Minnesota] law could control' potential claims" at the time they received their products.   *Id.* at 1120 (quoting *Phillips Petroleum Co.*, 472 U.S. at 822).    Likewise, this court recently

determined that applying Minnesota contract law to a nationwide class in claims asserted against a Minnesota company would be unconstitutional. *Thompson*, 330 F.R.D. at 223. There, as here, plaintiff argued that "a Minnesota corporate defendant cannot claim surprise by the application of Minnesota law to conduct emanating from Minnesota." *Id.* (internal quotation omitted). This court rejected that argument, finding that it was insufficient and that the significant contacts with other states and variations in applicable law made blanket application of Minnesota law unconstitutional. *Id.* at 223-24.

Other courts determining the constitutionality of choice of law in class actions have done the same. Plaintiffs cite *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019), but ignore that the court rejected a substantially similar argument, under Minnesota choice-of-law rules, finding it unconstitutional to apply the law of the defendant's headquarters, and holding that the law of the state of purchase governed. *Id.* at *4-10. The court explained that "it would be unfair to Plaintiffs to have one state's … laws apply to their claims, especially given the material differences … throughout the country." *Id.* at *7; *see id.* at 10.

Here, Plaintiffs' arguments regarding constitutionality focus only on BBY and LG's contacts with Minnesota, and LG's contacts with New Jersey. *See* Mem. at 51-52. Plaintiffs do not identify a single contact that Plaintiffs have to Minnesota or New Jersey. With no connection, it would be unconstitutional to apply Minnesota law to Plaintiffs' claims against BBY or New Jersey law to Plaintiffs' claims against LG.

43

### iv.      The *Milkovich* Factors Do Not Support Application of Minnesota or New Jersey Law Here

Should the Court determine that application of Minnesota and New Jersey law would be constitutional, the next step would be to apply the *Milkovich* factors.   That analysis points to each individual plaintiff's home state.   Plaintiffs agree that only the first, second, and fourth factors are relevant.

### a)      Predictability of Result (Points to Plaintiffs' Home/Purchase State)

As to the first factor – predictability of result – Plaintiffs' claims, even those for breach of contract and warranty, are based on alleged misrepresentations, not any written contract.   As such, this factor should be given little weight.   *Baycol*, 218 F.R.D. at 207 (factor not considered; claims based on alleged misrepresentations governed by law of plaintiffs' home state); *Nodak*, 604 N.W.2d at 94.

Moreover, applying Minnesota and New Jersey law to a nationwide class risks the very forum shopping the Minnesota Supreme Court has cautioned should be avoided. *See Nodak*, 604 N.W.2d at 94-95.   If this Court were to interpret Minnesota's choice-of-law rules to allow the present Wisconsin, California, and Pennsylvania plaintiffs to apply Minnesota and New Jersey law to all putative class claims, it would achieve a different result than if the case were brought in another jurisdiction and promote the forum shopping that the first factor is intended to eliminate.   *See e.g. Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593 (9th Cir. 2012).

**b)      Maintenance of Interstate Order (Points to Plaintiffs' Home/Purchase State)**

The second *Milkovich* factor – maintenance of interstate order – is "primarily" concerned with whether application of Minnesota law would show "manifest disrespect" to another state's sovereignty, or impede "interstate movement of people and goods." *Jepson,* 513 N.W.2d at 471.   It weighs heavily in favor of the law of Plaintiffs' home state or state of purchase.

This factor supports application of the law of the state where the injury occurred, and rejects the application of the law of the state whose "only 'contact' … to the litigation is that the defendant … has its principal place of business" there.   *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 621 (8th Cir. 2001).   "The Eighth Circuit … has not given the domicile of the corporate defendant much weight…."   *Baycol*, 218 F.R.D. at 207.   Here, Minnesota and New Jersey are nothing more than Defendants' respective principal places of business.   Plaintiffs' allegations that pricing and marketing was "managed" or "approved" fail to change the calculus as they are simply incidents of the fact that Defendants are headquartered there.   Plaintiffs cannot attempt to enhance the relevance of Defendants' principal places of business merely by listing things that arise from that same fact.   *See Hughes*, 250 F.3d at 621.

Courts find this factor to weigh "in favor of the state which has the most significant contacts with the facts relevant to the litigation." *Baycol*, 218 F.R.D. at 207. In *Baycol*, plaintiffs alleged the defendants made false and deceptive misrepresentations and omissions through product labeling and advertising.   *Id.* at 201-02.   Plaintiff argued

for the application of the law of the defendants' headquarters. The court disagreed, holding that "it is clear that this factor supports application of the state law in which the plaintiff resides, as Baycol was prescribed and ingested in the state of the plaintiff's residence, and the alleged injury occurred in the state of the plaintiff's residence." *Id.* at 207. Similarly, each Plaintiff here was injured at the time they shopped for and purchased their televisions; not in either Minnesota or New Jersey.

Applying Minnesota and New Jersey law here would show "manifest disrespect" for the law and interests of other jurisdictions, and would stand in contrast to what New Jersey would do. Courts in New Jersey, applying New Jersey law, have routinely found that the New Jersey Consumer Fraud Act does not apply to out-of-state consumers, because to do so would "disregard the individual laws of those states … [and] would ignore their strong compensatory interest in this matter and would threaten to upset the balance of our federal system." *Gray v. Bayer Corp.*, No. CIV.A. 08-4716 JLL, 2011 WL 2975768, at *6 (D.N.J. July 21, 2011) (collecting cases). Applying New Jersey law to all claims against LG would violate this principle and New Jersey's policy interests.

New Jersey is not alone in this approach. Many courts have acknowledged the significant interests of states in regulating transactions within their borders and refused to apply a single state's consumer fraud and contract/warranty law to a nationwide class. *See, e.g.*, *Mazza*, 666 F.3d at 593 ("The district court did not adequately recognize that each foreign state has an interest in applying its law to transactions within its borders and that, if California law were applied to the entire class, foreign states would be impaired in their ability to calibrate liability to foster commerce."); *Pilgrim v. Universal Health Card,*

*LLC*, 660 F.3d 943, 946 (6th Cir. 2011); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002); *St. Jude I*, 425 F.3d at 1120.

**c)**     **Advancement of the Forum's Governmental Interest (Points to Plaintiffs' Home/Purchase State)**

The fourth *Milkovich* factor – advancement of the forum's governmental interest – is less important than either of the first two factors. *Jepson*, 513 N.W.2d at 472. While Minnesota and New Jersey have an interest in regulating their businesses, courts do not agree that "applying [the law of the defendant's home state] to the claims of foreign residents concerning acts that took place in other states … is necessary to achieve that interest…." *Mazza*, 666 F.3d at 594. Nor have Plaintiffs explained why application of Minnesota and New Jersey law would vindicate Minnesota's interests any more than applying the law of each Plaintiff's home state.[79]

Plaintiffs attempt to distinguish *Mazza*, claiming that the court applied California choice of law rules that amount to *lex loci delicti*, which Plaintiffs contend Minnesota "long ago abolished." Mem. at 60 n.45. Not true. *Mazza* correctly applied California's "government interest test"; California simply considers the place of the harm to have a significant interest. *Mazza*, 666 F.3d at 594-95. Minnesota takes the same approach: "[W]hen all other relevant choice-of-law factors favor neither state's law, the state where the accident occurred has the strongest governmental interest." *Nodak*, 604 N.W.2d at

---

[79] Plaintiffs argument that "other states' *less* protective laws to shelter domiciled business are not implicated here at all…." (Mem. at 61) ignores that other states might have *more* protective laws.

96.  Here, the place where the injury purportedly occurred is where each plaintiff shopped for and purchased his or her television.

Even if this factor weighs in favor of applying Minnesota law to consumer protection claims, the same is not true for contract or warranty claims.  This court recently held that "[t]here is no such substantial interest [i.e. regulation of in-state businesses] regarding breach-of-contract claims." *Thompson*, 330 F.R.D. at 225.  As for warranty law, the case Plaintiffs' cite holds that "[t]he goal of warranty law is protection rather than regulation, and each state's warranty law is designed to protect consumers within the state…. [T]he law of each member's home state governs that member's transaction." *Barden v. Hurd Millwork Co., Inc.*, 249 F.R.D. 316, 320 (E.D. Wis. 2008).

### d)      Therefore, Application of the *Milkovich* Factors Results in Applying the Laws of the 50 States

The critical factor in this case – maintenance of interstate order – weighs heavily in favor of applying the law of 50 states to the putative class claims.  Failing to do so would disregard the significant interests of other states in having their laws apply to their residents.  Plaintiffs' contention otherwise contradicts the Eighth Circuit's reasoning in *St. Jude I* and the holdings of other circuits.  No other factor points decisively in any direction – the other four are neutral, even in the light most favorable to Plaintiffs.  Thus, application of the *Milkovich* factors results in applying the laws of 50 states.

Given that the laws of the 50 states apply to Plaintiffs' claims, and because of the numerous, significant, and unmanageable conflicts between the laws of 50 states as to each of the Plaintiffs' claims, individual issues of law predominate and class certification

must be denied.   *See, e.g.*, *Rapp*, 302 F.R.D. at 510; *Thompson,* 330 F.R.D. at 226; *Foster*, 229 F.R.D. at 605.

### B.   All of Plaintiffs' Theories of Liability Depend on First-Party Reliance and Thus Individual Issues Predominate

Even if Plaintiffs can apply Minnesota and New Jersey law to all of their claims, they would still fail to satisfy Rule 23(b)(3) because individual issues of reliance will predominate.  The central tenet of Plaintiffs' theory is that it was improper for LG and BBY to market televisions as having a refresh rate of 120Hz or 240Hz where backlight scanning was used to achieve that refresh rate.  The key problem for plaintiffs, however, is that each asserted cause of action requires proof of first-party reliance – individual plaintiffs having seen and relied upon statements from Defendants – and individual mini-trials would be required for each purchaser's claim.  Courts consistently refuse to certify classes under both Minnesota and New Jersey law when the claims require proof, or can be rebutted by evidence disproving, first-party reliance.[80]

---

[80] *See, e.g.*, *In re St. Jude Med., Inc. ("St. Jude II")*, 522 F.3d 836, 838 (8th Cir. 2008); *Brown*, 284 F.R.D. at 447; *In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Prices Litig.*, No. 09-MD-2059, 2010 WL 3893807, at *2 (D. Minn. Sept. 29, 2010); *Buetow.*, 259 F.R.D. at 191; *Ford Motor Co. Ignition Switch Prod. Liab. Litig.,* 174 F.R.D. 332, 342 (D.N.J. 1997).

i.     **Plaintiffs' Consumer Fraud Claims Require Individualized Evidence of Reliance**

a)     **Minnesota Consumer Fraud and Unjust Enrichment Claims Must Be Proved Through Individualized Showings of Reliance**

Plaintiffs attempt to avoid a reliance requirement under Minnesota law by arguing that *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2 (Minn. 2001), stands for the proposition that "misrepresentation in sales claims do not require a showing on individualized reliance." Mem. at 67. This is misleading, and ignores the holding of that case that plaintiffs "must establish a causal nexus between their alleged damages and the conduct of the defendants," and that "[t]his causal nexus has a component of reliance." *Grp. Health*, 621 N.W.2d at 15. The Eighth Circuit has agreed: "[t]he Group Health decision … did not entirely remove the element of reliance in Minnesota consumer fraud claims." *St. Jude II*, 522 F.3d at 839. Even if the reliance requirement were relaxed, it still exists, and Plaintiffs have offered no explanation for how there is common evidence to meet it. *See* Mem. at 67 (stating that causation can be proven through "common, circumstantial evidence" but providing no such evidence).

Instead, Plaintiffs propose that "[t]he Court can presume causation where a representation is not merely deceptive but actually false and material." Mem. at 68 (citing *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 273 (2d Cir. 1987)).[81] Courts routinely reject such presumptions of reliance. The district court on

---

[81] Plaintiffs propose presuming causation only under Minnesota law because New Jersey decisions make clear that such presumption cannot apply if "plaintiffs could have known the truth underlying the defendant's fraud." *Marcus v. BMW of N. Am., LLC*, 687 F.3d

remand from certification in *Group Health* rejected exactly this argument. Those plaintiffs argued, like Plaintiffs here (Mem. at 68), that footnote 11 in *Group Health* allowed for a presumption of causation. *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 188 F. Supp. 2d 1122, 1126 (D. Minn. 2002). The court called this proposition "dubious," described such a request as "a radical sea change in Minnesota consumer protection law," and held that "to do so would contravene the express language of *Group Health*." *Id.* Subsequent cases have reached the same conclusion. *See, e.g.*, *State v. Minn. Sch. of Bus., Inc.*, 915 N.W.2d 903, 912 (Minn. Ct. App. 2018); *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1183 (8th Cir. 2011).

Even if causation could be presumed for statements that are both false and material, Plaintiffs cannot achieve such a presumption, class-wide evidence. First, Plaintiffs cannot prove that the alleged misrepresentation is false through common evidence because there is no commonly used definition of "refresh rate," which means different things to different consumers. *See supra* Section II.A. While refresh rates are commonly expressed in Hz, achieving a refresh rate of more than 60Hz, can be achieved using different technologies (*see supra* Section II.B), and Plaintiffs cannot prove through common evidence that the term "refresh rate" or the use of Hz to describe refresh rate means the same thing to all consumers. Another court has denied certification of substantially the same claims on this basis. Ex. 50 at 17 ("[T]here is no indication that consumers uniformly share [plaintiff's] understanding of '120Hz refresh rate' to refer to a

583, 610 (3d Cir. 2012). Plaintiffs cannot meet this standard, which would require individual inquiry.

television that displays 120 unique images per second."); *see also In re 5-Hour Energy Mktg. & Sales Practices Litig.*, No. ML13-2438PSG(PLAx), 2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017).

Thus, in order to determine whether the claimed presumption of causation could be applied, the Court would need to inquire as to each individual plaintiff's understanding of the term "refresh rate" and what representation each plaintiff understood was being made if and when that plaintiff received any representation regarding refresh rate or a Hz rating. For example, Plaintiff Hudock confirmed in her deposition that, when she purchased her TV in 2013, she had never heard of backlight scanning, had no understanding of the term backlight scanning, and was not basing her decision on motion interpolation versus backlight scanning technology. Ex. 1, 86:21-87:20, 106:16-106:20. This is different from Plaintiff Mannacio who, while claiming to understand the two technologies, has no preference between them. Ex. 5, 30:8-30:14.

Second, materiality of any alleged representation cannot be proven through common evidence. As explained above, different consumers attach different values to various TV features, of which refresh rate is just one of many. *See supra* Section III.B.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Preferences relating to refresh rate itself differ and have changed over time, even as to the individual consumer him or herself.



All these variations in materiality are borne out in the experiences of the named Plaintiffs.  Hudock stated that her husband valued a higher refresh rate for watching sports and playing videogames. Ex. 1, 90:7-19.  However, she considered only price and size, not refresh rate, for the TV purchased for her bedroom or children's rooms. *Id.*, 181:3-182:12.



Some plaintiffs never saw

---

[82] *See, e.g.*, Exs. 21, 52, 22.

[83] Ex. 3, 219:15-25, 256:11-25.

[84] *Id.*, 256:11-25.

[85] *Id.*, 332:25-333:6.

[86] *Id.*, 199; 205:9-10.

the words "refresh rate" on the subject advertisement, calling into question how such specification could have been material to their purchase.   This was the case with Mannacio, whose fact tag did not contain the words at all.  Ex. 42.  This plaintiff-specific evidence shows  Plaintiffs' claims could not be resolved on a class-wide basis.

That different consumers attach different values to different features over time, and that individualized evidence shows what was material to a given consumer for a given purchase, means that the materiality of the alleged misrepresentation cannot be proven by common evidence on a class-wide basis.  *See, e.g.*, *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, No. CV 14-7242-DMG (KSx), 2016 WL 5920345, at *8 (C.D. Cal. June 23, 2016) (finding that individual inquires of materiality predominated in part because Defendants "introduced evidence that there are numerous reasons a consumer may purchase LED-lit LCD TVs, in addition to or aside from image quality").

Thus, although Plaintiffs bear the burden of proving at least some form of causation to prevail on their Minnesota consumer protection claims, they have not and cannot put forward any viable theory to do so that does not depend on first-party reliance.[87]

---

[87] Plaintiffs' unjust enrichment claim suffers from the same deficiencies in common proof. Plaintiffs acknowledge that certification of their unjust enrichment claims should rise or fall with the Court's decision on certification of their consumer protection claims (Mem. at 73), and it fails for the same reasons.  *See Kranz v. Koenig*, No. CIV. 06-3380 PAMJSM, 2007 WL 4562619, at *3 (D. Minn. Dec. 21, 2007) (reliance is an element of unjust enrichment based on alleged misrepresentations).

**b)      Plaintiffs' New Jersey Consumer Fraud Claims Also
Require Proof of Individualized Reliance**

The NJCFA requires proof of "a causal connection between the unlawful practice and ascertainable loss," which Plaintiffs acknowledge.  Mem. at 69.  Plaintiffs' argument seems to be they intend to prove ascertainable loss and a causal nexus by reference to the Choice-Based Conjoint Analysis ("CBC") performed by their putative experts, Gaskin and Weir.  *See* Mem. at 69 n.48.  The problem (apart from those in Section V *infra*), is that the CBC is a price-inflation theory, which the New Jersey Supreme Court has expressly held to be insufficient to prove ascertainable loss and a causal nexus on a class basis.

In *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 376 (2007), the Supreme Court of New Jersey reversed class certification where plaintiffs alleged that a pharmaceutical company artificially inflated the price of a drug through misrepresentations.  The plaintiff proposed to prove its case through an expert who would "establish a price effect in place of a demonstration of an ascertainable loss or in place of proof of a causal nexus."  *Id.* at 392.  The court rejected the proposal and held that these "proofs would fail" as a matter of law.  *Id.* at 392.  Without them the plaintiff lacked a predominating common issue for a "critical CFA proof element."  *Id.* This holding was affirmed in *Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 60 (2017), again reversing a certified class because while "[i]ndividual plaintiffs may be able to establish ascertainable loss and causation by showing that they would not have purchased" the product if informed of the true cost, "Plaintiffs' price-inflation theory **does not globally**

**establish those elements … for the vast and varied class of restaurant customers**."

*Id.* (emphasis added); *see also Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 312 (3d Cir. 2016).

Plaintiffs cannot rely on the CBC to establish ascertainable loss and causation. They must satisfy these elements through individualized first-party reliance, which defeats any claim of predominance.[88]

### ii. Likewise, Resolution of Plaintiffs' Contract and Warranty Claims Require the Same Individualized Inquiries, Defeating Their Bid for Class Certification

Plaintiffs' problem with reliance is not limited to their consumer protection claims given that "[e]ach legal theory uses as its factual trigger a common misrepresentation in connection with consumer transactions …. All claims … are predicated on the same factual allegations as the consumer protection claims." Mem. at 63. The same problems doom Plaintiffs' warranty and unjust enrichment claims against Defendants and their contract claim against BBY.

As for the warranty claims, Minnesota and New Jersey have adopted Section 2-313 of the UCC. An express warranty is created by "[a]ny affirmation of fact or promise made by the seller **to the buyer** which relates to the goods and becomes part of the basis of the bargain." Minn. Stat. Ann. § 336.2-313 (emphasis added); N.J. Stat. Ann. § 12A:2-313 (same). "[A] promise is presumed to be a part of the basis of the bargain …

---

[88] Class certification is also unwarranted where "did not react to information about the product they purchased or leased in a sufficiently similar manner." *Marcus*, 687 F.3d at 610. ███████████████████████████████████████. Ex. 3, 252:1-11.

once the buyer has become aware of the affirmation of fact or promise." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 825 (3d Cir. 1999) (internal quotation omitted); *see also Wurm v. John Deere Leasing Co.*, 405 N.W.2d 484, 489 (Minn. Ct. App. 1987). As a result, courts faced with warranty claims based on alleged representations have found that they are not suitable for resolution on a class-wide basis. *See, e.g.*, Ex. 50 at 17-18; *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-MD-2359, 2018 WL 262826 (D. Minn. Jan. 2, 2018).

The same is true for Plaintiffs' contract claim against BBY. The case on which Plaintiffs rely, *Thompson*, 330 F.R.D. at 222-23, found that class certification is inappropriate outside of the "standardized contract" context. Mem. at 53 n.35. Plaintiffs simply state that "there is no issue regarding interpretation of an ambiguous contract that would bring to bear various state rules regarding ambiguous contract term construction." *Id.* This ignores Plaintiffs' allegations that the operative "contract" is not a standard form, but "[t]he written specifications and labels BBY used to sell LG televisions." *Id.* at 71-72.

The evidence, including Plaintiffs own allegations, demonstrates that there were a variety of statements, presented in a variety of ways, between 2010 and the present:

- Plaintiffs claim that the fact tags Defendant used to market LG TVs in BBY stores appeared both with and without reference to the proprietary "TruMotion" technology, Mem. at 13, 26;

- Plaintiffs state that Defendants changed their advertising in 2014 and "stopped using TruMotion and Hz," *id.* at 32;

- A fact tag for Plaintiff Mannacio's television did not even have the words "refresh rate" or "Hertz" on it at all;[89]

- Plaintiffs claim that BBY removed "Hz" from all refresh rate marketing for LG TVs after Plaintiffs filed this action, Mem. at 33;

- Exhibits on which Plaintiffs rely show that the refresh rate specification was listed in various different ways for different models, at different times, Plfs.' Ex. 54, LGE0085489, at 85489-90, consistent with other evidence.[90]

The only way for Plaintiffs to establish a contract claim is to show the individual specifications and labels provided to individual customers at individual times.

Even if the Court accepts Plaintiffs' bald allegations that there was essentially a standard form, "demonstrating [that] the terms … were the same for all of the putative class members is 'only half of the battle.'" *Moua v. Jani-King of Minn., Inc.*, No. CIV08-4942ADMJSM, 2010 WL 935758, at *3 (D. Minn. Mar. 12, 2010) (quoting *De Giovanni v. Jani-King Int'l, Inc.*, 262 F.R.D. 71, 77 (D. Mass. 2009)).  The second half is determining whether conduct giving rise to the claim was uniform across the class.  *Id.* Here, class members' experiences in purchasing TVs vary significantly.  *See supra* Section III.E.  Evidence shows that a significant percentage of purchasers – including named Plaintiffs – meet with Blue Shirts and that these conversations are influential in their purchasing decisions.  (Ex. 40; Ex. 1, 351:7-352:6, 356:2-8, 446:18-447:7; *see also supra* Section III.E).  Plaintiffs' contract claims cannot be proven without assessing individualized extrinsic evidence, such the oral communications with sales associate. These individual inquiries swamp any common questions.  *See, e.g.*, *Avritt v. Reliastar*

---

[89] Ex. 42.

[90] Alessi Decl. ¶5.

*Life Ins. Co.*, 615 F.3d 1023, 1030 (8th Cir. 2010) (denying certification of contract claims because the defendant "would be entitled to introduce evidence about how the contract was explained in various sales discussions and whether each purchaser's understanding of the contract was consistent with the theory the [plaintiffs] now advance"); *Good v. Ameriprise Fin., Inc.*, 248 F.R.D. 560, 571 (D. Minn. 2008).

> ### iii.   Defendants Retain the Right to Present Evidence Negating Reliance, Which Can Only Be Done on an Individualized Basis

Even if Plaintiffs could somehow show causation absent first-party reliance, they still would not be entitled to class certification of their consumer protection claims because Defendants have the right "to present evidence negating a plaintiff's direct or circumstantial showing of causation and reliance." *St. Jude II*, 522 F.3d at 840. The same is true for Plaintiffs' breach of contract, breach of warranty, and unjust enrichment claims. *See In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Prices Litig.*, 2010 WL 3893807, at *2. Such evidence rebutting reliance "is highly relevant and probative on the question whether there is a causal nexus between alleged misrepresentations and any injury." *St. Jude II*, 522 F.3d at 840; *see also Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 222 (3d Cir. 2009).

Were this dispute to proceed to the merits, Defendants would introduce plaintiff-specific evidence to establish individual plaintiffs' understanding of the relevant technology and thus rebut reliance (for Plaintiffs' consumer protection and unjust enrichment claims) and prove that the terms of any contract or warranty received by specific class members is contrary to the theory advanced by the named Plaintiffs. It is

well known – and acknowledged by Plaintiffs' expert – that consumers commonly conduct research before purchasing TVs.  *See* Ex. 47, 245:21-246:7. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

For consumers who conducted research, publicly available information from LG and other sources explaining what backlight scanning and TruMotion were is probative, including customer reviews.  *See, e.g.*, Exs. 48, 53.  Articles were also in the public domain reporting the use of different technologies used to increase the refresh rate of televisions.  For example, a January 2009 Consumer Reports article stated that LG's new LED TV "also uses a scanning backlight technique to achieve a 240Hz effect (called TruMotion 240Hz), helpful in reducing motion blur."[91]  These articles, which consumers were aware of,[92] published on consumer websites such as CNET, made clear that LG used backlight scanning among other technologies to enhance refresh rate in the televisions it advertised as TruMotion 120Hz and TruMotion 240Hz.[93]

In addition, as described above, many purchasers – including some of the named Plaintiffs – interact with sales associates, such as BBY Blue Shirts. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[91] Ex. 36.

[92] Ex. 37 47:17-18; Ex. 5, 25:8-19.

[93] *See also* Plfs.' Exs. 11, 80.

████████████████████████████████████████████████████████

████████████████████████████████████████Plfs.' Ex. 20, 171:14–171:21, 173:6–173:21.  Use and training of sales associates varies at other retailers.  The prevalence and significance of these in-person, individualized communications makes class certification inappropriate.  *See In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 606 (D. Minn. 1999); *St. Jude II*, 522 F.3d at 839.

Discovery received from the named Plaintiffs shows that these facts are relevant to their claims.  ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ ██ ██████████████████████████████████████████████

████████████████████████████████████[96] His research and interaction with sales associates are individualized defenses against his own first-party reliance, and Defendants would be entitled to seek discovery from all class members in order to assert such individual defenses against each of them.  Such an inquiry would easily predominate over any common issues.  *St. Jude II*, 522 F.3d at 840.

---

[94] Ex. 3 183:1-3; 216:21-24; 218:6-21; 221:5-21.

[95] *Id.*, 187:20-22; 228:15-18; 229:5-16.

[96] *Id.*, 216:6-218:13.

## IV.     A CLASS ACTION IS NOT SUPERIOR

Plaintiffs' arguments on superiority focus exclusively on the theory that a large number of class members hold small claims.  Mem. at 77.  This type of high-level, conclusory statement does not meet Plaintiffs' burden.  *See Foster*, 229 F.R.D. at 607; *Schmitz v. Aegis Mortg. Corp.*, No. CIV. 97-3142, 1998 WL 1100084, at *5 (D. Minn. Aug. 3, 1998).  Plaintiffs ignore the significant "difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).  Where numerous states' law apply,[97] Plaintiffs bear a heavy burden to show that "such a class action would be manageable."  *Baycol*, 218 F.R.D. at 209-10.  Plaintiffs are silent on this point, which is fatal to their certification bid.  *See id.* at 210 ("Where plaintiffs have failed to provide the court clearly defined classes, based on the variations in state law, the superiority requirement has not been met.").

The same plethora of individual issues described above[98] make a class action unmanageable, aptly described by this court.  *See Good*, 248 F.R.D. at 573.  *Good* involved far fewer putative class members and dealt primary with only a breach of contract claim, but was unmanageable as a class action because, like here, there was "still no single unambiguous—or even ambiguous—contract provision for the Court to construe," and "[b]oth parties would introduce considerable extrinsic evidence, including evidence of oral statements made by various people at various times to various members of the class."  *Id.* at 571.

---

[97] *See supra* Section III.A.

[98] *See supra* Section I.

Plaintiffs also fail the superiority requirement because they have offered "no workable way to determine who the class members are and to give them notice of the class action." *Foster*, 229 F.R.D. at 606. Plaintiffs' submission does not mention this requirement. The evidence shows that identifying class members would create substantial difficulties. LG does not sell to consumers (*see* Ex. 18 203:2-6), and thus does not have records that identify all purchasers. Even to the extent Defendants have records, it would take a massive individualized inquiry to determine whether an individual is a valid class member. Take former Plaintiff Poppen. He alleged that he purchased television model numbers 55LA6200 and 55LN5100 from BBY. ECF No. 175 ¶ 8. ████████████████████████████████████████████

████████████████████████████████████████ Ex. 37, 36:13-38:20, 89:21-90:8.[99] Conducting this exercise for every prospective class member is unmanageable.

## V.      PLAINTIFFS HAVE NOT ESTABLISHED THAT DAMAGES CAN BE DETERMINED ON A CLASS-WIDE BASIS

Plaintiffs' proposed model — based on a flawed choice-based conjoint analysis (the "CBC") — purports to measure the "difference in the market value of an LG LED television with the Hz deceptive advertising, and the value of an otherwise identical LG LED television with the actual refresh rate disclosed to consumers at the time and point of first purchase." Mem. at 73-74. "Conjoint analysis is a marketing research method that measures customer preferences for particular product features." *Khoday v. Symantec*

---

[99] Poppen voluntarily dismissed his claims with prejudice during his deposition. *Id.*, 114:16-114:23.

*Corp.*, 93 F. Supp. 3d 1067, 1079 (D. Minn.)*, as amended* (Apr. 15, 2015). ███████

████████████████████████████████████████████████████

███████████████████████████████████████ Plfs.' Ex. 86 ¶14.   An

example is below:



*Id.* ¶14.

████████████████████████████████████████████

███████

███████████████████████████████████ ███ ████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

## A.      Plaintiffs' Damages Methodology Does Not Fit Their Legal Theory

Plaintiffs' damages model fails the predominance requirement because damages are not demonstrably calculable by common proof.  *Comcast*, 569 U.S. at 35.  In order to satisfy *Comcast*, Plaintiffs "must present evidence of a damages methodology that can determine the price premium attributable to [LG's alleged] use of the misleading advertisements and product labeling . . . ."  *In re NJOY, Inc. Consumer Class Action Litig. ("NJOY II")*, Case No. CV 14-428-JFW(JEMx), 2016 WL 787415, at *5 (C.D. Cal. Feb. 2, 2016).  They have failed to do so.

### i.      Plaintiffs' Model Does Not Measure a Change in Market Value

Gaskin's CBC does not measure a change in market value because it fails to adequately account for supply-side factors.  It is undisputed that market value or price is a function of both the demand and supply side of the market.[101]  ██████████████████

████████████████████████████████████████████

---

[100] Defendants will be filing a separate motion to exclude the Gaskin and Weir Reports.

[101] Ex. 23 ¶49; Ex. 47 118:6-9; Ex.49 196:8-13.

██

looking only at demand-side factors, like consumer preference, acknowledging that "you have to consider supply-side factors as well."  Ex. 47 132:12-19, 163:3-7.

Yet, conjoint analysis measures consumer preference, not change in market value price.  It is a "statistical technique capable of using survey data to determine how consumers value a product's individual attributes — often called the market's willingness to pay." *In re NJOY, Inc. Consumer Class Action Litig.* ("*NJOY I*"), 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015).  ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████ ██ ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Plfs.' Ex. 86 ¶22; *see also* Plfs.' Ex. 85 ¶36.  Yet, these are not appropriate supply-side considerations.[103]  Rather, to determine supply, factors such as ████████████████████████████████████████████

████████████████████████████████ generally must be considered.  Ex. 23 ¶49; *see id.* ¶¶46-58; Ex. 47, 134:5-8, 137:7-10, 138:11-139:22.

---

[102] *See* Ex. 47 151:17-152:7; *id.* at 157:23-158:1(████████████████████████████████ ████████████████████████████████████████████ ).

[103] Historic ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 23 ¶53.

ii.     **Plaintiffs' Methodology Did Not Consider Necessary Supply Side Factors**

Discovery confirms that Gaskin's and Weir's conclusions that supply side factors are adequately accounted for are incorrect. They conceded that they did not consider certain supply-side market factors in creating the CBC.

██████████████████████████████████████████████   First,

there are numerous instances where LG televisions with a lower refresh rate sold for

more than a television advertised as TruMotion 120Hz or TruMotion 240Hz.   For

example, Plaintiff Villa Lara purchased a 55LN5100 LG television for $499 on Black

Friday in 2013.  ECF No. ¶¶76-83.  The 55LN5100 television was advertised as having a

refresh rate of 120Hz.  *Id.* ¶¶82-83.  ████████████████████████████████

████████████████████████████████████████████████████

███████████████████

     █████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

█

### iii.     Courts Have Rejected Damages Models Based on Conjoint Analyses That Do Not Account for Supply-Side Factors

The failure to account for supply-side factors is fatal to Plaintiffs' class certification attempt.  For example, in *NJOY II*, plaintiffs filed a putative class action alleging *inter alia* that NJOY "engaged in a false and misleading advertising campaign conveying the message that its electronic cigarettes … are safer than regular tobacco cigarettes." 2016 WL 787415, at *1.

The Court denied plaintiffs' motion for class certification, in part, because the conjoint analysis provided "only a model for testing what a consumer is willing to pay, without considering other factors in the marketplace." *NJOY I*, 120 F. Supp. 3d at 1119. Plaintiffs submitted a modified proposed conjoint analysis, and claimed it sufficiently accounted for supply because it "propose[d] to incorporate different market brands and actual market prices directly into the choice sets offered to participants in the survey." *NJOY II*, 2016 WL 787415, at *7.

Again, the Court denied the motion for class certification, explaining that the modified conjoint still failed to properly calculate market value, as it did not adequately consider supply-side factors.  The use of "actual market prices" in the conjoint survey did not cure the defect because it still "only look[ed] to the demand side of the market equation, and ignor[ed] the price at which NJOY, and other e-cigarette manufacturers, would be willing to sell their products." *Id.*; *see also Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-66-SVW (MANx), 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014)

(certification denied because the proffered conjoint analysis accounted for demand but not supply).

Similarly, Gaskin's CBC does not include any analysis of the price at which Defendants would be willing to sell the products without the alleged deceptive advertising.   And, as noted above, neither Gaskin nor Weir undertook such an analysis and Plaintiffs cite to no evidence — besides their experts' reports — to support their class-wide damages model.  Mem. at 73-76.

      **iv.**        **Plaintiffs' CBC Differs From Other Conjoints That Have Been Accepted**

Even though he has done so in other cases, ███████████████

████████████████████████████████████████████

███████████████████████████████████████ Ex. Plfs.' Ex. 86 ¶¶24-26.  Courts have cited the use of competitive pricing data as a basis for finding that conjoint analyses adequately account for supply factors.   *See, e.g.*, *In re Lenovo Adware Litig.*, No. 15-MD-02624-RMW, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) (conjoint acceptable because expert (Gaskin) "consulted pricing of the Lenovo models at issue, as well *as comparable PC laptops*") (emphasis added); *Martinelli v. Johnson & Johnson*, No. 2:15-CV-01733-MCE-DB, 2019 WL 1429653, at *4 (E.D. Cal. Mar. 29, 2019) (conjoint "included market-based price points for the price attribute based on actual real-world prices of the Defendants' product and for competing products").  Conversely, courts reject conjoints where such data is not included.   *See Zakaria v. Gerber Prods. Co.*, LA CV15-00200 JAK (Ex), 2017 WL 9512587, at *20 (C.D. Cal.

Aug. 9, 2017) (decertifying class where plaintiff had "failed to show that the [conjoint] methodology … sufficiently accounted for the actual price of [the product], or the market conditions in which the product was sold.").

Plaintiffs rely on this Court's decision in *Khoday v. Symantec,* Civil No. 11-180 (JRT/TNL), 2014 WL 1281600 (D. Minn. Mar. 13, 2014), to argue that Gaskin's CBC is methodologically sound and sufficient to meet their burden. *Khoday*, however, is not on point as the defendant there did not raise the supply-side issue presented here. At the class certification stage the *Khoday* defendants merely challenged the *accuracy* of the plaintiffs' conjoint analysis. *Id.* They did not, as Defendants do here, "dispute that the conjoint analysis [was] capable of measuring damages on a classwide basis." *Id.* Nor did the Court have the benefit of the decisions cited above rejecting conjoint analyses because of their failure to adequately account for supply side factors. Those post-date *Khoday*.

In addition, *Khoday* differs factually from this case. There it was "undisputed" that defendants priced the product at issue (software with significantly fewer features than the televisions at issue here) "based solely upon a customer's perception of value." *Id.*, at *32. It was an unusual case where factors, like production costs, were not considered in defendants' pricing decisions. *Id.* Therefore, Gaskin's conjoint analysis, which measured customers' perceived value of one of the features of the product, was relevant to determine the damages at issue. *Id.* at *33. Here, Plaintiffs' experts agree that the market price of LG televisions is based on the interaction of both supply and demand. *See supra* Section V.A.i.

71

### v.      Plaintiffs' Damages Model Is Similar to One Presented in An Analogous Case Where Certification Was Denied

The recent decision denying class certification in *Larsen v. Vizio, Inc.*, is particularly relevant here, as the facts in *Larsen* are nearly identical.  The plaintiff in *Larsen* commenced a "consumer protection class action against [Vizio] in connection with Vizio's representations concerning the refresh rate of some of its [LCD] televisions." Ex. 50 at 1.   Plaintiff alleged, that Vizio "ha[d] systematically misrepresented the refresh rate" of its LCD televisions that utilized backlight scanning technology by "overstating, falsifying and obfuscating their actual refresh rates to improve sales." *Id.* at 3.  The plaintiff moved for class certification and argued that a "conjoint analysis" could be utilized to calculate damages on a class-wide basis.  *Id.* at 21.  The conjoint analysis utilized in *Larsen* ████████████████ as it included many of the same attributes in the choice-sets, and incorporated prices that were within the same range as those used by Gaskin. Ex. 51 ¶35.  The *Larsen* court denied plaintiff's motion for class certification on multiple grounds, and in doing so noted that plaintiff's conjoint analysis "generate[d] a subjective 'willingness to pay' amount that fail[ed] to take into account the reality of the market," despite its use of prices that were within the range of actual market prices of televisions sold. Ex. 50 at 23.  The same conclusion should be reached here.

### vi.      Plaintiffs' Additional Authority is Inapposite

The other decisions upon which Plaintiffs rely are inapposite.  In *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1367 (Fed. Cir. 2013) (not a class case), the conjoint

analysis at issue in that dispute was intended to be used *for the purpose* of determining consumers' willingness to pay for smartphones and tablets, and not the market value of those products. *See Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 909 F. Supp. 2d 1147, 1156 (N.D. Cal. 2012), *vacated in part*, *Apple Inc.*, 735 F. 3d at 1367.

Likewise, neither *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1021-32 (C.D. Cal. 2015) nor *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015) are analogous to this action. In both cases, at the class certification stage, the plaintiff had only proposed and not actually applied any of the statistical methods proposed. *In re Scotts,* 304 F.R.D. at 413-14; *In re ConAgra Foods*., 90 F. Supp. 3d at 1023-24. Furthermore, in both cases the plaintiffs proposed multiple methodologies (not just a conjoint survey), sometimes in tandem, to establish class-wide damages. In *In re ConAgra*, Weir was an expert and opined that it was the hedonic regression, not the conjoint analysis, that addressed defendants' concerns regarding consideration of supply-side factors. 90 F. Supp. at 1023-24. In *Scotts EZ Seed*, the Court granted class certification because, among other reasons, plaintiffs' expert (also Weir) argued that he could utilize any one of "*three* statistical methods" to compute price premium damages — "hedonic regression, a contingent valuation study, or a conjoint analysis." 304 F.R.D. at 413 (emphasis added). Weir did not utilize these other methods here. *See* Plfs.' Ex. 85; Ex. 49, 156:5-8.

### B.    Plaintiffs Have Not Presented a BBY Subclass Model

Gaskin admitted that his report does not address the BBY Subclass:



Ex. 47, 330:2-330:12.

Accordingly, class certification must be denied for the BBY Subclass.  *Comcast*, 569 U.S. at 35 (no predominance without a damages model).

**C.      Plaintiffs' Damages Model Does Not Support Their Damages Theory**

Separately, certification should be denied because Gaskin's results confirm that numerous purchasers suffered no injury at all.  ████████████████████████

████████████████████████████████████████████████████████████████████

The law is well-settled that "[i]n order for a class to be certified, each member must … show an injury in fact" traceable to the defendant and likely to be redressed in a favorable decision.  *Halvorson v. Auto-Owners Ins. Co.,* 718 F.3d 773, 778 (8th Cir. 2013). Plaintiffs have not met this requirement as to purchasers of LG LED televisions advertised as 240Hz or TruMotion 240Hz ("240Hz Purchasers").

Plaintiffs theory is that purchasers were harmed because they "paid more" than they would have otherwise paid "had the accurate refresh rate been disclosed."  Pl. Mem. at 76 (quoting Compl. ¶ 6).  █████████████████████████

*See* Ex. 23 ¶92; *In re Hardieplank*, 2018 WL 262826, at *9 (report that contained no analysis as to whether results were "statistically significant or their error rate" excluded under *Daubert*); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 990 (8th Cir. 2001) (affirming exclusion under *Daubert* where data "presented statistically insignificant results").

## VI.   THERE ARE NO GROUNDS TO CERTIFY A RULE 23(B)(2) CLASS.

Rule 23(b)(2) certification is proper "*only* when the *primary* relief sought is declaratory or injunctive."  *St. Jude I*, 425 F.3d at 1121 (emphasis added).  Where the case is "primarily about money damages" – as is the case here – Rule 23(b)(2) certification is inappropriate.  *Avritt*, 615 F.3d at 1036.  Additionally, Plaintiffs' request fails as the proposed class is not cohesive, and the requested relief is nothing more than a bare injunction to follow the law.

Plaintiffs cannot seriously debate that their claims are primarily seeking money damages.  Except for the MDTPA, money damages are available (and Plaintiffs seek them) for all of their putative claims.  Nor is their claim for injunctive relief severable from their other claims (as they acknowledge),[104] meaning that a finding of liability on a claim for injunctive relief may also give rise to a claim for damages.  The Eighth Circuit has specifically rejected this approach.  *See St. Jude I*, 425 F.3d at 1122 ("[P]laintiffs never demonstrated to the district court they 'would sue for [injunctive relief] even in the absence of a claim for damages.'" (internal quotation omitted); *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537, 544 (D. Minn. 2017) (certification denied where damages demand "strongly suggest[s] this is a case driven by money, not equitable relief. Indeed, to conclude otherwise would simply be to ignore reality.").

Moreover, Plaintiffs' proposed Rule 23(b)(2) class fails the cohesiveness requirement for all the same reasons the Rule 23(a)(3) class failed the predominance

---

[104] "Each legal theory uses as its factual trigger a common misrepresentation in connection with consumer transactions."  (Mem. at 63.)

requirement – individual issues swamp any claimed common ones.  *See, e.g. Avritt*, 615 F.3d at 1036; *Nat'l Hockey League*, 327 F.R.D at 257 (Rule 23(b)(2) certification denied "for the same reasons" as the denial of Rule 23(b)(3) due to "significant variance in legal standards"); *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 557 (D. Minn. 1999) (predominance problems that "plague" the 23(b)(3) argument "also preclude certification under 23(b)(2).").   Here, Plaintiffs' substantive basis to request injunctive relief is presumably the MDTPA (*see* Mem. at 48), which permits such relief only to persons "likely to be damaged by a deceptive trade practice." Minn. Stat. § 325D.45, subd. 1. This standard is not met where a plaintiff is "aware of the practice and is unlikely to be confused in the future."  *Olen v. N. Tier Retail, LLC*, No. CIV. 11-2665 (DWF/JJG), 2012 WL 1580994, at *6 (D. Minn. May 4, 2012).  The merits turn on each individual's awareness and likelihood of future confusion.[105]  As such, there is no cohesiveness.

Finally, Plaintiffs request fails for being nothing more "than a bare injunction to follow the law."  *Ung*, 319 F.R.D. at 544 (internal quotations omitted) (denying class). That is not what Rule 23(b)(2) relief is intended to provide.

## VII.  PLAINTIFFS' REQUEST FOR ALTERNATIVE CLASSES FAILS FOR THE SAME REASONS

Alternatively, Plaintiffs argue for a more limited multi-state class for consumer protection claims, or California, Wisconsin, and Pennsylvania state-wide classes.  Mem. at 78.  Neither approach has merit.

---

[105] Villa Lara, for example, testified that he felt he had been "duped" in early 2014, yet proceeded to purchase a new LG 120Hz TV in 2015.  Ex. 3, 199, 205:9-11, 252:1-11.

## A.   The Proposed Alternate Consumer Protection Class Is Unmanageable

Plaintiffs have not proposed any alternate consumer protection class against LG, as they offer nothing to the Court to address whether and to what extent other states have outcome-determinative conflicts with New Jersey law.[106]  With no attempt to carry their burden class certification must be denied.  *Baycol*, 218 F.R.D. at 209-10.  As to BBY, Plaintiffs are wrong that this Court may apply Minnesota law to consumers in "jurisdictions that have no outcome-determinative conflicts with Minnesota consumer protection law," because Plaintiffs have not shown that there are such jurisdictions. Mem. at 77.

Critically, Plaintiffs have ignored outcome-determinative, material conflicts between various state consumer protective laws.  These include, but are not limited to, the standard for actionable conduct, statute of limitations, and damages.[107]  For example, Minnesota's statute of limitations is six years whereas the period under California's UCL is four years.  *Compare Estate of Riedel by Mirick v. Life Care Ret. Cmtys., Inc.*, 505 N.W.2d 78, 81 (Minn. Ct. App. 1993) *with* Cal. Bus. & Prof. Code § 17208.  Other states have different limitations periods, and standards for accrual, (*see* Ex. 56), meaning that only an individual-by-individual assessment of each individual's purchase experience would  resolve the timeliness of that individual's claim – an exercise that would have to be undertaken irrespective of any purportedly common question.  *See, e.g.*, *Rapp*, 302

---

[106] Plaintiffs seek to apply New Jersey consumer protection law against LG.  Mem. at  63-66.

[107] *See* Ex. 56.

F.R.D. at 519 (statute of limitations issues are individual legal questions that predominate when multiple states' laws apply).

Similarly, whether "a substantial remedy" is available creates conflicts between state laws. *Burks v. Abbott Labs.*, 639 F. Supp. 2d 1006, 1012 (D. Minn. 2009). State laws vary significantly on the remedies available for consumer protection claims, and the standards to obtain such remedies. *See, e.g.*, *In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.*, No. 99-MD-1309(PAM/JGL), 2004 WL 909741, at *7 (D. Minn. Apr. 28, 2004); Conn. Gen. Stat. Ann. § 42-110g; 815 Ill. Comp. Stat. Ann. 505/10a.[108]

Defendants provide these examples for illustration only; it would be a Herculean undertaking to identify all the nuances of each state's consumer protection laws. For example, there are differences in whether states require some proof of injury and causation,[109] and even among those states that require some form of causation, the standard differs. Washington applies "but for" causation, *Patrick v. Wells Fargo Bank, N.A.,* 385 P.3d 165, 171 (Wash. Ct. App. 2016); Illinois applies proximate causation, which can be proven by actual deception, *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 199 (2005); and Florida allows proof of causation if "an objective[ly] reasonable person would have been deceived." *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011).

---

[108] More examples are available in Ex. 56.

[109] *See id.*

This is just a small sample of the myriad outcome-determinative conflicts that Plaintiffs have ignored even just among the consumer protection laws of Minnesota, California, Illinois, Connecticut, and Washington (not to mention the remaining states, *see* Ex. 56). Yet, each of these states is included in Plaintiffs' smallest proposed grouping. Mem. at 78 n.50. Were the Court to certify such a class, it "would face an impossible task of instructing a jury on the relevant law." *Foster*, 229 F.R.D. at 605 (internal quotations omitted). No multi-state class is manageable here – and Plaintiffs have not carried their burden to prove otherwise.[110]

### B.     The Proposed Single-State Subclasses Fare No Better

Plaintiffs offer no support to their throw-away request to certify California, Wisconsin and Pennsylvania state-wide classes, other than to string cite cases, with no additional analysis, in which other courts have certified state-wide classes in other cases. Mem. at 78-79. Plaintiffs' burden is to establish that class certification is appropriate based on the *facts* that exist here; yet, Plaintiffs have not done so.

Plaintiffs' single-state subclasses fail for the same reasons as articulated above, including, but not limited to, the necessity of individual inquiries into reliance. As to the consumer protection claims, Plaintiffs' concede – as they must – that Pennsylvania requires individualized proof of reliance. ECF No. 314-6 at 18 (citing *Debbs v. Chrysler Corp.*, 810 A.2d 137, 155-56 (Pa. Super. Ct. 2002)). As to California, Plaintiffs have the

---

[110] Apart from the omissions, Plaintiffs' analysis is erroneous. For example, Plaintiffs claim North Dakota law does not impose a scienter requirement. ECF No. 314-6 at 16. Not true. North Dakota prohibits deceptive sales and marketing activities "**with the intent that others rely thereon**." N.D. Cent. Code Ann. § 51-15-02 (emphasis added).

same problem discussed above,[111] that "even if the challenged statements were *facially* uniform, consumers' *understanding* of those representations would not be." *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *17 (N.D. Cal. June 13, 2014). And, in Wisconsin the "reasonableness of a plaintiff's reliance may be relevant in considering the third element of such a claim, that is whether a representation materially induced (caused) the plaintiff to sustain a pecuniary loss." *Novell v. Migliaccio*, 2008 WI 44, ¶ 53; *accord St. Jude II*, 522 F.3d at 840.

The same is true for contract, warranty, and unjust enrichment claims, where Plaintiffs would need to present evidence of their personal purchasing experience, and Defendants would be entitled to rebut the same. *See, e.g.*, *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 211 (E.D. Pa. 2017); *Schmidt v. Bassett Furniture Indus.*, No. 08-C-1035, 2011 WL 67255, at *5-8 (E.D. Wis. Jan. 10, 2011); *In re 5-Hour Energy*, 2017 WL 2559615 at *8. Individual issues would predominate.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' motion for class certification should be denied.

---

[111] *See supra* Section III.B.i.a.

Dated: September 18, 2019

**HOGAN LOVELLS US LLP**

*/s/ Phoebe A. Wilkinson*

Phoebe A. Wilkinson*
390 Madison Avenue
New York, NY 10017
T. (212) 918-3000
F. (212) 918-3100
phoebe.wilkinson@hoganlovells.com

Peter H. Walsh (MN No. 388672)
Alicia J. Paller (MN No. 0397780)
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
T. (612) 402-3000
F. (612) 402-3001
peter.walsh@hoganlovells.com
alicia.paller@hoganlovells.com

Robert B. Wolinsky*
555 Thirteenth Street NW
Washington, DC 20004
T. (202) 637-5600
F. (202) 637-5910
robert.wolinsky@hoganlovells.com

*pro hac vice*

*Counsel for Defendants LG Electronics USA, Inc., Best Buy Co., Inc., Best Buy Stores, L.P., and BestBuy.com, LLC*