**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| *Hudock et al. v. LG Electronics U.S.A., Inc. et al.*<br><br>This Document Relates To:<br><br>All Actions | Lead Case No. 16-cv-1220 JRT-KMM<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[REDACTED VERSION]** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

STATEMENT OF DISPUTED FACTS .................................................................. 3

ARGUMENT ........................................................................................................ 18

   I.    Legal Standard. ....................................................................................... 18

   II.   Choice of Law. ........................................................................................ 19

   III.  Plaintiffs Have Standing for Injunctive or Declaratory Relief. ........... 20

   IV.  The Representations Mr. Mannacio Relied on Present a Question of Fact for the Jury. ...................................................................................................... 25

        A.  Mr. Mannacio's credibility is a question for the jury. ............... 26

        B.  The evidence offered to counter Mr. Mannacio's testimony is far from uncontroverted. ....................................................................... 29

   V.   Plaintiffs Have Shown They Were Damaged. ....................................... 33

        A.  Benefit-of-the-bargain damages................................................... 34

        B.  Plaintiffs' damages model is admissible proof of benefit-of-the-bargain damages......................................................................................... 37

        C.  Plaintiffs' damages model shows that purchasers of televisions advertised as 240Hz were damaged. ........................................................... 41

        D.  Mr. Villa Lara was damaged........................................................ 42

   VI.  Plaintiffs Did Not Get What They Paid For........................................... 45

        A.  The issue is the numerical Hz specification.................................. 45

        B.  Defendants inflate the importance and capabilities of backlight scanning ....................................................................................... 47

i

C.  The Intertek Test proves nothing. ................................................................ 50

VII.   Plaintiffs Have Suffered an Ascertainable Loss. .................................................. 53

VIII.  Whether LG Validly Disclaimed Implied Warranties Is a Question for the
       Jury ..................................................................................................................... 59

IX.    There Is No Basis to Dismiss Plaintiffs' Unjust Enrichment Claims Against LG
       While Plaintiffs' Warranty Claims Have Yet to be Resolved. ............................ 63

X.     Plaintiffs' UCL Claim Should Not Be Dismissed. .............................................. 64

CONCLUSION ............................................................................................................. 66

# TABLE OF AUTHORITIES

Page(s)

## <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................. 26, 33

*Barger v. United States*,
   204 F.3d 1180 (8th Cir.2000) ......................................................................... 33

*Beck v. Mo. State High Sch. Activities Ass'n*,
   18 F.3d 604 (8th Cir. 1994) ............................................................................ 28

*Bernstein v. Serv. Corp. Int'l*,
   No. CV 17-4960, 2020 WL 224979 (E.D. Pa. Jan. 14, 2020) ........................ 61, 64, 65

*Bigham v. R&S Heating & Air Conditioning, Inc.*,
   182 F. Supp. 3d 919 (D. Minn. 2016) .............................................................. 26

*Bloomquist v. Wisdom Dev. Grp., LLC*,
   No. A08-0367, 2009 WL 67059 (Minn. Ct. App. Jan. 13, 2009) ................... 43

*Buetow v. A.L.S. Enterprises, Inc.*,
   259 F.R.D. 187 (D. Minn. 2009) ..................................................................... 42

*Buetow v. A.L.S. Enterprises, Inc.*,
   650 F.3d 1178 (8th Cir. 2011) ......................................................................... 40

*Camfield Tires, Inc. v. Michelin Tire Corp.*,
   719 F.2d 1361 (8th Cir. 1983) ......................................................................... 38

*Cappello v. Walmart Inc.*,
   394 F. Supp. 3d 1015 (N.D. Cal. 2019) .......................................................... 71, 73

*Castro v. Sovran Self Storage, Inc.*,
   114 F. Supp. 3d 204 (D.N.J. 2015) .................................................................. 61, 65

*Chowning v. Kohl's Dep't Stores, Inc.*,
   733 Fed. App'x 404 (9th Cir. 2018) ................................................................ 42, 50

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .......................................................................................... 31

*Damon v. Groteboer*,
   937 F. Supp. 2d 1048 (D. Minn. 2013) ........................................................... 30, 31, 41

*Davidson v. Apple, Inc.*,
   No. 16-CV-04942-LHK, 2019 WL 1004543 (N.D. Cal. Mar. 1, 2019) ......... 51

*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) ........................................................................... 31

*Davis v. HSBC Bank Nev., N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ................................................................................. 71, 72

*Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*,
   603 N.W.2d 336 (Minn. Ct. App. 1999) ......................................................................... 41

*Dibish v. Ameriprise Fin., Inc.*,
   134 A.3d 1079 (Penn. 2016) ............................................................................................ 61

*DiCarlo v. Keller Ladders, Inc.*,
   211 F.3d 465 (8th Cir.2000) ............................................................................................ 33

*DLH, Inc. v. Russ*,
   566 N.W.2d 60 (Minn. 1997) ........................................................................................... 32

*Duluth Steam Coop. Ass'n v. Ringsred*,
   519 N.W.2d 215 (Minn. Ct. App. 1994) ......................................................................... 51

*Dzielak v. Whirlpool Corp.*,
   26 F. Supp. 3d 304 (D.N.J. 2014) .................................................................................... 61

*Edmonds v. Minneapolis Pub. Sch. Special Sch. Dist. 1*,
   368 F. Supp. 3d 1329 (D. Minn. 2018) ...................................................................... 38, 39

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
   326 F.R.D. 592 (N.D. Cal. 2018) .................................................................................... 45

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ........................................................................................... 28, 30, 31

*Grp. Health Plan, Inc. v. Philip Morris Inc.*,
   621 N.W.2d 2 (Minn. 2001) .................................................................................. 51, 55, 72

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) ............................................................... 45, 46, 48

*Henderson v. Volvo Cars of N. Am., LLC*, Civ. No. 09-4146 (DMC)(JAD),
   2010 WL 2925913 (D.N.J. July 21, 2010) .............................................................. 66, 67

*Herron v. Best Buy Co.,*
   *Inc.*, 924 F. Supp. 2d 1161 (E.D. Cal. 2013) ............................................................ 72, 73

*Higgins v. Harold-Chevrolet-Geo, Inc.*,
   No. A04-596, 2004 WL 2660923 (Minn. Ct. App. Nov. 23, 2004) ............................. 42

*Hubbard Broad., Inc. v. Loescher*,
   291 N.W.2d 216 (Minn. 1980) ......................................................................................... 51

*Humphrey v. Philip Morris, Inc.*,
   551 N.W.2d 490 (Minn. 1996) .................................................................................*passim*

*In re Dial Complete Mktg. & Sales Practices Litig.*,
   320 F.R.D. 326 (D.N.H. 2017).........................................................................45, 46, 47

*In re Gen. Motors Ignition Switch Litig.*,
   407 F.Supp.3d 212 (S.D.N.Y. 2019)................................................................45, 47, 48

*In re Gen. Motors Ignition Switch Litig.*,
   14-MC-2543, 2019 WL 6827277 (S.D.N.Y. Dec. 12, 2019).....................................45

*In re Insulin Pricing Litig.*,
   No. 3:17-CV-0699-BRM-LHG, 2019 WL 643709 (D.N.J. Feb. 15, 2019) ...............61

*Investors Bank v. Torres*,
   197 A.3d 686 (N.J. App. Div. 2018) ........................................................................43

*Lala v. ADT Sec. Servs., Inc.*,
   Civ. No. 10-2698 (DRD), 2010 WL 49223452 (D.N.J. Nov. 29, 2010) ....................69

*Lieberson v. Johnson & Johnson Consumer Companies, Inc.*,
   865 F. Supp. 2d 529 (D.N.J. 2011) ..........................................................................42

*Loeblein v. Dormire*,
   229 F.3d 724 (8th Cir. 2000).....................................................................................33

*Lozano v. AT & T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007)...............................................................................71, 72

*McSpadden v. Mullins*,
   456 F.2d 428 (8th Cir. 1972) ....................................................................................26

*Mickens v. Ford Motor Co.*,
   No. 10-CV-5842 (KM)(MAH), 2015 WL 5310755 (D.N.J. Sept. 10, 2015) .........65, 66

*Nguyen v. Nissan N. Am., Inc.*,
   932 F.3d 811 (9th Cir. 2019)...............................................................................42, 50

*NorthBay Healthcare Grp. Hosp. Div. v. Blue Shield of California Life & Health Ins.*,
   342 F. Supp. 3d 980 (N.D. Cal. 2018) ......................................................................71

*Palmeri v. LG Elecs. USA, Inc.*,
   No. 07-5706(JAG), 2008 WL 2945985 (D.N.J. July 30, 2008)..................................70

*Plumlee v. Pfizer, Inc.*,
   No. 13-CV-00414-LHK, 2014 WL 695024 (N.D. Cal. Feb. 21, 2014)......................50

*Rouse v. Nissan N. Am., Inc.*, No.,
   CIV.A.04-5320, 2005 WL 61449 (E.D. Pa. Jan. 10, 2005) .........................................42

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
   72 Cal. App. 4th 861 (Cal. Ct. App. 1999) ................................................................71

*Saavedra v. Eli Lilly & Co.*,
   No. 2:12-CV-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)...................46

*Salschneider v. Kohl's Dep't Store*,
  No. 0:05-CV-00235 MJDSRN, 2006 WL 2033561 (D. Minn. July 17, 2006) ........... 32

*Steger v. Franco, Inc.*,
  228 F.3d 889 (8th Cir. 2000) ................................................................................. 27

*Stevenson v. Union Pac. R. Co.*,
  354 F.3d 739 (8th Cir. 2004) ................................................................................. 33

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................................. 31

*Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*,
  83 F. Supp. 2d 1016 (D. Minn. 2000) .................................................................... 29

*Thiedemann v. Mercedez–Benz USA, LLC*,
  183 N.J. 234, 872 A.2d 783 (2005) ....................................................................... 66

*Tri Coast LLC v. Sherwin-Williams Co.*,
  No. 16-3366, 2018 WL 468279 (D.N.J. Jan. 18, 2018) ............................................ 69

*Veldhuizen v. A.O. Smith Corp.*,
  839 F. Supp. 669 (D. Minn. 1993) ......................................................................... 50

*Viking Yacht Co. v. Composites One LLC*,
  496 F. Supp. 2d 462 (D.N.J. 2007) ........................................................................ 69

*Villa Lara v. LG Elecs. U.S.A., Inc.*,
  No. CV 17-5222 (JRT/KMM), 2018 WL 3748177 (D. Minn. Aug. 7, 2018) ............. 50

*Weitz Co. v. Lloyd's of London*,
  574 F.3d 885 (8th Cir. 2009) ................................................................................. 26

*Wierman v. Casey's Gen. Stores*,
  638 F.3d 984 (8th Cir. 2011) ................................................................................. 25

*Zabriskie Chevrolet, Inc. v. Smith*,
  240 A.2d 195 (N.J. Super. Law Div. 1968) ............................................................ 68

*Zakaria v. Gerber Prods. Co.*,
  No. LA CV-1500200 JAK (EX), 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017) .......... 48

## **Statutes**

Cal. Civil Code §1770(a)(5), §1770(a)(7) ...................................................................... 73

California Bus. and Prof. Code §17500 ......................................................................... 73

Minn. Stat. § 8.31, subd. 3a ......................................................................................... 30

Minn. Stat. § 336.2-714 ................................................................................................ 43

N.J. Stat. Ann. § 12A:1-201(10)...................................................................... 67

N.J. Stat. Ann. § 12A:2-714 ........................................................................... 43

N.J. Stat. Ann. § 12A:2-314(2) ................................................................. 67, 69

N.J. Stat. § 56:8-19 ........................................................................................ 30

## **Rules**

Fed. R. Civ. P. 37(c) ...................................................................................... 36

Fed. R. Civ. P. 37(c)(1) ................................................................................. 38

Fed. R. Civ. P. 56 .......................................................................................... 25

Fed. R. Civ. P. 56(c) ...................................................................................... 26

Fed. R. Civ. P. 56(c)(2) ................................................................................. 36

Fed. R. Civ. P. 56(c)(4) ................................................................................. 39

## **Regulations**

16 C.F.R. § 233.1(a) ................................................................................. 63, 64

## INTRODUCTION

This case is simple: it is about Defendants' deliberate decision to misrepresent a key feature of LG televisions that they knew consumers valued highly and which increased their sales. Defendants systematically and consistently passed off 60Hz televisions as televisions with refresh rates of 120Hz, and 120Hz models as having refresh rates of 240Hz. These televisions did not have the higher refresh rates as labeled. Instead of legitimately increasing the actual television refresh rates, LG merely cycled the backlight on and off, which cannot increase the refresh rate of a television.

But Plaintiffs' case is even stronger than many consumer actions. Here, Defendants conceded in documents that their practice was both deceptive and material to consumers—that is a big deal. Both Defendants knew the Accused Models have just half the refresh rates that were claimed. Both Defendants knew that higher refresh rates were a significant factor in consumers' purchasing decisions and were a price driver. And Both Defendants knew that their labeling was misleading to consumers.

Initially, Defendants seem to argue that since backlight scanning and higher refresh rates can both reduce motion blur, there is no deception. However, a car manufacturer is not permitted to label its four-cylinder car as having a six-cylinder engine merely because it adds turbocharging technology to increase engine power. Essentially, Defendants view this false equivalency labeling as perfectly acceptable. However, the law is clear that a manufacturer's opinion of its product does not give it the right to misrepresent *objective facts*. Defendants *never* even informed customers that LG used backlight scanning as a budget stand-in for increasing the refresh rate. Certainly, if backlight scanning were

superior, or even equal, to higher refresh rates, Defendants would have touted such an accomplishment. Instead, Defendants knew that "refresh rates," expressed in "Hz," had a marketing cache that was meaningful to customers while backlight scanning had none. Defendants exploited this to make sales. Defendants then pivot to claim that backlight scanning technology can "enhance" the actual refresh rate, and that there is evidence that a backlight, cycling 120 times per second, can turn a 60Hz refresh rate television into a 120Hz refresh rate television. Apart from the fact that the evidence Defendants cite does not allow for these conclusions, an avalanche of contrary evidence disputes this theory. A backlight has no image data of its own, and therefore the backlight cannot "update" the screen information.

Despite this overwhelming evidence, Defendants now move for summary judgment. Defendants citing very little evidence themselves while simultaneously *ignoring* the vast amount of evidence in dispute, Defendants largely repeat the same legal arguments this Court has already rejected in serial motions to dismiss. Yet, rather than disproving Plaintiffs' allegations, the voluminous discovery record overwhelmingly supports Plaintiffs' positions: (1) Defendants are recidivist offenders regarding refresh rate mislabeling and Plaintiffs thus have standing to pursue injunctive relief, (2) Plaintiffs have presented a mountain of evidence that they and consumers have been injured and can establish their ascertainable losses and damages through a conservative and robust conjoint survey, study, and economic analysis, (3) Plaintiffs have proven that they did not receive what Defendants' promised—televisions with twice the refresh rates as appeared in the labels, and (4) Plaintiffs have established their *prima facie* case under the applicable

statutory and warranty theories alleged in the complaint. A party cannot obtain summary judgment by ignoring disputed issues of material fact. Rather, Defendants must show there is no dispute at all. They have failed to do so, and their motion must be denied in all respects.

## STATEMENT OF DISPUTED FACTS[1]

Defendants offer very few (if any) uncontroverted facts in support of their motion for summary judgment. However, there are significant disputes as to the material facts at issue in this case, and thus summary judgment should be denied. What is not in dispute is that, between May 9, 2010 and at least May of 2016, Defendants marketed and sold LG LED televisions with advertised refresh rates of 120Hz, TruMotion 120Hz, 240Hz, and TruMotion 240Hz. ECF No. 320, ¶5 ("Alessi Decl."); Ex. 1 (list of accused models which LG admits were advertised with the misleading Hz label and use backlight scanning). However, the actual refresh rate of these LG LED televisions is one half of the advertised numeric Hz value (i.e. 60Hz and 120Hz, respectively). Due to this false and misleading advertising, Plaintiffs (and the Class) did not receive the LG LED televisions they were led to believe they did, and thus were damaged.

### A. Refresh Rate Has a Definitive Meaning.

███████████████████████████████████████████████

████████████        Ex. 2 ("den Boer Rprt."), ¶12. █████████████████

---

[1] Unless otherwise noted, all exhibit references herein refer to the documents attached to the Declaration of Raina C. Borrelli ("Borrelli Decl.") filed concurrently herewith.



*Id.* at ¶¶12, 13.

Ex. 3, ("Poynton Rprt.") ¶37.

den Boer Rprt. at ¶44; Ex. 4, ("Poynton Tr.") 159:16-21.

. den Boer Rprt. at ¶¶42-44.

Ex. 5, ("LG 30(b)(6) Tr.") 332:24 –333:24; Poynton Rprt. at ¶¶13, 18, 27, 30, 46, 70.

den Boer Rprt. at ¶12 (emphasis added) (quoting the IDMS definition).

Poynton Tr. at 164:23-165:7.

Poynton Rprt. at ¶28.

Poynton Tr. at 201:2-8

).



den Boer

Rprt. at ¶¶34, 44-45. The only basis for Defendants' argument is the opinion of their expert, Dr. Poynton, which Plaintiffs have challenged under *Daubert*. However, even if the Court allows Poynton's opinion, it merely raises a dispute of fact, making summary judgment improper.

### B. Defendants' Refresh Rate Representations

Ex. 6, ("Calacci Tr.") 30:1-31:25; Ex. 7, ("Nemecek Tr.") 31:2-18; 124:18-24.

Calacci Tr. at 28:23-29:6, 51:5-52:12, 74:20-75:1

; *id.* at 128:8-17, 133:3-9, 160:20-24

(Ex. 8, LGE0126487);

(Calacci Tr. at 71:24-72:13, 158:17-159:23; Ex. 9, LGE0317213);

Calacci Tr. at 99:11-19, 158:17-159:23.

*Id.* at 27:1-23, 31:18-25; 166:24-167:22.

Ex. 10, LGE0468062

(███████████████████████████████████████████████████████

███████████████████████████████████████████); Ex. 11, LGE0008110 (2010 PC Richards fact tag showing "TruMotion 240Hz" as a "KEY FEATURE[]."); Ex. 12, LGE0466407 (2013 Best Buy fact tag showing refresh rate in the heading as "120Hz"); Ex. 13, (Best Buy product detail page for the LG television model purchased by Plaintiff Hudock, showing 120Hz in the product headline and "TruMotion 120Hz refresh rate" in the "Product Features."); Ex. 14, LGE0087214 (2015 LG product grid with refresh rate shown as "TruMotion 120Hz" or "TruMotion 240Hz"); Ex. 15, LGE093199 (September 2016 Costco fact tag showing "TruMotion 120Hz"). That included listing the misleading refresh rate specification on the product pages on LG's own website. Ex. 16, LGE0085489.

███████████████████████████████████████████████

███████████████████████████████ LG 30(b)(6) Tr. at 39:23-40:13

(███████████████████████████████████████████████

████████); Ex. 17, LGE0460927 (LG rules for fact tags: "Be as consistent as possible. Create templates that use the same or similar bullets in the same place on the sign."). ████

████████████████████████████████████████████████

████████ Calacci Tr. at 28:2-17; *see also* Ex. 18, ("Simonson Tr.") 46:7-49:11 (████████████████████████████████████████████████); *id.* at 50:9-51:8. In practice, LG was successful at achieving this goal and was able to achieve retailer compliance with this consistent refresh rate specification. Ex. 19, LGE0468466 (when LG stopped using the deceptive refresh rate advertising, it ensured retailers complied

with that change as well); LG 30(b)(6) Tr. at 204:2-14 (█████████████

███████████████████████████████████████████████████

████████); *id.* at 224:14-225:21 (██████████████████████

██████████████████████████████████); *id.* at 225:24-

226:20 (citing Ex. 20, LGE0150502) ██████████████████████).

███████████████ Ex. 21, ("Wolf Tr.") 122:20-25 (█████

████████████████████████████). █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ Ex. 22, ("Best Buy 30(b)(6) Tr.") 195:8-196:22 ████████

███████████████████████████████████████████████████

████████████████████████████████; Wolf Tr. at 67:22-24, 69:4-11,

72:2-8, 72:18-25; LG 30(b)(6) Tr. at 208:22-209:24.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ Ex. 23, LGE0352814; *see also*,

Ex. 24, LGE0468539; Ex. 25, LGE0442911 and Ex. 26, LGE0442913 (LG will quickly

"engage" Walmart to stop it from using the native refresh rate in "Hz" on fact tags); Ex.

27, LGE0442919; Ex. 28, BBY0085951. Figures 1-6 below show examples of how the

relevant televisions were advertised both in-store and online:



**Figure 1**. Best Buy 2013 Fact Tag (Ex. 12, LGE0466407)



**Figure 2**. Best Buy 2013 Fact Tag (Ex. 99, LGE0466408)



**Figure 3.** Best Buy 2015 Assortment Grid (Ex. 100, LGE0007300)

**Figure 4.** PC Richards 2010 Fact Tag (Ex. 11, LGE0008110)

**Figure 5.** Fry's 2015 Assortment Grid (Ex. 14, LGE0087214)



http://www.costco.com/LG-70%22-Class-(69.5%22-Diag.)-4K-Ultra-HD-Smart-LED-LCD-TV-70UH6350.product.100287073.html

**Figure 6.** Costco 2016 Product Detail Page (Ex. 15, LGE0093199)

10

**C.    Defendants Knew the Refresh Rate Specification Was     False and Misleading**

In 2009, LG began using the proprietary term "TruMotion" along with the Hz representation in its refresh rate specifications for LED televisions. ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████ Ex. 29, BBY0065523; *see also* Ex. 30, LGE0139759 ████

███████████████████████████████████████████████████████████████

███████████████ . ███████████████████████████████████████████

███████████████████ *See* Best Buy 30(b)(6) Tr. at 276:12-277:5 (citing Ex. 31, BBY0031722). ██████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████ *See* Best Buy 30(b)(6) Tr. at 279:1-284:3, 289:14-290:1.

Both LG and Best Buy knew that the refresh rate representations used for the relevant LG LED televisions, which Plaintiffs each purchased, (TruMotion 120Hz, 120Hz, TruMotion 240Hz, 240Hz) were false and misleading because the actual refresh rate was half the advertised numerical value. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████ *Id.* at 254:2-12, 300:17-24. ██████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Ex. 32,

11



LGE0412105. █████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████ Ex. 34, LGE0329814; Ex. 35, LGE0139329; *see also* Ex. 33, LGE0003515; Ex. 36, LGE0332032.

████████████████████████████████████

██████████████████████████████████. Ex. 37, LGE0034469; Ex. 38, LGE0072756 ████████████

████████████████████████████████████

████████████; Ex. 39, LGE0070986; Ex. 40, LGE0035120; Ex. 41, LGE0135117; Ex. 42, LGE0071626. █████████████████████

█████████████████████████████████████

████████████████████████████████████

████████. Ex. 43, BBY0046436; Best Buy 30(b)(6) Tr. at 313:1-314:16.

███████████████████████████████████

████████████████████████████████████

███████████ Ex. 44, LGE0245954 (███████████████████

█████████████████████████████████); Ex. 45 LGE0090881 (████████████████████████████████

██████████████████████████████████████

████████████████); Ex. 46, LGE0468062; Ex. 47, LGE0061503; Best Buy 30(b)(6) 333:9-13; Ex. 15, LGE0093199. Finally, in 2017, after years of

misrepresentations to consumers, LG removed the Hz label from all refresh rate marketing for LG LEG televisions and clarified the true refresh rate of the televisions. Ex. 48, LGE0082048 (April 2017 email to Product Marketing Team stressing the "need to remove 'Hz' for TruMotion" and illustrating the new spec sheet call outs of "TruMotion 120 (Refresh Rate 60Hz)" and "TruMotion 240 (Refresh Rate 120Hz)."). ███████████

██████████████████████████████████████████████████████ Ex. 49, BBY0043773 (████████████████████████████████████████████ ██████████████████████); Ex. 50, BBY0052210 (██████████████ ████████████████████████████████████████████████████████).

████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████. *See* Ex. 51, LGE0400907 (████████████ ████████████████████████████████████████████████████████).

████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████. *See* Ex. 52, LGE0060245 ████████████████████████████████; Ex. 53, LGE0085661; Ex. 54, LGE0019259 (████████████████████████████ ████████████████████████████████████████████████████████); Ex. 55, LGE0138062 (████████████████████████████████████ █████████████████████████████████████████); Ex. 56, LGE0030906 (Product reviewer regarding "phony refresh rates" and seeking clarification

from LG and concluding "Why doesn't LG website provide the refresh spec?"). Despite these many complaints and requests for clarification, LG did not provide retailers or consumers with accurate information about the actual refresh rate of the LG LED televisions at issue. *See* Ex. 16, LGE0085489 ("Our agents are expressing some difficulty they have in providing proper explanation regarding refresh rates."); Exs. 57-60, LGE0139914, 139918, 139919, 139920 (respectively) (███████████████████████████ ██████████████████████████████████████████████████████████████████ ); Ex. 61, LGE0132555 (███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██); LG 30(b)(6) Tr. at 110:24-111:14 (██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███). A mock fact tag created by LG underscores that it knew the Hz deceptive advertising was confusing and misleading.



(██████████████)

████████████████████████████████████████████████████████████████

██████████████ *See* Ex. 63, BBY0063559 ███████████████████████

███████████████████████████████████████████); *see also* Best Buy

30(b)(6) Tr. at 303:20-305:10 (discussing Ex. 64, BBY0060394 and Ex 65, LGE0441993).

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████. Best Buy 30(b)(6) Tr. 317:6-18 ███████████

███████████) (discussing Ex. 66, BBY0065539)

**D. Defendants Knew That Refresh Rate Was Material to Consumers Like Plaintiffs**

LG and Best Buy knew that a television's refresh rate specification was a material

factor that consumers, like Plaintiffs, saw and considered when purchasing a LG LED

television. ██████████████████████████████████████████████████

█████████████████████████████ *See* Ex. 67, LGE0134043, Ex.

68, LGE0134044); *see also* Ex. 69, LGE0331892 (██████████████████

████████████████████████████████████████████████████████████████

███████); Ex. 70, LGE0334132, at slide 3; Ex. 71, LGE0136212; Ex. 72, BBY0070641

████████████████████████████████████████████████████████████████

████████████████; Ex. 73, LGE0331735 (█████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████). Plaintiffs' choice-based

conjoint study ("CBC study") conducted by their expert, Steve Gaskin, proved this to be true, finding that "[t]he reduction in market value due to a change from 'TruMotion 120 Hz' to 'Refresh Rate 60 Hz and TruMotion' is 5.31%... The reduction in market value due to a change from 'TruMotion 240 Hz' to 'Refresh Rate 120 Hz and TruMotion' is 1.300%...," or $76.90 for a $1500 television and $19.50 for a $1500 television. Ex. 74, "(Gaskin Rprt.") ¶54.



. *See, e.g.*, Best Buy 30(b)(6) Tr. at 266:17-25; Ex. 75, ("Loretucci Tr.") 41:10-21, 128:8-16 (⬛⬛⬛); Ex. 76, LGE0056756 ⬛⬛⬛ Ex. 77, LGE0060194 (⬛⬛⬛); Ex. 78, BBY0065020 (⬛⬛⬛); Ex. 79, BBY0030190, at slide 12 (⬛⬛⬛).

Each of the Plaintiffs testified that they considered refresh rate making their LG television purchase. Plaintiff Breann Hudock ("Hudock") is a resident of East Troy, Wisconsin, who purchased an LG television, model number 55LN5100-UB ("Model 5100-UB") from Best Buy's online retail site, BestBuy.com, on November 29, 2013. Ex. 80, ("Hudock Tr.") 261:8-10; 331:19-332:4; 469:2-6. Mrs. Hudock searched for televisions with specific features, including 120Hz refresh rates, and was told by a Best Buy employee that a high refresh rate is important when viewing sports and playing video games. *Id.* at

300:23-301:22. Prior to purchasing her LG LED television, Mrs. Hudock confirmed that it was advertised as 120Hz. *Id.* at 89:18-22; 93:9-21.

Similarly, Plaintiff Villa Lara researched televisions specifically looking for one with a high refresh rate. Ex. 81, ("Villa Lara Tr.") 185:20-186:15, 188:24-189:6, 192:17-23, 407:1-3. Mr. Villa Lara is a resident of Los Angeles County, California, who purchased an LG television, model number 55LN5100 from Best Buy's Compton, California, store location on November 28, 2013. *Id.* at 249:15-20. When making that purchase, he relied on a Best Buy advertisement and fact tag stating the refresh rate was 120Hz. *Id.* at 186:16-187:8, 256:14-25, 406:23-407:3. At the time of his purchase, he also purchased a separate five-year insurance plan from Best Buy that covered parts and labor. *Id.* at 188:15-23; Ex. 101, PL VILLA LARA 000007.[2]

Plaintiff Fleishman is a resident of Willow Grove, Pennsylvania, who purchased an LG television, model number 55LA9650 ("Model 9650"), from Best Buy. In or around June 2014, Mr. Fleishman purchased the Model 9650 by phone from a Best Buy located in Maryland and had it shipped to him in Pennsylvania. Ex. 82, ("Fleishman Tr.") 51:5-11; 52:4-8; 160:18-161:2. Mr. Fleishman also purchased his television in part due to the 240Hz advertised refresh rate featured on Best Buy's website. *Id.* at 168:14-21, 245:19-246:6.

---

[2] Years later, Mr. Villa Lara's television was not functioning properly (a screen brightness issue) so he made a claim under his insurance plan from Best Buy, in its capacity as the insurer/warrantor. Villa Lara Tr. at 248:7-249:4. After a failed repair attempt, Best Buy gave him $500 in store credit, which was equivalent to the purchase price of the television. *Id.*

Finally, Plaintiff Mannacio is a resident of Novato, California, who purchased an LG television, model number 60UH7700 from Best Buy's store location in San Rafael, California, in or around March 2016. Ex. 83, ("Mannacio Tr.") 132:2-17. Mr. Mannacio testified that he saw the 240Hz refresh rate advertised on LG's and Best Buy's websites for his model, *id.* at 174:1-23, 182:15-183:2, and "on the advertising in the Best Buy store as well …[,] the tag that they have … that includes the price and some basic information about the TV." *Id.* at 19:7-19; 163:22-25; 174:14-17; 301:14-24.  It was important to Mr. Mannacio to purchase a television that had a refresh rate of at least 120 Hz, and he chose to pay for an even higher-end television advertised as 240Hz. *Id.* at 220:19-221:2. Thus, each Plaintiff testified that the refresh rate itself (not motion blur reduction capabilities) were relevant to their purchase and that they saw the deceptive refresh rate advertising when they made their purchase and were thus damaged.

Due to the significant disputes of material fact (particularly when viewed in response to the minimal facts Defendants assert in their motion for summary judgment), Defendants' motion must be denied.

## ARGUMENT

### I.  **Legal Standard.**

"[S]ummary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011). Pursuant to Fed. R. Civ. P. 56, the movant must prove that "a fact cannot be or is genuinely disputed," which requires it cite to particular parts of

the record or show that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact. Fed. R. Civ. P. Rule 56(c). For purposes of summary judgment, a fact is "material" if it "*might affect* the outcome of the suit" and a factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added).

In reviewing the evidence, the facts, and the inferences drawn from those facts, are viewed in light most favorable to the non-moving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009); *Bigham v. R&S Heating & Air Conditioning, Inc.*, 182 F. Supp. 3d 919, 923 (D. Minn. 2016). To that end, "summary judgment should be granted with caution, and a plaintiff should be accorded any and all favorable inferences." *McSpadden v. Mullins*, 456 F.2d 428, 430 (8th Cir. 1972).

## II. Choice of Law.

Defendants give short shrift to their choice of law arguments and they should be rejected. In conclusory fashion, Defendants argue that because the law of Plaintiffs' home states governs their claims, Counts I through IV and Count VIII must be dismissed since no plaintiffs reside in Minnesota, New Jersey, or New York. ECF No. 436 at p. 9 ("Defs.' Br."). Defendants' insufficient analysis is plainly contrary to Minnesota's choice-of-law rules. *See* ECF No. 225 at pp. 49-66, 77-80 ("Pls.' Mot. Class Cert.").

To the extent this Court agrees with Defendants' choice-of-law analysis, Plaintiffs have consistently maintained the various state consumer protection statutes are asserted only in the alternative to the Minnesota and New Jersey claims by the Plaintiffs residing in

their respective states. ECF No. 175 at ¶176 (Count V), ¶186 (Count VI), ¶195 (Count VII), ¶206 (Count VIII), ¶213 (Count IX) ("Consolidated Second Amended Class Action Complaint" or "Complaint").

## III.   Plaintiffs Have Standing for Injunctive or Declaratory Relief.

Defendants next argue that Plaintiffs do not have Article III standing under the California "Unfair Competition Law" ("UCL"), California Legal Remedies Act ("CLRA"), and "Minnesota Deceptive Trade Practices Act" ("MDTPA"). Defs.' Br. at p. 9. Defendants conflate statutory standing with Article III standing, and further conflate Article III standing with mootness. However, under any analysis, their arguments that Plaintiffs do not have standing for injunctive relief fail.

This Court has already determined the "threshold question" of whether Plaintiffs suffered an Article III injury in fact and found in the affirmative. *See* ECF No. 59 at 6-7 ("Order Mot. Dismiss"). Article III standing is evaluated at the time the lawsuit is commenced, and the facts considered are only those that existed at the time of filing. *See, e.g.*, *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000). At the time they filed their claims against Defendants, Plaintiffs had purchased LG LED televisions in reliance upon false representations, which were present in the market until at least 2017. *See*, pp. 10-16, 23-25, *supra*. Accordingly, Plaintiffs had Article III standing for damages and injunctive relief at the time this case was filed in 2016.

Defendants' argument that they have corrected their deceptive labeling such that there is no longer any conduct to enjoin is more properly considered as one of mootness, not standing. However, a case becomes moot only when it becomes clear that "a federal

court can no longer grant effective relief." *Beck v. Mo. State High Sch. Activities Ass'n*, 18 F.3d 604, 605 (8th Cir. 1994). Even when a defendant voluntarily ceases a challenged practice, a federal court does not lose its power to determine the legality of the practice, and it is the defendant in those circumstances that bears a heavy burden to persuade the court that the challenged conduct *cannot reasonably be expected to recur*, in order to find it "moot." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.").

Here, the evidence shows that (1) Defendants engaged in a widespread and pervasive marketing scheme that was materially false and misleading, and (2) there is no way to know if Defendants will re-engage such tactics in the future. *See* pp. 10-16, *supra*. There is no reason to dispute that Plaintiffs will likely purchase televisions (maybe even LG televisions) in the future. Defendants argue there is no evidence that they are likely to repeat the challenged labeling in the future. But this is obviously wrong. ██████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *See, e.g.* Ex. 44, LGE0245954; Ex. 46, LGE0053900; Ex. 47, LGE0061503; Best Buy 30(b)(6) 333:9-13. Thus, they must be considered recidivists under the injunction analysis. Furthermore, some positions Defendants have taken in this litigation—contrary to their own documents—indicate that they do not believe their labeling was false or deceptive. Under these circumstances, there is a danger they will again use false refresh rates.

Additional facts supporting this threat are legion. For 2014 LG television models, Defendants altered the manner in which they advertised refresh rate by employing MCI and UCI monikers, rather than the challenged TruMotion rating labeled with "Hz". *See, e.g.*, Alessi Decl. at ¶5; Ex. 43, BBY0046436 (2014 Best Buy email "We are not calling out Hz in ANY vehicle (including fact tags) anymore as they don't properly communicate the technology to the customer and at times can be misleading."). However, not long after this change, both Defendants returned to the false and misleading TruMotion Hz advertising. *See, e.g.*, Alessi Decl. at ¶5. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████    *See, e.g.*, Exhibit 63, BBY0063559; Exhibit 52, LGE0060245; Exhibit 53, LGE0085661; Exhibit 54, LGE0019259; Exhibit 55, LGE0138062; BBY 30(b)(6) Tr. at 303:20-305:10 ██████████████████████████████

████████████████████████████████████████████████████████

██████████ ) (discussing Ex. 64, BBY0060394 and Ex. 65, LGE0441993); Ex. 56, LGE0030906.

This is plain evidence of the concrete possibility that Defendants will employ a false and misleading marketing scheme in the future and Plaintiffs remain at risk of Defendants marketing in a false and misleading manner in the future. *See, e.g.*, *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F. Supp. 2d 1016, 1020-21 (D. Minn. 2000) ( "[Defendants'] decision to publish the Millennium flyer even in the face of a false advertising complaint by Surdyk's and a cautionary letter from the Minnesota

Attorney General's Office suggests just the opposite" of an intention to halt or modify false advertising). Accordingly, injunctive relief is not only appropriate, but critically important. Defendants have not overcome their "heavy burden" to demonstrate that the claim for injunctive relief is moot, and it certainly existed at the time the case was filed. *Laidlaw*, 528 U.S. at 189.

For the same reasons, Plaintiffs likewise have statutory standing to seek injunctive relief under the UCL, CLRA, MDTPA. There is no categorical rule that plaintiffs lose standing to pursue injunctive relief (or their claim becomes moot) once they are aware of a defendant's false and misleading conduct. To the contrary, the legislature's provision of a private cause of action for injunctive relief expressly *assumes* that the private plaintiff has already been injured by a violation of the statutes in question. *See* Minn. Stat. § 8.31, subd. 3a ("[A]ny person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and … receive other equitable relief as determined by the court."); N.J. Stat. § 56:8-19 ("Any person who suffers any ascertainable loss of moneys or property … as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act … may bring an action …. In any action under this section the court shall [award] any other appropriate … equitable relief[.]").

Defendants' proffered authority does not hold otherwise. *Damon v. Groteboer* is an inapposite case involving the sale of commercial real estate; far removed from the context of a consumer class action. 937 F. Supp. 2d 1048 (D. Minn. 2013). There, the Court found that misrepresentations during a single, one-on-one real estate transaction did not provide a basis for injunctive relief because the plaintiffs failed to provide evidence that they faced

future harm. *Id.* at 1071. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (a civil rights suit stemming from alleged excessive force in connection with a traffic stop by police), and *Summers v. Earth Island Inst.* 555 U.S. 488 (2009) (an environmental suit attempting to enjoin the U.S. Forest Service from executing timber sale), are equally inapplicable. Notably, in *Lyons*, the Supreme Court explicitly distinguished between mootness and standing, finding, "the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Laidlaw*, 528 U.S. at 190 (citing *Lyons*, 461 U.S. at 101). This distinction between mootness and standing is key: there is no question Plaintiffs have standing (for both injunctive relief and damages) given the facts at the time of filing (and this Court's prior recognition of the same), and Defendants have not met their burden in proving that their subsequent conduct has rendered Plaintiffs' statutory claims for an injunction moot.

To hold otherwise would defeat nearly every claim for injunctive relief under consumer protection laws, because of course, by the time a lawsuit is commenced, the named representative is aware of the harm. *See* ECF No. 38-1, *Boschee v. Burnet Title Co.*, No. CT 03-016986 (Minn. Dist. Ct. Jun. 15, 2004) ("To bar a person … from bringing an action under the [MU]DTPA merely because they are now forewarned against such a practice would seem to run counter to the remedial nature of the [MU]DTPA. Moreover, the strong possibility exists that [plaintiff] may some time in the future again decide to re-finance her home or to purchase a new home."). *See also Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 640 (2018) ("Knowledge that the advertisement or label was false in the past does not equate to

knowledge that it will remain false in the future… once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved."). There is simply no way for Plaintiffs—particularly given Defendants' on-again, off-again deceptive Hz-labeling —to know if a particular LG television is truthfully labeled. But Plaintiffs should be able to trust that the Defendants will speak truthfully in the future, particularly after these issues have now been aired publicly and in Court.

## IV.    The Representations Mr. Mannacio Relied on Present a Question of Fact for the Jury.

Defendants argue that claims brought by Mr. Manaccio must be dismissed because each is predicated on exposure to a representation that he did not see. Defs.' Br. at p. 13. Defendants assert that Mr. Mannacio's "unsubstantiated" testimony is "directly contradicted by the evidence in the record," but Defendants' "evidence" is both circumstantial and cherry-picked, and their argument simply ignores conflicting, direct testimony and statements of fact by counsel. The Court should deny a motion for summary judgment, where, as here, it is evident that "reasonable persons 'might draw different conclusions from the evidence presented.'" *Salschneider v. Kohl's Dep't Store*, No. 0:05-CV-00235 MJDSRN, 2006 WL 2033561, at *2 (D. Minn. July 17, 2006) (quoting *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997)).

Whether Mr. Mannacio saw the false and misleading representations is undoubtedly a question for the jury. Indeed, Defendants' motion inappropriately attempts to resolve issues of witness credibility as a matter of law and introduces new evidence that both contradicts the record and is unreliable

25

### A.    Mr. Mannacio's credibility is a question for the jury.

Defendants' first strategy is to attack Mr. Mannacio's credibility. But this argument simply highlights why the factual dispute must be presented to the jury: "Determining the credibility of a witness is the jury's province, whether the witness is lay or expert." *Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) (quoting *DiCarlo v. Keller Ladders, Inc.,* 211 F.3d 465, 468 (8th Cir.2000)). *See also Loeblein v. Dormire*, 229 F.3d 724, 726 (8th Cir. 2000) (citing *Barger v. United States*, 204 F.3d 1180, 1182 (8th Cir.2000)) ("a witness's inconsistencies simply raise an issue of credibility, and the trier of fact is entitled to make the ultimate decision of whether testimony is to be believed.").

Initially, Defendants focus on Mr. Mannacio's alleged inability to recall the date of his television purchase. Defs.' Br. at p. 17.  However, whether or not Mr. Mannacio recalled the exact date or month of his purchase is immaterial (*see*, *Liberty Lobby, Inc.*, 477 U.S. at 248), and it is up to the jury to decide whether Mr. Mannacio's estimate regarding the date of his purchase, which was expressly qualified with "on or about," undermines his credibility because he was off by some number of days.

Defendants further attack Mr. Mannacio's credibility by arguing that he unequivocally stated an "incorrect" recollection: that Best Buy and LG "websites, as well as the in-store Best Buy fact tag, advertised the model as specifically stating the refresh rate of the television was 240Hz refresh rate." Defs.' Br. at p. 17. Importantly, for purposes of this motion, the evidence shows that Mr. Mannacio reviewed LG and Best Buy's websites and learned that the 60UH7700 television had a 240Hz refresh rate (Mannacio Tr. at 174:10-17, 182:20-183:2), and that he was also able to review the 240Hz specifications

in-person on a fact tag at the Best Buy store prior to purchase. *Id.* at 163:17-25. The web pages cited by Defendants clearly show 240Hz as a feature. *See* ECF No. 432-6 (Defs.' Ex. 17) (noting in bold header under "Product Features" of Best Buy page, "TruMotion 240Hz"); ECF No. 432-7 to 432-10 (Defs.' Exs. 18-21) (under "Picture Quality" heading, listing "TruMotion 240Hz"). Because Plaintiffs' claims hinge on the inflated numerical value tied to the "Hz" unit, Mr. Mannacio's claim is not defeated even if there was no literal reference to the phrase "refresh rate."[3] Plaintiffs allege (and Defendants agree) that "refresh rate" is "the number of Hz you see." Ex. 106 (Best Buy TV Buying Guide).

Even if it were appropriate to assess the veracity of Mr. Mannacio's testimony as a matter of law, a close examination of the transcript easily disposes of Defendants' argument. Defendants cite Mr. Mannacio's transcript at 163:22-164:10 as testimony that the fact tag he saw said "refresh rate 240Hz." Defs.' Br. at p. 17. Mr. Mannacio's testimony was actually as follows:

> Q. What do you remember about the fact tag saying about refresh rate?
> A. I remember it saying 240Hz.
> Q. And was that labeled 'refresh rate 240Hz'?
> A. That's my recollection, yes.
> Q. … Did it say 'TruMotion'
> A. It may have. I'm not certain of that.

Mannacio Tr. at 163:22-164:7. Defendants go on to argue that Mr. Mannacio testified that the LG website specifically referenced the words "refresh rate." Defs.' Br. at p. 17. But

---

[3] In footnote 8, Defendants assert Mr. Mannacio understood the label Hz could refer to something other than refresh rate. Notably, however, Mr. Mannacio identifies "radio signals" as something Hz may refer to and there is no evidence or indication Mr. Mannacio understood Hz to mean anything other than refresh rate *in the context of a television*. Defs.' Br. at p. 18 n. 8.

Mr. Mannacio could not recall with specificity what the websites for his model television stated. Instead, he testified, again, only that it stated 240Hz, that he was familiar with "TruMotion" from LG's advertising generally, and that the 'hard specs' said refresh rate:

> Q. When did you first become familiar with the term "TruMotion"?
> A. Probably three years ago or so.
> Q. And what advertising did you see it in?
> A. LG's Advertising.
> ***
> Q. How do you know that LG uses the term "TruMotion"?
> A. I've seen it in their advertising.
>
> ***
> Q. Did the web page for the TV model you bought, the 60UH7700, include information about LG's TruMotion technology?
> A. I'm not sure. I think it did but I don't recall.
> Q. So you don't remember one way or the other whether the website, LG website for the TV model your (*sic*) bought talked about TruMotion?
> A. No. And because I would be primarily looking for hard specs.
> Q. Do you know whether it referenced the words "refresh rate"?
> A. Well, that would have been under the hard specs and yes, it did.
> Q. So it's your testimony that the LG website for the TV model you bought specifically referenced the words "refresh rate"?
> A. That's what I'm saying, yes.
> Q. And do you remember what it said for the specification relating to refresh rate as you remember it?
> A. 240Hz.
> Q. And just said "240Hz," no other words?
> A. That's my recollection.
> Q. And it says "hertz" after the 240?
> A. Yes.
> Q. You're positive about that?
> A. I said that's my recollection.

*Id.* at 18:17-24; 26:16-18; 173:21-174:23. Assuming the web-archives Defendants include in their motion are complete depictions of everything Defendants said about the Hz ratings of LG's 60UH7700 television (Defendants represented that they retained *no*

online content whatsoever),[4] they largely corroborate Mr. Mannacio's testimony. Although his memory may have been imperfect, he was absolutely clear that, in his mind, "Hz" means refresh rate in the context of LCD televisions. *Id.* at 23:18-24:3. He testified that both Defendants labeled the 60UH7700 online as "240Hz," which Defendants' proffered documents demonstrate is absolutely correct.

**B.    The evidence offered to counter Mr. Mannacio's testimony is far from uncontroverted.**

In an attempt to bolster their argument that Mr. Mannacio's testimony is unreliable, Defendants offer, for the first time, "declarant" evidence from Best Buy Employee Taylor Vander Aarde ████████████████████████████████████████

████████████████████████████████████████

████████████████  Defs.' Br. at pp. 17-19; ECF Nos. 434, 434-1, and 434-2. ("Vander Aarde Declaration," "Exhibit 1" and "Exhibit 2," respectively). Assuming Defendants' evidence is even admissible,[5] it is inadequate and unpersuasive. For the reasons discussed below as well as in Plaintiffs' motion to exclude Mr. Vander Aarde's declaration under Fed. R. Civ. P. 37(c) (ECF No. 477), Plaintiffs object to Mr. Vander Aarde's declaration and the supporting exhibits under Fed. R. Civ. P. 56(c)(2).

---

[4] Best Buy 30(b)(6) Tr. at 203:5-204:25.

[5] Plaintiffs have filed a motion to exclude Mr. Vander Aarde's declaration and the supporting exhibits under Fed. R. Civ. P. 37(c). *See* ECF No. 477. The arguments in support of that motion are relevant and incorporated herein. As Defendants urge, unsubstantiated, self-serving testimony, should be given little weight in connection with a summary judgment motion. Defs.' Br. at p. 14. #

First, Exhibits 1 and 2 to Mr. Vander Aarde's declaration are mock fact tags attached to emails—they are not photos of fact tags in any store. Plaintiffs pressed hard in discovery to obtain every fact tag that appeared in stores, and Defendants' counsel represented in stark and unequivocal terms, ███████████████████████████████████████ ███████████████████████████████████████ Ex. 90 (10/11/2018 email from R. Wolinsky). Best Buy's corporate designee testified, ███████████████████████ ██████████████████████████ Best Buy 30(b)(6) Tr. 202:7-11; *see also* Ex. 91, ("Gezella Tr.") 38:4-9. Based on these representations, Plaintiffs reasonably did not seek to depose any other witnesses to find out whether any given mock-up fact tag that appeared in an email was actually used in-store.

Now, with no warning and nine months after the close of discovery, Best Buy employee Mr. Vander Aarde (who was never disclosed in discovery—*see* Ex. 88 (Best Buy Initial Disclosures); Ex. 89 (6/15/2018 email from E. Korchin disclosing Defendants' custodians)—claims to have *knowledge* that a certain fact tag mock-up was final and ultimately used in stores—exactly what Defendants counsel said *no one* knew. And *that* fact tag just happens to be a fact tag related to one of the Plaintiffs' televisions. Defendants cannot have it both ways. They cannot have their counsel head-off an entire line of questioning in discovery by making the sweeping representation that no one knows whether any given fact tag that appeared in Best Buy's production was final or ultimately used in a store, and then at summary judgment have a new witness swoop in and claim that knowledge with regard to the fact tag for Mr. Mannacio's  television model. Last minute disclosure of evidence that appears to be probative of the claims in this case is highly

prejudicial to Plaintiffs. *See, e.g.*, *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983) ("If testimony under oath…. can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment."); *Edmonds v. Minneapolis Pub. Sch. Special Sch. Dist. 1*, 368 F. Supp. 3d 1329, 1338 (D. Minn. 2018) ("A party who fails to disclose or supplement required discovery 'is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'") (excluding declaration and documents that were not produced during discovery, citing Fed. R. Civ. P. 37(c)(1)).

Second, there is substantial evidence indicating that the specific fact tag mock-up cited by Defendants was anomalous, making its use unlikely. For example, in 2016 LG was using "TruMotion followed by a number value and then Hz" "to describe the refresh rate of its LED TVs." Alessi Decl. at ¶5. After Mr. Mannacio purchased his television, ██

███████████████████████████████████████████████████

███████████ *See, e.g.*, Ex. 102, BBY0026441 (██████████████████

████████████████████████████████████████); Ex. 85, BBY0074651 (████████████████████████

████████████████████████); Ex. 86, BBY0074652 (██████████████

███████████████████████████████)

███████████████████████████████████████████████████

████████████████████████████████████████████.

Ex. 50, BBY0052210; Ex. 87, BBY0055236. Archives of Defendants' web pages

corroborate this by showing the TruMotion Hz representation. *See* ECF No. 432-6 (Defs.'
Ex. 17) (web archive of Best Buy page noting TruMotion 240Hz); ECF No. 432-7 (Defs.'
Ex. 18) (web archive of LG page listing TruMotion 240Hz).

Third, Mr. Vander Aarde's declaration cannot definitively confirm one way or the
other that the fact tag Mr. Mannacio "saw" did not display the "240Hz" representation.



Vander Aarde Decl. at ¶11

).

Similarly, Mr. Vander Aarde states that

*Id.* at ¶12. Mr.

Vander Aarde is incorrect.

*See* Ex. 92 (excerpt of BBY000013). Lastly, even if
the fact tag in Exhibit 1 were the first "systematically created" fact tag for Mr. Mannacio's
model, that does not necessarily mean it was the *only* fact tag used for that model. As Best
Buy testified,

Best Buy 30(b)(6) Tr. at 201:20-24; 212:1-213:5. Accordingly,
it cannot be, as Defendants represent, the fact tag the Mr. Mannacio "saw."

Finally, Mr. Vander Aarde lacks the proper foundation to render his declaration. *See*
Fed. R. Civ. P. 56(c)(4) ("an affidavit or declaration used to support or oppose a motion
must be made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant or declarant is competent to testify on the matters stated.").

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ (Vander Aarde Decl. at ¶4), so he has no personal knowledge about what

happened to the fact tag after such approval, including that those fact tags were then printed

in a specific store and affixed to shelves by Best Buy employees in a specific-store; and

importantly, Mr. Vander Aarde did not personally view the fact tag cited in his declaration

in the San Rafael store on the date of Mr. Mannacio's purchase, the critical piece of

personal knowledge required to testify which fact tag any consumer "saw" at a specific

store on a specific date. Mr. Vander Aarde's declaration is inadmissible and otherwise

cements the conclusion that Mr. Mannacio's claims are subject to factual determinations

solely within the province of the jury.

Without having conclusively proved what representations Mr. Mannacio saw,

whether Mr. Mannacio saw the representations as alleged and testified is a fact issue for

the jury. Accordingly, summary judgment on this basis is inappropriate and should be

rejected.

## V.    Plaintiffs Have Shown They Were Damaged.

Plaintiffs do not disagree with Defendants' assertion that damages or proof of injury

is an element of many of their claims.[6] *See* Defs.' Br. at pp. 19-20. However, Plaintiffs do

---

[6] However, with respect to Plaintiffs' MDTPA and MUTPA claims, Plaintiffs note that to receive the requested injunctive relief under those claims, Plaintiffs need only show that they face a threat of future harm. *See Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178,#

disagree (and thus there is a genuine issue of material fact) with Defendants' criticisms of their damages model, which is supported by the scientifically valid and admissible expert work of Mr. Gaskin and Mr. Weir. As discussed at length in Plaintiffs' class certification briefing [ECF Nos. 225, 337] and Plaintiffs' opposition to Defendants' motion to exclude Mr. Gaskin and Mr. Weir [ECF No. 384] ("*Daubert* Opp."), the choice-based conjoint ("CBC") study designed, conducted, and analyzed by Mr. Gaskin in combination with the economic expertise and damage calculations done by Mr. Weir proves that Plaintiffs and the proposed Classes were damaged, or injured, by Defendants' false and misleading refresh rate advertisements.

### A.    Benefit-of-the-bargain damages.

Plaintiffs bring damages claims under the Minnesota Prevention of Consumer Fraud Act ("MCFA") (Count I), the Minnesota Unlawful Trade Practices Act  ("MUTPA") (Count III), New Jersey's Consumer Fraud Act ("NJCFA") (Count IV), the California Legal Remedies Act ("CLRA") (Count V), California Unfair Competition Law ("UCL") (Count VI), Pennsylvania Unfair Trade Practices and Consumer Law (Count IX), breach of express warranty (Count X), breach of implied warranty (Count XI), breach of contract (as to Best Buy) (Count XII), and unjust enrichment (Count XIII). Under each of these claims, the proper measure of damages is the benefit of the bargain, or the difference between what Plaintiffs thought they were purchasing (i.e. a LG LED television with a

---

1185 (8th Cir. 2011); *Damon v. Groteboer*, 937 F.Supp.2d 1048, 1071 (D. Minn. 2013). Additionally, they do not need to prove that monetary damages would be inadequate. *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999).#

truthfully advertised refresh rate) and what they received (i.e. a LG LED television with a refresh rate of half the advertised numerical Hz value).

As discussed in more detail below, Plaintiffs' damages model properly measures their benefit-of-the-bargain damages as the difference between what they paid for their LG LED televisions as advertised and the actual LG LED television they received. This is the appropriate measure of damages for Plaintiffs' consumer protection claims. *See Higgins v. Harold-Chevrolet-Geo, Inc.*, No. A04-596, 2004 WL 2660923, at *3 (Minn. Ct. App. Nov. 23, 2004) (under Minnesota law, "fraud damages are generally measured… [as] the difference between the amount the defrauded person paid for merchandise and the actual value of the merchandise, plus any other damages proximately caused by the fraud."); *Buetow v. A.L.S. Enterprises, Inc.*, 259 F.R.D. 187, 192 (D. Minn. 2009) (out-of-pocket damages are recoverable under Minnesota's consumer protection statutes and are "calculated…by determining the difference between the value of the property and the price paid."); *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 818 (9th Cir. 2019) (the Ninth Circuit found that the "[p]laintiff's proposed benefit-of-the-bargain measure of damages is both cognizable under the CLRA and a reasonable basis of computation."); *Chowning v. Kohl's Dep't Stores, Inc.*, 733 Fed. App'x 404, 405 (9th Cir. 2018) (finding that the proper calculation of restitution in UCL claims is the difference between the price a plaintiff paid for a good or service and the value plaintiff actually received); *Lieberson v. Johnson & Johnson Consumer Companies, Inc.*, 865 F. Supp. 2d 529, 541 (D.N.J. 2011) (under the NJCFA, an ascertainable loss can be shown by "the difference in value between the promised product and the actual product received."); *Rouse v. Nissan N. Am., Inc.*, No.

CIV.A.04-5320, 2005 WL 61449, at *3 (E.D. Pa. Jan. 10, 2005) ("The standard measure of damages under the [Pennsylvania Unfair Trade Practices & Consumer Protection Law] is the difference between the value of goods as warranted and the value of the defective goods." (citation omitted; internal quotation market omitted).

Loss of the benefit of the bargain is also the proper measure of damages for Plaintiffs' breach of warranty, breach of contract, and unjust enrichment claims. *See* Minn. Stat. § 336.2-714 (breach of warranty "damages are measured as "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted..."; N.J. Stat. Ann. § 12A:2-714 (same); *Bloomquist v. Wisdom Dev. Grp., LLC*, No. A08-0367, 2009 WL 67059, at *4 (Minn. Ct. App. Jan. 13, 2009) ("recovery for unjust enrichment is based upon what the person enriched has received…"); *Investors Bank v. Torres*, 197 A.3d 686, 693 (N.J. App. Div. 2018) ("A cause of action for unjust enrichment requires proof that a defendant received a benefit and that retention of that benefit without payment would be unjust.") (citation omitted; internal quotation market omitted).

Plaintiffs' damages model shows that Plaintiffs (and the Classes) suffered benefit-of-the-bargain losses due to Defendants' conduct, and thus Plaintiffs' damages model properly shows the existence of damages under each of their claims. This evidence, which is supported by Mr. Gaskin's CBC study and Mr. Weir's economic analysis, is admissible for the reasons detailed in Plaintiffs' opposition to Defendants' motion to exclude these experts, and because that motion should be denied, that evidence is admissible to support Plaintiffs' damages under each of their claims and summary judgment should be denied.

**B.      Plaintiffs' damages model is admissible proof of benefit-of-the-bargain damages.**

In their motion for summary judgment, Defendants, for the third time, raise the same arguments as to why Mr. Gaskin's CBC is inadmissible. Their reasoning is no more persuasive here. Plaintiffs' opposition to Defendants' motion to exclude Mr. Gaskin and Mr. Weir (*Daubert* Opp. at 4-7, 9-17) details the design and economic considerations of Mr. Gaskin's CBC study and discusses why Plaintiffs' damages model is economically and legally sound. Plaintiffs will not repeat each of those arguments here, but rather incorporates them by reference. However, key to responding to Defendants' arguments in their motion for summary judgment, Plaintiffs note it is undisputed that Mr. Gaskin used real-world market prices in his CBC study (provided by Mr. Weir who reviewed transactional data showing sales of the Class televisions) and it is also undisputed Mr. Gaskin's analysis of his CBC results held constant the historical quantity of Class televisions sold for purposes of determining the reduction in market value associated with Defendants' refresh rate misrepresentations. Gaskin Rprt. at ¶¶26, 52, 56; Ex. 93, ("Weir Report") ¶¶26, 30-46. The consideration and presence of these two factors, (1) the use of real-world market prices and (2) holding the quantity supplied constant, allows Mr. Gaskin (and Mr. Weir) to properly conclude that his CBC study results show a reduction in ***market value*** (as opposed to simply willingness to pay as Defendants present it) of the Class televisions that is attributable to Defendants' false advertising of the refresh rate.

Defendants, however, contend that Mr. Gaskin's CBC study, and thus Plaintiffs' damages model, should be excluded because these two factors do not fully consider the

supply side when determining a reduction in market value. Defendants are wrong. Defendants' argument relies almost solely on the non-binding and factually distinguishable decisions in *In re Gen. Motors Ignition Switch Litig. ("GM I")*, 407 F.Supp.3d 212 (S.D.N.Y. 2019), and *In re Gen. Motors Ignition Switch Litig. ("GM II")*, 14-MC-2543, 2019 WL 6827277 (S.D.N.Y. Dec. 12, 2019) (on reconsideration) and ignores the overwhelming case law finding that, in false advertising cases like this one where damages are based on a CBC study, the use of real-world market prices and holding quantity supplied constant sufficiently accounts for supply side factors. As discussed in Plaintiffs' *Daubert* Opposition brief, many courts have made such a finding in false advertising cases like this. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) (admitting CBC study to show benefit-of-the-bargain damages where plaintiffs challenged advertising statements made on cereal packaging); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 335 (D.N.H. 2017) (admitting CBC study to show benefit-of-the-bargain damages where plaintiffs challenged statements made regarding hand soap); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018), *leave to appeal denied*, No. 18-80081, 2018 WL 4922825 (9th Cir. Sept. 18, 2018), *and reconsideration denied sub nom.*, *Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*, No. 17-CV-00564-NC, 2018 WL 5793479 (N.D. Cal. Nov. 2, 2018) (admitting CBC study to show benefit-of-the-bargain damages where plaintiffs challenged statements made about the presence of "real ginger" in Canada Dry ginger ale).

In *Hadley*, which involved a CBC study conducted by Mr. Gaskin to determine the reduction in market value associated with misleading statements about the healthiness of

certain Kellogg's cereal products given the level of sugar they actually contained, the court considered the same argument Defendants make here about which supply side factors are sufficient to determine the change in market value of a consumer product due to an alleged misrepresentation. 324 F. Supp. 3d at 1105. Like the CBC study he conducted here, Mr. Gaskin's study accepted by the Court in *Hadley* used real-world market prices derived from sales data as an attribute in the consumer survey and also used "quantity figures that reflect the quantities of the challenged products that were actually sold during the class period[.]" *Id.* at 1103-1104; Gaskin Rprt. at ¶¶26, 52, 56. As explained by the court, this ensures that all factors that affected the defendant's "willingness to sell" in the market that existed during the class period are accounted for. *Hadley*, 324 F. Supp. 3d at 1106.

Beyond being consistent with relevant case law from other districts, Mr. Gaskin's use of these supply-side considerations makes sound economic sense. Regarding real-world market prices, as the court in *Dial* noted, citing *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *1 (C.D. Cal. Dec. 18, 2014), in an "ordinary market, price is a proxy for value," and thus the use of actual market prices takes into account the competitive forces that existed in the market when the relevant purchases were made. *Dial*, 320 F.R.D. at 335. In *Dial*, the court found that the hand soap market was an ordinary market, meaning it is "relatively stable, unlike the highly regulated and often artificial pharmaceutical market [at issue] in *Saavedra*." *Id.* █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ Weir Rprt. at ¶39 (internal quotation marks

omitted).

Holding the quantity sold fixed also makes economic sense. If Gaskin and Weir did

what Defendants contend is proper and analyzed supply side forces to determine the

intersection between supply and demand in the but-for world without Defendants'

misrepresentation, such a model would "be expected to describe a price for the product at

a point on the quantity sold axis below (perhaps significantly) the point that represents the

actual number of offending products sold to class consumers in the actual market." *Dial*,

320 F.R.D. at 336. This would inflate the reduction in market value associated with

Defendants' misrepresentations, and thus overstate Plaintiffs' damages (to which

Defendants would also certainly object).

Beyond reaching a contrary conclusion from the many well-reasoned cases finding

conjoint studies appropriate for determining damages in false advertising cases, *GM I* and

*GM II* are not binding on this Court and, importantly, are plainly distinguishable from the

present case. First, the *GM* cases were not false advertising cases but rather product liability

claims. *GM I*, 407 F.Supp.3d 212. The plaintiffs alleged that "certain General Motors

vehicles [] had been manufactured with a defective ignition switch." *Id.* at 216. The *GM I*

court expressly recognized that conjoint studies in cases involving "classic allegations of

mislabeling" (exactly like Plaintiffs' claims here) ***do*** in fact properly account for supply

side factors where "(1) the prices used in the surveys underlying the analyses reflect[ed]

the actual market prices that prevailed during the class period; and (2) the quantities used

(or assumed) in the statistical calculations reflect[ed] the actual quantities of products sold

during the class period." *Id.* at 238 (quoting *Hadley*, 324 F.Supp.3d at 1105). Defendants

concede that this is exactly what Mr. Gaskin and Mr. Weir did here. Defs.' Br. at 25. Unlike

*GM I*, this case does not involve misrepresentations or omissions about "dangerous

defects" that would affect whether such defective and dangerous products **would be sold**

**at all** should the defect be disclosed. *GM I*, 407 F.Supp.3d at 239. Rather, this is exactly

the type of "classic mislabeling case" where the supply-side factors in the CBC study

conducted by Mr. Gaskin "makes sense." *Id.*

The only other case cited by Defendants in support of this argument is similarly

unpersuasive. In *Zakaria v. Gerber Prods. Co.*, No. LA CV-1500200 JAK (EX), 2017 WL

9512587, at *20 (C.D. Cal. Aug. 9, 2017), *aff'd*, 755 F. App'x 623 (9th Cir. 2018), the

court found that the conjoint study at issue did not "account[] for the actual price" of the

product at issue and thus did not consider the market conditions in which that product was

sold. As discussed above and in Plaintiffs' *Daubert* Opp., that was not the case here.

The CBC study conducted and designed by Mr. Gaskin, with economic input from

Mr. Weir, measures the reduction in market value (or benefit-of-the-bargain damages)

associated with Defendants' refresh rate misrepresentations, and thus Defendants' motion

should be denied as Plaintiffs have demonstrated (or, at the very least, shown a genuine

issue of material fact) that they were injured by Defendants' conduct.

### C.     Plaintiffs' damages model shows that purchasers of televisions advertised as 240Hz were damaged.

Defendants renew yet another criticism of Plaintiffs' damages model in their motion

for summary judgment, arguing that Mr. Gaskin's CBC study did not show that purchasers

of LG LED televisions advertised as "240Hz" were damaged by Defendants' conduct. Defs.' Br. at p. 27. This is not the case. Mr. Gaskin's CBC analysis showed that televisions advertised as 240Hz have a decrease in market value of 1.30% due to the misrepresentation. Gaskin Rprt. at ¶54. As discussed in detail in Plaintiffs' *Daubert* Opp. at pp. 19-21 (which Plaintiffs incorporate herein), ███████████████████████████

████████ Ex. 94, ("Gaskin Tr.") 316:23-317:10, 324:22-326:7. Defendants' expert challenges this finding by employing a different (and inappropriate) calculation methodology than Mr. Gaskin. *Daubert* Opp. at p. 20. However, this is an issue of expert admissibility to be decided in the *Daubert* context, not on summary judgment.

Moreover, Mr. Gaskin's choice to not include confidence interval calculations in his expert report does not mean Plaintiffs have "fail[ed] to put forth any evidence" that there is a reduction in market value for televisions advertised as "240 Hz." Defs.' Br. at p. 28. Rather, Mr. Gaskin's report, the data underlying that report, and his deposition support this conclusion, and there is clearly a genuine issue of material fact, making summary judgment inappropriate.

### D.     Mr. Villa Lara was damaged.

Mr. Villa Lara purchased a 55LN5100 model LG television from a Best Buy store in Compton, California on November 28, 2013. Villa Lara Tr. at 249:15-20. That television was advertised as having a 120Hz refresh rate, which factored into Mr. Villa Lara's decision to purchase that particular television. *Id.* at 185:20-186:15, 188:24-189:6, 192:17-23, 407:1-3. Mr. Villa Lara paid $499 for his LG television (by making the credit card payments on his grandmother's credit card for the television) that was falsely and

misleadingly advertised as having a refresh rate of 120Hz, and thus he (like the other Plaintiffs) was damaged by paying for a television with a feature different from what he actually received. *Nissan*, 932 F.3d at 818; *Kohl's Dep't Stores, Inc.*, 733 Fed. App'x at 405 (the proper calculation of restitution for UCL claims is the difference between the price a plaintiff paid for a good or service and the value plaintiff actually received). In fact, this Court has already found that Mr. Villa Lara "suffered an actual and concrete injury by not receiving the benefit he bargained for." *Villa Lara v. LG Elecs. U.S.A., Inc.*, No. CV 17-5222 (JRT/KMM), 2018 WL 3748177, at *3 (D. Minn. Aug. 7, 2018).

As the Court acknowledged, Mr. Villa Lara's "refund" was "because of an unrelated issue" and he "received store credit for his television only because he paid an additional amount for a service contract." *Villa Lara*, 2018 WL 3748177 at *3. The facts confirm this. *See* Villa Lara Tr. at 248:5-249:4; Ex. 101, PL VILLA LARA 000007. Mr. Villa Lara's claims against Defendants accrued at the time he made his purchase as a result of Defendants' deceptive refresh rate advertising. *Plumlee v. Pfizer, Inc.*, No. 13-CV-00414-LHK, 2014 WL 695024, at *7 (N.D. Cal. Feb. 21, 2014) ("a cause of action under each statute [CLRA, UCL, FAL] accrues when a defendant misrepresents or omits material information regarding a product or service and a consumer makes a purchase as a result of such deceptive practices."; *Veldhuizen v. A.O. Smith Corp.*, 839 F. Supp. 669, 676 (D. Minn. 1993) ("a cause of action accrues under the Minnesota Consumer Fraud Law on the date of sale when the alleged statutory violations occurred.").

The store credit that Mr. Villa Lara received for returning his defective television pursuant to his *separately purchased protection plan* is irrelevant to calculating his

damages stemming from Defendants' refresh rate misrepresentations. As argued in Plaintiffs' opposition to Defendants' motion to dismiss Mr. Villa Lara's claims (17-cv-05222, ECF No. 35 at 16-17), the collateral source rule, recognized by many jurisdictions including Minnesota and California, provides that compensation a plaintiff receives from sources not credited against the tortfeasor's liability "will not diminish recovery against a wrongdoer." *Duluth Steam Coop. Ass'n v. Ringsred*, 519 N.W.2d 215, 217 (Minn. Ct. App. 1994) (quoting *Hubbard Broad., Inc. v. Loescher*, 291 N.W.2d 216, 222 (Minn. 1980)). Thus, the store credit that Mr. Villa Lara received from Best Buy, which was entirely unrelated to the claims at issue here, cannot relieve Best Buy or LG from liability for their false advertising. *See, e.g.*, *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2019 WL 1004543, at *1 (N.D. Cal. Mar. 1, 2019) (finding that damages due to a misrepresentation about a purchased iPhone accrued at the point of sale and it is irrelevant that the plaintiff later sold his iPhone for "full value" from a third party).

Even if the collateral source rule did not apply, however, reimbursement defenses, such as those claiming the Plaintiff was subsequently made whole later, do not exist because under the law, the Plaintiff was injured and realized damages at the moment the transaction took place. *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 7 (Minn. 2001) (recognizing that in misrepresentation cases reimbursement defenses are not applicable); *Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 496-97 (Minn. 1996) (holding that injury is sustained as soon as the artificially inflated price has been paid, and that "subsequent reimbursement" is of no concern to the wrongdoer because the law does

not inquire into later events). What occurred three years after the injury is irrelevant under the law.

## VI.   Plaintiffs Did Not Get What They Paid For.

From the outset of their brief, Defendants amplify and exaggerate Plaintiffs' focus on motion blur while exalting the benefits of backlight scanning as the pinnacle of blur reduction technology. Defs.' Br. at p. 1. Defendants further contend that Plaintiffs' expert agrees backlight scanning is a superior technology and the better option to address motion blur. *Id.* at pp. 1, 30-31. Beyond the motion blur topic being irrelevant, Defendants' contentions regarding motion blur, backlight scanning and increased refresh rate are not only disputed, they are incomplete and incorrect.

This case is about—and has always been about—Defendants misrepresenting the numerical "Hz" refresh rate specification of LG's televisions. This case has never been about a reduction of motion blur in general, a strawman Defendants now create merely to knock down. *Id*. Not only do Defendants' improperly misstate the case and focus on an irrelevant subject, they do so insincerely.

### A.   The issue is the numerical Hz specification.

As has been consistently stated throughout this litigation, this case is about Defendants' misrepresentation of the refresh rate value regarding certain LG televisions.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████   Poynton Rprt. at ¶8. Indeed, Plaintiffs defined the proposed Classes as consumers who purchased an LG television "labeled as having a Hz-rating that was twice

the native refresh rate of its panel." Pls.' Mot. Class Cert. at p. 40; *see also* Complaint at ¶¶141-42. This notwithstanding, Defendants now claim the case is solely about Plaintiffs' desire to receive a single "benefit" of a higher refresh rate—a reduction in motion blur. Defs.' Br. at p. 1.

Defendants' ultimate assertion is that because backlight scanning reduces motion blur, it therefore increases the refresh rate. *Id.* At a minimum, this presents a clear factual issue for resolution by the jury, and Plaintiffs contend that Defendants' positions have been definitively disproven and further contradicted by Defendants' own words. Defendants' position is transitive: since increased refresh rate reduces motion blur, and backlight scanning can also reduce motion blur, backlight scanning increases refresh rate. This argument fails because, while both backlight scanning and increased refresh rate can reduce motion blur, it absolutely does not follow that backlight scanning increases refresh rate.

As has been consistently highlighted in Plaintiffs' filings throughout this litigation, beyond a reduction in motion blur, a benefit to higher refresh rates is the capability to fully and properly display higher frame content.[7] Defendants have never addressed the high frame content benefit of higher refresh rates (as they likely will not again) because it disproves their entire theory. ███████████████████████████████████ ,

---

[7] Complaint at ¶59 ("[T]he more often a television can refresh the picture and generate unique images, the better and more clearly a television is able to display moving objects on the screen."); den Boer Rprt. at ¶20 ████████████████████████████████ ████████████████████████████████████████████████████ ; Pls.' Mot. Class Cert. at p. 15 ("An LED television with a refresh rate of 120Hz or 240Hz has the capability … to fully render advanced content, like video games, which may already deliver content at 120 and 240 images per second.").

███████████████████████████████████████████████. den
Boer Rprt. at ¶25. This unchallenged truism destroys Defendants' foundational claim that
backlight scanning increases refresh rate.

While Defendants now claim backlight scanning can be equated to refresh rate
because it can reduce motion blur, this position is in direct conflict to LG's positions both
before and after this litigation commenced. █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ Ex. 34, LGE0329814; Ex. 95, LGE0131144

(█████████████████████████████████████████████████

██████████████████████); Ex. 35, LGE0139329 ████████████████). Further,
LG's current marketing not only fails to reflect its now stated hypothesis, it unquestionably
contradicts it. LG's current marketing clearly distinguishes between backlight scanning
and refresh rate: "TruMotion 120 (Refresh Rate 60Hz)" and "TruMotion 240 (Refresh Rate
120Hz)." *See, e.g.*, Ex. 48, LGE0082048; Alessi Decl. at ¶5. Equating a reduction in motion
blur to an increase in refresh rate is illogical and unsupported by the facts.

### B. Defendants inflate the importance and capabilities of backlight scanning.

Continuing its false equivalency argument, Defendants elevate the general function
of backlight scanning far beyond its station. Defendants confidently proclaim Plaintiffs'
expert "has testified that backlight scanning as used in LG's LED televisions" has
eliminated motion blur and improved picture quality. Defs.' Br. at 1. Further, Defendants

claim that Plaintiffs' expert believes backlight scanning is the superior and better solution to addressing motion blur. *Id.* at 1, 30-31. Even if backlight scanning performance related to motion blur was a relevant subject (it is not), Defendants' claims are completely untrue.

In his book, Plaintiffs' expert Dr. den Boer proposes varying solutions to emulate an impulse-type display for LCD displays to combat motion blur. Ex. 96, at pp. 169-72 (Willem den Boer, <u>Active Matrix Liquid Crystal Displays Fundamentals and Applications</u> (1st ed. 2005)). The first solution was to increase the refresh rate to 120Hz. *Id.* at p. 169. ███████████████████████████████████. *Id.*; *see also* Ex. 97, ("den Boer Tr.") 212:10-18. The second solution was to manipulate the backlight. Ex. 96, at p. 170. ██████ ██████████████████████████████████. den Boer Tr. at 219:20; den Boer Rprt. at ¶26. There are two backlight manipulation methods presented: turning the backlight on and off in its entirety (blinking backlight) and backlight scanning. Ex. 96, at p. 170. After noting the deficiencies with one backlight manipulation method, the blinking backlight, den Boer turns to backlight scanning and a *specific* backlight scanning method utilizing six lamps is detailed and illustrated. *Id.*

Defendants altogether ignore the above context to disingenuously imply that Plaintiffs' expert opined backlight scanning, *in general*, is the superior method to address motion blur compared to increasing the refresh rate to 120Hz. Defs.' Br. at pp. 1, 30-31. Plaintiffs' expert said no such thing. ████████████████████████████

████████████████████████████████████████████████████

den Boer Tr. at 104:21-105:4; *see also* den Boer Rpt. at ¶ 17 ███████████████

████████████████████████████████████). Read in context, it is

clear that the backlight scanning method presented was being compared to the other backlight manipulation method – backlight blinking – and not to 120Hz. Ex. 96, at p. 170. In addition, Defendants go so far as to reconstruct den Boer's words in an attempt to legitimize their false narrative. Defendants quote Dr. den Boer as "the use of [a] scanning backlight…virtually eliminates blur of moving objects" [8]  yet the true quote, read in context, reveals this statement refers to his *specific* six-lamp backlight scanning method and not backlight scanning in general: "the use of *this* scanning backlight…virtually eliminates blur of moving objects". *Id.* at pp. 170-71 (emphasis added).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. *See* den Boer Tr. at 217:4-6, 17-24; 218:13-17, 20-22; 220:22-221:4; 221:21-222:13. A simple reading of den Boer's book and testimony reveals Defendants' contentions regarding den Boer's position and statements regarding backlight scanning in general to be flatly untrue. There is no support for Defendants' statement that den Boer confirmed "backlight scanning as used in LG's LED televisions" provided benefit to the consumer. Beside the fact that any motion blur benefit received by the consumer is irrelevant to the question of what the refresh rate is, den Boer testimony that blur reduction results are dependent on the number of backlight scanning segments (the more the better), makes LG's method of backlight scanning (with only three

---

[8] Defs.' Br. at p. 1.

segments)[9] highly suspect for purposes of motion blur reduction. Defendants' blatant mischaracterization of text and testimony is emblematic of its inability to legitimately defend its technical position.

### C.     The Intertek Test proves nothing.

Defendants contend that "results from Intertek, a well-known and respected third-party testing lab that confirm LG's backlight scanning technology increases refresh rate." Defs.' Br. at p. 4. Defendants consider these results to be "scientific evidence" that LG's backlight scanning method increases refresh rate. *Id.* at p. 30. ████████████████

████████████████████████████████████████████████████

████████████. Poynton Tr. at 15:7-8 ████████████████████████████);

LG 30(b)(6) Tr. at 293:12-13 ████████████████████████████████

████████); Ex. 105,  ("Park Tr.") 51:15-20 ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.

Further, as detailed in Plaintiffs' motion to exclude Dr. Poynton, the Intertek test cited as "scientific evidence" simply cannot be used to make such a sweeping statement. Plaintiffs incorporate those arguments in full, but restate them here in brief: (1) the results of the Intertek test were confined to three panels tested and there is no evidence in the record any of these panels were used in any of the Accused Models; (2) there is no

---

[9] ██████████████████████████████████████████████
████████ Poynton Tr. at 239:9-13 ████████████
████████████████████████████████████████████████
████████████

indication the panels tested used LG's method of backlight scanning or backlight scanning at all; and (3) the test results reported in the Intertek test cannot possibly be achieved with LG's purported method of backlight scanning. ECF No. 408 at pp. 24-30 (Poynton *Daubert*).

Defendants have relied on an Intertek test to support their claims that LG's "240Hz" televisions are legitimately 240 Hz. *See* ECF No. 315 at pp. 13-14. To the extent Defendants' assert this Intertek test is scientific evidence of its refresh rate claims regarding 240Hz, such a statement is just as unsupported. ████████████████████ ████████████████████████████████████████ ████████████████████████. Ex. 103, BBY0062994 ("8/25/2010 Intertek Test"). ██████████████████████████████. *Id.* at pp. 3, 8. ████████████████████████████████████. *Id.* at pp. 6-7. ████████████████████████████████████████ ████████████████████████.

Defendants have described backlight scanning as "turning the backlight on and off rapidly . . . in sequence in a pattern down the screen." ECF No. 315 at p. 6. However, ████████████████████████████████████████ ██████████████████████████████.





█████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████. den Boer Rpt.

at ¶¶47-48. ███████████████████████████████

████████████████████████████████████████

████████████████████████. *Id.* at ¶¶49-50. In sum, far from definitively
proving LG's backlight scanning method increases refresh rate, the Intertek test results
raise more questions than they provide answers. At minimum, the relevance and
applicability of these tests is in dispute.

## VII.   Plaintiffs Have Suffered an Ascertainable Loss.

Plaintiffs agree that evidence of an ascertainable loss (here, under a benefit-of-the-
bargain theory) is a required element for their claims under the NJCFA and the UTPCPL.
Contrary to Defendants' contentions, however, Plaintiffs have shown that they suffered an

ascertainable loss. Benefit-of-the-bargain damages under the NJCFA can be proven through evidence showing that, "(1) a reasonable belief about the product induced by a misrepresentation; and (2) that the difference in value between the product promised and the one received can be reasonably quantified." *In re Insulin Pricing Litig.*, No. 3:17-CV-0699-BRM-LHG, 2019 WL 643709, at *15 (D.N.J. Feb. 15, 2019) (citation omitted). Under the UTPCPL, "[t]hough no precise definition of actual damages currently prevails, it is clear that a successful plaintiff is entitled to the benefit of her bargain." *Dibish v. Ameriprise Fin., Inc.*, 134 A.3d 1079, 1089 (Penn. 2016).

As discussed in detail in Plaintiffs' class certification briefing [ECF Nos. 225, 337], Plaintiffs' *Daubert* Opp., and pp. 47-54, *supra*, the CBC study designed and conducted by Mr. Gaskin with economic input from Mr. Weir shows that Plaintiffs suffered an ascertainable loss—the LG LED televisions they purchased with the false or misleading refresh rate representations were worth 5.31% (for televisions advertised as 120Hz) or 1.3% (for televisions advertised as 240Hz) less than what Plaintiffs paid. Gaskin Rprt. at ¶56. As this Court previously held, a CBC study that "isolate[s] and quantif[ies] the portion of the retail price attributable to refresh rate" is a valid methodology to show ascertainable loss. ECF No. 94 at 8-9 (citing *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 336 (D.N.J. 2014)); *see also Castro v. Sovran Self Storage, Inc.*, 114 F. Supp. 3d 204, 220 (D.N.J. 2015) (there is a "low threshold for determining the existence of an ascertainable loss" under the NJCFA) (citation omitted); *Bernstein v. Serv. Corp. Int'l*, No. CV 17-4960, 2020 WL 224979, at *11 (E.D. Pa. Jan. 14, 2020) (there is an ascertainable loss under the UTPCPL where there are identifiable damages, and thus "damages are speculative only if the

uncertainty concerns the fact of damages rather than the amount.").  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ . Gaskin Tr. at 74:5-10.

With respect to Mr. Villa Lara, as discussed above, the store credit he received under his separately-purchased service plan is irrelevant to his damages for the claims in this case. *See* pp. 54-56, *supra*. As with Mr. Villa Lara, the "discounted" price that Plaintiffs may have paid for their LG LED televisions because they happened to purchase them on sale or due to a price match is entirely unrelated to their damages resulting from the refresh rate misrepresentation. Regardless of the purchase price, Plaintiffs have shown that the market price that consumers (including Plaintiffs) should have paid is 5.31% or 1.3% less when the refresh rate is truthfully advertised.[10] Gaskin Rprt. at ¶56. The fact that Defendants charged varying prices for Plaintiffs' televisions, or that Best Buy lost money on any transactions (at prices set by them) does not have any bearing on Plaintiffs' damages.

Defendants attempt to illustrate the "deep discount" problem by pointing to the transactions of Mr. Villa Lara and Ms. Hudock, who both purchased the 55LN5100 during the Black Friday sale of 2013. The sales data produced by Best Buy, however, reveals this "deep discount" to be utterly illusory and thus deceptive in its own right. In order to claim

---

[10] If the Court agrees with Defendants' argument that Plaintiffs' class-wide damages model cannot be used to determine the damages suffered by the individual Plaintiffs, Plaintiffs seek leave to conduct supplemental expert discovery and damages briefing.

a price reduction under the federal regulations adopted by the Federal Trade Commission, the former price must have been the "actual, bona fide price at with the article was offered to the public on a regular basis for a reasonably substantial period of time." 16 C.F.R. § 233.1(a). A seller cannot represent the regular selling price to have been higher "unless substantial sales at that price were actually made." *Id*. at § 233.1(b). Defendants represented that the 55LN5100 was "$499.99 ON SALE; Regular Price: $999.99; You Save $500.00." ECF No. 26-3. This was deceptive.

███████████████████████████████████████

███████████████████████████████████████

███████████████ .



*(*created from transactional data found at BBY000007-13, BBY000016-18).

█████████████████████████████. *Id*. The intention was clearly to create a Black Friday "deal," and make it appear like the television typically sold for $1000. The discount was not deep, it was illusory: "[W]here an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects." 16 C.F.R. § 233.1(a).

This deceptive practice notwithstanding, and regardless of what Mrs. Hudock and Mr. Villa Lara paid, they paid 5.31% more than they otherwise would have had the refresh rate been truthfully advertised. Gaskin Rprt. at ¶54 ("The percentages I calculated are applicable across all LG LED televisions in the class during the class period."). In fact, this is a very conservative measure of Plaintiffs' benefit-of-the-bargain damages. When calculating these percentages, Mr. Gaskin took the smallest dollar value for the reduction of market value and divided it by the highest price option available in his survey—$1500. *Id*. at ¶54. Using the highest price option available results in the percent reduction in market value to be far smaller than it would be had he used any of the lower price points shown to survey respondents. *Id.*

Moreover, Defendants' criticism that Plaintiffs' damages model does not account for sales promotions or discounts is more than a red herring, it is untrue. ████████
████████████████████████████████████████████████████████████
█████████████. Ex. 98, ("Weir Tr.") 93:16-18, 159:3-6, 171:23-74:11; Weir Rprt. at Ex. 2 (listing sales data reviewed). This sales data reflected transactions that actually occurred in the market, and thus inherently and fully captures purchases made using discounts or other

promotions. Gaskin Rprt. at ¶26 ("The range of prices I used in this conjoint analysis reflects those actually observed in the market for the televisions in the survey and is based on sales data from the Defendants."). Survey respondents were asked to assume that the price shown in the choice sets was the price they would pay and that "No coupons, store promotions, or discounts will be applied to the purchase." *Id.* at ¶42. ████████████████

████████████████████████████████████████████████

████████████ Gaskin Tr. at 286:20-23. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████. *Id.* at 286:24-25; 287:1-11 ████████████████████████

████████████████████████████████ ); 287:16-22 ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████.

Defendants rely heavily on *Mickens v. Ford Motor Co.*, No. 10-CV-5842 (KM)(MAH), 2015 WL 5310755 (D.N.J. Sept. 10, 2015), to support their contention that Plaintiffs' NJCFA claims should be dismissed for failure to show an ascertainable loss. Defs.' Br. at p. 37. However, that case clearly found that where expert testimony is offered to show an "estimate of damages, calculated within a reasonable degree of certainty," summary judgment is inappropriate and ascertainable loss has been shown. *Mickens*, 2015 WL 5310755 at *6. To survive summary judgment, the "loss must be presented with sufficient 'certainty' to demonstrate that it is 'quantifiable or measurable,' although the

exact dollar amount need not be precisely calculated." *Id.* at *12 (quoting *Thiedemann v. Mercedez–Benz USA, LLC,* 183 N.J. 234, 248, 872 A.2d 783 (2005)). In *Mickens*, the plaintiffs offered no expert testimony about the decreased value of the automobiles at issue, but rather based their benefit-of-the-bargain damages on their own testimony about what they believed their vehicles would be worth without the alleged defect. *Id.* at *13-14. The court found, "Mickens [the plaintiff] cites no evidence sufficient to create an issue of fact that he received less than the fair value of a mustang without hood corrosion." *Id.* at *14. This case could not be more different. Here, Plaintiffs have, at a minimum, created a genuine issue of material fact as to damages through the credible and scientifically valid CBC study done by Mr. Gaskin and the damages calculations and economic analysis provided by Mr. Weir. This evidence of an ascertainable loss is more than enough to defeat Defendants' summary judgment motion.

## VIII. Whether LG Validly Disclaimed Implied Warranties Is a Question for the Jury.

Defendants do not argue that summary judgment is appropriate regarding Plaintiffs' express warranty theory. Nor do they argue that Best Buy should be granted summary judgment with regard to Plaintiffs' implied warranty. They argue only that LG has disclaimed any implied warranty. However, Plaintiffs have established their *prima facie* case for implied warranty against LG with common evidence. "The implied warranty of merchantability ensures that a merchant warrants that goods sold are fit for the ordinary purposes for which the goods are used." *Henderson v. Volvo Cars of N. Am., LLC*, Civ. No. 09-4146 (DMC)(JAD), 2010 WL 2925913, at *9 (D.N.J. July 21, 2010). The goods at

issue must pass without objection in the trade under the contract description and conform to the promises or affirmations of fact made on the container or label. N.J. Stat. Ann. § 12A:2-314(2). Plaintiffs have presented evidence that LG's usage of "Hz" refers to refresh rates and that LG used false or misleading refresh rates on consumer-facing materials at the point of sale. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. den Boer Rprt. at ¶¶16. 20. The record thus shows that the televisions at issue, which were actually 60 Hz or 120 Hz respectively, were unfit for the ordinary purpose for which consumers purchase televisions with higher refresh rates. The evidence also demonstrates that the televisions at issue are not "merchantable" as defined by the New Jersey legislature because the televisions do not conform to the promises and affirmations that appear on the label, as discussed below.

Defendants do not argue these points. Instead, they argue that LG validly disclaimed its implied warranty. Defs.' Br. at pp. 38-41. The only evidence of this is "the first page of LG's warranty card," which contains standard implied warranty disclaimer language in bold type. *Id.* To defend a claim for breach of implied warranty on the basis of a disclaimer, however, LG must do more than provide a copy of the disclaimer in isolation or show how it was written; it must demonstrate the disclaimer was conspicuous, which necessarily requires a careful evaluation of the context and circumstances under which the disclaimer was offered. *See, e.g.*, N.J. Stat. Ann. § 12A:1-201(10) ("'Conspicuous,' with reference to

a term, means so written, *displayed*, or *presented* that a reasonable person against which it is to operate *ought to have noticed* it.") (emphasis added).

Here, while the *text* of alleged disclaimer language appears in bold on the warranty card, there is no evidence in the record regarding the conspicuousness of the card itself, that is, when and how it was presented to consumers, and whether *that* presentation was conspicuous. ███████████████████████████████████████████

██████████████████████████████████████████████████████████ LG 30(b)(6) Tr. at 233:5-12. Nothing in the discovery record shows the size of the "warranty card" or that it was not otherwise buried in a stack of product literature inside the box. LG presents no surveys or consumer studies demonstrating that it presented the warranty card in a way that a reasonable consumer (let alone the Plaintiffs) ought to have noticed it. LG has simply failed to meet its evidentiary burden to establish its affirmative defense as a matter of law at the summary judgment stage.

Furthermore, LG cites no facts establishing that any consumer could have possibly seen the disclaimer—even if it had been conspicuously presented—prior to purchasing the television. Under New Jersey law, a warranty disclaimer is ineffectual if disclosed after a contract has been entered into and ownership has transferred. *Zabriskie Chevrolet, Inc. v. Smith*, 240 A.2d 195, 199 (N.J. Super. Law Div. 1968). There is absolutely no evidence here that Plaintiffs or class members were aware of the warranty disclaimer prior to purchase.

Even if LG could satisfy the conspicuity *and* timeliness requirements for its boilerplate disclaimer, LG fails to show that the disclaimer is consistent with the

televisions' *express labeling*. Even a conspicuous disclaimer is inoperable where it is unreasonably inconsistent with a products' express labeling. *Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 470 (D.N.J. 2007). While *Viking Yacht* dealt with the disclaimer of an express warranty, its reasoning applies equally in the context of implied warranty in this case. The reason is that, in codifying the implied warranty standard, the New Jersey legislature expressly requires that "merchantable" goods must "conform to the promises or affirmations of fact made on the container or label if any." N.J. Stat. Ann. § 12A:2-314(2). Thus, because LG made an express promise or affirmation in its labeling regarding the refresh rates of its televisions, which cannot be disclaimed under *Viking Yacht*, LG's attempt to disclaim merchantability fails under the express terms of the New Jersey statute.

Defendant's argument and the discovery record thus stand in contrast to the cases upon which LG relies. *Tri Coast LLC v. Sherwin-Williams Co.*, No. 16-3366, 2018 WL 468279, at *1 (D.N.J. Jan. 18, 2018), is inapposite because there (1) the warranty was emailed to the plaintiff months before the purchased products were used, (2) the transaction was a commercial transaction, between two sophisticated parties, and (3) the disclaimer appeared in three separate places, in three separate documents in the email that contained the project documents. *Id.* at *3, n.5.

Similarly, the court in *Lala v. ADT Sec. Servs., Inc.*, Civ. No. 10-2698 (DRD), 2010 WL 49223452, at *5-6 (D.N.J. Nov. 29, 2010), considered many factors before deeming the warranty disclaimer sufficiently conspicuous to operate against the plaintiffs. For example, the court considered: (1) the context of other documents contained in the contract,

(2) plaintiffs' own testimony that they did not read the contract, (3) other text that could potentially have distracted the reader from the warranty (such as other text in bold, all caps, underlined, etc.), and (4) importantly, the fact that "Plaintiffs could have read and considered the contract" prior to entering into the agreement for services. *Id.*

Here, by contrast, Defendants provide no evidence indicating Plaintiffs were able to review the warranty disclaimer prior to making their purchase. Defendants provide no evidence indicating this disclaimer was conspicuous in relation to any other documents that may have accompanied Plaintiffs' purchase. And Defendants have not laid the proper foundation for even proving that this disclaimer was consistently provided to each Plaintiff. LG has therefore failed to establish conspicuity and timeliness. Even if it had established those, though, the disclaimer contradicts the televisions' express labeling, which makes the disclaimer inoperable under New Jersey's definition of merchantable and case law barring disclaimers that contravene express labeling.

## IX.   There Is No Basis to Dismiss Plaintiffs' Unjust Enrichment Claims Against LG While Plaintiffs' Warranty Claims Have Yet to be Resolved.

Defendants argue that Plaintiffs' cannot sustain their unjust enrichment claims against LG because "Plaintiffs' warranty-based allegations… preclude their unjust enrichment claims." Defs.' Br. at p. 42. However, nothing in New Jersey law requires dismissal of an unjust enrichment claim as an alternative theory of recovery until the factual issues are resolved as to each claim. *Palmeri v. LG Elecs. USA, Inc.*, No. 07-5706(JAG), 2008 WL 2945985, at *6 (D.N.J. July 30, 2008) ("Defendants next argue that, under New Jersey law, the existence of a contract precludes an unjust enrichment claim. No such

bright-line rule exists; Defendants have misstated the law… New Jersey Supreme Court cases abound that are inconsistent with such a bright-line rule."). As detailed throughout (and to the extent not challenged by the instant motion), Plaintiffs' warranty claims survive and will be determined by a jury. Accordingly, Plaintiffs claims for unjust enrichment should proceed as well.

## X.  Plaintiffs' UCL Claim Should Not Be Dismissed.

Contrary to Defendants' argument that Plaintiffs' UCL claim under the "unfair" prong should be dismissed, it is clear that Defendants' conduct "violates established public policy or… is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *NorthBay Healthcare Grp. Hosp. Div. v. Blue Shield of California Life & Health Ins.*, 342 F. Supp. 3d 980, 988 (N.D. Cal. 2018). What is "unfair" is a question of fact. *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1171 (9th Cir. 2012). Contrary to the bright line rule Defendants articulate, California courts are currently split on the standard to apply to UCL unfairness claims, with some courts applying the balancing test articulated in *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (Cal. Ct. App. 1999) (requiring an "examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer"), and others applying a tethering test, "under which the unfairness must be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019) (quoting *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735

64

(9th Cir. 2007)) (internal quotation marks omitted). Under either test, Plaintiffs' claims under the UCL fairness prong should proceed.

Under the balancing test (which Defendants assert the Court should apply), it is clear that the impact on Plaintiffs (who paid a price premium for their LG LED televisions of either 5.31% or 1.3%, as discussed *supra*) must outweigh the "reasons, justifications and motives" of LG and Best Buy, who knowingly inflated the refresh rate of LG LED televisions in order to drive sales and command a higher price. *See* pp. 10-16, *supra*. Defendants offer no justification for this behavior, and in fact have admitted that they knew the refresh rate advertising was false and misleading. *Id.*

Defendants' contention that Plaintiffs "could have avoided their harm by returning or cancelling the offending product" ignores the fact that that harm happened at the point of sale, not when Plaintiffs discovered that Defendants had deceived them. Defs.' Br. at p. 43; *see, e.g. Grp. Health Plan*, 621 N.W.2d at 7; *Humphrey*, 551 N.W.2d at 496-97. Unlike in *Davis*, 691 F.3d at 1170, cited by Defendants, Plaintiffs Mannacio and Villa Lara expressly reviewed and relied on the material terms – the Hz representation – at issue prior to making their purchase. *See* pp. 23-25, *supra*. In addition, the Ninth Circuit also recognized that the terms were "quite the opposite" of being contrary to "public policy, immoral, unethical, oppressive, or unscrupulous" given the clear warnings in the text. *Davis*, 691 F.3d at 1170. Here, Plaintiffs have demonstrated reliance on intentionally false statements that were carefully crafted to induce sales. *See* pp. 16-23, *supra*. *Herron v. Best Buy Co., Inc.*, 924 F. Supp. 2d 1161, 1178 (E.D. Cal. 2013) does not create a bright line duty for a plaintiff to attempt to return a falsely advertised product in order to have a UCL

unfairness claim. In *Herron*, the court applied the balancing test and found that the defendant had a justification for the false advertising used —as it was an "industry standard" benchmark, and an alternative "would have impaired, not improved, Plaintiff's ability to make a meaningful comparison between different computers." *Id.* The opposite is true here —Defendants' false and misleading refresh rate advertising distorted a standard industry metric leaving Plaintiffs unable to make any meaningful comparison to other televisions during the shopping experience.

Similarly, Plaintiffs' UCL unfairness claim should also proceed under the alternative tethering test, where the unfairness "must be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019). Plaintiffs' claims that Defendants refresh rate representations were false and misleading implicates the public policy against false advertising reflected in the UCL and CLRA (*see* Cal. Civil Code §1770(a)(5), §1770(a)(7) and the California Bus. and Prof. Code §17500).

Regardless of the standard the Court applies to Plaintiffs Villa Lara and Mannacio's claims under the unfair prong of the UCL, genuine issues of material fact exist, and Defendants' motion should be denied.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request this Court DENY Defendants' Motion for Summary Judgment.

Dated: February 5, 2020                    Respectfully submitted,

*/s/ Raina C. Borrelli*
Raina C. Borrelli (MN Lic. #392127)
Daniel C. Hedlund (MN Lic. #258337)
Brittany N. Resch (MN Lic. #397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
rborrelli@gustafsongluek.com
dhedlund@gustafsongluek.com
bresch@gustafsongluek.com

David M. Cialkowski (MN Lic. #306526)
Alyssa J. Leary (MN Lic. #397552)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com
alyssa.leary@zimmreed.com

Hart L. Robinovitch (MN Lic. #240515)
**ZIMMERMAN REED LLP**
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Telephone: (480) 348-6415
hart.robinovitch@zimmreed.com

Luke P. Hudock (*Pro Hac Vice*)
**HUDOCK LAW GROUP, S.C.**
P.O. Box 83
Muskego, WI 53150
Telephone: (414) 526-4906
lphudock@law-hlg.com

Samuel J. Strauss (*Pro Hac Vice*)
Alex Phillips (*Pro Hac Vice*)
**TURKE & STRAUSS LLP**
613 Williamson Street, Suite 201
Madison, WI 53703

67

Telephone: (608) 237-1774
Sam@turkestrauss.com
AlexP@turkestrauss.com

***Attorneys for Plaintiffs and the Putative Class***